# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| SOUTHERN CROSS SEAFOODS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA, and NATIONAL MARINE FISHERIES SERVICE,<br><br>Defendants. | Court No. 22-00299<br><br>**NON-CONFIDENTIAL VERSION**<br><br>**Confidential Information has been deleted on Pages 12, 14 and in Attachments A-F.** |

## COMPLAINT

Plaintiff, Southern Cross Seafoods, LLC ("Southern Cross"), by and through the undersigned counsel, alleges and states as follows:

1. This action concerns Defendants' unlawful denial of Southern Cross's application for preapproval to import Patagonian or *Dissostichus eleginoides* toothfish ("toothfish"), more commonly referred to as "Chilean seabass," harvested from the Food and Agricultural Organization of the United Nations Statistical Subarea 48.3 in the South Georgia fishery ("Subarea 48.3") in the Atlantic Ocean north of Antarctica. Southern Cross's application was submitted pursuant to 50 C.F.R. § 300.105.

2. Conservation measures for Subarea 48.3, including catch limits, may be established under the Conservation of Antarctic Marine Living Resources Convention, May 7, 1980, 1329 U.N.T.S. 47 ("CAMLR Convention"). Such measures must be established by consensus among all Members of the Commission for the Conservation of Antarctic Marine Living Resources ("CCAMLR"), which is composed of the Members of the CAMLR Convention. The United States

and the United Kingdom of Great Britain and Northern Ireland ("United Kingdom") are Members of CCAMLR, as are 24 other Parties, including the Russian Federation ("Russia").

3.     Most of Subarea 48.3 is managed and patrolled by the United Kingdom through the United Kingdom Overseas Territory of South Georgia & the South Sandwich Islands ("SGSSI"). The Government of SGSSI manages and patrols its waters.  It licenses fishing vessels to operate in its waters, setting regulatory standards which are consistent with, and in many cases more rigorous than, those set by the CCAMLR.  The management and enforcement of these waters has almost completely eliminated illegal, unreported and unregulated ("IUU") fishing in this region. The South Georgia toothfish fishery was the first fishery certified as sustainable by the Marine Stewardship Council ("MSC"), and the toothfish fishery in Subarea 48.3 is one of the highest scoring sustainable fisheries certified by the MSC.

4.     In 2021, Russia unilaterally prevented a catch limit and other fishery-specific measures from being set by CCAMLR for the 2021/22 fishing season for Subarea 48.3.  Other CCAMLR conservation measures for Subarea 48.3 remained in effect, as do complementary measures, including a catch limit and other fishery-specific measures, adopted by the United Kingdom for vessels licensed to fish in the UK-managed areas of Subarea 48.3.

5.     Under U.S. law and regulations, it is only unlawful to import "any Antarctic marine living resource (or part or product thereof) harvested *in violation of a conservation measure in force* with respect to the United States pursuant to article IX of the [CAMLR] Convention or *in violation of any regulation* promulgated under this title . . . ."  16 U.S.C. § 2435(3) (emphasis added).   In denying Southern Cross's application, the National Marine Fisheries Service ("NMFS") cited the lack of a CCAMLR conservation measure "establishing a catch limit and other fishery-specific requirements" for toothfish harvested from Subarea 48.3, stating that "fishing in

Subarea 48.3 was not authorized under CCAMLR conservation measures." *See* Letter from Alexa Cole, Director, Office of Int'l Affairs, Trade, and Commerce, National Marine Fisheries Service, to Daniel Thomas, Southern Cross Seafoods, LLC, at 4 (Sept. 15, 2022) (**Attachment A**). Defendants stated that 50 C.F.R. § 300.105(h)(2) required NMFS to deny preapproval and entry because the toothfish were "harvested in contravention of CCAMLR CM 31-01." *Id.*

6.     However, CCAMLR Conservation Measure ("CM") 31-01 (1986) does not prohibit fishing for toothfish in Subarea 48.3 in the absence of a CCAMLR conservation measure "establishing a catch limit and other fishery specific requirements." Attach. A, at 4. Indeed, Defendants did not point to any provision of the CAMLR Convention, CCAMLR conservation measures in force, or the U.S. statute and regulations establishing that fishing in the absence of a catch limit is illegal or that CCAMLR CM 31-01 requires adoption of a conservation measure establishing a catch limit and other fishery-specific requirements for fishing to be permitted. In fact, Defendants conceded that "there is no explicit prohibition on fishing in the absence of agreed measures . . . ." Attach. A, at 3.

7.     Defendants' denial of Southern Cross's preapproval application was in error because Defendants did not demonstrate that the toothfish that Southern Cross sought to import was harvested or exported in violation of any CCAMLR conservation measure in force, as required under U.S. law and regulations. Defendants likewise did not demonstrate that the toothfish in question was harvested from a fishery or by a vessel that were IUU under applicable law.

8.     In sum, Defendants had no legal basis upon which to deny Southern Cross's application for preapproval under 50 C.F.R. § 300.105. Denying Southern Cross's application was contrary to U.S. law and U.S. obligations under the CAMLR Convention and the CCAMLR conservation measures that are in force with respect to the United States. The arbitrary and

capricious manner in which Defendants denied Southern Cross's preapproval application violated the Administrative Procedure Act ("APA").

9. The Court should set aside Defendants' denial of Southern Cross's application for preapproval as *ultra vires* and otherwise contrary to law, and issue a declaratory judgment that Defendants may not deny future applications for preapproval submitted by Southern Cross based on the absence of a CCAMLR conservation measure in force at the time.

## JURISDICTION

10. The U.S. Court of International Trade has "exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for . . . embargoes or other quantitative restrictions on the importation of merchandise . . . ," and of the "administration and enforcement with respect to the matters referred to in subparagraphs (A) through (C) of this paragraph . . . ." 28 U.S.C. § 1581(i)(1)(C)-(D).

11. Defendants' decision to bar imports of toothfish from Subarea 48.3 amounts to an embargo on toothfish. The Court thus has jurisdiction over this action pursuant to 28 U.S.C. § 1581(i)(1)(C)-(D).

12. Southern Cross also seeks declaratory judgment that the embargo on toothfish harvested from Subarea 48.3 is unlawful, and this Court similarly has jurisdiction to grant that relief under 28 U.S.C. § 1581(i)(1)(C)-(D).

## PARTIES

13. Southern Cross is a U.S. importer of record of toothfish. Southern Cross submitted an application for preapproval to import toothfish harvested from Subarea 48.3, which Defendants denied.

14.     Defendant United States of America is the statutory defendant under 5 U.S.C. § 702 and 28 U.S.C. § 1581(i)(1)(B).

15.     Defendant NMFS is part of the National Oceanic and Atmosphere Administration, which itself is part of the U.S. Department of Commerce.  NMFS imposed the embargo on toothfish from Subarea 48.3 and denied Southern Cross's application for preapproval to import toothfish.

## STANDING

16.     Southern Cross has standing to sue because it is "suffering legal wrong because of agency action" and is "adversely affected or aggrieved by agency action within the meaning of" the APA.  5 U.S.C. § 702; 28 U.S.C. § 2631(i) ("Any civil action of which the Court of International Trade has jurisdiction, other than an action specified in subsections (a)–(h) of this section, may be commenced in the court by any person adversely affected or aggrieved by agency action within the meaning of section 702 of title 5").  Specifically, Southern Cross is adversely affected or aggrieved by Defendants' decision to deny Southern Cross's application for preapproval to import toothfish harvested from Subarea 48.3, which prevents Southern Cross from importing and selling the product.

## TIMELINESS OF THE ACTION

17.     Southern Cross commenced this action under 28 U.S.C. § 1581(i) "within two years after the cause of action first accrue[d]."  28 U.S.C. § 2636(i).  NMFS denied Southern Cross's application for preapproval of toothfish imports on September 15, 2022.  Attach. A, at 1.  Southern Cross therefore timely filed this action.

**RELEVANT LAW**

**A.      The Convention on the Conservation of Antarctic Marine Living Resources and Relevant Conservation Measures In Force**

18.      Toothfish harvesting in Subarea 48.3 is governed by the United Kingdom through the Overseas Territory of South Georgia and the South Sandwich Islands and by the CAMLR Convention.  CAMLR Convention, art. I, ¶ 1.  Historically, the fishing fleets of the Union of Soviet Socialist Republics ("USSR") and other nations engaged in widespread fishing near Antarctica.  In 1980, to address this and other problems, and with the objective of conserving Antarctic marine living resources, 26 countries, including the USSR (now Russia), the United Kingdom, and the United States, concluded the CAMLR Convention, which entered into force in 1982.  *Id*.  The CAMLR Convention's objective is carried out by the CCAMLR.  *Id*. at art. VII, ¶¶ 1-2.  The CCAMLR operates by consensus.  *Id*. at art. XII, ¶ 1.

19.      Article II of the CAMLR Convention states that the objective of the Convention is the "conservation of Antarctic marine living resources," specifically including the "rational use" of such resources, and requires that any harvesting and associated activities "shall be conducted in accordance with the provisions of this Convention" and with listed principles of conservation.  *Id*. at art. II, ¶¶ 1-3.  In order to realize its objective of conserving Antarctic marine living resources, the CCAMLR must "formulate, adopt and revise conservation measures on the basis of the best scientific evidence available."  *Id*. at art. IX, ¶ 1(e)&(f).  The conservation measures CCAMLR may adopt include designating the "quantity of any species which may be harvested," "open and closed seasons for harvesting," and "methods of harvesting, including fishing gear."  None of the enumerated conservation measures prohibits harvesting or requires authorization by CCAMLR to engage in harvesting activity.  *Id*. at art. IX, ¶ 2.

20.     Because conservation measures must be based on the "best scientific evidence available," the CAMLR Convention established a Scientific Committee to formulate methodologies for determining conservation measures.  *Id*. at art. IX, ¶¶ 1-2; art. XIV, ¶ 1.  The CCAMLR must "take full account of the recommendations and advice of the Scientific Committee" in developing and agreeing to conservation measures.  *Id*. at art. IX, ¶ 4.

21.     In 1986, the CCAMLR adopted what is now CCAMLR CM 31-01, a conservation measure relating to the waters around South Georgia in Subarea 48.3.  The measure required the Commission to "adopt limitations on catch, or equivalent measures, binding for the 1987/88 season" and provided that, "[f]or each fishing season after 1987/88, the Commission shall establish such limitations or other measures, as necessary, around South Georgia on a similar basis," based on the advice of the Scientific Committee.  CM 31-01.

22.     Starting in 1990, the CCAMLR has established a yearly catch limit on toothfish, most recently under CM 41-02.  The most recently-adopted catch limits were for the 2019/2020 and 2020/2021 seasons, with limitations set at 2,327 metric tons.  CM 41-02 (2019-2021) at ¶ 4.

23.     In 2002, the CCAMLR adopted CM 10-05, which established a catch documentation scheme ("CDS") for toothfish in order to ensure that toothfish imported into or exported from a party's territory was "caught in a manner consistent with CCAMLR conservation measures."  CM 10-05 (2002).  The CDS includes a catch document ("DCD"), which provides details of the harvest and shipment of the toothfish, and an export document ("DED"), which provide details of the toothfish exportation.  *See generally* CM 10-05 (2002); CM 10-05 (2021).

24.     Conservation measures adopted by CCAMLR are in force with respect to the United States unless the Secretary of State, in consultation with the Secretary of Commerce and Director of the National Science Foundation, notifies the Secretariat of CCAMLR that the United

States does not accept, or can no longer accept, a particular conservation measure. CAMLR Convention, art. Article IX, paragraph 6(b); 16 U.S.C. § 2434(a).

25.     Of key importance, CCAMLR CM 32-02 (2017) expressly states that there is no prohibition on directed fishing for toothfish in Subarea 48.3 and there is no other conservation measure in force that prohibits toothfish harvests in Subarea 48.3 or requires CCAMLR to authorize toothfish harvests in Subarea 48.3.

**B.      The Antarctic Marine Living Resources Convention Act of 1984**

26.     Congress enacted the Antarctic Marine Living Resources Convention Act ("AMLRCA") in 1984 to implement the CAMLR Convention. Pub. L. No. 98-623, 98 Stat. 3398 (1984), as amended by Pub. L. No. 114-81, 129 Stat. 649 (2015) (codified at 16 U.S.C. § 2431, et seq.). The AMLRCA prohibits harvesting (or associated activities) "in violation of a conservation measure *in force* with respect to the United States pursuant to article IX of the Convention[.]" AMLRCA, § 306(1) (codified at 16 U.S.C. § 2435(1)) (emphasis added). Similarly, the statute prohibits importing any Antarctic marine living resource that was harvested "in violation of a conservation measure in force . . . ." AMLRCA, § 306(3) (codified at 16 U.S.C. § 2435(3)) (emphasis added).

**C.      Regulations Implementing the AMLRCA**

27.     Section 307 of the AMLRCA directed the Secretary of Commerce to promulgate regulations to implement the provisions of the AMLRCA. The AMLRCA's initial implementing regulations were issued in 1988-89. *Antarctic Marine Living Resources Convention Act of 1984; Final Rule*, 53 Fed. Reg. 8766 (Dep't Commerce Mar. 17, 1988); *Antarctic Marine Living Resources Convention Act of 1984; Final Rule*, 54 Fed. Reg. 6407 (Dep't Commerce Feb. 10, 1989). Similar to the statutory prohibition, the regulations ban the importation of toothfish that

were harvested "in violation of a conservation measure **in force** with respect to the United States under article IX of the Convention." 50 C.F.R. § 300.114(d) (emphasis added).

28.     The regulations require that all toothfish imports entering the United States be accompanied by a complete and validated CCAMLR DCD and DED. 50 C.F.R. § 300.106(c)(1) and (e)(1)(i). In addition, an importer must obtain a preapproval certificate from the NMFS:

> NMFS may issue a preapproval certificate for importation of a shipment of frozen Dissostichus species if the preapproval application form is complete and NMFS determines that the activity proposed by the applicant meets the requirements of the Act and that the resources were not harvested in violation of any CCAMLR conservation measure or in violation of any regulation in this subpart.

50 C.F.R. § 300.105(d).

29.     NMFS may only refuse to approve an application for preapproval if at least one of four conditions are met. Three of those conditions are relevant here.

30.     First, under 50 C.F.R. § 300.105(h)(2), an application for preapproval can be denied if the resources were harvested or transshipped in violation of a CCAMLR conservation measure. Under the CCAMLR regulatory scheme, this question is determined by the flag state of the harvesting vessel (here, the United Kingdom). CM 10-05(5) and (10) (2021). NMFS may only refuse to approve an application under 50 C.F.R. § 300.105(h)(2) if a determination is made, after consultation with the flag state and exporting state as required by CM 10-05(13), that the toothfish was harvested or exported in "contravention of any CCAMLR conservation measure in force at the time of harvest or transshipment . . . ." 50 C.F.R. § 300.105(h)(2).

31.     Second, under 50 C.F.R. § 300.105(h)(3), NMFS may deny an application for preapproval if the CCAMLR identifies the vessels that harvested the fish as engaged in IUU fishing under CM 10-06 (2016) or CM 10-07 (2016). CCAMLR must place a vessel on a final IUU list by consensus. NMFS does not have independent authority to designate IUU fishing.

32.     Third, NMFS can deny an application if the import is accompanied by "inaccurate, incomplete, invalid, or improperly validated CDS documentation . . . ." 50 C.F.R. § 300.105(h)(4). NMFS must consult with the flag state and exporting state in making such a determination. CM 10-05(13).

## FACTS

**A.      Russia Unilaterally Blocked the Establishment of a 2021/22 Catch Limit Conservation Measure for Patagonian Toothfish in Subarea 48.3**

33.     The CCAMLR requires parties to establish conservation measures, such as catch limits, based upon the "best available scientific information," as provided in recommendations from CCAMLR's Scientific Committee. CAMLR Convention, art. XII, ¶ 1, art. IX, ¶¶ 1-2. The CCAMLR generally adopts the Scientific Committee's recommendations for conservation measures. In the current case, Russia blocked the Scientific Committee's recommendation for Subarea 48.3 in October 2021, citing unsupported scientific concerns. Every other Member of the CAMLR Convention that addressed the issue, including the United States and United Kingdom, stated that Russia's position was not based on the best available scientific information. For example, the United States said that it did not believe there was a scientific basis to close the toothfish fishery in Subarea 48.3. Report of the Fortieth Meeting of the Commission, at ¶ 6.30 (2021), available at https://meetings.ccamlr.org/system/files/e-cc-40-rep.pdf. As a result of Russia's opposition, the CCAMLR could not adopt a 2021/22 catch limit and other fishery-specific measures for Subarea 48.3.

34.     Presently, CM 32-02, Prohibition of Directed Fishing, expressly states that there is no CCAMLR prohibition of directed fishing for toothfish in Subarea 48.3. CM 32-02. Similarly, there is no CM or other provision that *requires* a catch limit or other fishery-specific measures in order for fishing to proceed legally in Subarea 48.3. Defendants have acknowledged this,

confirming that "there is no explicit prohibition on fishing in the absence of agreed measures . . . Attach. A, at 3.

35.     CM 31-01 is a direction to the CCAMLR to adopt "limitations or other measures, as necessary," for all fisheries occurring around South Georgia Island.  It does not state that authorization by CCAMLR is necessary for a fishery to occur or that fishing is prohibited if CCAMLR does not adopt a measure for a fishery occurring around South Georgia.  CM 31-01 (1986).

36.     Nonetheless, NMFS denied Southern Cross's preapproval application for the import of toothfish harvested in Subarea 48.3 because "the toothfish at issue was harvested in contravention of CCAMLR CM 31-01."  Attach. A, at 4.

**B.      Fishing Was Previously Allowed in Subarea 48.3 When There Was No Catch Limit and Other Fishery-Specific Measure in Place**

37.     This is not the first time that Subarea 48.3 has not had a catch limit and other fishery-specific measures for toothfish in place.  Fishing was ongoing among Member States before the first catch limit and other fishery-specific measures were adopted for Subarea 48.3, even after CM 31-01 in 1986 instructed CCAMLR to establish a catch limit or other measures, as necessary, for fisheries in Subarea 48.3.

38.     Further, Russia's recent refusal to allow a catch limit for toothfish is not unprecedented.  The USSR blocked what would have been the first catch limit for toothfish in Subarea in 48.3 in 1989.  However, fishing continued in Subarea 48.3 nonetheless.  Report of the Eighth Meeting of the Commission, at ¶¶ 104-109, 130 (1989), available at https://meetings.ccamlr.org/system/files/e-cc-viii.pdf.

39.     In 1990 the United Kingdom again proposed a CCAMLR catch limit for toothfish. The CCAMLR report reiterated that most Members had endorsed the Scientific Committee's

advice for a catch limit in 1989, but the USSR had challenged the limit on the basis of scientific arguments that other Members did not support. The report also stated that the catch had increased by 100% from the prior year. The report did not suggest that the ongoing fishing was illegal. Report of the Ninth Meeting of the Commission, at ¶¶ 2.3, 13.27-13.28 (1990), available at https://meetings.ccamlr.org/system/files/e-cc-ix.pdf.

### C. NMFS Embargoed Imports of Toothfish from Subarea 48.3

40.     Southern Cross has an International Fishery Trade Permit pursuant to 50 C.F.R. § 300.322, and submitted an application for preapproval to import toothfish pursuant to 50 C.F.R. § 300.105. Application for Pre-Approval Certificate to Import Frozen Toothfish (July 27, 2022) (**Attachment B**). The application was accompanied by a DCD (*Dissostichus* Catch Document, No. GB-22-0012-E (July 21, 2022) (**Attachment C**)), and DED (*Dissostichus* Export Document, Export Code E0F6-1129-9E83 (July 21, 2022) (**Attachment D**)). NMFS denied Southern Cross's application.

41.     The denial of preapproval has caused significant economic harm to Southern Cross by preventing Southern Cross from importing a valuable product. These losses will continue for the remainder of the 2021/22 fishing season and, potentially, for future fishing seasons as well.

42.     The toothfish that were the subject of the preapproval application were harvested in Subarea 48.3 pursuant to all CCAMLR conservation measures in force and under licenses issued by the United Kingdom through the United Kingdom Overseas Territories of St. Helena as the flag state authority (Fishing Vessel Authority Number [                    ] (June 1, 2022) (**Attachment E**)) and South Georgia and the South Sandwich Islands as the Coastal State administration (Fishing Vessel License [                    ] (June 2, 2022) (**Attachment F**)). The licenses were issued in compliance with CMs 10-02 and 10-05 and all other CCAMLR conservation measures in force. The license and authority state that the vessel in question, the "[                    ]," is authorized to

fish for toothfish during the 2021/22 season in CCAMLR Statistical Subarea 48.3, in the South Georgia maritime zone. Attach. E & F.

43. Although there is no CCAMLR catch limit for the 2021/22 season, the United Kingdom has imposed a catch limit of 1,670 metric tons for the toothfish harvest in Subarea 48.3, to implement Article II of the CAMLR Convention and pursuant to CM 10-02. This catch limit is lower than the limit recommended by the CCAMLR Scientific Committee for the 2021/22 season. The catch limit standard used by the United Kingdom is the same standard imposed on US-flagged fishing vessels under 50 C.F.R. § 300.107(d).

44. The United Kingdom Overseas Territory of the Falkland Islands issued the DED required under CM 10-05 as the exporting authority following landing and inspection of both vessel and catch. Attach. D. Pursuant to the license issued by St. Helena under the authority of the United Kingdom, the vessel and harvest had to comply with all CCAMLR conservation measures in force. Attach. E.

45. In the denial of Southern Cross's application for preapproval, Defendants asserted that "the toothfish at issue was harvested in contravention of CCAMLR CM 31-01." Attach. A, at 4. Defendants further asserted that "[i]n the absence of any measure affirmatively establishing a catch limit and other fishery specific requirements for the current season, fishing in Subarea 48.3 was not authorized under CCAMLR conservation measures." *Id*. NMFS therefore asserted they must deny the application pursuant to 50 C.F.R. § 300.105(h)(2). *Id*.

46. CM 31-01 states that "[CCAMLR] shall establish [catch] limitations or other measures, as necessary," for fisheries in Subarea 48.3. It does not prohibit harvesting in the absence of such measures. Indeed, as Defendants have conceded, CM 32-02 expressly states that there is no prohibition on directed fishing for toothfish in Subarea 48.3. Attach. A, at 3.

47.     Upon information and belief, Defendants have not consulted with the United Kingdom, which is both the flag state and exporting state for purposes of CM 10-05, concerning the validity of the DCD and DED issued under CM 10-05 attesting that the harvest was consistent with all CCAMLR conservation measures in force.

48.     The vessel that harvested the toothfish that Southern Cross seeks to import has not been placed on a list of IUU vessels by CCAMLR under CM 10-06.  The United Kingdom has notified CCAMLR that it would not agree to list vessels fishing legally in Subarea 48.3, including the "[                    ]," on the IUU fishing list.

49.     Finally, CM 10-05 and CM 32-02, are in force with respect to the United States because the United States has never notified CCAMLR that it did not accept CM 10-05 or CM 32-02.  *See* CAMLR Convention, art. IX, ¶ 6(c).

## STATEMENT OF CLAIMS

### COUNT ONE

### (DECLARATORY JUDGMENT: VIOLATION OF THE ANTARCTIC MARINE LIVING RESOURCES CONVENTION ACT OF 1984)

50.     Paragraphs 1 through 49 are incorporated by reference.

51.     The Declaratory Judgment Act authorizes any court of the United States to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).

52.     The AMLRCA prohibits importing any Antarctic marine living resource harvested "in violation of a conservation measure in force . . . ."  AMLRCA, § 306(3) (codified at 16 U.S.C. § 2435(3)).

53.     In denying Southern Cross's application for preapproval, Defendants did not set forth any evidence demonstrating that the toothfish imports were harvested "in violation of a

conservation measure in force," including CM 31-01. *Id.* Nor did Defendants assert or provide evidence establishing that any other criteria for denying toothfish imports were met. *See* 16 U.S.C. §§ 2435(1), 2437(a); 50 C.F.R. § 300.105(d), (h). Defendants have thus imposed a *de facto* embargo on imports of toothfish harvested in Subarea 48.3 in violation of the statute.

54.     Plaintiff is entitled to a declaratory judgment stating Defendants may not deny future applications for preapproval submitted by Southern Cross based on the absence of a CCAMLR conservation measure in force at the time.

## COUNT TWO

## (VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT)

55.     Paragraphs 1 through 54 are incorporated by reference.

56.     The APA requires the Court to hold unlawful and set aside agency action that is: "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law; (E) unsupported by substantial evidence . . . ; or (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court." 5 U.S.C. § 706(2).

57.     Defendants failed to offer any evidence to demonstrate that the harvesting or importation of Southern Cross's toothfish violated any CCAMLR conservation measure in force with respect to the United States. *See* 16 U.S.C. § 2435(1)-(3); 50 C.F.R. § 300.105(h). Further, Defendants failed to offer any evidence that the harvest of the toothfish that Southern Cross sought to import was IUU.

58. By denying Southern Cross's application for preapproval and issuing an embargo on Southern Cross's toothfish imports, Defendants have violated the APA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

A. enter judgment in favor of Plaintiff;

B. issue a declaratory judgment stating that Defendants may not deny future applications for preapproval submitted by Southern Cross based on the absence of a CCAMLR conservation measure in force at the time;

C. hold that NMFS's decision to bar the importation of Plaintiff's toothfish was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, all in violation of the Administrative Procedure Act;

D. vacate the embargo and denial of Plaintiff's application for preapproval;

E. award Plaintiff its costs and reasonable attorneys' fees, including attorneys' fees and expenses as authorized by the Equal Access to Justice Act; and

F. grant Plaintiff such additional relief as the Court may deem just and proper.

Dated:    October 12, 2022                          Respectfully submitted,

                                                    WHITE & CASE LLP


                                                    By:  /s/ *David E. Bond*
                                                              David E. Bond

                                                    David E. Bond
                                                    Lucius B. Lau
                                                    701 13th St. NW
                                                    Washington, DC 20005
                                                    202-729-2307
                                                    dbond@whitecase.com
                                                    alau@whitecase.com

                                                    Attorneys for
                                                    Southern Cross Seafoods, LLC

# CERTIFICATE OF SERVICE

I, David E. Bond, of the law firm of White & Case LLP, hereby certify that, pursuant to U.S. Court of International Trade Rule 4(b) and (h), that on October 12, 2022, I caused copies of Plaintiff's Summons, Complaint, Form 5, and Form 13 to be served on the following parties by certified mail, return receipt requested:

> Attorney-In-Charge International Trade Field Office
> Commercial Litigation Branch
> U.S. Department of Justice
> 26 Federal Plaza
> New York, NY 10278
>
> Attorney-In-Charge
> Commercial Litigation Branch
> U.S. Department of Justice
> 1100 L Street, NW
> Washington, DC 20530
>
> National Marine Fisheries Service
> National Oceanic and Atmospheric Administration
> U.S. Department of Commerce
> 1315 East-West Highway
> Silver Spring, MD 20910

/s/ *David E. Bond*

David E. Bond



Attachment A



**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
1315 East-West Highway
Silver Spring, Maryland 20910

September 15, 2022

Southern Cross Seafoods, LLC
28227 Kailees Court
Spring, Texas 77386

Dear

We received an application from Southern Cross Seafoods, LLC on August 8, 2022, for pre-approval to import frozen toothfish harvested from Statistical Subarea 48.3 in the area managed by the Commission for the Conservation of Antarctic Marine Living Resources (CCAMLR) (hereinafter referred to as the Convention Area). The *Dissostichus* Catch Document (DCD) for the toothfish shows that the fish was harvested in Subarea 48.3 between June 3 and July 16, 2022, following the lapse of the fishery-specific Conservation Measure on November 20, 2021 that had set limits for the toothfish fishery in Subarea 48.3. This unfortunate situation is unprecedented within CCAMLR, poses novel legal and policy questions, and implicates sensitive foreign affairs concerns  After giving careful consideration to all of the relevant issues in order to reach a determination on the admissibility of the fish, and recognizing its potential impact as well as the precedent that will be set, the National Marine Fisheries Service (NMFS) is denying issuance of a pre-approval certificate for this shipment of toothfish for the reasons outlined below.

The Convention on the Conservation of Antarctic Marine Living Resources (CAMLR Convention) provides that the function of the Commission is to give effect to the conservation objective of the Convention, and its principles, through, *inter alia,* the adoption of conservation measures establishing limitations and requirements including catch limits, protection of protected species, and gear restrictions applicable to fisheries in the Convention Area. Art. IX, paras. 1(f) and 2.  The CAMLR Convention defines conservation to include rational use, meaning that harvesting activities that are conducted in a manner consistent with the principles of conservation set out in Article II are permissible, not that there is any rational use goal that must be satisfied.[1] This in contrast to the Conventions establishing many regional fishery management organizations, which generally have an objective of conservation and management in order to ensure long-term sustainable yield from fishery resources.[2]

---

[1] Report from the 35th Meeting of CCAMLR discussing the paper presented by the United States and Australia, *Conservation of Antarctic Marine Living Resources* (CCAMLR-XXXV/BG/28), CCAMLR-XXXV, paras. 9.12-9.21. *The United Kingdom "as an original signatory to the Antarctic Treaty and to the CAMLR Convention, advised that it fully supports the analysis of the US and Australian paper. In the UK's view, the meaning of Article II was clear." Para. 9.18.*

[2] *See, e.g.,* Convention on Cooperation in the Northwest Atlantic Fisheries, Arts. II, III((a)(calling on Contracting Parties to "promote the optimum utilization and long-term sustainability of fishery resources"), and III(b); International Convention for the Conservation of Atlantic Tunas, Preamble and Art. IV, para. 2(b); Convention on the Conservation and Management of High Seas Fishery Resources in the South Pacific Ocean, Art. II



Subarea 48.3 includes waters around South Georgia that are claimed by both the United Kingdom and Argentina. The United States takes no position on these competing territorial claims.[3] The CAMLR Convention and applicable measures adopted pursuant to Article IX apply to all waters within the Convention Area. In the Chairman's Statement,[4] the parties expressed the intent that certain areas may be excluded from application of measures adopted by the Commission. However, the Chairman's Statement has not been invoked by the United Kingdom. In 1986, CCAMLR adopted CM 31-01[5], which provides that the Commission shall adopt catch limits or other measures as necessary for Subarea 48.3 and the Commission has adopted an ever-increasing suite of catch limits and other measures for the area each year from 1990 until last year, when Russia blocked consensus to adopt proposed CM 41-02.

We recognize that the United Kingdom has, since 1995, issued fishing licenses that authorize harvest of toothfish in its claimed waters within Subarea 48.3. However, the United Kingdom's issuance of the licenses in prior years was within the context of CCAMLR-adopted catch limits and other measures for the Subarea set in CM 41-02, in accordance with CM 31-01.  Even if the United Kingdom has unilaterally imposed comparable measures to those included in CM 41-02 in prior seasons, that is irrelevant to the question of whether prosecution of this fishery in the absence of a measure adopted by CCAMLR contravenes CM 31-01.

The first paragraph of CM 31-01 directed CCAMLR to adopt "limitations on catch, or equivalent measures," for the 1987/88 season. The second paragraph of the measure refers back to "such limitations on catch or equivalent measures" as does the third paragraph; CCAMLR "shall adopt such limitations or other measures, as necessary". There is no basis for concluding that CCAMLR's failure to adopt CM 41-02 represents a decision by CCAMLR that catch limits and other measures for Subarea 48.3 were unnecessary for the current season and, therefore, the fishery could proceed in the absence of such measures without contravening CM 31-01. Nor was such a conclusion supported by the discussions that were held in the Commission.[6]  In fact, several of the statements made in the Commission reflect the view that failure to reach consensus on catch limits effectively closes the fishery.[7]  A conclusion that fishing could proceed in the

---

[3] *See, e.g.,* Report of the Fifteenth Meeting of the Commission, 1996, at para. 13.27.

[4] *See* Statement by the Chairman of the Conference on the Conservation of Antarctic Marine Living Resources https://www.ccamlr.org/en/organisation/camlr-convention-text.

[5] *See* Report of the Fifth Meeting of the Commission, 1986, at page 16 (note that CM 31-01 was previously numbered CM 7/V).

[6] *See* Report of the Fortieth Meeting of the Commission, 2021, at paras. 6.18-6.22, 6.26-6.32 and 6.35.

[7] *See* CCAMLR-40, Para. 6.22 (statement from the UK, stating in relevant part that "*Russia's block on a scientifically determined catch limit for the toothfish fishery in Subarea 48.3, contrary to the management advice from the Scientific Committee (SC-CAMLR-40, paragraph 3.61), **marks the first time in CCAMLR's 40-year history that an established fishery has been completely blocked, and it results in a failure of CM 31-01*.**" (emphasis added)); Para. 6.28 (statement from the European Union, stating in relevant part *"the catch limits proposed for Subarea 48.3 (and other areas) are precautionary. They are based on best available science and consistent with CCAMLR decision rules and established CCAMLR procedures. In short, **there is no scientific basis for closing the fishery**." (emphasis added)*); and Para. 6.30 (statement from the United States, stating in relevant

2

absence of a measure would also be inconsistent with decades of CCAMLR practice. While Subarea 48.3 is unique in having a measure requiring the annual adoption of catch limits and other measures as necessary, the adoption of increasingly sophisticated fishery-specific measures has been consistent across CCAMLR fisheries. In addition, CM 31-01 applies to the entirety of Subarea 48.3, which includes waters outside the United Kingdom's claimed exclusive economic zone (EEZ). Since 2004, directed fishing for toothfish has been prohibited in portions of Subarea 48.3 outside the United Kingdom's claimed EEZ, and Management Area A (which included areas inside and outside the claimed UK EEZ) was open to fishing, but with a zero catch limit. If the consequence of a failure to adopt measures pursuant to CM 31-01 was to allow harvest, these additional areas would also be open to harvest, a result that would be inconsistent with the Convention's conservation objective.

For the 2021/22 fishing season, CCAMLR failed to adopt catch limits or other measures as necessary in accordance with CM 31-01. Therefore, even if the toothfish at issue was harvested in compliance with other applicable conservation measures, such as those that apply to vessel licensing (CM 10-02) and monitoring (CM 10-05), that does not make the harvest *authorized* in accordance with CM 31-01.

While there is no explicit prohibition on fishing in the absence of agreed measures applicable to the whole Convention area, consistent with Articles II and IX, fisheries have not been prosecuted in the absence of applicable fishery-specific measures authorizing and proscribing the conditions of harvest since the earliest years of the Commission when the management regime was still being established. Given the consensus-based decision-making structure of CCAMLR, an alternative approach would mean that a Member wishing to fish without restrictions could do so just by blocking consensus on the adoption of applicable measures.

The fact that directed fishing for toothfish in Subarea 48.3 is not prohibited by CM 32-02 similarly fails to support the conclusion that absent a fishery-specific conservation measure, the fishery is open without catch limits. CM 32-02 has been in force and unchanged since 2017 and, as described above, CCAMLR has adopted specific prohibitions on directed fishing or zero catch limits for certain portions of Subarea 48.3 since 2004, including each year since the adoption of CM 32-02, until this year.

The Antarctic Marine Living Resources Convention Act of 1984 (AMLRCA), 16 U.S.C. § 2431 *et seq.*, provides the statutory authority for the United States to carry out its obligations under the CAMLR Convention, including implementation of adopted conservation measures. AMLRCA regulations, in relevant part, provide:

> NMFS may issue a pre-approval certificate for importation of a shipment of frozen *Dissostichus* species if the pre-approval application form is complete and NMFS determines that the activity proposed by the applicant meets the requirements of the Act

part, "[t]he USA does not believe **there is a scientific basis to close the toothfish fishery in Subarea 48.3**. We continue to support the adoption of CM 41-02 with catch limits for toothfish in Subarea 48.3 at the levels indicated in paragraph 3.61 of the Scientific Committee's report." (emphasis added))

and that the resources were not harvested in violation of any CCAMLR conservation measure or in violation of any regulation in this subpart.

50 CFR § 300.105(d). The regulations further provide that NMFS will not issue a pre-approval certificate for any shipment "[d]etermined to have been harvested or transshipped in contravention of any CCAMLR Conservation Measure in force at the time of harvest or transshipment." 50 CFR § 300.105(h)(2).

NMFS is not issuing a pre-approval certificate because, as explained above, the toothfish at issue was harvested in contravention of CCAMLR CM 31-01. *See* 50 CFR § 300.105(h)(2). In the absence of any measure affirmatively establishing a catch limit and other fishery-specific requirements for the current season, fishing in Subarea 48.3 was not authorized under CCAMLR conservation measures. Therefore, as provided in the regulations, at 50 CFR § 300.105(d) and (h)(2), NMFS may not issue a pre-approval certificate.

Denial of this application is consistent with the AMLRCA regulations and U.S. obligations under the CCAMLR Catch Documentation Scheme (CM 10-05) which prohibits the importation of toothfish harvested in a manner inconsistent with CCAMLR conservation measures. The decision is also consistent with the initial assessment that we provided to you via email on July 28, 2022, that the product in question did not meet the regulatory requirements for admissibility. We received acknowledgment of receipt of our email from you on July 29, 2022.

Sincerely,

Alexa Cole
Director
Office of International Affairs,
    Trade, and Commerce

Attachment B

OMB No.: 0648-0742
(Expires: 08/31/2019)



**THE UNITED STATES OF AMERICA
DEPARTMENT OF COMMERCE
NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION
NATIONAL MARINE FISHERIES SERVICE
ANTARCTIC MARINE LIVING RESOURCES**



*Application for Pre-Approval Certificate to Import Frozen Toothfish*

1. NAME OF IMPORTER (Contact Person):_____  PERMIT #:_____

   COMPANY NAME (Business):_____
   Southern Cross Seafoods LLC

   COMPANY ADDRESS:_____

   CITY:_____  ST:_____  ZIP:_____

   PHONE NUMBER:_____  EMAIL ADDRESS:_____

2. ESTIMATED DATE OF ARRIVAL:_____

3. PORT OF ARRIVAL:_____

   PORT OF UNLADING IF DIFFERENT THAN PORT OF ARRIVAL:_____

4. CONSIGNEE(S) OF PRODUCT:_____

5. AMOUNT TO BE IMPORTED (in kgs):_____

6. U.S. CUSTOMS 7501 NUMBER: ..._____
   (must be 11 digits/characters long; to be supplied at least 3 working days prior to shipments arrival)

7. SHIPPING LINE AND CONTAINER NUMBERS FOR EACH CONTAINER IN THIS SHIPMENT:
   _____

*Items 8 and 9 below are found on the Dissostichus Catch Document (DCD) and/or Dissostichus Export Document (DED):*

8. DOCUMENT NUMBER OF DCD(S):_____

9. EXPORT CODE:_____

10. SIGNATURE:_____  TITLE:_____  DATE:_____

The non-refundable application fee of $200.00 must accompany each application. Submittal of the application and accompanying payment and documents does not guarantee issuance of the pre-approval certificate. As the product is prohibited from release into the United States unless it has been pre-approved for import, dealers are cautioned to obtain the pre-approval certificate before engaging in transactions to ship the product.

The completed application with Dissostichus Catch Documents and Dissostichus Export Document must be received by NMFS, National Seafood Inspection Laboratory (see address below) **at least 10 working days prior to the shipment's arrival into port,** with the exception of the U.S. Customs 7501 number which can be supplied at a later date but no later than 3 working days prior to the shipment's arrival into port.

Send application and fee by check payable to Department of Commerce, NOAA and catch documents to:

   National Marine Fisheries Service
   National Seafood Inspection Laboratory
   3209 Frederic Street
   Pascagoula, MS 39567
   Attention: CCAMLR Data Management

Attachment C

*DISSOSTICHUS* CATCH DOCUMENT                                                    V 1.10

| Document Number: GB-22-0012-E | Flag State Confirmation Number: A2EE-32EE-1EDD |
|---|---|

**1. Issuing Authority of Document**

| Name: Agriculture & Natural Resources Department (ANRD) | Address: St Helena Island, South Atlantic Ocean | Telephone: | Fax: |
|---|---|---|---|

**2. Fishing Vessel**

| Name: | Home port: | Registration number: | Call sign: | IMO/Lloyd's number (if issued): |
|---|---|---|---|---|

| 3. Licence number (if issued) | Fishing dates for catch under this document | | |
|---|---|---|---|
| | 4. From: | 5. To: | |
| | 6. Date of port departure: | 7. Date of port entry: | |

**8. Description of fish (landed/transhipped)**

**9. Description of fish sold**

| Species | Type | EEZ | Area caught | Estimated weight to be landed (kg) | Verified weight landed (kg) | Net weight sold (kg) |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**10. Description of fish sold**

| Name of recipient: | | Telephone: | |
|---|---|---|---|
| Address: | | Fax: | |

**11. Landing/Transhipment information:** I certify that the above information is complete, true and correct, and that for any *Dissostichus* spp. taken in the Convention Area, I certify that it was taken in a manner which is consistent with CCAMLR conservation measures.

| Master of fishing vessel or authorised representative: | Date: | Transhipment port and country or at-sea coordinates: | Transhipment date: |
|---|---|---|---|
| | | Landing port and country: | Landing date: |

**12A. Certificate of transhipment and subsequent landing:** I certify that the above information is complete, true and correct to the best of my knowledge.

| Master of receiving Vessel: | Vessel name: | Call sign: | IMO/Lloyd's Number: |
|---|---|---|---|
| | Intended landing port and country: | Intended date of landing: | |

**12B. Transhipment within a Port Area** (countersignature by Port Authority if appropriate)

| Name: | Authority: | Date: |
|---|---|---|

**13. Certificate of Landing:** I certify that the above information is complete, true and correct to the best of my knowledge.

| Name: Sheena Ross | Authority: Fisheries Department Falkland Islands | Date: 21 Jul 2022 - 16:19 UTC |
|---|---|---|

Attachment D

| *DISSOSTICHUS* EXPORT DOCUMENT | | V1. 9 |
|---|---|---|
| **Catch Document Number:** | **Export code** | |
| **From** | **To:** | **Fishing Vessel Name:** |

**1. Description of Fish Exported**

| Species | Type | Net Weight Exported (kg) | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**2. Transport Details** – complete one of the four sections below

| Complete this section if transport method is by **SEA**: | Complete this section if transport method is by **ROAD**: |
|---|---|
| **Container number:** | **Truck registration number:** |
| **Vessel name:** | **Nationality of truck:** |
| **Bill of Lading number:** | |
| Complete this section if transport method is by **AIR**: | Complete this section if transport method is by **RAIL**: |
| **Flight number:** | **Railway transport number:** |
| **Airway Bill number:** | **Bill of Lading number:** (or other shipment document number to identify shipment) |

Complete the following section regardless of the transport method

| **Expected date of export:** | **Port or Place of Departure:** |
|---|---|

**3. Exporter Certification**: I certify that the above information is complete, true and correct to the best of my knowledge.

| **Name:** | **Address:** | |
|---|---|---|
| | **Date:** 21 Jul 2022 | **Export Licence:** |

**4. Import Section**

| **Name of Importer:** | **Importer address:** | |
|---|---|---|
| **Port or place of arrival:** | **State/Province:** | **Country:** |

**5. Export Government Authority Validation**: I certify that the above information is complete, true and correct to the best of my knowledge.

| Name/Title: | Government: | Date of issue: |
|---|---|---|
| Sheena Ross | United Kingdom | 21 Jul 2022 - 16:49 UTC |

Attachment E

# ST. HELENA

## FISHING VESSEL AUTHORITY NUMBER NP/001/2022

This Authority is issued the *1st* day of June 2022 by **THE GOVERNMENT OF ST. HELENA, South Atlantic Ocean** (acting herein by Dr. Philip Rushbrook, Governor of St Helena) in respect of the fishing vessel "[          ]" registered in Jamestown, St. Helena and authorises the said "[          ]", subject to a licence being obtained from the proper authority, to fish in the South Georgia maritime zone (within CCAMLR Statistical Sub-area 48.3) during the 2021/22 season subject to the terms contained in the Schedule hereto:

## SCHEDULE

1. Subject to a licence being obtained from the relevant authorities the Fishing vessel "[          ]" is authorised to fish for Toothfish (*Dissostichus spp)* during the said 2021/22 season in the South Georgia maritime zone, in CCAMLR Statistical Sub-area 48.3.

2. Whilst operating in the Convention Area, the vessel shall comply with all Conservation Measures in force, including those of particular relevance set out in Annex "A" hereto.

3. For the purposes of the longline fishery for *Dissostichus eleginoides* in the South Georgia maritime zone (Statistical Sub-area 48.3), the 20221/22 season is defined as the period from 1 May to 14 September (subject to confirmation by UK Government).

4. For the purpose of the longline fishery for *Dissostichus eleginoides* in the South Georgia maritime zone (Statistical Sub-area 48.3), in the 2021/22 season shall not exceed the precautionary catch limit of 1670 tonnes.

5. The vessel shall comply with all the reporting requirements of CCAMLR.

6. The vessel shall have at least one independent scientific observer on board throughout all fishing activities within the fishing period.

7. The relevant authority in St Helena is the Director of Environment, Natural Resources and Planning and he must be advised at least 72 hours in advance of the following:-

   (a) exit or entry from any port;
   (b) entry into the Convention Area and movement between areas, sub-areas/divisions; and
   (c) intention to tranship harvested marine living resources and any other goods or materials to or from fishing vessels.

8. The "[          ]" must have a fully operational Automatic Location Communicator system on board which complies with Conservation Measure 10-04.

9.    This authority must be carried on board the vessel at all times whilst in the CCAMLR Convention Area and be available for inspection by a designated CCAMLR inspector on request.

10.   Resolution 28/XXVII  IMO guidelines for ballast water exchange in the Antarctic treaty area is to be complied with.

P. Rushbrook

Dr. Philip Rushbrook
Governor of St Helena

**Annex "A"**

Conservation Measures of particular relevance to the *Dissostichus spp* fishery in the South Georgia maritime zone (sub-area 48.3) during the 2021/22 season are:

10-01 (2014)  Marking of Fishing Vessels and Fishing Gear.

10-02 (2016)  Licensing and Inspection Obligations of Contracting Parties with regard to their Flag Vessels Operating in the Convention Area.

10-03 (2019)  Port Inspections of fishing vessels carrying Antarctic marine living resources.

10-04 (2018)  Automated Satellite-linked Vessel Monitoring Systems (VMS).

10-05 (2018)  Catch documentation scheme for Dissostichus spp.

10-06 (2016)  Scheme to promote compliance by Contracting Party vessels with CCAMLR Conservation Measures.

10-07 (2016)  Scheme to Promote Compliance by Non-Contracting Party Vessels with CCAMLR Conservation Measures.

10-08 (2017)  Scheme to promote compliance by Contracting Part nationals with CCAMLR conservation measures.

10-09 (2019)  Notification system for transhipment within the Convention Area.

10-10 (2019)  CCAMLR Compliance Evaluation Procedure

22-06 (2019)  Bottom fishing in Convention Area

22-07 (2013)  Interim measure for bottom fishing activities subject to CM 22-06 encountering potential vulnerable marine ecosystems in the Convention Area.

| | |
|---|---|
| 22-09 (2012) | Protection of registered vulnerable marine ecosystems in subareas, divisions, small-scale research units, or management areas open to bottom fishing |
| 23-01 (2016) | Five-day Catch and Effort Reporting System. |
| 23-04 (2016) | Monthly Fine-Scale Catch and Effort Data Reporting System for Trawl and Longline Fisheries. |
| 23-05 (2000) | Monthly Fine-Scale Biological Data Reporting System for Trawl and Longline Fisheries. |
| 24-01 (2019) | The application of Conservation Measures to Scientific Research. |
| 24-02 (2014) | Longline weighting for seabird conservation. |
| 24-05 (2020) | Fishing for research purposes pursuant to Conservation measure 24-01 |
| 25-02 (2018) | Minimisation of the Incidental Mortality of Seabirds in the Course of Longline Fishing or Longline Fishing Research in the Convention Area. |
| 26-01 (2019) | General Environmental Protection during Fishing. |
| 31-02 (2007) | General Measure for the closure of all fisheries. |
| 32-01 (2001) | Fishing seasons |
| 32-18 (2006) | Conservation of Sharks. |
| 41-01 (2020) | General Measures for Exploratory Fisheries for *Dissostichus spp.* in the Convention Area in the 2020/21 season. |

Attachment F

# SOUTH GEORGIA & THE SOUTH SANDWICH ISLANDS



## FISHING VESSEL LICENCE

Issued by

**The Director of Fisheries**

I, Mark Belchier, Director of Fisheries, hereby authorise the fishing vessel: [                    ] (IMO No: [            ]) to fish within the Maritime Zone of South Georgia & the South Sandwich Islands under the terms and conditions attached to this licence.

**FISHING VESSEL LICENCE NUMBER:**

**SPECIES TO BE FISHED:** Patagonian toothfish (*Dissostichus eleginoides*)

**GEAR TYPE TO BE USED:** Demersal longline (Autoline)

**PERMITTED FISHING AREA:** CCAMLR Sub-Area 48.3

**VESSEL QUOTA:** 417 tonnes *Dissostichus eleginoides*

**AREA LIMITS:** Catch limits will be 501 tonnes in Area B and 1,169 tonnes in Area C. Licenced vessels are required to catch quota in each of the Management Areas.

**AGENT IN STANLEY:**

**PERIOD OF VALIDITY OF THIS LICENCE:** From: 1st May 2022
To: 14th September 2022

**CONVERSION FACTOR:** TOP = 1.61

**EXPORT:** This licence also permits the import and export of fish and fish products to and from the Territory

Mark Belchier
Director of Fisheries

Date: 2nd June 2022

This licence must be displayed in the bridge on the vessel at all times during the period of licenced operations

# SOUTH GEORGIA & THE SOUTH SANDWICH ISLANDS

**TERMS AND CONDITIONS OF**
**TOOTHFISH FISHING IN AREA 48.3 LICENSING 2022**

This licence is issued under the South Georgia and South Sandwich Islands Fisheries (Conservation and Management) Ordinance 2000 (as amended).

While operating in the South Georgia & South Sandwich Islands Maritime Zone, it is a condition of this licence that vessels comply with:

- the Fisheries (Conservation and Management) Ordinance 2000 (as amended) and any regulations made under it;
- the Marine Protected Areas Order (2019);
- the terms and conditions set out in 'Toothfish Licensing Information for Applicants for the 2022-2023 Fishing Seasons';
- the terms and conditions of the letter of 1st June 2022 providing information on allocation of quota and other relevant information;
- any further vessel-specific conditions issued by GSGSSI; and
- any additional conditions issued in writing by or on behalf of GSGSSI.

Licence Conditions must be complied with throughout the entire season. A breach of licence conditions may lead to the suspension and/or revocation of a licence, to the imposition of an administrative penalty, and/or the institution of criminal and/or civil proceedings.