## UNITED STATES COURT OF INTERNATIONAL TRADE

SOUTHERN CROSS SEAFOODS, LLC,    )
    )
            Plaintiff,    )
    )
    v.    )
    )    Case No. 22-00299
    )
UNITED STATES OF AMERICA, and    )
NATIONAL MARINE FISHERIES SERVICE, )
    )
            Defendants.    )
    )

## PLAINTIFF'S STATUS REPORT AND MOTION
## TO EXPEDITE BRIEFING AND CONSIDERATION

Pursuant to the Court's letter of October 20, 2022 as well as Rules 1, 3(g), and 7 of the Rules of this Court, Plaintiff Southern Cross Seafoods, LLC ("Southern Cross") respectfully submits this status report setting forth its proposed briefing schedule and requests that the Court order expedited treatment of this action that contests the National Marine Fisheries Service's ("NMFS") decision to order an embargo on Patagonian toothfish ("toothfish") from the South Georgia fishery in Statistical Subarea 48.3 ("Subarea 48.3"). Pursuant to Rule 3(g) of the Rules of this Court, "the court may expedite . . . [a]ny other action that the court determines, based on motion and for good cause shown, warrants expedited treatment." USCIT R. 3(g). Southern Cross is only requesting expedited briefing for its own briefs, and is not asking the Court to shorten any of Defendants' deadlines. Southern Cross also asks the Court for expedited consideration of this case. As set forth below, there is good cause for the Court to order expedited treatment of this action.

## I.    LEGAL STANDARD

USCIT Rule 3(g) allows the Court to grant expedited treatment in "(1) [a]n action involving the exclusion of perishable merchandise or redelivery of such merchandise" or in "(5) [a]ny other action that the court determines, based on motion and for good cause shown."  There is good cause to expedite under Rule 3(g)(5) where "[1] in a case in which failure to expedite would result in mootness or deprive the relief requested of much of its value, [2] in a case in which failure to expedite would result in extraordinary hardship to a litigant, or [3] actions where the public interest in enforcement of the statute is particularly strong."  *Ontario Forest Indus. Ass'n v. United States*, 30 C.I.T. 1117, 1127 (2006) (citing H. Rep. No. 98-985, at 6 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 5779, 5784) (footnote omitted).  Applying these factors here, expedited briefing and consideration is warranted under both Rule 3(g)(1) and (5).

## II.    ARGUMENT

### A.    Failure to Expedite Would Deprive Southern Cross of All U.S. Sales in the Coming Year

Pursuant to USCIT Rule 3(g)(5), there is good cause to expedite this case.  As previously discussed in the Complaint, NMFS denied Southern Cross's application for preapproval to import toothfish harvested from Subarea 48.3 during the 2021/22 fishing season based on its misinterpretation of the Convention on the Conservation of Antarctic Marine Living Resources, May 7, 1980, 1329 U.N.T.S. 47 ("CAMLR Convention") and its implementing legislation, the Antarctic Marine Living Resources Convention Act ("AMLRCA"), Pub. L. No. 98-623, 98 Stat. 3398 (1984), as amended by Pub. L. No. 114-81, 129 Stat. 649 (2015) (codified as 16 U.S.C. § 2431, *et seq.*).   Under the CAMLR Convention, members of the Commission for the Conservation of Antarctic Marine Living Resources ("CCAMLR") may set catch limits and other Conservation Measures ("CM") through consensus (*i.e.*, a unanimous decision).

Defendants' embargo is a direct result of Russia's 2021 decision to unilaterally block CCAMLR from setting a catch limit on toothfish for the 2021/22 fishing season in Subarea 48.3. Compl. ¶ 4.  In denying Southern Cross's application for preapproval, NMFS argued (incorrectly) that the lack of a CCAMLR Conservation Measure setting a catch limit for Subarea 48.3 rendered any toothfish harvesting unauthorized under the CCAMLR Conservation Measures ("CM"). Compl. ¶ 5.  Thus, NMFS imposed a complete embargo on all toothfish imports from this major fishery so long as there is no CCAMLR CM catch limit, a situation that is ongoing and could persist indefinitely.  Compl. ¶ 53.  Southern Cross is thus unable to import and sell its product in the United States until the embargo is lifted.

At the just-concluded annual CCAMLR meeting in November 2022, Russia again blocked the adoption of a CCAMLR CM catch limit for the 2022/23 fishing season for toothfish in Subarea 48.3.  Attachment A (Report of the Forty-first Meeting of the Commission (Hobart, Australia 24 October to 4 November 2022) (preliminary version) at ¶ 4.34); Attachment B (Evan T. Bloom, *No. 16 | Antarctic Treaty System shows resilience in the face of Ukraine war tensions*, POLAR POINTS, A BLOG OF THE POLAR INSTITUTE (Nov. 10, 2022)) (noting that Russia "continued its efforts begun last year" to prevent adoption of a CCAMLR CM catch limit for toothfish in the waters near South Georgia).  At that same meeting, the United States specifically stated that "there is no scientific reason to close the toothfish fishery in Subarea 48.3."  Attachment A at ¶ 4.33.  As a result of this meeting, Defendants' embargo on toothfish from that area, which is expressly based on the lack of a CCAMLR CM catch limit, will continue at least through the end of 2023, absent action from this Court.  The nature of this embargo means that the failure to expedite relief would deprive Southern Cross of all sales, without remedy, in the United States unless and until the Court lifts the embargo (or a CCAMLR CM catch limit is reinstated by consensus at a future annual CCAMLR meeting).  Therefore, expedited treatment of this case is vital to ensure that Southern

Cross is not completely barred from importing toothfish from Subarea 48.3 into the United States during the next fishing season and, possibly, beyond.

**B.    This Case Should Be Expedited Because It Involves an Embargo on Perishable Goods**

Expedited treatment also is warranted under USCIT Rule 3(g)(1) because Patagonian toothfish are perishable goods.[1]   Toothfish is harvested, processed, frozen, and then shipped to purchasers.   Generally, toothfish can be frozen for a two-year period, but purchasers expect toothfish to be delivered with at least one year of remaining shelf life in its frozen state.   The shipping time for frozen fish to the United States is approximately two months.   Some of the toothfish for the 2021/22 season in Subarea 48.3 was caught in the first week of June 2022. Therefore, in order for Southern Cross to obtain meaningful relief with respect to toothfish caught in the first week of June 2022 (meaningful relief meaning the ability to import such toothfish into the United States with sufficient shelf life remaining), it would need a decision from the Court in March 2023.   These potential sales to the United States (as well as other potential sales of toothfish that are subsequently harvested) will be permanently lost, unless the Court renders a decision more quickly than normal.   *See Jazz Photo Corp. v. United States*, 28 C.I.T. 1954, 1988 (2004) (shortening automatic stay where camera sales during the holiday season were akin to "perishable" because their "commercial importance to the plaintiff depende[d] significantly on its availability for sale in the very near future.").   Thus, expedited treatment is needed in this case to prevent "the

---

[1]   This Court has explained that the types of actions included in Rule 3(g) are listed in order of precedence, and cases involving perishable goods have the highest priority.   *See Corus Staal BV v. United States*, 29 C.I.T. 777, 783 n.9 (2005) (stating that Rule 3(g) lists "an action contesting a determination in a countervailing or antidumping duty proceeding third in order of precedence, following only an action seeking injunctive relief and an action involving the exclusion or redelivery of perishable merchandise").

relief requested of . . . [being deprived of] . . . much of its value." *Ontario Forest Indus. Ass'n*, 30 C.I.T. at 1127.

### C.    Public Interest in Stopping an Embargo is Particularly Strong

Further, "the public interest in enforcement of the statute is particularly strong" in this case. *Id*.  Unless and until Defendants' embargo on toothfish is lifted, neither Southern Cross nor any other company will be able to import Patagonian toothfish (commonly referred to as Chilean seabass) from Subarea 48.3 into the United States through at least the end of the 2022/23 fishing season.  The public, in turn, cannot purchase that seafood.  Fishing in Subarea 48.3 is managed by the United Kingdom through the UK Overseas Territory of South Georgia & the South Sandwich Islands, and the fishery is not only the first fishery that the Marine Stewardship Council ("MSC") certified as sustainable, but is one of the highest scoring sustainable fisheries certified by the MSC. Compl. ¶ 3.  The toothfish that Southern Cross sought to import into the United States was harvested under a license issued by the United Kingdom.   As the U.S. State Department representative to the 2022 CCAMLR meeting stated, the United Kingdom's fishing is "within the bounds of what had been permitted in the past, and should not in any way be controversial other than the fact that Russia has blocked it."  Attachment C (Nick Perry, *Russia may again block Antarctic marine protections*, ASSOCIATED PRESS (Oct. 26, 2022)).  As a result of this embargo, the public is deprived of the ability to purchase some of the most sustainably-harvested Chilean seabass in the world at least through the end of 2023.

The public also has a strong interest in proper and accurate enforcement of U.S. law.  It is only unlawful to import "any Antarctic marine living resource (or part or product thereof) harvested in violation of a conservation measure in force with respect to the United States pursuant to article IX of the [CAMLR] Convention or in violation of any regulation promulgated under this title . . . ."  16 U.S.C. § 2435(3).  NMFS claimed, in denying Southern Cross's application for

preapproval, that the toothfish were harvested in violation of CCAMLR CM 31-01 (1986), but that CM does not prohibit fishing in the absence of a catch limit.  Compl. ¶¶ 5-6.  In fact, Defendants have conceded that "there is no explicit prohibition on fishing in the absence of agreed measures . . . ."  Compl. ¶ 6.  Under the plain language of the statute, because neither CCAMLR CM 31-01 nor any other CCAMLR conservation measure prohibits fishing in Subarea 48.3 without a CCAMLR CM catch limit or other fishery specific measures, harvesting toothfish in Subarea 48.3 cannot possibly violate a conservation measure in force.  *See Angus Chem. Co. v. United States*, 140 F.3d 1478, 1484 (Fed. Cir. 1998) ("If that . . . [statutory] . . . language is unambiguous, it controls.").  The public has an interest in ensuring NMFS does not exceed its authority under the statute and regulations and impose an embargo to the public's detriment.

Accordingly, expediting briefing and consideration of this case would serve the public's strong interest in being able to purchase the seafood of its choice and in proper administration of the law.

### D.      Failure to Expedite Would Result in Extraordinary Hardship

Finally, failure to expedite briefing and consideration in this case will "result in extraordinary hardship" to Southern Cross.  *Ont. Forest Indus. Assoc.*, 30 C.I.T. at 1127.  Already, Southern Cross has suffered significant economic harm as a result of Defendants' embargo preventing Southern Cross from importing a valuable—and perishable—product into the United States.  Compl. ¶ 41.  Losses will continue until Defendant's unlawful embargo is lifted or the CCAMLR adopts by consensus a CCAMLR CM that satisfies Defendant's unsupported interpretation of CCAMLR CM 31-01.  Neither of those events will occur during the 2022/23 season, blocking Southern Cross from the U.S. market for the entirety of the season unless the Court lifts the embargo.  Granting this motion to expedite will help remedy this ongoing harm as quickly as possible.

## III.     PROPOSED BRIEFING SCHEDULE

Because there is good cause to expedite this matter and the case is well-suited for expedited

treatment, Southern Cross respectfully requests that the Court enter the following expedited

schedule for this proceeding:

| Date | Event |
|---|---|
| December 12, 2022 | Deadline for Defendants to answer or otherwise respond to the Complaint. |
| December 22, 2022 | Deadline for Southern Cross to file its Rule 56.1 Motion for Judgment on an Agency Record and supporting brief. |
| February 7, 2023 | Deadline for Defendants to file their response brief. |
| February 21, 2023 | Deadline for Southern Cross to file its reply brief. |
| February 28, 2023 | Deadline for motions for oral argument, if any, to be filed |

In drafting the proposed schedule, Southern Cross shortened its own briefing schedule ***but***

***did not shorten Defendants' schedule***.  Defendants' December 12, 2022 deadline to respond to

the Complaint remains unchanged.  As a courtesy to Defendants, Southern Cross also took the

holiday season into account and gave Defendants additional time to respond to Southern Cross's

Rule 56.1 Motion for Judgment on an Agency Record, starting Defendants' time to respond on

January 3, 2023 rather than on December 22, 2022.

On November 21, 2022, Lucius B. Lau, counsel for Southern Cross, consulted with Sosun

Bae, counsel for the government, who does not consent to this motion.  Ms. Bae states that

Defendant intends to oppose this motion, as it plans to file a motion to dismiss this action, which

may altogether alleviate the need for briefing on the merits.

## IV.     CONCLUSION

For these reasons, the Court should grant this motion, and expedite both the briefing and

the Court's consideration of this action.

Respectfully submitted,

WHITE & CASE LLP

  /s/ *David E. Bond*
David E. Bond (DC Bar No. 453711)
Lucius B. Lau (DC Bar No. 446088)
701 13th St. NW
Washington, DC 20005
202-729-2307
dbond@whitecase.com
alau@whitecase.com


Attorneys for
Southern Cross Seafoods, LLC

November 21, 2022

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of November 2022, "PLAINTIFF'S STATUS REPORT AND MOTION FOR EXPEDITED BRIEFING AND CONSIDERATION" was filed electronically.  I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Lucius B. Lau*
Lucius B. Lau

# Attachment A

CCAMLR-41
Created: 10 November 2022

**Report of the Forty-first meeting
of the Commission**
(Hobart, Australia, 24 October  to 4 November 2022)

This is a preliminary[1] version of the CCAMLR-41 Report
as adopted on Friday 4 November 2022.

---

[1]   Preliminary in this case means that further proofreading and verification is still to be done by the Secretariat.

# Contents

|  | Page |
|---|---|
| **Opening of the meeting** | 1 |
| **Organisation of the meeting** | 9 |
| Adoption of agenda | 9 |
| Status of the Convention | 9 |
| Chair's report | 11 |
| Report from SCAR | 11 |
| **Implementation of Convention objectives** | 12 |
| Objectives of the Convention | 12 |
| Second Performance Review (PR2) | 16 |
| **Management of marine resources** | 18 |
| Advice from the Scientific Committee | 18 |
| Rules for Access and Use of CCAMLR Data | 18 |
| Krill resources | 19 |
| Fish resources | 21 |
| Icefish | 21 |
| Toothfish (*Dissostichus* spp.) | 21 |
| Scientific research under Conservation Measure 24-01 | 27 |
| Non-target species | 28 |
| Fish and invertebrates | 28 |
| Seabirds and marine mammals | 28 |
| Bottom fishing and vulnerable marine ecosystems | 29 |
| Marine debris | 30 |
| **Spatial management** | 31 |
| Proposals for marine protected areas (MPAs) | 32 |
| Review of existing MPAs | 39 |
| General issues related to spatial management | 41 |
| **Impacts of climate change on the conservation of Antarctic marine living resources** | 43 |
| **Implementation and compliance** | 50 |
| Advice from SCIC | 50 |
| CDS Fund expenditure | 51 |
| Implementation of the CDS | 51 |
| Vessel inspections implementation | 51 |
| Vessel monitoring system (VMS) | 52 |
| Transhipment | 52 |
| NCP Engagement Strategy | 52 |
| Proposals for new and revised conservation measures | 52 |
| CCAMLR Compliance Evaluation Procedure (CCEP) | 54 |
| Illegal, unreported and unregulated (IUU) fishing in the Convention Area | 57 |
| Fishery notifications | 59 |

**CCAMLR Scheme of International Scientific Observation** ........................... 59

**Conservation measures** ............................................................... 59
  Implementation and Compliance ..................................................... 61
  General fishery matters ................................................................ 61
    Fishery regulations ................................................................... 61
    Exploratory fisheries ................................................................ 63
    Toothfish catch limits ............................................................... 63
    Icefish catch limits .................................................................. 64
    Krill fisheries ......................................................................... 64
    Other fishery matters ............................................................... 64

**Administration and Finance** ......................................................... 64
  Advice from SCAF ....................................................................... 64
  Review of the 2022 budget, the 2023 budget and forecast budget for 2024 .......... 65
  Administration matters ................................................................ 65
  Other business .......................................................................... 66

**Cooperation with the Antarctic Treaty System and international organisations** ... 66
  Cooperation with the Antarctic Treaty System ...................................... 66
  Cooperation with international organisations ........................................ 67
  Reports of observers from international organisations .............................. 67
    Reports from CCAMLR representatives at meetings of international
      organisations in the previous intersessional period and nominations of
      representatives to forthcoming meetings of relevant international organisations 69
    Cooperation with regional fisheries management organisations (RFMOs) ........ 70

**Administrative matters** .............................................................. 70
  Election of officers .................................................................... 70
  Invitation of observers ................................................................ 72
  Next meeting ........................................................................... 72

**Other business** ...................................................................... 73

**Report of the Forty-first Meeting of the Commission** .............................. 77

**Close of the meeting** ................................................................ 78

**Table** ................................................................................ 79

**Annexes that are not attached to this report are available
from the website (see links below)**

**Annex 1:**   List of Registered Participants

**Annex 2:**   List of Documents

**Annex 3:**   Opening address by the Governor of Tasmania, Her Excellency
            the Honourable Barbara Baker AC

CCAMLR-41 Report – Preliminary version

**Annex 4:**    Agenda

**Annex 5:**    Summary of activities of the Commission during the 2021/22 intersessional period – Report of the Chair

**Annex 6:**    Proposal for an extraordinary meeting of the Commission on Spatial Planning and Marine Protected Areas

**Annex 7:**    Report of the Standing Committee on Implementation and Compliance (SCIC)

**Annex 8:**    Report of the Standing Committee on Administration and Finance (SCAF)

**Report of the Forty-first**
**Meeting of the Commission**
(Hobart, Australia, 24 October to 4 November 2022)

**Opening of the meeting**

1.1     The Forty-first Annual Meeting of the Commission for the Conservation of Antarctic Marine Living Resources (CCAMLR-41) met at its Headquarters in Hobart, Australia, from 24 October to 4 November 2022. It was chaired by Dr J. Granit (Sweden).

1.2     The following Members of the Commission were represented: Argentina, Australia, Belgium, Chile, People's Republic of China (China), Ecuador, European Union (EU), France, Germany, India, Italy, Japan, Republic of Korea (Korea), the Kingdom of the Netherlands (Netherlands), New Zealand, Norway, Russian Federation (Russia), South Africa, Spain, Sweden, Ukraine, United Kingdom of Great Britain and Northern Ireland (UK), United States of America (USA) and Uruguay. Namibia did not attend the meeting. Brazil and Poland were not present in person at the meeting but connected to the online streaming of the proceedings.

1.3     The following contracting Parties were represented as Observers in person or online: Canada, Finland, Mauritius, Panama and Peru.

1.4     The following non-Contracting Parties (NCPs) were represented as Observers: Luxembourg and Singapore.

1.5     The following Observers were represented in person or online: the Agreement on the Conservation of Albatrosses and Petrels (ACAP), the Association of Responsible Krill harvesting companies (ARK), the Antarctic and Southern Ocean Coalition (ASOC), the Antarctic Treaty Secretariat, the Coalition of Legal Toothfish Operators (COLTO), the Commission for the Conservation of Southern Bluefin Tuna (CCSBT), the International Union for Conservation of Nature and Natural Resources – the World Conservation Union (IUCN), Oceanites Inc., the Scientific Committee on Antarctic Research (SCAR), the Southern Indian Ocean Fisheries Agreement (SIOFA), the South Pacific Regional Fisheries Management Organisation (SPRFMO) and the Western and Central Pacific Fisheries Commission (WCPFC).

1.6     The List of Participants is given in Annex 1. The List of Documents presented to the meeting is given in Annex 2.

1.7     The Chair welcomed all participants to the meeting and introduced Her Excellency, the Honourable Barbara Baker AC, the Governor of Tasmania, who delivered the opening address (Annex 3).

1.8     On behalf of the meeting, Mr F. Lopez Crozet (Vice-Chair, Argentina) thanked the Governor for her welcome.

1.9     A number of statements were made by Members.

1.10    The USA made the following statement:

'I am here to talk about what CCAMLR can do to advance conservation efforts in the Antarctic.

But I must first condemn the unprovoked war one Member has waged against another Member of this organisation. Russia's unprovoked war on Ukraine is a direct affront against the basic principles embodied in international law, including the United Nations Charter, and the principles of sovereignty and territorial integrity that underpin global security and stability.

The US delegation cannot ignore the threat to the rules-based international order that Russia's brutal war of aggression against Ukraine presents.

In addition, we specifically condemn the heavy damage the National Antarctic Scientific Center of Ukraine in Kyiv has sustained due to ongoing war.

As Secretary Blinken said recently, "Moscow can knock out the lights across Ukraine, but it cannot, it will not, extinguish the Ukrainian spirit. President Putin thought he could divide the transatlantic alliance. Instead, he's brought us even closer together."

Russia must withdraw its troops from Ukraine and immediately cease its aggression against Ukraine, a sovereign and independent state defending its internationally recognised borders.'

1.11    Ukraine made the following statement:

'Hopefully, this CCAMLR meeting will allow us to do together the important steps to achieve significant progress on all the actual challenges in the context of the Convention's Article II.

However, we should like to inform all attendees, that, unfortunately, this CCAMLR meeting is starting in a situation of continuing unprovoked aggression of the Russian Federation against Ukraine.

So, that is a reality that the one CCAMLR Member country has initiated a war against another CCAMLR nation to achieve its political goals, in particular to obtain new territories. They consider this as a suitable way to achieve it by destroying Ukrainian economy and killing Ukrainian people.

Nearly 20% of Ukraine's territory remain occupied by Russia. In the recently occupied areas, Russia reproduces the same patterns it has been using in Crimea and parts of Donbas since 2014; it appoints occupation administration, imposes Russian passports, and recruits Ukrainian men into the Russian armed forces.

Last week Russia was attacking Ukrainian critical civilian infrastructure, in particular energy infrastructure, using missiles and kamikaze drones. Currently nearly 40% of Ukraine's energy facilities were damaged or destroyed. That is a way by which Russia is hoping to leave Ukrainian citizens without energy, heating and water.

We consider all this absolutely unacceptable and as a crime against humanity. Silent consent to Russia to continue their war against Ukraine is something what is breaking our World, our civilisation, not only that of Ukraine.

This terror should be finished as soon as possible. We are urging every CCAMLR party to do their maximum efforts to stop this war.'

1.12    The UK confirmed its solidarity with Ukraine and condemned in the strongest possible terms the illegal war of Russia on Ukraine. The UK demanded that Russia immediately cease this illegal war and respect Ukraine's independence and sovereignty. The UK expressed delight at seeing Ukraine at the meeting and encouraged all Members to engage fully in the meeting and the commitments under the Convention.

1.13    The EU and its Member States made the following statement:

'The EU and its Member States wish to express their full solidarity with Ukraine and the Ukrainian people. We condemn in the strongest possible terms Russia's unprovoked and unjustified act of aggression against Ukraine, which grossly violates international law and the UN Charter, and undermines international security and stability.

The EU and its Member States demand that Russia immediately cease its military actions, withdraw all its troops from the entire territory of Ukraine and fully respect Ukraine's territorial integrity, sovereignty and independence within its internationally recognised borders and abide by UN General Assembly resolution titled "Aggression against Ukraine" supported by 141 states at the 11th emergency special session.

We resolutely support Ukraine's inherent right of self-defence and the Ukrainian armed forces' efforts to defend Ukraine's territorial integrity and population in accordance with Article 51 of the UN Charter. At all times Russia must respect its obligations under international law, including international humanitarian and human rights law, including with respect to the protection of civilians, women and children. Russia also needs to stop its disinformation campaign and cyber attacks.'

1.14    Australia made the following statement:

'Australia condemns Russia's unilateral, illegal and immoral aggression against the people of Ukraine.

The invasion is a gross violation of international law, including the Charter of the United Nations, and it is unacceptable that one CCAMLR Member has invaded another.

Russia's missile strikes target civilians in Ukraine, including in Kyiv. We note also the damage to the National Antarctic Scientific Center of Ukraine. President Putin's continued threats of escalation are reprehensible.

Australia strongly supports Ukraine's sovereignty and territorial integrity and we thank Ukraine for their background paper detailing the challenges faced by its national Antarctic program in the context of the current invasion by Russia, which we will discuss under Agenda Item 3. We respect Ukraine's efforts to make a full contribution to the Antarctic Treaty System.

Australia calls on Russia to immediately withdraw its forces from Ukrainian territory, required by the legally binding decision of the International Court of Justice on 16 March 2022.'

1.15    New Zealand affirmed its support of the statements made previously and condemned Russia's invasion of Ukraine. New Zealand emphasised its solidarity with Ukraine, welcomed the incoming Chair, and looked forward to progressing the important and urgent work of the Commission and delivering on the objective of the Convention at this meeting.

1.16    Norway aligned itself with the previous speakers and strongly condemned the war in Ukraine.

1.17    Italy made the following statement:

'Italy strongly supports the declarations of the USA, UK, the EU, Australia, New Zealand and Norway, and it also wishes to express its full solidarity with Ukraine and the Ukrainian people.'

1.18    Japan made the following statement:

'Japan echoes the positions expressed by my previous speakers in support of Ukraine. Japan's position on the aggression against Ukraine has been expressed and explained at many international meetings and stays the same. Japan urges Russia to withdraw from Ukraine immediately.'

1.19    Russia made the following statement:

'First of all, I would like to note that the Convention on the Conservation of Antarctic Marine Living Resources is the fundamental document for the activities of the CCAMLR Commission.

In accordance with Article II of the Convention, its purpose is to conserve Antarctic marine living resources.

According to Article IX of the Convention, the function of the Commission is to implement the purposes and principles set out in Article II of the Convention. These features are clearly limited.

Nevertheless, anti-Russian rhetoric was voiced in CCAMLR today by individual countries. Politicisation undermines the foundations of CCAMLR's activities, diverting from the achievement of the goals of the Convention.

We remind you that the Commission is called upon to focus on the conservation of marine living resources and the management of their fisheries.

Separately, we draw attention to the fact that the content of the Ukrainian document does not comply with the mandate of CCAMLR and the Scientific Committee in particular does not address issues of conservation of Antarctic marine living resources and the principles of the Convention.

We have already encountered similar stuffing, the sole purpose of which is to whip up anti-Russian rhetoric, at another Antarctic forum. The implications of this discussion are well known. We would like to avoid repeating this scenario in CCAMLR.

The Russian Delegation is against the politicisation of CCAMLR's work. Bringing political issues into CCAMLR's activities is a dangerous precedent that can permanently undermine the foundations of future activities and cause irreparable damage to the organisation's international reputation.

Once again, we urge the parties to return to depoliticised discussions within the mandate of this unique platform. We proceed from the fact that issues that are not within the competence of CCAMLR cannot be included in its report.'

1.20    The Chair noted that, in his opinion, a number of Members left the meeting room during the reading of Russia's statement.

1.21    The Chair invited Members to make a second round of statements.

1.22    The USA made the following opening statement:

'I'm glad to be here as a demonstration of the USA's unwavering commitment to conserving and protecting the Antarctic – an increasingly fragile and precious part of our planet.

And this is a pivotal moment for both Antarctica and for the world – climate change is changing this region faster than any of us thought possible. Which is why the actions we take at this meeting in Hobart and in future global meetings over the next six months will shape the future health of the planet – and all its inhabitants – for generations.

It is important to meet in person – for the first time in three years – to re-invigorate the collaborative spirit that has characterised CCAMLR and the Antarctic Treaty system. But that cooperation is crumbling and so I urge that we come together now and reach consensus on the key issues, such as the creation of a system of marine protected areas, that have been languishing for far too long.

The cooperation and open collaboration that is required by CCAMLR had been its strength. But frankly it is now holding back progress. Countries that have prioritised their individual needs have weakened our ability to meet the shared conservation objectives on which this body was founded.

For example, CCAMLR has adopted some of the most comprehensive fishery management measures for the toothfish fishery, setting a global standard and nearly eliminating IUU fishing in the area.

Which is why it was extremely disappointing that CCAMLR was not able to reach consensus last year on catch limits for toothfish in Subarea 48.3. CCAMLR has always managed this fishery based on precaution and sound science. This fishery is now a source of division among like-minded nations due to a Russian "conservation" objection that is not supported by this body's Scientific Committee.

5

We urge Members to work together at this session to resolve this situation so that CCAMLR remains able to meet its conservation objectives while allowing limited, well-managed fishing for high-value species.

We must recommit to the "Hobart Spirit" of cooperation and consensus and find ways to come together as we have for more than 40 years.

And in the face of climate change, we must renew this ethos of international cooperation here in Antarctica more than ever. This past summer, NASA released a study showing that Antarctica is shedding icebergs faster than the ice can be replaced – doubling previous estimates of ice loss from 6 trillion metric tonnes to 12 million metric tonnes.

To echo NASA scientist Chad Greene, Antarctica truly is "crumbling at its edges." And these "edges" have a real effect on the rate of global sea-level rise. If emissions continue at their current pace, the Antarctic ice sheet will have crossed a critical threshold by about 2060, committing the world to a sea-level rise that is not reversible on human timescales.

In the face of this new data, we need to act to protect Antarctica to conserves its biodiversity and do our best to mitigate the effects of climate change on the Antarctic ecosystem.

We have a clear path forward.

CCAMLR should now – at this meeting – establish a representative system of marine protected areas in the Southern Ocean.

We have less than a decade to conserve or protect at least 30 percent of the global ocean, and MPAs in the Southern Ocean are a critical piece of that goal. A series of MPAs will help create a nature-positive world and support ecosystems, migratory pathways, and endemic ocean species. CCAMLR's decision in 2016 to establish the Ross Seas region marine protected area proves this institution has the wherewithal to implement this type of meaningful, positive change.

And for those with questions, I would point to our Members reporting on research activity that demonstrates the resounding success of the Ross Sea region MPA. This research includes more than 460 projects by 20 CCAMLR Members, 2 Acceding States, and 7 Cooperating Parties, related to 11 MPA objectives. This is what a collective effort can achieve.

So, I want to urge any nations with objections to drop them before it is too late to save what we can of this precious place – and its penguins, whales and seabirds. The proposed MPAs are essential to delivering on our treaty objective to conserve Antarctic marine living resources and to furthering our understanding of climate change impacts in the Southern Ocean.

If we cannot come to agreement now, then the USA will provide a voluntary contribution of US$75 000 to help offset the cost of hosting a special meeting on MPAs early next year.

This is also the time to modernise the management of the krill fishery. CCAMLR has already set precautionary catch limits for krill. There are clear steps such as requiring port inspections for 100 percent of vessels carrying krill or krill products. Krill fishing effort could also be updated as well as the dispersion of fishing to ensure that it is not too highly concentrated.

As I mentioned, we are entering a critically important stretch of international engagement on climate change, biodiversity, the ocean, plastic pollution and more.

The actions we take here at CCAMLR can build on the momentum we have seen so far this year, and drive action at COP27, CITES, the launch of the plastic pollution agreement, CBD COP15, the completion of BBNJ negotiations, and the 8th Our Ocean conference in Panama, to name just a few!

It's time to move from ambition to action.

Let's make Hobart 2022 an historic moment for the conservation of the Antarctic living marine resources.'

1.23  The EU and its Member States made the following opening statement:

'The EU and its Member States are very pleased to be back in Hobart. We would like to thank the Australian government for hosting CCAMLR and the Secretariat for their excellent work in organising this annual meeting.

It is a relief that after two virtual meetings due to the COVID pandemic, we can finally meet in person again. It offers a real opportunity for progress.

We return to Hobart with a renewed sense of purpose and urgency.

Urgency because the challenges we face are considerable. The dual global crises of climate change and biodiversity loss have created unprecedented challenges, nowhere more so than in Antarctica. Climate change is already having profound and potentially irreversible impacts on the Southern Ocean.

But while the situation is certainly very serious, there is also hope. Marine protected areas can help conserve marine biodiversity, maintain ecosystems and build ocean resilience against climate change.

We are still far from achieving CCAMLR's objective to create a representative system of marine protected areas in the Convention Area, despite the fact that proposals to establish marine protected areas in East Antarctica and the Weddell Sea have been on the table for many years. This year marks the 10th anniversary of the first submission of the East Antarctica marine protected area proposal.

Considering what is at stake, this is deeply worrying.

Biodiversity loss and the climate emergency are outpacing us, going faster than we had ever anticipated. There is therefore no room for complacency or time to lose. We therefore urge all Members to support the adoption of the proposed marine protected areas and to work towards establishing a representative system of such areas.

We should also step up efforts to fully integrate climate change considerations into CCAMLR's work. We call on all Members to support the adoption of the updated CCAMLR resolution on climate change. We look forward to the SCAR lecture which will contribute to our understanding of how climate change is affecting Antarctica.

Another area where further progress is essential is to ensure that CCAMLR's fisheries monitoring, control and surveillance framework keeps pace with new developments.

We are convinced that CCAMLR can only address these challenges effectively by working together in a spirit of openness and compromise.

We therefore appeal to CCAMLR Members to engage in genuine dialogue and to make constructive efforts to progress the important work of CCAMLR.'

1.24   Argentina highlighted that the main objective of CCAMLR is conservation, and that to achieve this objective there are several tools such as the establishment of marine protected areas (MPAs). Argentina expressed that it has supported, and continues to do so, the MPA proposals, and jointly with Chile has presented the MPA proposal in Domain 1, which meets the requirements to be approved.

1.25   Argentina added that other essential tools to fulfill the objective of the Convention are the conservation measures. In that sense, it stated that the fact that there is a special circumstance with respect to Subarea 48.3 does not in any way enable any Member to take measures outside of, and against, the Convention. Argentina regretted that there was a serious breach of Conservation Measure (CM) 31-01 in said subarea during the 2021/22 season and urged all Parties to comply with the conservation measures. Finally, it expressed its hope that this irregular situation would not constitute a precedent for CCAMLR.

1.26   The UK endorsed the comments previously made by the USA, the EU and Argentina in respect of the importance of conservation with regard to the impact of climate change and emphasised the importance of effective conservation measures that accurately reflect CCAMLR's understanding of climate change and its impact on Antarctica. The UK stated that it regards the actions of Russia as preventing the best science being utilised in Subarea 48.3. The UK stated that it has set out its position in this regard in circulars COMM CIRCs 22/31, 22/51, 22/69 and 22/99 and re-endorsed that position.

1.27   Russia made the following statement:

'Russia, acting in a spirit of cooperation, actively participates in the implementation of the basic objectives of CCAMLR, aimed, among other things, at the development of scientifically based measures for the management of Antarctic marine living resources. In this regard, confirming their commitment to the implementation of the CCAMLR Convention we consider it of principal importance that the management of Antarctic marine living resources be based on a balance between conservation and rational use.

In this context, we believe it is important to note that marine protected areas can be considered as one of the management tools, but not the main one in relation to the conservation of marine living resources. At the same time, climate change issues are global in nature and should be considered comprehensively, and not in isolation for individual regions

With regard to the management of the toothfish fishery in Subarea 48.3, the Russian side has repeatedly pointed out that the longline fishery for toothfish in Subarea 48.3 is based on fish of the recruitment group and under the influence of the fishery there are critical changes that do not allow talking about the rational use of this living resource. Over the past five years, Russia has presented a number of documents at CCAMLR meetings reflecting its position on the management of toothfish resources in Subarea 48.3.

In the absence of CCAMLR conservation measures, the toothfish fishery ceased on Subarea 48.3. The Russian side sees no reason to take unilateral measures to manage the toothfish fishery in Subarea 48.3, bypassing CCAMLR, which, among other things, was reflected in its circulars addressed to the CCAMLR Secretariat. In this regard, we express our regret that such a unilateral decision is based on economic interests, and not science.'

1.28    At the time of report adoption of the report, Members of the Commission expressed different views regarding how to include paragraphs 1.10 to 1.20 in the report.

1.29    The Chair closed Agenda Item 1.


**Organisation of the meeting**

2.1    The Chair confirmed that Ms M. Engelke-Ros (USA) would chair the Standing Committee on Implementation and Compliance (SCIC) and Ms S. Langerock (Belgium) would chair the Standing Committee on Administration and Finance (SCAF). The USA proposed Dr C. Jones (USA) as Chair of the ad hoc Conservation Measures Drafting Group. The proposal was **endorsed** by the Commission.


Adoption of agenda

2.2    The provisional agenda was amended to include the presentation of the paper by SCAR, SC-CAMLR-41/21) as Agenda Item 2.4.

2.3    The agenda, as amended, was **adopted** (Annex 4).


Status of the Convention

2.4    Australia, as Depositary of the Convention on the Conservation of Antarctic Marine Living Resources 1980 (the Convention), reported that Ecuador acceded to the Convention on 24 June 2022, with entry into force on 24 July 2022. The number of Contracting Parties to the Convention is now thirty-seven (37). A copy of the status list for the Convention is available on the Australian Treaties Database.

2.5     Australia also reported that the Republic of Ecuador became a Member of the Commission on 19 October 2022 in accordance with Article VII(2)(d) of the Convention. On behalf of the Commission, the Chair welcomed Ecuador to Membership of the Commission.

2.6     Ecuador provided the following statement on its acceptance to the Commission as a Member:

'It is an honour to be here today, and to represent the Republic of Ecuador in this special occasion. Besides the celebration of the 40th Anniversary of the Convention, this meeting constitutes a milestone for Ecuador, since this is the very first time we participate in this forum as a full Member of CCAMLR.

We received the notification of this great news just a few days ago. This was a process that took us some years to finalise, but thanks to the perseverance of our Executive Secretary, Dr David Agnew and the work of the Embassy and the Government of Ecuador, this has become a reality, and we are now officially part of the CCAMLR family.

The adhesion to the Convention for the Conservation of Antarctic Marine Living Resources, was in effect since 24 July 2022, and this ratifies the commitment of the Republic of Ecuador to the management of fisheries, their traceability throughout the entire production chain and marketing, and the sustainability of its activity, under the precautionary principle established in the Convention. It also means that Ecuador can make an important contribution to the regional position in sustainable fishing, and scientific contributions to the conservation of Antarctic marine living resources.

Ecuador, as one of the most biodiverse countries in the world, is an internationally recognised example of good practices in the conservation of marine biodiversity, through measures such as the creation of marine protected areas, which have proved to be effective, not only for marine resources in the Galápagos Islands and the coastal region of the country, but along the whole Pacific Ocean, especially regarding the protection of highly migratory species.

In the multilateral sphere, Ecuador has led the implementation of important conservation policies and regulations both, at a regional and global level. Ecuador, therefore, is no stranger to the concern for the regulation of the exploitation of marine living resources in the fragile Antarctic ecosystem, some of them on the brink of extinction.

Conservation and fisheries management have been at the core of Ecuadorian policies and legislation for decades, in accordance with the Antarctic Treaty. It is also the case of the control of marine pollution. We currently lead at the United Nations the creation of a UN Convention against Plastics in the Ocean. The international scientific community has witnessed the research of the Ecuadorian scientific vessel *Orion*, and the Pedro Vicente Maldonado Scientific Station in the Antarctic, in accordance to the Ecuadorian Antarctic Institute plans and goals, led by the National Navy. Ecuador has also participated in several joint research projects with other countries and international organisations, like the South Pacific Permanent Commission (CPPS).

It is important to mention that Ecuador, coordinates and promotes scientific research projects of national interest in Antarctica, within the Technical-Scientific Program,

which is part of the different Ecuadorian Antarctic expeditions, through the Ecuadorian Antarctic Program PROANTEC – INOCAR (1988–2004), the Ecuadorian Antarctic Institute (2004–2020), and currently through the Oceanographic and Antarctic Institute of the Navy (2020 to date), within the framework of the provisions of the Antarctic Treaty.

So far, 25 Antarctic expeditions have taken place, in which approximately 180 research projects have been carried out with the participation of Public Institutes, the Academy, and the cooperation of other International Antarctic Programs. The projects have been implemented mainly in the areas of influence of the Pedro Vicente Maldonado scientific station located on Greenwich Island-South Shetland, and some projects on the Ecuadorian navy ship *Orion*, that participated in the I, II and VII Ecuadorian Antarctic expeditions.

Antarctic scientific research is aimed to obtain new knowledge, bridging gaps in science, and supporting decision-making in terms of governance, administration and environmental protection in Antarctica.

The past, present, and future guidelines for the development of Antarctic and Southern Ocean research proposed by Ecuador are oriented and articulated within the research priorities of the Scientific Committee on Antarctic Research (SCAR), as well as with areas and lines of research determined at the national level.

The participation of Ecuador in this forum is vital to our country, in order to enhance the coordination of the implementation of our research programs, and to combine and acquire the knowledge from the other members.

We are looking forward to cooperating and working together in a more active and efficient manner, and we have no doubt that all the more experienced Members of the Convention will guide us, so we can fully contribute with our experience and knowledge and gain as well from the expertise of all of you.'

Chair's report

2.7    The Chair introduced his report (CCAMLR-41/BG/03) as read (Annex 5). He recalled that this year saw the 40th anniversary of the signing of the Convention on 7 April 1982 and expressed appreciation for the 40th anniversary book that has been compiled and edited by the Secretariat from contributions by Members, Acceding States and Observers.

2.8    The Chair expressed the Commission's condolences to Japan on the passing of Mr K. Yonezawa, Chair of the Commission for 2003 and 2004.

Report from SCAR

2.9    In accordance with the decision taken at CCAMLR-38, paragraph 8.5, the Commission invited Prof. S. Chown (SCAR) to present SC-CAMLR-41/BG/21, Antarctic Climate Change and the Environment (ACCE): A Decadal Synopsis and Recommendations for Action. This

report, which is a major update to the ACCE, provided an infographic summary of the ACCE Decadal Synopsis, key findings relevant to CCAMLR, a summary of risks for ecosystems and particular species and a series of recommendations derived from these findings. The report concluded that climate change is largely the consequence of anthropogenic greenhouse gas emissions, that impacts on Antarctic species such as krill and seabirds, and on Antarctic marine ecosystems, are already clear, and will worsen into the future without urgent action to mitigate global greenhouse gas emissions, and that considerations of climate change should be included in the conservation and management of Antarctic ecosystems and marine living resources. In his presentation, Prof. Chown made clear that currently, a critical window for regional Antarctic action is open, and that without urgent action, impacts on Antarctic ecosystems and species would unfold that would not be reversible within two or three decades.

2.10    The Commission thanked SCAR for its informative lecture. It recalled Resolution 30/XXVIII, which encourages wide dissemination of SCAR's report on ACCE and encourages SCAR's input to inform CCAMLR's decision-making. Many Members also encouraged SCAR to provide updates of the ACCE report as available.

2.11    The Commission congratulated SCAR and the many scientists who contributed to the landmark report and noted that the SCAR report represented a synopsis of the latest peer-reviewed scientific literature relating to climate change in Antarctica. The Commission noted that the implications of climate change were of great importance to CCAMLR, and its conservation measures given the rapid change in the Antarctic ecosystems due to climate effects.

2.12    The Commission drew attention to the Antarctic Treaty Consultative Meeting (ATCM) Resolution 4 (2022) in which the Antarctic Treaty Parties welcomed SCAR's Decadal Synopsis and its advice that urgent action is required to prevent irreversible changes to Antarctica. The Commission requested that SCAR keep the Commission updated on climate change and the environment.

2.13    In response to questions raised by a number of delegations, SCAR noted that whilst the causes of climate change may lie beyond the boundaries of the Convention Area, it will be important to seek both global and local solutions to mitigate its impacts, including using MPAs to provide protection to ecosystems and refuge for species vulnerable to climate change. SCAR also indicated that models of the impact of climate change on the future state of marine living resources which extended substantially into the future would be needed to allow CCAMLR to manage them effectively. SCAR concluded with the statement that not to use all of the conservation tools available to the Commission now would be a bold statement that everyone is prepared to let these ecosystems go.

2.14    The Chair closed Agenda Item 2.


**Implementation of Convention objectives**

Objectives of the Convention

3.1    The Commission considered CCAMLR-41/BG/30 submitted by Ukraine which outlined the main challenges faced by its National Antarctic Program.

3.2    Ukraine made the following statement:

'Following condemned by world community attempted by Russian annexation of the Autonomous Republic of Crimea in 2014 and four Ukrainian oblasts – Luhansk, Donetsk, Zaporizhzhia and Kherson in 2022, Ukraine lost several scientific infrastructure facilities including four marine research institutions and scientific personnel. This created significant difficulties in the implementation of oceanographic research by Ukraine, also within the framework of the National Antarctic Program.

Russia's war of aggression against Ukraine, which began on 24 February 2022, led to killing of many Ukrainian citizens, destroying civil and critical infrastructure, a significant drop down in economic indicators, and this continuing currently. Armed invasion of Russia to Ukraine resulted reorientation of the country's economy to martial law and the sequestration of budget allocated for areas such as education, science, culture and directing the released funds to the needs of state defence and ensuring the safety of citizens.

As the budget of the National Antarctic Program of Ukraine was also significantly cut, Ukrainian research vessel's *Noosfera* research plan for the Southern Ocean was much reduced, and return of the vessel to Ukraine is temporarily impossible now. Possible long demurrage of the vessel *Noosfera* caused by reduction of marine researches raises a question of finding temporary home port for the off-season.

Due to current hostilities, there are significant logistical problems. There are no any functioning airport and safe ground way in Ukraine due to permanently possible Russian missile and drone attacks. It is real challenge now for Ukrainian specialists (scientists, officials, technical specialists), who is involved to the National Antarctic Program, to achieve their destination points in the Antarctic region.

In October 2022, as a result of a massive missile strike by the Russian Federation on the territory of Ukraine, the building of the National Antarctic Research Center in Kyiv, as well as all equipment, was significantly damaged and which led to impossibility to use these facilities by staff for further work. Currently the rebuilding works are going, but it meet such difficulty as continuing attacks of the Ukrainian capital by kamikaze drones.

So, the all above is clearly demonstrate why the Russian aggression, considered by Ukraine as a crime against humanity, undoubtedly hinder the development of Ukraine's scientific capacity and has a direct impact to the CCAMLR effectiveness, being directed for breaking economical and scientific potential of the other CCAMLR Member.

In this regard we call to the CCAMLR Parties to respond as a CCAMLR community to unfriendly actions (including military actions), taken by one Party towards another Party, as well as develop preventive measures to preserve the CCAMLR unity in this situation.

Ukraine believes that lessons learned from current situation should be duly taken into account by other CCAMLR Parties and become a platform for further consultations to adjust our Commission to emerging challenges.

We consider very important to note that Russia's war of aggression against Ukraine is a main cause of a global food crisis, which entails serious political and economic consequences.

Taking into account the above, Ukraine proposes to express, on behalf of CCAMLR, an unequivocal condemnation of Russian war of aggression against Ukraine, as an unacceptable way of satisfying political ambitions in the modern World, noting that such unlawful actions destroy the principles of international cooperation and threatens catastrophic consequences for the whole world. In this regard, to call on the aggressor country to immediately stop its actions in Ukraine with the unconditional withdrawal of troops from the territory of Ukraine within its internationally recognised borders.'

3.3     Many Members expressed support for Ukraine and referred to statements they had made previously during Agenda Item 1. Most Members condemned the actions of Russia and stated that the damage to Ukraine's scientific capabilities due to the ongoing war in Ukraine was regrettable and undermines the Antarctic Treaty System and objectives of the Convention, including its fisheries management. Many Members offered their support to Ukraine and its Antarctic program. Some Members emphasised Ukraine's commitment to CCAMLR and its call for unity even in these circumstances.

3.4     Russia stated that the paper from Ukraine was provocative and aimed to create anti-Russian sentiment. Russia claimed the allegations provided in CCAMLR-41/BG/30 were unfounded and that time should be spent on the important issues facing CCAMLR and not used for discussion of rhetoric which undermines the Commission's work.

3.5     China stated that the objective of the CAMLR Convention is the conservation of Antarctic marine living resources and the operation of the Commission should focus on this objective and not be disturbed by regional disputes.

3.6     The Commission considered CCAMLR-41/BG/26 submitted by Argentina and Chile. Chile introduced the paper and highlighted challenges facing the Commission, including climate change, recalling that proposals such as the draft update of the climate change resolution and the creation of a representative system of MPAs are closely linked to the objective of the Convention. Chile noted the current challenges CCAMLR is facing in carrying out its work. Chile also noted the benefits of consensus and its importance within the Antarctic Treaty System and encouraged delegations to reflect on whether enough is being done to reach consensus on priority issues. Chile also noted the ignoring of sound scientific advice on specific issues, with consequences on the decision-making process. Chile also recalled the damage unilateral decisions may have on the Antarctic Treaty System. Chile reiterated that the intent of the paper was to encourage Members to look for creative solutions to advance the objective of the Convention.

3.7     Argentina stressed that CCAMLR was a fundamental part of the Antarctic Treaty System, so the interaction between the ATCM and the CEP, with this Commission and the Scientific Committee was essential for the comprehensive conservation of the Antarctic continent and the surrounding oceans. Argentina also pointed out that situations of blockade and the adoption of unilateral measures do not contribute to the achievement of CCAMLR's objective, and that not all actions that are not expressly prohibited within the Antarctic Treaty System are automatically permitted, but rather require a multilateral decision authorising them. In that sense, Argentina highlighted the relevance of multilateralism and international

cooperation. Argentina encouraged Members to reflect on the objective of the CAMLR Convention and the importance of cooperation to reach consensus. Argentina noted that while consensus requires hard work, many great achievements have been made by the Commission using consensus and they urged Members to reflect on that point.

3.8    The Commission thanked Chile and Argentina for their paper. Many Members supported the conclusions of the CCAMLR-41/BG/26, noting that all the Members' considerable efforts to build consensus are essential for fulfilling the objective of the Convention. Many Members supported the recommendations contained in the paper and supported its call for unity, peace and cooperation in all of CCAMLR's work.

3.9    The EU and its Member States expressed concern about the functioning of the Scientific Committee, in particular the approach of some Members to apply different standards to similar issues, depending on their own interests. They considered that such an approach undermines the work of the Commission and the Convention, as it is inconsistent with the principles of basing decision-making on the best available science and the precautionary approach. They also noted that one Member continues to block consensus on a range of issues based on arguments that have no scientific merit and that have been refuted repeatedly. They called on all Members to use their decision-making powers responsibility and to make genuine efforts to build consensus.

3.10    The UK made the following statement:

'We are grateful to Argentina and Chile for developing this paper. We endorse their call for unity and cooperation in CCAMLR and for a collective approach to find solutions for the challenges we face. We do not, however, agree with all of the arguments in the paper. Notably in respect of the characterisation in the paper of CM 31-01, we have set out our position in COMM CIRCS 22/39, 22/51 and 22/69 and also in detail at SCIC last week, so I will not repeat here. We also do not recognise the characterisation of the role of the CEP in the paper.

Nevertheless, we completely recognise the reasoning for tabling this paper and fear that the circumstances that lead to the highly unfortunate outcome of last year's meeting are going to repeat. Russia has again predetermined its position on a number of agenda items, without submitting any new scientific evidence or analysis. Notably in relation to its position on Subarea 48.3, its previous assertions about the status of the toothfish stock in this region were comprehensively addressed by the Scientific Committee working groups in 2019. There is just no evidence to suggest that there is anything unusual about the stock in Subarea 48.3 compared to any other toothfish fishery managed by CCAMLR. Yet Russia persists in its position. Similarly, Russia continues to block research and progress on the development of a stock assessment in Division 58.4.1, also on the basis of a spurious position not recognised by other Members of the Scientific Committee and without any engagement or constructive approach to finding a way forward.

In the view of the UK, the most damaging behaviour for the effective functioning of this Commission is behaviour that prevents the Commission from discharging its mandated functions under the Convention – notably to adopt conservation measures based on the best available science. We are dangerously close to sleepwalking into the denigration of the regulatory framework we have developed over the past 40 years. We therefore call

on all Members to engage in the work of the Commission in good faith. If it were really acceptable for each Member to simply develop political positions, based on subjective, rather than statistical, interpretations of 20 year old data, whilst simply stating that other Members need to do more scientific work – as is evidently the approach of Russia – then we could all save ourselves a great deal of time and money by closing down the CCAMLR scientific process and also engaging here on the basis of pre-determined "positions".

The UK remains fully committed to the conservation of the Southern Ocean. We will continue to ensure UK fishing vessels operate to the highest standards, and that our scientists produce world leading, verifiable science to the highest standards. We will also continue to play our part in protecting the Convention Area from illegal, unregulated and unreported fishing activities.'

3.11    The Commission noted that climate change advice has been considered in the Scientific Committee, and these considerations have been embedded in every item in the Scientific Committee's agenda and under the specific climate change agenda item.

3.12    Belgium reconfirmed its commitment to the objective of the Convention, to maintaining CCAMLR's high standards, and to upholding the integrity of both this organisation as well as the Antarctic Treaty System. Belgium emphasised the strong need for cooperation between Members, especially within the scientific community and including the active engagement and different research programs of all Members. Belgium further emphasised the importance of the precautionary principle as well as the importance of the conservation of Antarctic biodiversity and ecosystems. Belgium noted that any sustainable use of marine living resources relies on adherence to these principles and to Article II of the CAMLR Convention.

3.13    The Commission considered CCAMLR-41/BG/17, submitted by ASOC and COLTO. COLTO introduced this joint paper noting that CCAMLR now finds itself in a difficult situation, with it increasingly unable to progress on routine tasks. ASOC and COLTO believe CCAMLR needs to consider new processes to assist it in reaching consensus, and hope CCAMLR can find ways to move past the current stalemate and reclaim its status as a leading organisation.

Second Performance Review (PR2)

3.14    The Commission noted the report by the Executive Secretary on the progress of the recommendation of the Second Performance Review (PR2). The Executive Secretary referred delegates to CCAMLR-41/06 recalling this is the first update to the Commission on the progress of the PR2 since CCAMLR-38 due to the effects of the global pandemic.

3.15    The Commission noted that significant progress has been made across the recommendations of PR2 and **agreed** that the Secretariat should continue to track this progress and keep Members informed of the progress by maintaining the progress of the performance review on the CCAMLR website.

3.16    Korea specifically recalled Recommendations 11 and 18, noting that a proposal was discussed by SCIC for the review of the CCAMLR Compliance Evaluation Procedure (CCEP), Recommendation 12, noting a proposal was discussed for the review of CM 10-02 to address non-Contracting Party (NCP) vessels in transhipments.

3.17    The EU and France noted Recommendations 4 and 25, stating that work on both recommendations should be considered by the Commission. Furthermore, the EU encouraged the development and adoption of a monitoring procedure for climate change decisions.

3.18    Many Members noted Recommendation 7, regarding the identification and designation of a representative system of MPAs. Russia recalled that MPAs was a regular item on the agenda.

3.19    Australia welcomed progress on Recommendation 7 and noted that it would like to see further progress on developing a representative system of MPAs. Australia noted Recommendation 4(iii), requesting the Commission to give further consideration for the joint meeting of CCAMLR and ATCM delegates to identify opportunities for coordination and cooperation on matters of mutual interest. Additionally, Australia recalled Recommendations 5, 8 and 25, noting it would like to see further progress.

3.20    Russia noted that the significant progress has been achieved on several recommendations and recalled the discussions of SCIC on illegal, unreported and unregulated (IUU) fishing, vessel safety, and International Maritime Organization (IMO) rules to be particularly important.

3.21    China noted significant progress has been made and regarding krill management, noting that there is still a need for improvement to the scientific knowledge and to streamline this information into the management procedures. Additionally, China expressed a desire for this to be included in future work.

3.22    The Chair of the Scientific Committee (Dr Dirk Welsford (Australia)) recalled paragraphs 11.7 to 11.9 of SC-CAMLR-41, reporting on the Scientific Committee's discussion of PR2, and he highlighted the significant overlap between the performance review and the Scientific Committee's five-year Strategic Plan.

3.23    The SCIC Chair noted the discussion held in SCIC (SCIC-2022, paragraphs 157 to 160) on the second performance review and that Members were interested in making preparations for a third performance review with consideration whether there could be a focus on specific topics. Additionally, Russia noted that the financial health of the organisation is an important consideration for the future and should be included in future considerations.

3.24    ASOC noted the importance of independent performance reviews but suggested the summary provided an optimistic view of what work has been undertaken. ASOC noted its difficulty in identifying significant progress on MPAs since 2017 and recalled that Recommendation 10 on the polar code has not been implemented. ASOC noted they look forward to future reporting on the progress of the performance review.

3.25    The Chair closed Agenda Item 3.

**Management of marine resources**

Advice from the Scientific Committee

4.1     The Chair of the Scientific Committee presented the report of the Scientific Committee (SC-CAMLR-41). He highlighted that the Working Group on Incidental Mortality Associated with Fishing (WG-IMAF) had been reconvened for the first time in 11 years and that a Scientific Committee Symposium was held (SC-CAMLR-41, Annex 4) which resulted in a five-year strategic workplan and updated draft workplans and draft terms of reference for all Scientific Committee working groups, which were finalised at the 2022 Scientific Committee meeting (SC-CAMLR-41, Tables 6 to 10 and Annex 11). The Chair of the Scientific Committee thanked all Members who had participated in the deliberations of the Scientific Committee and its expert working groups. He also thanked the Secretariat for its support.

4.2     The Commission noted the Scientific Committee's advice, recommendations and detailed workplan of research and data requirements and congratulated the Chair of the Scientific Committee and the conveners of its working groups and the many scientists who had contributed to the successful outcomes of their meetings despite challenging circumstances.

4.3     Many Members expressed concern that for several topics the Scientific Committee had not been able to provide consensus advice while most Members agreed that there is clear advice based on best available science (see also SC-CAMLR-41, Annex 4, paragraph 4.1(b)i). Many Members recalled that the Commission's mandate allows it to make policy decisions based on best available science even if the Scientific Committee is not able to provide consensus advice.

4.4     Regarding the provision of best available science, the Chair of the Scientific Committee noted that scientific disagreements needed to be supported by testable hypotheses. The Commission noted that in order to ensure the integrity of science-based management approaches, there should be improved separation between the provision of advice and decision-making.

4.5     The Commission noted that the Scientific Committee has had a number of discussions on integrating climate change considerations into its analysis and advice in recent years (SC-CAMLR-41, paragraph 7.8). It also noted the Scientific Committee's agreement to hold a climate change workshop (SC-CAMLR-41, paragraph 7.10). It noted that the Scientific Committee had included into the revised terms of reference for all working groups a request that they include consideration of the impact of climate and environmental change in their advice.

Rules for Access and Use of CCAMLR Data

4.6     The Commission noted CCAMLR-41/08, which provided a summary of the working group reviews of the Rules for Access and Use of CCAMLR Data, and the discussions held during the Scientific Committee (SC-CAMLR-41, paragraphs 11.30 to 11.35).

4.7     The Commission noted that the Rules for Access and Use of CCAMLR Data are complex and that the modifications to these rules proposed by the working groups require further consideration. The Commission **endorsed** the Scientific Committee request (SC-CAMLR-41, paragraph 11.35) that the Secretariat provide a simple process diagram to

outline the workflow for data requests and that the Data Services Advisory Group (DSAG) coordinate further discussion through the DSAG e-group and the Scientific Committee working groups for consideration at CCAMLR-42. The Commission agreed to work on potential revisions to the Rules for Access and Use of CCAMLR Data intersessionally.

Krill resources

4.8    The Commission noted discussions during the Scientific Committee meeting regarding the status and trends of krill resources (SC-CAMLR-41, paragraphs 3.2 to 3.4), acoustic surveys of krill (SC-CAMLR-41, paragraphs 3.5 to 3.11), the planned krill observer workshop (SC-CAMLR-41, paragraph 3.14) and acoustic biomass estimates (SC-CAMLR-41, paragraphs 3.16 to 3.25). The Commission also noted that the SCAR Krill Expert Group (SKEG) intended to convene an online expert group to discuss and develop krill stock hypotheses in 2023 (SC-CAMLR-41, paragraph 3.28).

4.9    The Commission **endorsed** the recommendation from the Scientific Committee that details on the mesh size of any codend liners should be included as part of fishery notifications (SC-CAMLR-41, paragraph 3.17).

4.10   The Commission noted the progress made towards establishing a krill stock assessment (SC-CAMLR-41, paragraphs 3.30 to 3.34) and the spatial overlap assessment (SC-CAMLR-41, paragraphs 3.35 to 3.39). It noted that the revised estimate of gamma of 0.0338, to be used in the calculation for the Subarea 48.1 catch limits, was the first revision to this parameter for several decades.

4.11   The Commission noted with concern the >80% reported decline of the population of fur seals in the South Shetland Islands (SSI), and discussed that this could be attributed to a combination of reduced summertime krill availability, female population ageing and increased leopard seal predation of pups possibly due to climate-change induced shifts in leopard seal distributions. It noted the potential for additional pressure to be put on the population by the krill fishery and that such impacts needed to be quantified. The Commission noted that the Domain 1 MPA (D1MPA) proposal, if adopted, would holistically protect several components of the ecosystem, including the declining fur seal population. It further noted that the revised krill management approach has considered these components, including krill predator demand in spatial overlap analysis and precautionary harvest rate estimate, and the impact of climate change incorporated in krill average biomass estimates, and encouraged the continuation of the work.

4.12   The Commission welcomed the significant progress made by the Scientific Committee and recognised the extensive amount of work that had been undertaken this year, which had resulted in it being able to apply the new krill management approach to calculate new catch limits in management units within Subarea 48.1 (SC-CAMLR-41, paragraphs 3.45 and 3.46 and Table 2). It noted the Scientific Committee's consideration of the management implications of applying these new catch limits, in particular the need to acquire new monitoring data as catch limits increase, and the integration of krill management approaches in Subarea 48.1 with the D1MPA proposal (SC-CAMLR-41, paragraphs 3.43 to 3.66) to coordinate efforts and develop a coherent approach for the conservation and rational use of marine living resources.

4.13    The Commission noted that the Scientific Committee was unable to provide consensus advice (SC-CAMLR-41, paragraphs 3.67 to 3.69).

4.14    The Commission considered SC-CAMLR-41/12, submitted by China, which provided options for the implementation of an interim krill management approach for Subarea 48.1, including to simultaneous revisions of CM 51-01 and CM 51-07 together, and CM 51-07 alone, and noted that all three components of the revised management approach, including krill biomass estimation, precautionary harvest rate assessment, and krill–predator spatial overlap analysis, have been endorsed by the Scientific Committee and also noted the involvement of many Members which contributed to this success.

4.15    The Commission noted CCAMLR-41/37, submitted by Russia, which considered the establishment of a system of synoptic and regional standardised acoustic surveys in Area 48 to be a prerequisite for updating CMs 51-01 and 51-07 based on contemporary information at the scale of the krill population in this area.

4.16    Many Members noted the suggestion in SC-CAMLR-41, paragraph 3.59(ii), that the revised krill management strategy could be implemented using a staged approach by incrementally increasing catch limits, was a possible way forward.

4.17    The Commission noted that further consideration was needed regarding:

(i)     the monitoring of catch limits at smaller spatial scales (SC-CAMLR-41, paragraph 3.51)

(ii)    the harmonisation and/or integration of different spatial management initiatives within Subarea 48.1, including the ARK voluntary restricted zones and the D1MPA proposal (SC-CAMLR-41, paragraph 3.65)

(iii)   future monitoring of krill biomass and other components of the ecosystem, including fish by-catch, krill dependent predator species, especially in data-limited areas such as the Gerlache Strait, and the assessment of the potential impacts of the increased fishery on the ecosystem (SC-CAMLR-41, paragraph 3.49).

4.18    The Commission discussed a workplan to progress a holistic approach to management in Subarea 48.1, including with the D1MPA proposal and the organisation of a collaborative CCAMLR symposium integrating science, policy and industry. Time did not permit its final adoption at CCAMLR-41, but the Commission acknowledged the valuable contributions from many Members to this work and agreed that the proposal could form the basis for intersessional discussions, work by the Scientific Committee's working groups, and a future symposium, and retained the draft workplan as CCAMLR-41/BG/43.

4.19    The Commission welcomed SC-CAMLR-41/BG/07, BG/08 and BG/09 by ARK which reported its activities and some recommendations for improvement of the fishery. The Commission thanked ARK for maintaining the voluntary restricted zones to ensure the fishery was precautionary and encouraged ARK to maintain those buffer zones until such time that the Commission agrees on the implementation of the new krill management plan.

4.20    The Commission noted SC-CAMLR-41/BG/29, presented by ASOC, which provided a series of recommendations to ensure precautionary management of the krill fishery.

4.21    The Commission **agreed** to carry CM 51-04 and CM 51-07 forward to the 2022/23 fishing season.

Fish resources

Icefish

4.22    The Commission **endorsed** the advice of the Scientific Committee on catch limits for mackerel icefish (*Champsocephalus gunnari*) in Subarea 48.3 for the 2022/23 season and Division 58.5.2 for the 2022/23 and 2023/24 seasons (SC-CAMLR-41, paragraphs 3.81 and 3.84).

Toothfish (*Dissostichus* spp.)

4.23    The Commission considered the advice of the Working Group on Statistics, Assessments and Modelling (WG-SAM), the Working Group on Fish Stock Assessment (WG-FSA) and the Scientific Committee on catch limits for the toothfish fishery in Subarea 48.3. Many Members had agreed that the catch limit for the toothfish fishery in Subarea 48.3 is based on the best available science. This issue generated a significant number of statements from Members during the meeting this year (paragraphs 1.25 to 1.27) as it had last year (CCAMLR-40, paragraphs 6.18 to 6.37).

4.24    The Commission noted that the Scientific Committee could not provide consensus advice on catch limits for Patagonian toothfish (*Dissostichus eleginoides*) in Subarea 48.3 (SC-CAMLR-41, paragraph 3.110). Many Members considered that the catch limits referred to in SC-CAMLR-41, paragraph 3.109, were based on best available science and should be the basis of the decision of the Commission. Many Members strongly encouraged the Commission to agree a catch limit by consensus based on the advice of the Scientific Committee. Russia reiterated its view that an international survey should be undertaken in Subarea 48.3 in the 2022/23 season, but many Members noted that the suggestions did not have any scientific justification.

4.25    Many Members supported the proposal that the catch limit specified in SC-CAMLR-41, paragraph 3.109 (1 970 tonnes for 2022/23 and 2023/24) be adopted and that it would be consistent with the precautionary yield estimated using the CCAMLR decision rules, the process for setting catch limits in previous years, and the use of best available science.

4.26    Many Members expressed their concern with the situation, noting that consensus requires an active engagement in finding solutions to problems and noted that one Member has persistently avoided engagement to discuss the way forward, resulting in a lack of consensus on a number of issues. Furthermore, many Members noted that, in their opinion, Russia was ignoring and actively blocking the use of the best available science provided by the Scientific Committee and its working groups. Some Members noted that, in their view, in the Scientific Committee, Russia had indicated that there was no science that could be presented that would change its position on the issue of the Subarea 48.3 toothfish fishery (SC-CAMLR-41, paragraph 3.106).

4.27    Russia noted that the documents submitted to CCAMLR meetings for 2021 and 2022 show that, as before, fish from 5 to 7 years of age are involved in the toothfish fishery in Subarea 48.3 and are actively caught. The basis of the toothfish fishery in Subarea 48.3 is immature fish 8–13 years old at all depths (SC-CAMLR-41, paragraph 3.93).

4.28    Russia noted that the precautionary catch limit calculated using the CCAMLR decision rules will be achieved by the catch of immature fish and emphasised the need to clarify how such a fishery responds to the rational use of the *D. eleginoides* resources in Subarea 48.3. Russia has repeatedly highlighted this specific management of the toothfish fishery in Subarea 48.3 and has urged CCAMLR to pay attention to the irrational use of the resource for *D. eleginoides* in the CAMLR Convention Area.

4.29    Russia maintained its position that the *D. eleginoides* population in Subarea 48.3 needs to be protected and maintains the proposal that the precautionary approach to the use of the *D. eleginoides* stock in the CCAMLR area (Subarea 48.3) should be reviewed as the current approach does not ensure the sustainable and rational use of this *D. eleginoides* resource (SC-CAMLR-40/15; SC-CAMLR-40, paragraphs 3.47 and 3.48).

4.30    Russia noted that its specific proposals regarding the regulation of the toothfish fishery in Subarea 48.3 (limiting the size of *D. eleginoides* catches, fishing only at depths of 1 000 m, reducing the catch limit to 500 tonnes, according to the fishing grounds with depths from 1 000 to 2 250 m; conducting an international survey to assess toothfish stock) (SC-XXXVII/14 Rev. 2), were ignored.

4.31    Russia noted the principles and objectives of the Convention, and considered it fundamentally important that the management of *D. eleginoides* resources in Subarea 48.3 be carried out on the basis of a balance between conservation and rational use (Article II of the Convention).

4.32    Some Members noted that according to CM 31-01, limitations of catch permitted in Subarea 48.3 shall be based upon the advice of the Scientific Committee.

4.33    The USA made the following statement:

'We find the Scientific Committee's discussion on the toothfish fishery in Subarea 48.3 to be compelling; there is no scientific reason to close the toothfish fishery in Subarea 48.3. In our view, the Commission should adopt the catch limit advised in paragraph 3.109 of the Scientific Committee's report, reinstate CM 41-02, and authorise fishing for toothfish in the subarea during the 2022/23 fishing season.

We are not convinced by Russia's assertion that this fishery is somehow overexploited, in fact, it is clear from the scientific record that this assertion is based on a falsified hypothesis. We cannot find any rationale for why Russia continues to ignore new data and analyses that disprove its hypothesis and simply conclude that Russia's approach is intended to sow discontent and crush the spirit of collaboration that many of us share in CCAMLR.

Colleagues, we would like to work with all of you to negotiate a solution to this problem; doing so is in all our best interests and can demonstrate that CCAMLR remains a

premier venue for international cooperation. If we are not able to agree again this year, we fear this organisation may be viewed by the international community as a failure.'

4.34    The UK noted that Russia continues to block consensus on a catch limit for the Subarea 48.3 toothfish fishery based on a spurious scientific rationale that has been rejected by all other Members in the scientific working groups, the Scientific Committee and Commission since 2018. The UK has provided additional scientific analysis, at considerable cost, to further demonstrate the precautionary nature of the fishery, in line with all other toothfish fisheries in the Convention Area.

4.35    The UK agreed with previous speakers that there is no evidence that there is any difference between the Subarea 48.3 fishery and other directed toothfish fisheries or that the Subarea 48.3 fishery was the only directed fishery in the Convention Area as incorrectly stated by Russia during the meeting of the Scientific Committee. Russia continues to ignore the best available science, instead referencing selected data prior to 2006, despite there being no evidence of overexploitation as agreed by all other Members.

4.36    The UK requested clarification from the Chair of the Scientific Committee concerning his comment that one Member had stated during the working group that 'no science could be presented that would change its position', specifically whether this one Member was Russia and whether this comment was made in relation to the Subarea 48.3 toothfish fishery. The Scientific Committee Chair nodded in confirmation. The UK noted this meant that Russia must have no credible scientific reason for blocking the adoption of this catch limit and could only be pursuing political objectives.

4.37    The Commission discussed three options regarding the Subarea 48.3 fishery for the 2022/23 season.

4.38    The Commission was unable to reach consensus on any of the three options put forward for discussion.

4.39    The Commission **endorsed** the advice of the Scientific Committee (SC-CAMLR-41, paragraph 3.108) for an independent review of relevant data, stock assessment and application of CCAMLR decision rules for all toothfish fisheries subject to the CCAMLR harvest control rule, including Subarea 48.3, in 2023, to further ensure that the management of toothfish is precautionary and underpinned by the best available science.

4.40    The Commission **endorsed** the advice of the Scientific Committee (SC-CAMLR-41, paragraph 3.112) for the catch limit for Antarctic toothfish (*D. mawsoni*) in Subarea 48.4.

4.41    The Commission **endorsed** the advice that the prohibition of directed fishing for *D. eleginoides* in Divisions 58.5.1 and 58.5.2 and Subareas 58.6 and 58.7 outside areas of national jurisdiction will remain in force (SC-CAMLR-41, paragraph 3.113).

4.42    The Commission considered the advice of the Scientific Committee to refine the requirements for research plans in exploratory fisheries conducted in accordance with CM 21-02, paragraph 6(iii), by adding a new annex to CM 21-02 (SC-CAMLR-41, paragraph 3.116). However, the Commission did not reach consensus on the development of such a new research plan annex to CM 21-02.

4.43    The Commission **endorsed** the Scientific Committee's advice on the use of the updated decision tree for the trend analysis (WG-FSA-2022, Figure 2).

4.44    The Commission **endorsed** the advice of the Scientific Committee to use of the catch limits in SC-CAMLR-41, Table 4, for toothfish fisheries in Subareas 48.6 and 88.2 and Division 58.4.2 (SC-CAMLR-41, paragraphs 3.117, 3.118, 3.124 and 3.125).

4.45    The Commission **endorsed** the research plan for the exploratory toothfish fishery by Australia, France, Japan, Korea and Spain in Division 58.4.2, but it did not reach consensus on this research plan for Division 58.4.1 (SC-CAMLR-41, paragraph 3.136).

4.46    Russia reminded the Commission that the Scientific Committee considered the assessment of *Dissostichus* spp. in data-limited fisheries to be of a high priority, with special attention needed on the use of different longline gear types in research plans and issues associated with gear effects (SC-CAMLR-XXIX, paragraphs 3.125 to 3.145; SC-CAMLR-XXX, Annex 7, paragraph 6.74; SC-CAMLR-XXXVI, paragraph 3.115).

4.47    Russia noted that the use of different gear types and constructions for the implementation of the research plan for the *Dissostichus* spp. exploratory fishery in East Antarctica (Divisions 58.4.1 and 58.4.2) is a critical factor for the efficiency and reliability of this research plan in data-limited fisheries. Russia noted that using different gear affects the performance of tag releases and recaptures and reminded the Commission that tag survival rate varied by gear type. It also recalled that 5 509 fish were tagged with 26 tagged fish recaptured during the period from 2011/12 to 2017/18 during the implementation of the research plan in East Antarctica.

4.48    Russia noted that the research plan for the *Dissostichus* spp. exploratory fishery in East Antarctica (Divisions 58.4.1 and 58.4.2) should fully comply with the requirements of CM 24-01 (Annex 24-01/A, format 2), including standardisation of the fishing gear. There are no provisions in the Rules of Procedure of the Scientific Committee and the Commission for partial implementation of a CCAMLR conservation measure.

4.49    Russia stated that the new research plan for the *D. mawsoni* exploratory fishery in East Antarctic (Divisions 58.4.1 and 58.4.2) in the 2022/23 to 2025/26 seasons does not comply with CM 21-02 and will not provide adequate data to achieve the main goals and objectives of this new research plan.

4.50    Australia made the following statement:

'Australia is disappointed that the Commission could again not find consensus on our research plan proceeding in Division 58.4.1. The lack of consensus is based again on the claim by Russia that multiple gear types could not be used in this area. There is no such requirement for standardised gear types.

Since 2018, the co-proponents of the Division 58.4.1 research plan have provided considerable scientific evidence to the Scientific Committee and its working groups supporting CCAMLR's approach for the use of various longline gear types in exploratory fisheries, and that we can account for various longline gear types in analyses and integrated assessments.

Indeed, as has been stated many times now, a number of integrated assessments, including the one in the Ross Sea, have been developed and are currently in use in the Convention Area, and they are based on data collected using mixed gear types.

Russia has repeatedly stated that multiple gear types cannot be used in Division 58.4.1 but has yet to provide any scientific evidence supporting this claim. In addition, it is unclear why this purported requirement applies only to Division 58.4.1, but not other areas (WG-FSA-2022, paragraph 5.31). Australia is hopeful that a new annex to CM 21-02, as recommended by the Scientific Committee, could resolve this issue, and provide clarity, which is why we support this annex and the recommendation of the Scientific Committee in this regard.

However, we are pleased that the research plan for Division 58.4.2 has been endorsed by the Scientific Committee and the Commission.'

4.51    France made the following statement:

'France considers that the research plan is fully compliant with the conservation measures in force, including the mention of "calibration/standardisation" which is clearly assessed on page 13 of the research plan. France also stresses its commitment to the success of the research plan for Divisions 58.4.1 and 58.4.2.

We recall that the resumption of fishing in Division 58.4.1 is very important for the collection of data needed to enable toothfish stock assessment in this area, and which are also necessary for a better knowledge of the functioning of the ecosystem. France stresses that it is regrettable that no exploratory fishing activities can take place in Division 58.4.1, despite the solid scientific information available, accumulated by the Members participating in the research plan over the last few years.

We note that the blocking by one Member of this exploratory fishery also interrupted an important research effort into the functioning of the ecosystem in this vast and little explored area. The multi-Member research plan involving Australian, French, Japanese, Korean and Spanish , , scientists allowed for coverage of a wide range of scientific disciplines, which would not otherwise have been possible. France regrets that this collaborative work cannot go ahead.'

4.52    Korea made the following statement:

'Korea thanks those Members who are working on a joint research plan with Korea. The joint research in Division 58.4.1 has been halted from 2018, and over the four years, the Commission has been deprived of good opportunities to collect important data that would have significantly contributed to the objectives of the Commission.

This year, the Members submitted a new research plan for the 2022/23 fishing season with an updated stock hypothesis based on the scientific advice that gear standardisation does not affect the result of the research operation, and the merit of scientific research outweighs formatting issues. Also, gear standardisation does not mean that all gears should be identical, and we are not convinced as to why this issue should serve as a reason for the research not being able to go ahead.

'Korea is extremely concerned that the last three years' effort has not made any difference and frustrated that a research plan that has a solid scientific foundation cannot be accepted by one Member. The continued lack of data in the data-limited area will significantly undermine the information and database that is absolutely necessary for science-driven conservation and management of Antarctic marine living resources.

Korea calls on the Member to reconsider its position and to exercise flexibility so that this long-halted research operation can resume and make contributions to the information base of the Commission.'

4.53    Many Members voiced concern that Russia was once again blocking the research fishery proposal for Division 58.4.1 but also blocking consensus to add an annex to CM 21-02 which would alleviate Russia's misinterpretation of the use of standardised gear contained in the annex. The UK recalled that Russia continues to present spurious scientific arguments to block consensus for fisheries in which it is not involved.

4.54    The Commission also considered the position of some Members in SCIC (SCIC-2022, paragraph 152) highlighting that a requirement to include all considerations listed in CM 24-01, Annex 24-01/A, format 2, would require longline fishing vessels to describe trawl net configurations, and therefore this position cannot be reflective of the conservation measure requirements.

4.55    The Commission **endorsed** the advice of the Scientific Committee that both the tagging rate, and tag-overlap statistic, be specified and applied at the smallest area to which a catch limit applies (SC-CAMLR-41, paragraph 3.121).

4.56    The Commission noted the joint COLTO–CCAMLR tagging workshop to be held in March 2023 in Hobart, Australia (SC-CAMLR-41, paragraph 3.122).

4.57    The Commission **endorsed** the advice of the Scientific Committee that the Ross Sea Data Collection Plan commence for the 2023/24 to 2027/28 fishing seasons, as outlined in WG-FSA-2022, Tables 1 and 2 (SC-CAMLR-41, paragraph 3.142).

4.58    To improve spatial structure in the small-scale research unit (SSRU) 882H fishery, the Commission **endorsed** the Scientific Committee's advice to use option 3 in Table 3 of WG-FSA-2022, where structured fishing with research hauls on minor seamounts (which have been less fished to date as specified in WG-FSA-2021/29, Figure 2) would precede fishing elsewhere in the SSRU. In addition, the Commission **agreed** delaying the start of fishing in this SSRU by two weeks, as this would increase the likelihood that sea-ice conditions would allow vessels to access an increased number of seamounts in this region, and so increase to value of data collected during research hauls in this SSRU (SC-CAMLR-41, paragraphs 3.145 and 3.146).

4.59    The Commission considered the number of research hauls (CM 41-01, paragraph 4) to be required on SSRU 882H minor seamounts (as defined in WG-FSA-2021/29) prior to vessels fishing elsewhere in the SSRU. The Commission **agreed** that five research hauls on minor seamounts should be completed each season prior to fishing elsewhere in the SSRU.

4.60    The Commission considered CCAMLR-41/38, submitted by Russia, proposing the Commission review the procedural and implementational aspects of *D. mawsoni* fisheries

classifications in the regulatory framework and establish the status of existing fisheries (to clarify fishery nomenclature). Russia believed the outcome of the first stage should be a CCAMLR regulatory framework approved by the Commission in its entirety, including the procedural and implementational aspects of fisheries classification. The outcome of stage two should be a status allocated to each existing fishery in the Convention Area as approved by the Commission.

4.61    The Commission encouraged Members to work collaboratively to clarify the regulatory framework intersessionally in the 'Regulatory framework and clarification on fisheries nomenclature' e-group.

Scientific research under Conservation Measure 24-01

4.62    The Commission considered the advice of the Scientific Committee on activities conducted in 2021/22 relating to the three proposals under CM 24-01 (SC-CAMLR-41, paragraphs 4.1 to 4.8 and 3.137 to 3.140).

4.63    The Commission **endorsed** the recommendation by the Scientific Committee (SC-CAMLR-41, paragraph 4.8) that the research plan for *Dissostichus* spp. by Korea and Ukraine in Subarea 88.3 should continue, noting that the catch limits are based on the trend analysis as shown in SC-CAMLR-41, Table 4.

4.64    The Commission **endorsed** the recommendation of the Scientific Committee (SC-CAMLR-41, paragraph 3.138) to continue the Ross Sea shelf survey to monitor abundance of *D. mawsoni* in the southern Ross Sea.

4.65    The Commission **endorsed** the catch limits for the Ross Sea shelf survey for the next three seasons of this survey:

> (i)    2022/23: 99 tonnes (including the core strata and the Terra Nova Bay stratum)
> (ii)   2023/24: 69 tonnes (including the core strata and the McMurdo Sound stratum)
> (iii)  2024/25: 99 tonnes (including the core strata and the Terra Nova Bay stratum).

4.66    The Commission considered three methods for allocating catch for the Ross Sea shelf survey.

4.67    The UK, although noting that it would not block consensus, recalled that method 3 would be in contravention of CM 91-05 and questioned the failure of the Commission to adhere to requirements it had agreed for itself, on this and other issues.

4.68    The Commission **agreed** to use method 3 which was used previously from 2019/20 to 2021/22 (SC-CAMLR-41, Table 5).

4.69    The Commission **endorsed** the recommendation of the Scientific Committee (SC-CAMLR-41, paragraph 4.2) regarding the proposal by Ukraine to conduct a local acoustic trawl survey of *C. gunnari* in Subarea 48.2.

4.70    The Commission noted the catch limits proposed by the Scientific Committee (SC-CAMLR-41, paragraphs 4.5 and 4.6) and **endorsed** a precautionary catch limit of

120 tonnes of *C. gunnari*. The Commission also **agreed** a krill by-catch limit of 279 tonnes and that any krill caught in the survey should be included in the total catch for krill in Subarea 48.2.

Non-target species

    Fish and invertebrates

4.71    The Commission noted the discussions of the Scientific Committee on fish and invertebrate by-catch (SC-CAMLR-41, paragraphs 5.1 to 5.7), including the monitoring of by-catch species in the Ross Sea region toothfish fishery as part of the Ross Sea medium-term research plan (WG-FSA-2022/45).

4.72    The Commission noted the proposed inclusion of a poster and training video for skate handling and injury assessment (SC-CAMLR-41, paragraph 5.6) on the CCAMLR website and the proposed toothfish tagging workshop which will include discussion on handling practices to maximise skate survival after release.

4.73    The Commission **endorsed** the inclusion of an additional field on the fine-scale catch and effort data form (C1 trawl fisheries) to identify if information on the form was collected by the crew or the scientific observer.

    Seabirds and marine mammals

4.74    The Commission noted the discussions of the Scientific Committee on the outcomes of WG-IMAF (SC-CAMLR-41, paragraphs 5.8 to 5.37).

4.75    The Commission welcomed the information that the extrapolated number of seabird mortalities from provisional data resulting from CCAMLR longline fishing in 2022 was the lowest total on record.

4.76    The Commission noted that the success of seabird mortality reductions in CCAMLR through the implementation of mitigation measures was due to the past efforts of WG-IMAF. The Commission further noted the recovery of the white-chinned petrel (*Procellaria aequinoctialis*) population at Possession Island (Crozet Islands, Subarea 58.6), and recognised that integrated management of ecosystems through all tools available, including fisheries management actions through a combination of effective seabird by-catch mitigation measures on fishing vessels and actions implemented to reduce IUU fishing in the Convention Area, and ecosystem management actions through the control of introduced species, particularly rodents and cats, as one of the main objectives of the management plan of the French Southern Territories National Nature Reserve in Kerguelen and Crozet have made it possible to achieve this remarkable objective.

4.77    The Commission noted the inclusion of ACAP guidelines for the safe handling and release of live-caught seabirds hooked or entangled in longline fishing gear into the Scheme of International Scientific Observation (SISO) manuals, and publication of the guideline sheets on the CCAMLR website for Members to access (SC-CAMLR-41, paragraph 5.30).

4.78    The Commission noted the recommendation of the Scientific Committee to reintroduce recording of the severity of warp strikes by seabirds on krill vessels using the protocols for SISO observers on finfish trawl vessels (SC-CAMLR-41, paragraph 5.11).

4.79    The Commission **endorsed** the recommendation of the Scientific Committee for the extension of the existing derogation on the use of net monitoring cables in CM 25-03 for one year, with additional conditions outlined in SC-CAMLR-41, paragraph 5.32, where applicable.

4.80    The Commission noted the establishment of the 'IWC–SC-CAMLR collaboration' e-group including experts from the Scientific Committee of the IWC (IWC-SC) intersessional group on whale entanglement in the krill fishery, for developing a data collection template and accompanying instructions for vessels to report standardised data in the event of a whale by-catch event (SC-CAMLR-41, paragraphs 5.21 and 5.22).

4.81    The Commission further supported the development of training materials to support the collection of data on incidental mortalities of seals, and the development of a gear library to document the marine mammal exclusion devices used by trawl vessels operating within the Convention Area (SC-CAMLR-41, paragraphs 5.26 to 5.28).

4.82    The Commission welcomed the offer from Norway to circulate information on modifications made to marine mammal exclusion devices to minimise the risk of whale by-catch and encouraged the further development of technologies and mitigation measures to decrease the risk of entanglement and by-catch of marine mammals (SC-CAMLR-41, paragraph 5.29).

4.83    Russia noted that research conducted on board the RV *Atlantida* in 2020 in Subareas 48.1 and 48.2 (WG-EMM-2021/31) included observation of krill-dependent predators on 180 hauls and during acoustic survey transects and undertook to present the results of these observations to the 2023 meeting of the Working Group on Ecosystem Monitoring and Management (WG-EMM).

4.84    The Commission noted the Scientific Committee decision to provide a standing invitation to experts from ACAP, ARK, COLTO and IWC at future meetings of WG-IMAF, noting their valuable input to the meeting.

Bottom fishing and vulnerable marine ecosystems

4.85    The Commission noted the discussions of the Scientific Committee on bottom fishing and vulnerable marine ecosystems (SC-CAMLR-41, paragraphs 5.37 to 5.46).

4.86    The Commission **endorsed** the addition of eight new vulnerable marine ecosystems (VMEs) in Subarea 48.1 to be included in the CCAMLR VME registry (SC-CAMLR-41, paragraph 5.38).

4.87    ASOC welcomed the endorsement of the eight VMEs, and noted it was encouraged by the approach to documenting these VMEs, which brought together governmental organisations and civil society. ASOC also thanked Germany for its work on fish nesting habitat and noted it was important for CCAMLR's credibility to protect these areas.

4.88    The Commission noted the recommendation of the Scientific Committee to use a modification of CM 22-06 as a mechanism to protect 'fish nest areas' detailed in SC-CAMLR-41/BG/05.

4.89    The Commission noted that no consensus could be reached on amending CM 22-06 as recommended by the Scientific Committee. Some Members considered that these recommendations could be better addressed through a self-standing conservation measure. The EU and its Member States submitted a proposal for a new conservation measure to protect fish nest areas in the Convention Area, which was discussed under agenda item 9 (paragraphs 9.14 to 9.18).

4.90    Many Members noted that the advice from the Scientific Committee on the importance of protecting fish nest areas was clear (SC-CAMLR-41, paragraph 5.42).

4.91    Some Members considered that protecting sensitive areas such as fish nests was conceptually different from protecting other benthic features, and required a management framework, additional science, and indicators to be developed so that it could be applied to other areas in the Convention Area.

Marine debris

4.92    The Commission noted the discussions by the Scientific Committee on marine debris (SC-CAMLR-41, paragraphs 5.47 to 5.52).

4.93    The Commission **endorsed** the recommendations of the Scientific Committee that:

(i)    marine debris and lost gear be summarised in the report by the Scientific Committee to the CEP

(ii)    the 'Intersessional Correspondence Group on Marine Debris' e-group be used to progress discussions on marine debris intersessionally.

4.94    Recalling the request by the Scientific Committee (SC-CAMLR-41, paragraphs 5.50 and 8.3) and SCIC (SCIC-2022, paragraph 116), the Commission **recommended** that discussions be reinitiated on the mechanisms to reduce gear loss through improved marking techniques in the 'Unidentified fishing gear in the Convention Area' e-group.

4.95    COLTO noted the decreasing trend in lost longline gear (WG-FSA-2022, paragraph 6.28) and advised it would be working closely with longline fishing gear manufacturers to further minimise lost fishing gear via an industry-led workshop. COLTO looked forward to working with the Scientific Committee to find practical solutions to this issue in CCAMLR.

4.96    The Chair closed Agenda Item 4.

**Spatial management**

5.1     The Commission noted the discussions held during the meeting of the Scientific Committee on the proposal to merge the management plans for Antarctic Specially Protected Area (ASPA) No. 152 Western Bransfield Strait and ASPA No. 153 Eastern Dallmann Bay (SC-CAMLR-41, paragraphs 6.30 to 6.39) and noted CCAMLR-41/BG/29 which presented highlights of scientific research results in these ASPAs.

5.2     Some Members noted that the proposed expansion of ASPA Nos 152 and 153 sent to CCAMLR for approval was a major change and that both the justification for the change as requested by WG-EMM and the revised management plan had not been provided to the Scientific Committee and the Commission for evaluation. China noted that it was therefore impossible to evaluate to what extent the updated management plan would affect CCAMLR-related activities.

5.3     Many Members did not agree with the comments made by China and Russia.

5.4     The Commission was informed by the USA that the revised management plan has been available from the CEP website and had been provided to the Scientific Committee (Agenda Item 6.2, WG-EMM-2022/45) and in a supplemental document which was presented orally to the Scientific Committee.

5.5     The Commission did not reach consensus to approve the revised management plan for ASPAs Nos 152 and 153.

5.6     Many Members noted that the intent of ATCM Decision 9 (2005) was to allow CCAMLR to identify the actual harvesting, or potential capability of harvesting, of marine living resources which might be restricted by a site designation, and that the proposal would not cause any such restrictions. Furthermore, most Members considered that sufficient scientific justification for the revised ASPA management plans had been provided to the Commission and Scientific Committee. In addition, they further noted that the lack of consensus will send a message of non-cooperation to the CEP and ATCM as these bodies relied on CCAMLR's consideration of the issue. Some Members noted that these ASPAs did not meet the outlined criteria for Decision 9 (2005) and that the Commission did not need to review the proposal.

5.7     The Commission requested the Chair of the Scientific Committee report on this discussion to the CEP in 2023.

5.8     Many Members and ASOC noted that Annex V of the Protocol states that any area, including any marine area, may be designated as an ASPA or Antarctic Specially Managed Area (ASMA) and that ATCM Decision 9 (2005) confirms that prior CCAMLR approval is not required for all ASPAs or ASMAs, but only to those that may affect CCAMLR activities. As such, these Members and ASOC noted that the ASPAs considered could be endorsed without further delay.

5.9     The Commission **endorsed** the revised management plan proposal for ASPA No. 145.

Proposals for marine protected areas (MPAs)

5.10    The Commission considered CCAMLR-41/34, submitted by Argentina and Chile, which presented a revised proposal for a conservation measure establishing an MPA in Domain 1 (Western Antarctic Peninsula and South Scotia Arc). The proponents highlighted the modifications made to the proposal over the years following feedback from interested parties through a consultative, transparent and inclusive process. The proponents noted that the Antarctic Peninsula is one of the areas most affected by climate change on the globe and that these effects are compounded by other stressors such as tourism and fishing activities. The proponents indicated that the proposal included a krill fishery zone which allowed flexibility for the future revision of the krill management strategy. They highlighted the envisioned interplay between the proposed MPA and the fishery whereby the MPA would enable a spill-over effect, increased productivity, the determination of reference points to assess fishery impacts and provide protection for krill nursery areas, while the fishery would assist in scientific research through data collection.

5.11    The Commission congratulated the proponents for the extensive work and the adjustments made to the proposal following feedback from Members and, while noting the 143 data layers used to establish a baseline dataset relevant to the proposal, it recalled that the Scientific Committee had noted that Domain 1 was one of the relatively data-rich regions in the Convention Area, and that the research activities identified could provide a firm basis for developing a research and monitoring plan (RMP) for the D1MPA (SC-CAMLR-41, paragraph 6.2). It also noted that the D1MPA encompassed the area of concern to fur seal populations (South Shetland Islands; SC-CAMLR-41, paragraphs 3.36 and 3.39; paragraph 4.11).

5.12    Most Members supported the proposal and noted it presented the best available science. They recalled the Commission's engagement to establish a representative network of MPAs by 2012 and that under CM 91-04 the development of an RMP was not a prerequisite to the establishment of an MPA. They also noted the need for harmonisation between the different area-based management tools in the region (paragraph 4.18).

5.13    Russia noted its concern, as outlined in CCAMLR-41/BG/33, relating to the scientific and legal aspects of this MPA that required clarification. Russia noted the need for criteria to assess conservation objectives, the need for baseline data collection and an RMP prior to MPA establishment, the development of indicators to assess the effectiveness of the MPA, justifications for the proposed boundaries and duration, and explanation of the relationship between the D1MPA and the South Orkney Islands southern shelf (SOISS) MPA. Russia emphasised that MPA proposals should be considered in conjunction with the other conservation measures to ensure systemic approach to conservation of marine living resources. It stressed the significant difference of requirements applicable to establish limitations under conservation measures and under MPAs as proposed.

5.14    Russia noted the need for clarity on how the creation of the D1MPA will contribute to the protection of marine ecosystems, biodiversity and habitats from climate change. In Russia's opinion, CCAMLR-41/34, Draft CM 91-XX, does not contain sufficient procedural and implementation measures, namely: procedures for reviewing the boundaries and duration of the D1MPA; procedures for monitoring and the periodic review of MPAs; procedures and criteria in accordance with which the MPA ceases to exist, including setting precedents for early closure. Russia noted that it did not agree with paragraph 14 (Draft of CM 91-XX), according

to which the D1MPA can exist without an approved RMP for many years. In Russia's opinion, establishing the D1MPA should be carried out by approving the entire package of necessary documents by the Commission, and an integral part of such a package is the MPA RMP. Russia noted that key characteristics of ecosystem processes and biodiversity, as well as their associated measurable monitoring indicators and indicators of achievement of the objectives of the MPA, should be recorded in the RMP for the D1MPA. In Russia's opinion, such information must precede the establishment of a D1MPA and not be the focus of long-term research conducted under the RMP as envisaged by the Draft of CM 91-XX (Draft of CM 91-XX, Annex 91-XX/C, paragraph 4).

5.15    China shared some of these concerns and noted that many issues have been raised over the years since 2017 and are still outstanding in the Scientific Committee. China appreciated the information provided by the proponents on the comprehensive scientific activities of Members in this region, and encouraged the proponents to provide scientific data for updating priority elements for the RMP for the MPA proposal. Thus, China noted the proposal did not constitute best available scientific data, and that it was not mature enough for approval. China also noted the rich discussion on the scientific research and management related to the krill fisheries in this year.

5.16    Argentina thanked Russia and China for their comments, and noted that proponents had already answered these concerns through working and background papers submitted both to the Scientific Committee and Commission (SC-CAMLR-37/BG/07; SC-CAMLR-37/BG/08; SC-CAMLR-38/BG/22; SC-CAMLR-41/BG/30; CCAMLR-38/BG/22), and also during plenary discussions (SC-CAMLR-37, paragraph 6.53;SC-CAMLR-38, paragraphs 6.55 and 6.56; CCAMLR-37, paragraphs 6.48 and 6.54; CCAMLR-39, paragraph 5.51). Argentina noted that proponents are open to have conversations regarding these concerns, and that most of the issues could be addressed through the RMP, encouraging all Members to take part in its development. Finally, Argentina does not agree that CM 91-04 establishes the requisite of an RMP prior to the adoption of an MPA, and the D1MPA proposal has all the required elements.

5.17    The Commission noted that CM 91-04 stipulated that the conservation measures establishing MPAs shall include priority elements of an RMP and any interim research and monitoring arrangement until those plans are adopted (CM 91-04, paragraph 3iv), and most Members considered that such elements were set out in the proposal.

5.18    Most Members congratulated the proponents for addressing feedback through the years, reiterated that their proposal constituted best scientific evidence available and was well justified, clear and had attainable objectives. They recalled the SCAR lecture (paragraphs 2.9 and 2.13) and the existence of strong evidence supporting the role of MPAs in protecting biodiversity and as providers of refuge for adaptation to climate change in the absence of human activities. They also noted that the D1MPA would enable ecosystem resilience to climate change impacts in the area of the globe most affected by climate change.

5.19    Some Members also noted the 143 data layers included in the D1MPA proposal and highlighted the disparity between the amount of information that is requested for conservation initiatives to be adopted versus the minimum scientific and monitoring requirements for fishing activities to proceed, denoting the need to balance such disparities which seem to be making the work of this Commission increasingly stray from the objectives of the CAMLR Convention.

5.20    ASOC also thanked Argentina and Chile for their strong proposal for an MPA in Domain 1, noting that over 140 data layers had been compiled to support the future development of an RMP. ASOC also encouraged the Commission to harmonise the development of this MPA with the revised management of the krill fishery and to designate the D1MPA without delay.

5.21    The Commission considered CCAMLR-41/27, submitted by Australia, the EU and its Member States, India, New Zealand, Norway, Korea, Ukraine, the UK, the USA and Uruguay, which presented a draft conservation measure for an East Antarctic MPA. The proponents noted that the proposed MPA will conserve representative areas of biodiversity, including nursery areas for krill and toothfish, and foraging areas for predators and establish scientific reference areas for monitoring natural variability, human activities and long-term change. The proposal balanced conservation and rational use, and was based on the best scientific evidence available as agreed by the Scientific Committee. The proponents noted that the proposal was ready for adoption by the Commission and called on all Members to support it.

5.22    Australia made the following statement:

'The Commission has committed to establishing a representative system of marine protected areas in the Convention Area.

We underline the Scientific Committee endorsed the East Antarctic marine protected area proposal as based on the best available science.

The establishment of the East Antarctic marine protected area will contribute to the Convention's objective to conserve Antarctic marine living resources.

Like other MPAs, the East Antarctic marine protected area will: ensure protection of marine ecosystems, biodiversity and habitats to maintain their viability and integrity in the long term; protect key ecosystem processes, habitats and species, including populations and life-history stages; and establish scientific reference areas for monitoring natural variability, human activities and long-term change.

It also allows for sustainable fishing, consistent with the scientific and conservation objectives of the MPA.

This will be to the benefit of all Members. Australia looks forward to further discussion on progressing MPAs at this meeting. Given there is no impediment to adopting this MPA, we urge the Commission to do so.'

5.23    On behalf of Mr O. Poivre d'Arvor (Ambassador of France for the Poles and Maritime Issues), France read his statement:

'France fully supports the statement already made on behalf of the EU and its Member States.

I would like to address this agenda item dedicated to MPAs in order to stress the extent to which the work of our Commission is scrutinised and expected throughout the world, well beyond these walls. Governments and public opinion alike fail to understand why the discussions we started several years ago have not yet reached a satisfactory

conclusion. This inertia undermines the credibility of our mutual commitment to protect Antarctica. Furthermore, it challenges the work accomplished by our predecessors by casting doubt on our ability to follow their example.

Only half a century ago, in the midst of the Cold War and despite intense international tensions, our countries were able to wisely carry the vision of Antarctica that brings us together today, the vision of an exceptional continent, which is "in the interest of all mankind" as defined in the Antarctic Treaty, to which twelve countries were the original Consultative Parties: Argentina, Australia, Belgium, Chile, France, Japan, New Zealand, Norway, South Africa, the United Kingdom, the United States and the USSR, i.e. today's Russia. This exemplary Treaty was joined by other countries as Consultative Parties, including China in 1983, and many other nations, represented here today.

In 1975, the Antarctic Treaty Consultative Parties decided to seek agreement to establish a wide-ranging conservation convention for the protection of Antarctic species against irreversible damage caused by unregulated fishing. This led to the adoption, on 20 May 1980, of the Convention on the Conservation of Antarctic Marine Living Resources, which entered into force on 7 April 1982, 40 years ago!

These commitments made by our forebears, to the conservation and protection of the Antarctic and the surrounding waters were visionary. Overcoming their differences, sovereignty claims and economic interests, they founded a community based on goodwill and science around a continent about which little was known at the time.

Antarctica has since spoken. In the 1980s, Russian and French teams in particular were able to identify what is known today as climate change from ancient ice cores. Antarctica sounded the alarm, pointing to greenhouse gas emissions ($CO_2$) as a threat for the coming decades. As we all know, global warming, the tragedy of which we are the witnesses, actors and victims, is the major issue for our generation and generations to come. In addition to the irreversible melting of the Greenland ice sheet, the movement of Antarctic glaciers, both in the West and now in the East, promises a dramatic rise in sea levels. From recent conversations with IPCC experts, I understand that by 2100 they could be as much as one and a half to two metres above present levels worldwide. This would mean the displacement of two billion people due to climatic changes, and significant damage to the world's entire coastline, which would be a deplorable scenario.

Antarctica is in trouble. Antarctica's glaciers are suffering. Antarctica, which contains 70% of the world's fresh water and whose Southern Ocean is an irreplaceable carbon sink and oxygen supplier, is in danger. The exceptional biodiversity of its waters, fauna and flora, to which the Commission is dedicated to protect, is seriously threatened.

The alarm is raised, and we are walking on thin ice. And what are we doing today, unworthy of the commitments of our predecessors and founders of the Antarctic Treaty? For years we have been arguing with each other, in vain, on the subject of the designation of MPAs. However, is arguing the right word in this instance? The vast majority of countries represented here, with their scientists working on the continent and its surrounding waters, are calling for the designation of MPAs for the East Antarctic, the Weddell Sea and the Domain 1 proposal in the Antarctic Peninsula with

a view to finally establish the representative system of Antarctic MPAs as planned in 2011, which will allow for the primary objective of conservation to be achieved at this pivotal time.

Today I would like to appeal to representatives of two countries whose scientific communities are crucial parts of global research efforts and who, like us all, hold Antarctica close to their heart. I reach out to my Russian and Chinese counterparts to ask them to join the community of those who are willing to protect Antarctica while it is under threat. We have been discussing these issues for 10 years now. One cannot always be against everyone else. Russia and China, as great scientific nations, cannot opt for isolation when we so badly need to act collectively, as one. What would be the risks in accepting these designations today? What better message could we send to our youth, our citizens who are threatened by climate change and who do not comprehend why nations are arguing over the merits of protecting the waters and endemic species of the continent dedicated to peace and science.

Therefore, I urge all of us to adopt the proposals during this meeting and to meet again soon, in a few months, whatever the international situation and conflicts, for a special meeting dedicated to these marine protected areas. The world will be watching us, our children will be watching us, and we will then have the opportunity to write or not to write a new page in the glorious history of the unique relationship between humanity and the Antarctic.'

5.24    Most Members recalled that the proposal was based on the best scientific evidence available, in line with Article II of the Convention, part of the Commission's commitment to establish a representative network of MPAs, and comprehensive and mature enough to be adopted. They further noted that the adoption of this MPA would also be an important step towards meeting the UN Sustainable Development Goal 14, Life below water.

5.25    Russia noted its concern, as outlined in CCAMLR-41/BG/35, relating to the scientific and legal aspects of this MPA that required clarification. Russia noted the need for recent baseline data, justification for the proposed boundaries, the establishment of performance indicators, and the need for separate conservation measures for each area. Russia noted that not all of the MPA's objectives might be met, in particular in the case of species adaptation to climate change.

5.26    China recalled that this proposal was initially proposed as elaborating a system of MPAs in data-limited regions, and noted that the East Antarctic region is a data-limited region with a paucity of time-series data that can be used to describe the structure and process of the ecosystem. China noted that it had been considered best scientific evidence available eight years ago, as well as issues of paucity of time-series data for the region relevant to the quantitative assessment of some important fish and krill stocks, the possible increase of IUU fishing activities, the capacity for research and monitoring, and the heterogeneity of scientific data availability that was noted by the Scientific Committee. China noted that after almost 10 years, the ecosystem and the environment may have experienced many changes, and that more recent data needed to be considered. China noted that the proposal aimed at protecting biodiversity and the areas instead of marine living resources, which was a concept that further operation elements needed to be clarified in the context of the Convention. China also noted that an MPA cannot address the root cause of climate change.

5.27    Most Members questioned China's views indicating that the lack of recent 'best scientific evidence available' qualification had been caused by the blocking of this proposal by China and Russia for the last 10 years. They further indicated their confusion regarding the need to clarify the concept of biodiversity and noted that the conservation of marine biodiversity was an integral part of CM 91-04. They expressed strong concern that the Presidency of COP15 of the United Nations Convention on Biological Diversity was questioning what biodiversity entails. They further noted that MPAs were known to be effective in mitigating climate change impacts by providing refuge to marine living resources from additional stressors such as fishing pressure.

5.28    France stressed that the methodology used to determine the spatial boundaries of the proposal was specifically designed for data limited regions. France indicated that the proposal had been updated to account for recent ecosystem changes, such as that caused by glacier calving leading to two years of null reproductive success of Adélie penguins (*Pygoscelis adeliae*), and the discovery of remarkable diversity of fish and benthic organisms in inner shelf depressions. France further highlighted recent independent scientific studies, including in East Antarctica, pertaining to marine predators' Areas of Ecological Significance (RAATD) and Important Marine Mammal Areas (IMMA), which both confirmed the perimeter of the proposed MPA.

5.29    Most Members supported the proposal and considered it ready for adoption. They further noted that the proposal had addressed two Members' concerns over the years, had no scientific counter arguments, and that not adopting it was a decision that had implications for the rest of world. Some Members requested that the two Members not joining consensus clarify how to achieve the Commission's objective to establish a representative system of MPAs.

5.30    ASOC supported the interventions by Members on the strong scientific basis for the proposal. ASOC considered that the proposal was fully mature and should be designated without delay.

5.31    The Commission considered CCAMLR-41/28, submitted by the EU and its Member States, Norway, Uruguay, Australia, the UK, New Zealand, the USA, Korea, India and Ukraine, which presented a draft conservation measure establishing an MPA across the Weddell Sea region. Following discussions at CCAMLR-40, the paper described updates to the proposal, including a new recital about the location of the wreck of Ernest Shackleton's *Endurance* and the addition of the area where in 2021 a large colony of demersal fish nests was discovered, within the proposed special protected zone (SPZ).

5.32    Most Members supported the proposal which represented the best available science and was an integral part of the Commission's commitment to establish a representative system of MPAs.

5.33    Russia noted that the consideration of rational use was lacking from the objectives of the proposal for establishing an MPA across the Weddell Sea region and encouraged the identification of areas for protection and fishing activity in phase 1 of the proposal. Russia noted that revision of the Weddell Sea MPA (WSMPA) proposal is needed, requiring new information on the commercial potential for dominant fish species in the MPA to designate areas for protection and fishing activity. Russia noted that this new information may be provided from

research programs in the Weddell Sea. Russia further noted that part of the MPA would be inaccessible to monitoring due to ice cover and that more data was needed to strengthen the proposal.

5.34    China noted the great effort of the proponents but that substantial issues, discussed for the past five years, were still outstanding. Further, China questioned the large size of the proposed MPA that is covered by heavy sea ice all the year round, and noted that justifications for the MPA needed clarification as the area was less impacted by climate change than other areas, and the fishing activities were managed well and at low levels. China also noted that the area was data limited, especially for quantified marine living resources and ecosystems, and suggested simplifying the dual system of objectives and providing baseline data for the proposed objectives and indicators.

5.35    Germany clarified that rational use was accounted for in the proposal as, among other things, it had been developed in consultation with Japan and South Africa who have been fishing in research blocks in Subarea 48.6 for many years. Germany further noted that the permanent presence of sea ice in large parts of the Weddell Sea had not prevented conducting ship-based science (e.g. with the research icebreaker *Polarstern*) in the area since 1982, and that modern technologies such as satellite observation and autonomous systems were routinely used as additional monitoring tools. Germany noted that climate change was impacting the entire planet, including the waters around Antarctica. Germany noted that scientific data indicate that the Weddell Sea will be an area which will experience a delay in the onset of climate change impacts, and where sea-ice conditions might remain relatively stable in the foreseeable future. In the light of this, Germany noted that the Weddell Sea will act as a refuge for cold-adapted species and ecosystems and that this was an explicit part of the WSMPA conservation objectives. Finally, Germany noted that Russia's and China's feedback had been addressed in the past, that the proposal included Russian data and thanked them for their contribution.

5.36    Most Members reiterated that this proposal was sound, provided sufficient details for its adoption and recalling the SCAR lecture, noted that inaction would signal that CCAMLR had not understood the urgency and importance of adopting MPAs for the Southern Ocean ecosystems, and by extension the global marine ecosystem.

5.37    Chile notified the Commission that it will join the co-proponents of this MPA proposal for its next iteration.

5.38    Uruguay made the following statement:

'Uruguay would like to reassert its support for MPAs as a fundamental tool for the conservation of the Antarctic ecosystem. The proposals co-sponsored by Uruguay are in line with the objective of the Convention, which is the conservation of Antarctic marine living resources, where conservation includes rational use in accordance with the provisions of the Convention and the conservation principles in Article II.

At the same time, we understand that MPAs have been found to contribute towards the achievement of the Sustainable Development Goals, particularly, Goals 2, 13, 14 and 17.

Some scientific studies have shown that MPAs can help to make vulnerable ecosystems more resilient to the impacts of climate change through the elimination of other ecosystemic stressors, such as fishing.

Networks of MPAs also contribute to species adaptation to climate change or to their capacity to evolve or modify their behaviour in response to changes in habitat conditions, through the establishment of protected pathways for migration and for the areas of distribution of most Antarctic species. MPAs can therefore make a significant contribution to achieving the global goals of ocean protection and sustainable use of the world's fishing resources.

We must also consider that the waters in these areas constitute natural laboratories to study how pristine marine ecosystems react to the warming and acidification of the ocean.

Uruguay hopes that during the current meeting of the Commission a favourable consensus can be reached regarding the proposals for the establishment of MPAs, namely, the East Antarctica MPA and the Weddell Sea MPA, which are co-sponsored by our country.'

5.39   The Commission did not reach consensus on any of the three MPA proposals.

5.40   The Commission considered CCAMLR-41/BG/42, in which Norway summarised the progress made towards developing the proposal for phase 2 of the WSMPA , including convening a workshop in September 2022 with invited experts from CCAMLR Members and Observers, updates to the WSMPA phase 2 atlas (https://tryggve.npolar.no/WEB/maudatlas/Atlas-3.0.html) and the development of an interactive visualisation tool (https://mathmarecol.shinyapps.io/WSMPA2). A proposal for WSMPA phase 2 is planned for submission to the Commission in 2023.

5.41   The Commission congratulated Norway on the progress made and for hosting a successful in-person workshop with virtual attendance. Norway encouraged all Members, including those who were not able to engage in the workshop, to contribute to the further development of the WSMPA phase 2 proposal.

5.42   The Commission noted the lack of consensus on MPA proposals and discussed the possibility of establishing a roadmap to help identify steps to enable progress on these issues.

Review of existing MPAs

5.43   The Commission noted the Scientific Committee discussions on existing MPAs (SC-CAMLR-41, paragraphs 6.8 to 6.21), including on RMPs (SC-CAMLR-41, paragraph 6.15), activity reports (SC-CAMLR-41, paragraph 6.18) and CMIR activities (SC-CAMLR-41, paragraph 6.19).

5.44   The Commission considered CCAMLR-41/40, submitted by Russia, which presented comments on the status of the SOISS MPA relating to its scientific and legal aspects, noting that clarification was essential for developing a system of MPAs in the Convention Area. The paper discussed the paucity of scientific research in the MPA during the first and second review

periods. Russia noted that the SOISS MPA is currently operating under CM 91-03, despite the existence of CM 91-04 (2011) governing the development and existence of MPAs in the Convention Area. In Russia's opinion, this duality enabled the prolongation of the SOISS MPA for the second review period (2015–2019) and then for the third review period (2020–2024), despite the absence of an RMP and the achievement of an assessment of the MPA's objectives for the reporting period, approved by the Scientific Committee and the Commission and well as the lack of consensus on its RMP due to the absence of criteria for assessing the achievement of specific objectives of the MPA and the need to align CM 91-03 and CM 91-04. Russia believed that the transition of the SOISS MPA to governance under CM 91-04 should be carried out as soon as possible by consensus of the Scientific Committee and the Commission. In Russia's opinion, in the absence of consensus, the existence of the SOISS MPA should be suspended.

5.45    China noted that it was impossible for the Commission to assess if the MPA was achieving its objectives due to the lack of scientific data, in contrast to the expectation of the Scientific Committee in 2006 that the establishment of this MPA may stimulate robust scientific research, and argued that future MPAs should be better implemented.

5.46    Most Members noted the MPA is achieving its objectives and is based on a world-leading scientific and legal framework. Many Members noted that this was a CCAMLR MPA and belonged to all Members and noted that the papers submitted by Russia and China contained ideas towards the harmonisation of MPAs in the Convention Area.

5.47    The Commission considered CCAMLR-41/BG/20, submitted by Italy, New Zealand and the USA, which presented the Ross Sea region MPA (RSRMPA) RMP (SC-CAMLR-XXXVI/20, endorsed by the Scientific Committee in 2017) and a five-year report on research and monitoring. The paper celebrated the five-year anniversary of the MPA and updated the Commission on the five-year reports on the research and monitoring. Reported research to date comprised 460 projects related to all 11 MPA objectives, carried out collaboratively (20 CCAMLR Members, 2 Acceding States and 7 Cooperating Parties), with information accessible through the 'RSRMPA Member activities 2022' e-group, the CCAMLR MPA Information Repository (CMIR), SC-CAMLR-41/BG/36 and WG-EMM-2022/37.

5.48    Most Members congratulated the Commission and its Members on the five-year anniversary of the RSRMPA and the research done under the RMP.

5.49    China noted that the Commission will adopt an RMP for an MPA on the basis of advice from the Scientific Committee in accordance with CM 91-04 and CM 91-05, and recalled that an RMP had yet to be adopted for this MPA and that this was a matter of concern. China sought clarification from the Commission on how Members can proceed with the RMP for the RSRMPA, and urged the proponents of the RSRMPA to lead the work to undertake the initial update and additional update to the draft RMP, so that it can be adopted by the Commission based on the advice of the Scientific Committee. China noted CCAMLR-41/BG/25 had provided concrete proposals on how to improve the draft RMP for the RSRMPA, which contents did not need to be reiterated as they had been discussed in the past.

5.50    Russia shared China's concern and further noted that the provisions of CM 91-05 were not met and recalled that a catch limit for research programs implemented in the frame of the RMP had yet to be agreed for the RSRMPA.

5.51    Most Members noted the substantial amount of collaborative research conducted, and that these contributions represented a great example of how an MPA could achieve its objectives. They noted that the Scientific Committee endorsed the RMP in 2017 (SC-CAMLR-2017, paragraph 5.45) and that the RMP is ready to be endorsed by the Commission, that it is intended to be a living document which could be improved upon over the years through the contributions of all Members, and urged Russia and China to join consensus to adopt the RMP.

5.52    ASOC also congratulated Members on the extensive research they had carried out in support of the RMP, and noted that CCAMLR is showing leadership in demonstrating how research and monitoring can be carried out in large-scale remote MPAs. ASOC considered that this sets a positive precedent for demonstrating that CCAMLR Members have the capacity and will to carry out effective research and monitoring in other MPAs, including those currently being considered for adoption.

5.53    The USA made the following statement applicable to all of the MPA-related papers submitted by China and Russia:

'As our time is limited, we will not address the papers point by point. As a suggestion to the rapporteurs, rather than restate our view after every paper it might be simpler to include it once after all these papers have been summarised.

The USA does not currently agree with all the conclusions nor endorse all the recommendations made by China and Russia regarding MPAs and associated research and monitoring plans. We are, however, keen to establish a system of CCAMLR MPAs around Antarctica and understand that a general "reset" of the MPA discussion is needed to achieve such a system. We are thus open to a more constructive dialog on MPAs and RMPs in the future, starting with a Special Meeting in 2023. As we noted in the discussions on krill, we think the work to revise the management strategy for krill in Subarea 48.1 demonstrates how Members can work constructively to advance complex issues. Integrating the development of the krill fishery with that of the D1MPA proposal thus also provides fertile ground for all of us to find a way forward with MPAs.'

General issues related to spatial management

5.54    The Commission considered CCAMLR-41/09, submitted by the CCAMLR Secretariat and the Chair of the Commission, which presented a proposal for an extraordinary meeting of the Commission on spatial planning and MPAs. Taking into account comments provided to the 'Commission special session on MPAs' e-group and during the Heads of Delegation meeting of 7 June 2022, the paper presented draft terms of reference and included proposed practical arrangements for a meeting.

5.55    The Commission thanked the Secretariat and the Chair of the Commission for developing the paper. The Commission welcomed the offer by Chile to host the meeting in the first half of 2023 and the offers from Australia to contribute A$100 000 and the USA to contribute US$75 000 (paragraph 1.22) towards the costs of the meeting. The Commission agreed that observers should be invited to the meeting under Rule 30 of the Rules of Procedure.

5.56    The Commission considered the terms of reference and draft agenda. There was agreement that the meeting should consider the way forward for the Commission to progress MPA design, designation, implementation and the establishment of RMP consistent with the Convention and based on the best scientific evidence available.

5.57    Russia stressed that the Host State grossly violated the Headquarters Agreement between the Commission and the government of Australia and did not provide visas to all Members of the Russian Delegation to CCAMLR-41 from the Ministry of Foreign Affairs. Under any circumstances the possibilities for equal participation of all Members should be ensured.

5.58    Australia noted for the record that Australia is proud to host the Commission and strongly supports its objective to conserve Antarctic marine living resources. Australia takes its international obligations seriously and is acting in accordance with the Headquarters Agreement.

5.59    The Commission **agreed** to carry out an extraordinary meeting of the Commission on spatial planning and MPAs in 2023. The terms or reference and arrangements were agreed by the Commission as an updated version of CCAMLR-41/09 (see Annex 6). The date for the meeting will be agreed in consultation with the host country (Chile) from the options in Annex 6.

5.60    The Commission considered CCAMLR-41/41, submitted by Russia, which presented comments and proposals on developing unified criteria for establishing MPAs in the Convention Area. The paper argued that there were insufficient procedural and implementation measures to manage a single unified process for designating scientifically based MPAs and to regulate their operation by the CAMLR Commission. The paper outlined several proposals, including the development and adoption of an agreed definition of 'marine protected areas', the adoption of a mandatory MPA checklist for the establishment of MPAs, the requirement for a RMP as part of MPA proposals and a change to CM 91-04 to specify that sufficient best available data will be required to establish MPAs. Russia proposed that this MPA checklist for the establishment of MPAs in the Convention Area could be endorsed as Annex 1 to CM 91-04, as well as clear and transparent criteria and requirements for developing RMPs for MPAs could be adopted as Annex 2 to CM 91-04. Russia also stressed to add the following to CM 91-04: 'Marine protected areas may be established on the basis of the best available data, which shall be sufficient to provide a scientific basis for the designation of MPAs in a particular area'. Russia noted unified criteria should be endorsed by the Commission and used in the establishment of new MPAs as well as in the review of existing MPAs.

5.61    The Commission did not reach consensus on the proposals presented by Russia and noted that the process currently in place for the designation of MPAs was described in CM 91-04.

5.62    Some Members noted that MPAs were all different and that each had its own merits and specificities, and that some flexibility in processes is required. They encouraged Russia to submit a draft of an edited version of CM 91-04 in the future to facilitate consideration of their proposal by the Commission.

5.63    China noted that elements of the proposal presented by Russia could contribute to a roadmap for MPA establishment (paragraph 5.42).

5.64    Most Members noted that further discussions on MPAs were needed to progress the issue and looked forward to the extraordinary meeting of the Commission on spatial planning and MPAs (paragraph 5.59) to reach consensus on spatial management issues and, in particular, MPAs.

5.65    The Commission considered CCAMLR-41/BG/23, submitted by China, which revisited the establishment of MPAs in the waters surrounding Antarctica and provided suggestions that have been raised in previous meetings in the context of the Convention, including to elaborate on a definition of MPA, to improve and integrate CCAMLR Ecosystem Monitoring Program (CEMP) results, to devise a scientific approach to identify the requirement of 'further special consideration', to develop a mandatory scientific checklist for MPA proposals, and to design a framework for research and monitoring plans.

5.66    The Commission considered CCAMLR-41/BG/24, submitted by China, which discussed the development of RMPs for CCAMLR MPAs with a specific proposal drawn on the guidelines from the United Nations and the EU on the research, monitoring and assessment of the oceans and seas to interact with decision-making process. China also noted the necessity to consider the cost-effectiveness of the choice of different management tools to give effect to the objective and principles of the Convention, taking into account the cost of Antarctic activities, including scientific monitoring in the harsh Antarctic environment.

5.67    The Commission **agreed** that MPAs are one of the conservation tools, and most Members noted that the establishment of a representative system of MPAs has been a Commission objective since 2009.

5.68    The Commission considered CCAMLR-41/BG/32, submitted by ASOC, which presented recommendations regarding CCAMLR's MPAs. Noting that CCAMLR is now 10 years past the agreed 2012 deadline to establish a representative system of MPAs in the waters surrounding Antarctica, and that in addition to co-sponsoring proposals, 24 of 26 Members have stated their support for the adoption of at least one of the MPAs currently under consideration, ASOC recommended to: (i) adopt the three currently proposed MPAs, (ii) approve the RSRMPA RMP, and (iii) make progress on MPA proposals for MPAs in the remaining planning domains.

5.69    Recalling CCAMLR-38/BG/53, the EU enquired whether China still intended to propose an MPA in the near future and indicated it would be happy to collaborate on this endeavour. China clarified that the intent of that paper was to provide information on the scientific research plans intended to address the paucity of scientific data in the East Antarctic sector and that the results will help identify the conservation necessity and the development of management tools.

5.70    The Chair closed Agenda Item 5.


## Impacts of climate change on the conservation of Antarctic marine living resources

6.1    The Commission noted the discussions of the Scientific Committee on climate change (SC-CAMLR-41, paragraphs 7.1 to 7.23), and further noted discussions in its report regarding the SCAR lecture (paragraphs 2.9 to 2.13).

6.2     The UK presented CCAMLR-41/29, a summary of the current understanding of the roles played by Antarctic krill and continental shelf benthic ecosystems in carbon export and storage and introduces a new initiative to map carbon storage hotspots. The authors recommended that CCAMLR recognises the important contribution of Antarctic marine living resources and their habitats to the processes of carbon export and storage.

6.3     The Commission recognised that climate change is already having effects in the Convention Area and that these effects will have global implications as also recognised by COP26 and the ATCM. Furthermore, climate change effects elsewhere will also impact the Antarctic and may influence the ability of the Commission to achieve Article II.

6.4     The Commission noted that the Scientific Committee has incorporated climate change into its advice (SC-CAMLR-41, paragraph 7.8) and through discussions at the SC-Symposium (SC-CAMLR-41, Annex 11) has also added climate change to the work plans and terms of reference of its working groups (SC-CAMLR-41, paragraph 7.14).

6.5     The Commission agreed that it needed to act urgently to prepare for, and adapt to, the effects of climate change on the marine ecosystems within the Convention Area.

6.6     Some Members shared concern about the effects of climate change and indicated the need for more integrated analysis of ecosystem trends to assess the effects of climate change and to align the management response with the appropriate management tool.

6.7     CCAMLR-41/31 Rev. 1 presented the proposal for a workshop on integrating climate change and ecosystem interactions into CCAMLR science, noting that evaluating the effects of climate change on Antarctic marine living resources is a priority topic for CCAMLR and was identified by the recent Scientific Committee Symposium as a key area of research.

6.8     The Commission welcomed the Scientific Committee's agreement to hold a workshop on climate change in the first half of 2023 and supported the conceptual design for the workshop of regional hubs with remote access which would expand the ability of experts to participate while minimising the carbon footprint (SC-CAMLR-41, paragraph 7.10). The Commission also encouraged the inclusion of a range of scientific experts as well as policy makers to foster integration of the best available science into management actions.

6.9     The UK made the following statement:

> 'The UK has taken serious note of SCAR's Decadal Synopsis Report on Antarctic Climate Change and Environment. We have heard the clear message that climate change is having a profound impact on Antarctica and the Southern Ocean, and that these impacts have consequential global effects. Last year the UK hosted COP26 where the Antarctic had a significant profile, due to international concern regarding climate change in the region and the need for urgent action. Members can review the paper ATCM44/WP29, submitted by the UK, nine other Parties, SCAR and ASOC which provides a list of COP26 Antarctic events and briefings. The UK will also engage in COP27. It is imperative that all of our governments act on the urgency of, at the very least, meeting the Nationally Determined Contributions of the Paris Climate Agreement, and SCAR's call to communicate the implications of climate change for Antarctica and the Southern Ocean to a wide audience.

The UK welcomes the work set out by the Scientific Committee on climate changes and we look forward to further work on blue carbon (outlined in the UK paper CCAMLR-41/29) and we look forward to future reports of that project. We are also very pleased that the proposed climate change workshop (CCAMLR-41/31) has been agreed, alongside the inclusion of climate change considerations to the terms of reference of all Scientific Committee working groups.

The UK believes CCAMLR must urgently consider whether our approach to delivering some of the founding principles of the Convention – particularly the way in which we assess the prevention or minimisation of risk of changes and their reversibility over two or three decades – are fit for purpose in light of the key messages from SCAR.'

6.10    CCAMLR-41/30 submitted by the UK, Korea, the EU and its Member States, Australia and the USA presented a proposal to amend CM 24-04 on establishing time-limited special areas for scientific study in newly exposed areas following ice-shelf retreat or collapse. The proposal sought to extend its application to the whole Antarctic continental coast, in order to provide for the designation of Special Areas for Scientific Study in all regions where ice-shelf collapse or retreat may occur.

6.11    Most Members offered full support to the proposal, noting the scientific basis was compelling and simple. They agreed that the risk of exposure of new marine areas to an ice-free environment due to ice-shelf collapse is not limited to the Antarctic Peninsula and supported the expansion of CM 24-04 to the entire coast of the continent to promote research into the effects of climate change on marine ecosystems under an agreed framework.

6.12    Some Members considered that a more comprehensive plan for addressing ice-shelf collapse in other areas should be developed which may include developing RMPs, as well as reporting requirements for each of the areas of concern. Other Members requested that those Members bring concrete proposals to advance the discussions, noting that planning and scheduling expeditions to study ice shelves requires complex planning.

6.13    China noted that spatial data files on ice shelves are not included as part of the CCAMLR geographic information system (GIS) or in the *Schedule of Conservation Measures* as it was before 2016 and requested this information be added. The Secretariat indicated that ice shelves were now considered to be dynamic features and that, accordingly, the most recent data on their extent would be acquired from the SCAR Antarctic Digital Database to be added to the CCAMLR GIS and displayed as dotted lines in the schedule.

6.14    China also recalled that CM 24-04 was proposed with the aim to facilitate research on the fast alteration of the ecosystems and benthic habitats in newly exposed marine waters due to the collapse and retreat of ice shelves. However, little scientific research has been conducted in the newly exposed waters in such areas as Larsen C and the Pine Island so far, China therefore proposed to include requirement for scientific research on the ecosystems for review by the Scientific Committee in its review at the end of the stage 1 Period.

6.15    There was no consensus to revise CM 24-04.

6.16    The Commission considered CCAMLR-41/32 Rev. 1, submitted by the EU and its Member States, the UK, Australia, Chile, New Zealand, Norway, the USA, Uruguay and Korea. Based on the unambiguous findings of the recent Intergovernmental Panel on Climate Change

(IPCC) reports (IPCC 2019; 2021, 2022) with respect to the future likely implications for Antarctica and the waters surrounding Antarctica, coupled with the impacts of climate change already observed in the Convention Area, including as a result of warming trends already in the global system, and the urgent need to take action now, the authors recommended that the Commission adopt an updated resolution on climate change.

6.17    The Commission recalled the SCAR presentation on the opening day of the Commission, on SC-CAMLR-41/BG/21, and noted that climate change is largely the consequence of anthropogenic greenhouse gas emissions, and that impacts on Antarctic marine living resources and marine ecosystems are already observed (paragraphs 2.9 to 2.13).

6.18    The EU presented CCAMLR 41/32 on behalf of its Member States, the UK, Australia, Chile, Korea, New Zealand, Norway, the USA and Uruguay which proposed a CCAMLR resolution on climate change.

6.19    The UK made the following statement:

'UK fully supports this resolution and hopes we will adopt it this year, especially following the presentation of the SCAR ACCE Report, which provides us with unequivocal evidence that climate impacts are affecting Antarctic marine living resources.

The Resolution would be a collective expression of the importance the Commission attaches to its work to develop adaptive management that takes climate change implications into account in all its decision-making.

As well as taking collective action by agreeing to this resolution, we also call on all CCAMLR Members to consider what further we can all take ourselves. For example, the UK delegation to CCAMLR has made a commitment to consider the implications of climate change in all our activities. We have dedicated ecosystem climate science experts on our delegation and through the wider engagement of the British Antarctic Survey with the delegation, as the UK national Antarctic science program, we ensure an integrated and multi-disciplinary approach to UK scientific input to CCAMLR. As a delegation, we have agreed a standing agenda item on climate change at all of our meetings, to consider our scientific input to CCAMLR; our role in communicating Antarctic climate change research findings and implications outside of CCAMLR to other stakeholders and interested parties; and how to work together as a delegation to deliver our objectives in a climate responsible way.

We would be pleased to share best practice and learn from other delegations who have already, or who are ready to make a similar commitment.'

6.20    Belgium made the following statement:

'Belgium as one of the co-proponents of the resolution in front of us fully aligns with the interventions of the EU and other co-proponents and supporters. We also want to express our support for the work being done by the Scientific Committee on climate change and welcome the organisation of the climate change workshop. We join others in thanking SCAR for its valuable report and Prof. Steven Chown for the presentation he gave last week. This lecture highlighted the dramatic effect of climate change on

Antarctica and the Convention Area and underlined the need for urgent action. We fully support the recommendations put forward in the Decadal Synopsis on Antarctic Climate Change and the Environment.

Having listened to discussions the past few days, it seems like some Members around this table are of the opinion that CCAMLR operates in a vacuum. I'm sorry to say that we are not.

We are not operating in a geo-political vacuum. Still, we remain hopeful that, together, we can find our way back to true cooperation, genuine collaboration and to dedicate Antarctica to peace and science in accordance with the commitment all of us made.

We are not operating in an organisational vacuum as CCAMLR is both part of the Antarctic Treaty System as well as of the international community. That is why we have an agenda item on cooperation with other international organisations.

And last but not least CCAMLR is not operating in an environmental vacuum. As was illustrated in the presentation of Prof. Chown, the Southern Ocean is the central connection between all ocean basins. At the ecological level, there is ample evidence of biological exchanges across the Antarctic Convergence at all trophic levels. What happens in the Southern Ocean doesn't stay in the Southern Ocean, and equally important: what happens outside of the Southern Ocean has an impact on the Southern Ocean.

In order to conserve Antarctic marine living resources it is of utmost importance to take into account all drivers that impact them. This includes climate change, pollution, direct exploitation and changes in sea use. Not taking these into consideration will lead to "changes in the marine ecosystem which are not potentially reversible over two or three decades".

In CCAMLR we can take action to reduce the cumulative impact of climate change and other drivers on the Antarctic ecosystems. Even more: we need to take action! Not just for us, but also for future generations.

As mentioned yesterday, Belgium is not prepared to give up on the Antarctic ecosystems. In this regard we express our disappointment that we were not able to find consensus on the revision of CM 24-04 earlier today. We call upon all Members to join forces to take urgent action and to adopt this resolution.'

6.21    Australia made the following statement:

'Thank you to the EU for introducing this draft resolution on this fundamental important issue that has profound implications for all of our work.

We have heard from the experts that, on the current trajectory of human-derived emissions of $CO_2$ and other greenhouse gases, the atmosphere and ocean will continue to warm, the ocean will continue to acidify, atmospheric and ocean circulation will be altered, the cryosphere will continue to lose ice, and sea level will rise.

As a co-sponsor, Australia would like to join those supporting the draft resolution.

Australia would like to note also the recent ATCM resolutions on climate change (Resolutions 8 and 4 (2022)).

We thank China for its intervention, and appreciate the engagement and the suggestions made. Australia shares the hope that we can have a new amended resolution on climate change this year. We very much look forward to gathering the fruit for this meeting together.

We urge the Commission to continue to show our commitment to considering the implications of climate change in our work by adopting this resolution on climate change.'

6.22   Uruguay made the following statement:

'Uruguay considers that climate change is the most important global environmental challenge of our times, and that multilateralism is the only possible way to deal with the urgency of this global problem.

Uruguay is a country particularly vulnerable to the adverse impacts of climate change despite contributing with a minimum percentage to global emissions of greenhouse gases. Due to this reason, we have shown a very active participation in all multilateral fora where the issue is being considered. In this sense, we coincide with the draft resolution with regard to the fundamental role of this Commission as responsible for the conservation of Antarctic marine living resources.

In previous interventions we had highlight our concern with regard to the climate change impacts on the Antarctic ecosystem. We agree with the reports of the Intergovernmental Panel on Climate Change (IPCC) that climate change is having a profound impact on Antarctica and in this regard, we believe that the draft resolution presented is needed and pertinent, and it is the reason why it counts with my country's co-sponsorship.

The draft has been revised and it contains several modifications which were included with the aim of accommodating the different positions among delegations. We expect this text to be finally adopted during this session.'

6.23   Norway made the following statement:

'CCAMLR recognised the need for management responses to climate change over a decade ago, including by adopting a climate change resolution in 2009. A lot of good science relevant to this issue has been produced since then, and the best available science has been assessed and summarised inter alia by the IPCC and SCAR.

The Southern Ocean is among the parts of the worlds oceans that are projected to change the most due to the combination of global warming and ocean acidification. These changes will increasingly affect the marine ecosystem of the Southern Ocean, with likely consequences for biodiversity as well as productivity, abundance and distribution of marine living resources in the convention area. Norway is concerned that rapidly changing environments of Antarctica and the ocean surrounding it will require similarly rapid and receptive environmental governance and management responses. In some cases we are already moving in the right direction, for example by developing

feedback-based management of krill, and by exploring how to take future climate change into consideration in conservation planning, as we are currently trying to do in our work on WSMPA phase 2.

The draft resolution encourages Members to commit to integrating climate change considerations across all CCAMLR activities to better prepare for and respond to unavoidable impacts through adaptation measures that can ensure ecosystem resilience. This is in everyone's interest, since failing to do so will mean that we are much less likely to achieve the goals of CCAMLR. Active engagement in, and support of climate science, including through SCAR, will be key to develop our common knowledge base for adaptation.

The draft resolution also urges the Scientific Committee to continue to develop its management advice based on and fully integrating current understanding of climate change impacts on Antarctica and the Convention Area; not adapting to climate change is not a rational option for CCAMLR.

Norway strongly encourages all Members to adopt the draft resolution on climate change.'

6.24   South Africa made the following statement:

'South Africa would like to thank the CCAMLR Scientific Committee for tackling the effects of climate change. The ongoing changes in trend, status and general weather patterns as a result of an average rise in the temperature of the earth's surface have impacted both Antarctica and the Southern Ocean's biodiversity. This rise in the average global temperature, is primarily due to increased concentration of gases emitted through increased human activities.

Currently, the global climate is changing much more rapidly as a result of global warming, leading to, among others, the melting of polar and glacier ice, sea-level rise, ocean acidification, changes in rainfall and snowfall patterns, more frequent floods and droughts and increased frequency and intensity of extreme weather events.

Along the western Antarctic Peninsula, there have been recent losses of ice and decreases of ice-dependent Adélie penguins, but increases and a southward range extension of gentoo penguins, which do not depend on ice. It is believed that changes in sea-ice distribution influence breeding success and impact the viability of colonies of emperor penguins.

South Africa acknowledged the importance of the Southern Ocean in maintaining global climate change We also encourage the integration of climate change and ecosystem interactions relevant scientific information into analysis of CCAMLR's science work program and its terms of reference and support the hosting of the workshop and request that this should be held both virtually and in person.'

6.25   Sweden stressed the importance of climate change research, and spatial management, including MPAs, as a tool to strengthening ecosystem resilience to climate change. Climate change is one of the main drivers of biodiversity loss according to the Intergovernmental

Science-Policy Platform on Biodiversity and Ecosystem Services, and it is important to address these challenges together. Sweden therefore highlighted the need to fully integrate climate change considerations across all CCAMLR activities.

6.26    ASOC noted that although CCAMLR cannot directly influence the main causes of climate change, it could take climate change action, including generating and disseminating Antarctic climate research, establishing area-based tools for ecosystem resilience and scientific reference, and reducing regional stressors from fisheries. ASOC considered that CCAMLR-41/29 to 41/32 proposed the absolute bare minimum climate change actions that CCAMLR should be taking. ASOC hoped that these proposals would be adopted this year and expressed concern that the update of CM 24-04 (CCAMLR-41/30) has already been rejected. ASOC noted 17 Members contributed to one or more of the four climate change papers, and 24 Members co-sponsored the adoption of MPAs which contribute to climate change resilience. ASOC encouraged CCAMLR to communicate its current and future climate actions to the 2022 United Nations Climate Change Conference and encouraged CCAMLR Members to meet their own nationally determined contributions.

6.27    SCAR made the following statement:

'SCAR strongly supports the proposed update to Conservation Measure 24-04 and supports and welcomes the revised Resolution on Climate Change. We recall that in his presentation to the Commission on behalf of SCAR, Prof. Chown made clear that we have a critical window in which to urgently act, otherwise further impacts on Antarctic ecosystems and species will occur that will not be reversible within two or three decades. The ACCE Report, which is grounded in IPCC research, also makes clear that urgent action is needed to include considerations of climate change in the conservation and management of Antarctic systems and marine living resources. CCAMLR is the responsible body to take such management action. SCAR stands ready to assist to share its expertise with the Commission and Scientific Committee and its associated working groups where helpful, including in the forthcoming climate change workshop.'

6.28    The Commission adopted Resolution 36/41.

6.29    The Chair closed Agenda Item 6.


## Implementation and compliance

Advice from SCIC

7.1    The Chair of SCIC, Ms Engelke-Ros, presented the SCIC-2022 report (Annex 7). The Chair of SCIC thanked the Secretariat, interpreters, translators, rapporteurs and support staff for their dedicated service throughout the meeting, and Members for their constructive and cooperative engagement.

CDS Fund expenditure

7.2     The Commission noted that the Catch Documentation Scheme for *Dissostichus* spp. (CDS) Fund Review Panel was convened to consider one proposal from the Secretariat (CCAMLR-41/20) for the expenditure of A\$165 000 from the CDS Fund. The CDS Fund Review Panel, which consisted of representatives from Australia, France, Korea, New Zealand, the UK and the USA, approved the proposal.

7.3     The Commission **endorsed** the recommendation of SCIC to adopt the proposal (SCIC-2022, paragraph 9) and thanked the Secretariat for the work undertaken thus far to enhance the e-CDS.

Implementation of the CDS

7.4     The Commission noted the consideration by SCIC of the current cooperating status granted to Mexico and Singapore as per CM 10-05, Annex 10-05/C, paragraph C9 (SCIC-2022, paragraphs 12 to 14). The Commission **agreed** that Mexico and Singapore maintain their cooperative status with CCAMLR and encouraged Members to reach out to Mexico via appropriate diplomatic channels to assist the Secretariat in facilitating Mexico's implementation of CM 10-05.

Vessel inspections implementation

7.5     The Commission noted that nine CCAMLR port inspection reports were reported to have been undertaken without a physical inspection of the vessel and further noted that port inspections undertaken remotely do not meet the requirements of the relevant CM 10-03.

7.6     The Commission **endorsed** the recommendation that the Secretariat undertake a review of the CCAMLR port inspection report forms to develop a form which can be used alongside the Port State Measures Agreement (PSMA) form to reduce duplication, along with conforming amendments with CM 10-03, for presentation to SCIC-2023.

7.7     The Commission **endorsed** the recommendation that the Secretariat investigate other electronic means of submitting port and at-sea inspection reports, including the possibility for the completion and submission of forms in an electronic application or directly through the website, and requested that the Secretariat report its findings at SCIC-2023.

7.8     The Commission thanked Chile for its efforts in undertaking at-sea inspections, noting the significant efforts these activities require in difficult sea conditions, and the benefits of these activities for all Members.

Vessel monitoring system (VMS)

7.9     The Commission **endorsed** the recommendation that the Secretariat further investigate the requirements and estimated costs of implementing an automated vessel monitoring system (VMS) movement notification system, with a review of what changes to CM 10-04 would be necessary, noting that this would be presented in 2023 or 2024.

Transhipment

7.10    The Commission **endorsed** the proposal by the Secretariat to revise CM 10-09 to revise the transhipment notification form and time zone reporting (CCAMLR-41/18).

NCP Engagement Strategy

7.11    The Commission **endorsed** the proposed NCP Engagement Strategy (CCAMLR-41/17, Annex 1) and action plan for 2023–2024 (CCAMLR-41/17, Annex 2) and noted the expansion of the strategy to include parties involved in the harvest of any Antarctic marine living resources within the Convention Area, and *Dissostichus* spp. globally.

Proposals for new and revised conservation measures

7.12    The Commission noted SCIC's consideration of a number of proposals to amend conservation measures (SCIC-2021, paragraphs 37 to 66) and **endorsed** the proposed amendments to CMs 10-02, 10-04, 10-05, 10-09, 23-06 and 26-01.

7.13    COLTO noted, regarding CM 10-02, that there are better tools to avoid collisions at sea instead of automatic identification systems (AIS), such as Automatic Radar Plotting Aids (ARPA). COLTO further noted ARPA can detect a range of targets, including sea ice and vessels that do not have this technology installed, and that there is a negligible risk of IUU fishing operators being able to track vessels remotely, which can easily be done when using AIS. COLTO requested the Commission to consider exploration of other options before agreeing to the proposed changes, as AIS data will provide the real time location of all fishing vessels in the Convention Area via publicly available systems.

7.14    The Commission noted that the proposed changes to CMs 10-05, 10-09, 10-10, 21-01 and 31-02 and most of the conservation measures submitted in the proposal from the USA and Australia (CCAMLR-41/36 Rev. 1) for improved management of CCAMLR's krill fisheries (CMs 10-03, 10-04, 10-09, 51-01, 51-02, 51-03, 51-06 and 51-07), were not endorsed by SCIC and were referred to the Commission for further discussion.

7.15    Many Members thanked Korea for its proposal to amend CM 10-09 (CCAMLR-41/24 Rev. 1) noting the need to improve the Commission's regulation of transhipment activities and the recently adopted FAO Voluntary Guideline for Transshipment. Russia noted that a balance needs to be found between control and barriers to entry for transhipment vessels, noting control should be better focused on the harvesting vessels. Korea expressed its concern that the current

CM 10-09 requires rudimentary information on carrier vessels that engage in transhipment activities, but this falls short of what is required in other fisheries-related organisations, and indicated it is willing to continue working with Members to move forward with improving transhipment management.

7.16    ASOC thanked Korea and other Members who had made proposals for improving the monitoring and control of transhipments. ASOC noted that, unfortunately, CCAMLR lagged behind other organisations in regulating transhipments, and therefore ASOC hoped that progress could be made on this issue in the coming years.

7.17    Some Members noted their disappointment regarding the lack of consensus on the proposal by EU and its Member States, Korea and the USA (CCAMLR-41/35) to amend CM 10-10 following months of intersessional work and expressed concern that the current CCEP is stifling the progress and ambition of the Commission.

7.18    China and Russia noted that the discussion on CM 10-10 was constructive and were welcoming further discussion, noting their concerns with the current proposal. China further noted that the Commission was able to adopt a Compliance Report as a whole by consensus, while noting that consensus on some individual items was not reached.

7.19    Some Members noted that this process could be the precedence for future CCEP Report adoptions without the need for any amendments to CM 10-10.

7.20    Many Members thanked the USA and Australia for their proposals for improved management of CCAMLR's krill fisheries (CCAMLR-41/36 Rev. 1) and noted the need to improve the standard of management to bring the krill management to the standard of the CCAMLR toothfish fisheries, alongside progressing research and monitoring of krill, and spatial management, including the D1MPA.

7.21    Some Members noted there are some differences between the operation of toothfish and krill fisheries, but there is no reason for monitoring, control and surveillance to be different in these two fisheries.

7.22    China and Russia noted their concerns with the proposals, citing that krill management is currently operating well, noting that discussions are ongoing regarding catch limits and the harmonisation of spatial management. China further noted that the krill fishery has much fewer compliance issues compared to the toothfish fishery as can be seen in the SCIC report.

7.23    Many Members encouraged cooperation to find ways to progress the improvement of krill management in CCAMLR, such that krill fisheries are managed to a similar standard as toothfish fisheries. Those Members requested the Secretariat to provide information on the technical requirements and costs to either expand the *Dissostichus* CDS to krill or to develop a parallel CDS for krill to be presented at CCAMLR-42.

7.24    ASOC thanked the USA and Australia for their proposal, which it considered to be very timely and important, and echoed the comments of Members on the need to work on all aspects of the krill fishery, including compliance. ASOC further noted that CCAMLR had many successes in managing toothfish fisheries, and that it was logical to apply these successful measures to the krill fishery.

CCAMLR Compliance Evaluation Procedure (CCEP)

7.25    The Commission considered the compliance table as presented in SCIC-2022, Appendix I, noting that SCIC did not reach consensus on a compliance status for six matters in the Summary CCAMLR Compliance Report, but that the SCIC report summarised the discussion on all issues.

7.26    Russia noted that consensus was not reached on four matters under CM 31-01 and expressed its deep regret that a compliance status of 'seriously, frequently or persistently non-compliant (Level 3)' was not applied to the UK-flagged vessels *Argos Georgia*, *Argos Helena*, *Nordic Prince* and *Polar Bay*. Russia noted that, in its opinion, the activities of the vessels were a blatant example of violation of CM 31-01. Russia further noted that the activity was encouraged by the UK and did not include a Flag State response.

7.27    Ukraine made the following statement:

'It is important in evaluating this issue to draw attention to all relevant factors. There are several facts to be clear and evident for the majority of us. This is a fact that the Patagonian toothfish fishery in Subarea 48.3 (CM 31-01 continuation) has been blocked by the Russian Federation. No other CCAMLR party agreed to the Russian Federation's arguments. Furthermore it was noted at the level of the Scientific Committee, that the toothfish fishery in Subarea 48.3 is managed on a high scientific level, fully complying with the precautionary approach, and most experts recognised that the Russian Federation's interventions to the toothfish fishery in Subarea 48.3 seems to be a political action, technically performed by blocking consensus.

Therefore, the Russian Federation should take their part of responsibility for raising this issue which brought damage to the CCAMLR unity. On the other hand we can't compare a typical IUU fishery aiming to receive a commercial benefit by illegal fishery actions with the case of UK fishing vessels conducting managed fishery in Subarea 48.3 in harmony with the main CCAMLR approaches, with submitting regular and summarised fishery reports.

Taking into account all above mentioned, we will rather refrain of formal CCAMLR decision on this issue, the nature of which is outside the CCAMLR competence by comprehensive way. We mean that it can't be evaluated as usual within Compliance Report procedure, as well as it can't be taken as a comprehensive basis for including UK fishing vessels on the IUU list. At the same time, we are assuring our respect to the national interests of the CCAMLR nations, and we are far from any evaluations on the field of general politics the UK's response to Russia's destructive activities in CCAMLR. We hope to save the CCAMLR unity, which is really necessary for moving forward together to achievement the Convention's objectives.'

7.28    Argentina made the following statement:

'Argentina expresses its deep concern that Ukraine did not raise these considerations during the discussion of CCEP during SCIC. Argentina recalls its statement that the behaviour of one Member should never lead another Member to act outside of the regulations, as has occurred in Subarea 48.3. Argentina recalls the UK expressing their regret that CM 41-02 had not been extended to the 2021/22 season. However, Argentina

notes that the UK was the only Member that proceeded to undertake fishing activities in Subarea 48.3 without a conservation measure. Argentina states that all other Members refrained from fishing in said subarea and from importing the produce of such fishing in order to comply with CCAMLR provisions.

Argentina recalls CCAMLR-41/BG/36, highlighting that the paper clearly explains why the *D. eleginoides* fishery in Subarea 48.3 should not have proceeded as it contravened CM 31-01, which clearly states that it is the Commission's obligation to establish total allowable catch limits, among other conditions, for toothfish fishery in said subarea. Argentina expresses its deep concern that the four UK-flagged vessels were not considered non-compliant due to the opposition of a few Members. Also, Argentina recalls that due to the existence of CM 31-01, no Member had the right to unilaterally establish the fishing conditions for a permitted fishery in Subarea 48.3, including the catch limit. However, that was exactly what the UK had done the past season, arrogating itself the right to unilaterally define all the parameters hitherto included in CM 41-02. Argentina alerts that were this situation to continue, there was a risk of returning, not only Subarea 48.3 but also the entire Convention Area, to the legal situation in force in the 1960s and 1970s, thus severely thwarting the progress achieved so far in the management of Antarctic marine living resources. Argentina adds that it had unsuccessfully requested the UK to provide data about catches and exports for this fishery, following the standard procedures in CCAMLR. Argentina recalls that it had also requested the Secretariat not to allow the use of the CDS for this fishery this season, which had nonetheless been utilised by the UK-flagged vessels. Argentina requests the Secretariat not to enable the use of the CDS for any vessel that might fish without a conservation measure in the 2022/23 season.'

7.29    The Executive Secretary stated that, in his view, CM 10-05 does not give the Secretariat power to comply with the request made by Argentina. It would require a decision made by the Commission.

7.30    Argentina made the following statement:

'Argentina regrets the view just expressed by the Executive Secretary on CM 10-05, which reveals there is a legal void in the CDS in these situations of blatant non-compliance that must be addressed.'

7.31    Chile and Uruguay noted that they had refrained from fishing in said subarea and also from importing the produce of such fishing in order to comply with CCAMLR provisions.

7.32    Norway made the following statement:

'Non-renewal of CM 41-02 does not lead to prohibition against fisheries in Subarea 48.3:

None of the provisions in the Convention may be interpreted as imposing a general prohibition against fishing in Subarea 48.3. Any such prohibition would have to be establish by a conservation measure.

The non-renewal of CM 41-02 at the Commission meeting in 2021 does not mean that toothfish fisheries in Subarea 48.3 are generally prohibited, or "closed", as some parties have suggested.

CM 31-01 is clear in placing a responsibility on the Commission to decide upon renewal of conservation measures for fishing around South Georgia. And I quote: "For each fishing season after 1987/88, the Commission shall establish such limitations or other measures, as necessary, around South Georgia on a similar basis at the meeting of the Commission immediately preceding that season." – end of quote.

The non-renewal of CM 41-02 is indeed a failure of the Commission to live up to the expectation placed on it in CM 31-01. But the Commission is a political organ and it decides for itself whether it wishes to exercise its competence, in this case by renewing the measures in question and live up to the expectations placed on it in CM 31-01. Its failure to do what CM 31-01 calls for is deeply regrettable, but it does not lead to a prohibition against fisheries in Subarea 48.3. CM 31-01 stipulates no such thing, explicitly or implicitly. Prohibitory rules of such magnitude cannot simply be assumed to exist without any basis in the wording of the resolution that the parties negotiated and agreed on.

Participation in fisheries in Subarea 48.3 for the 2022 season is not a basis for IUU-listing of vessels. CM 10-06 is clear that IUU listing requires that the relevant vessel "have engaged in fishing activities in the Convention Area in a manner which has diminished the effectiveness of CCAMLR conservation measures in force". As there is no conservation measure prohibiting fisheries in Subarea 48.3 and CM 41-02 is not in force, the simple fact that a vessel has engaged in fishing in that area does not justify IUU listing of that vessel.'

7.33   The UK made the following statement:

'The UK fully agrees with the interventions from Ukraine and Norway. This is a highly sensitive issue that has been bought into this Commission by the behaviour of Russia. Behaviour with which they persist. Today within CCAMLR their attention is on the UK; tomorrow it could be on any other Member.

The UK has set out its position on the interpretation of CM 31-01, Argentina's background paper CCAMLR-41/BG/36 and the other issues they raised, in detail in the SCIC report and the series of COMM CIRCS issued over this year.

We reject the characterisation of the situation by Russia and Argentina. The UK again draws the Commissions attention to Article IV of the Convention and our rights enshrined therein.'

7.34   Argentina made the following statement:

'Argentina refutes Norway's claims that non-renewal of CM 41-02 would permit fishing activities, noting an active conservation measure like CM 31-01 is critical for the management of fishing activities as it defines the catch limits and all other regulations required for that fishery to occur. Argentina recalls that CM 31-01 was adopted in 1986 precisely to prevent the area in question from being left outside the CCAMLR regime

and its multilateral management. Argentina notes that the South Georgias, South Sandwich and Malvinas Islands are an integral part of Argentine territory, and that its territorial integrity was violated by the UK 190 years ago, also recalling that the sovereignty dispute over these territories is recognised not only by the UK itself but also by the United Nations. In this regard, Argentina states that for that reason, the UK could not be deemed a Coastal State in said areas according to UNCLOS and neither had the right to adopt "national" measures under the statement of the Chairman of the Conference of 1980, as in this particular case paragraph 5 of said Statement requires recognition by all Contracting Parties of the existence of a single sovereignty of one State over South Georgias and South Sandwich Islands, which is not the case. Moreover, Argentina recalls that the United Nations General Assembly had approved numerous resolutions in which it urges the Parties in the dispute to refrain from adopting decisions that entail unilateral changes in the situation while said territories are subject to the process recommended in Resolutions 2065/XX and 3160/XXVIII, adding that the unilateral action of the UK was not compatible either with the letter or the spirit of those resolutions. Finally, Argentina reiterates that it does not believe that the UK should be able to benefit from CCAMLR's CDS mechanism to trade the illegally caught *Dissostichus* spp. with Contracting Parties or non-Contracting Parties that use the CDS.'

7.35    Some Members expressed regret that this issue was being raised again in the Commission and noted that their views were reflected in the SCIC report.

7.36    The UK made the following statement:

'The UK has responded to Argentina's points during the SCIC discussion, and in the interests of time, we will not repeat them. We must, however, reject Argentina's statement, including its interpretation of the Convention and Chairman's Statement. The UK also reiterates that it has no doubt over its sovereignty of the Falkland Islands, South Georgia and the South Sandwich Islands and their surrounding maritime zones, which is well known to all delegates.'

7.37    The Commission noted that consensus was not reached for those four issues.

7.38    The Commission **adopted** the CCAMLR Compliance Report.

Illegal, unreported and unregulated (IUU) fishing in the Convention Area

7.39    The Commission noted some information has been provided by INTERPOL to CCAMLR regarding the SEAFO IUU listed vessel *Cobija*, suspected of conducting fishing activities targeting toothfish within Divisions 58.4.2 and/or 58.4.3, which remains detained in Yemen. The Commission **endorsed** the recommendation that the Secretariat continue engagement with INTERPOL with respect to the *Cobija* and to circulate relevant information as it becomes available.

7.40    The Commission **endorsed** the recommendations that the Secretariat review CCAMLR's data holdings to identify organisations, vessel masters and fishing masters which are associated with known IUU vessels and IUU fishing activity and develop a plan of action for the enhanced sharing of information and collaboration to combat IUU fishing and related activities, with both tasks to be presented to SCIC-2023.

7.41    The Commission noted that there were no updates to the NCP-IUU Vessel List and **adopted** the 2022/23 NCP-IUU Vessel List.

7.42    Some Members recalled their statements in SCIC-2022 in respect of the British-flagged vessels *Argos Georgia*, *Argos Helena*, *Nordic Prince* and *Polar Bay* included on the Provisional CP-IUU Vessel List.

7.43    Norway recalled its previous statement and stated that fishing in Subarea 48.3 in the 2021/22 season is not a legal basis for IUU listing.

7.44    Argentina expressed its deep concern that the four UK-flagged vessels were not included either in the CP-IUU Vessel List or the Compliance Report despite their serious breach of CM 31-01. Argentina expressed its surprise that although early notes from the UK had urged Members to reach an agreement on fishing activities in Subarea 48.3, this Member later decided to take unilateral measures outside of the CCAMLR regime and went on to block consensus on the CP-IUU Vessel Listing and compliance status in the Compliance Report. Argentina reminded Members of their obligations under CM 10-08 and also to make themselves aware of the vessel owners, beneficiaries and associated companies of the *Argos Georgia*, *Argos Helena*, *Nordic Prince* and *Polar Bay* and aware of the conservation measures they must comply with. Finally, Argentina urged all Members to work in good faith and cooperatively so as to reinstate a conservation measure allowing for the Patagonian toothfish fishery in this subarea, and therefore abide by the provisions of the CAMLR Convention.

7.45    On the issue of the proposed listing of the UK vessels *Argos Georgia, Argos Helena, Nordic Prince* and *Polar Bay* on the CP-IUU Vessel List, Russia viewed the illegal activities during the 2021/22 season in Subarea 48.3 as egregious and noted that they appear to be part of a pattern of illegal activity by these vessels. Russia also noted that the response of the UK appears part of a pattern to ignore the legal framework of the CCAMLR, including Article XXI of the Convention, not conducting full investigations, not granting SCIC and the Commission a possibility to access relevant data to support compliance evaluation, and not holding its vessels accountable for illegal activity. In this regard, Russia recommended to include the UK-flagged vessels *Argos Georgia, Argos Helena, Nordic Prince* and *Polar Bay* on the CP-IUU Vessel List.

7.46    The UK rejected the Russian comments and made the following statement:

'The UK has already set out its position on this issue in detail, as is recorded in the SCIC report. Consistent with our position on the operation of the fishery more generally, we refute any assertion that the British vessels that have been operating in the South Georgia toothfish fishery can be characterised in any way as illegal, unreported or unregulated.'

7.47    The Commission noted that there was no consensus to include the *Argos Georgia*, *Argos Helena*, *Nordic Prince* and *Polar Bay* on the CP-IUU Vessel List and the CP-IUU Vessel List was **adopted** with no changes from CCAMLR-40.

Fishery notifications

7.48    The Commission noted SCIC's discussion on the fishery notifications for the 2022/23 season (SCIC-2022, paragraphs 142 to 145). Russia noted its concern that four vessels notified from the UK had obtained commercial gain from participating in the *D. eleginoides* fishery in Subarea 48.3 in the 2021/22 season and were considered for the CP-IUU Vessel List.

7.49    On the issue of notifications for exploratory fisheries, Russia requested for the removal of the UK from paragraph 1 of CMs 41-09 and 41-10 because of serious concerns about the activities of the UK vessels *Argos Georgia, Argos Helena, Nordic Prince* and *Polar Bay* that led to the recommendation that it be listed on the CP-IUU Vessel List. Russia also noted that mentioned vessels benefit from illegal activity in Subarea 48.3 and should not claim the right to carry out commercial activities in the CCAMLR area.

7.50    The UK made the following statement:

'The notifications for the four British-registered vessels were submitted in accordance with the relevant conservation measures. A few years ago, Russia called for assurances that all delegations and vessels be treated indiscriminately and double standards not be applied. We have set out our position on the wider issue relating to the South Georgia toothfish fishery during the SCIC meeting. It is wholly unreasonable and political for Russia to seek to bully the UK into agreeing a Ross Sea fishery without British vessels.'

7.51    The Commission noted that Ms Engelke-Ros was nominated for, and accepted, a second term as SCIC Chair. There were no nominations for a Vice-Chair of SCIC.

7.52    The Chair closed Agenda Item 7.


**CCAMLR Scheme of International Scientific Observation**

8.1    The Commission thanked China for offering to host a three-day krill fishery workshop in Shanghai in 2023 to improve krill sampling protocols and priorities for data collection (SC-CAMLR-41, paragraphs 9.2 to 9.8). The Commission encouraged interested Members and ARK to attend.

8.2    The Chair closed Agenda Item 8.


**Conservation measures**

9.1    The Commission's consideration of revised and new conservation measures and resolutions, and related matters, is reported in this section. Conservation measures and resolutions adopted at CCAMLR-41 will be published in the *Schedule of Conservation Measures in Force 2022/23*.

9.2     The Commission noted that the following conservation measures and resolutions will remain in force for 2022/23:

Measures on compliance

10-01 (2014), 10-03 (2019), 10-06 (2016), 10-07 (2016), 10-08 (2017) and 10-10 (2019).

Measures on general fishery matters

21-01 (2019), 21-02 (2019), 21-03 (2019), 22-01 (1986), 22-02 (1984), 22-03 (1990), 22-04 (2010), 22-05 (2008), 22-06 (2019), 22-07 (2013), 22-08 (2009), 22-09 (2012), 23-01 (2016), 23-02 (2016), 23-03 (2016), 23-04 (2016), 23-05 (2000), 23-07 (2016), 24-01 (2019), 24-02 (2014), 24-04 (2017) and 25-02 (2018).

Measures on fishery regulation

31-01 (1986), 31-02 (2007), 32-01 (2001), 32-02 (2017), 32-18 (2006), 33-01 (1995), 41-08 (2021), 42-01 (2021), 51-01 (2010), 51-02 (2008), 51-03 (2008) and 51-06 (2019).

Measures on protected areas

91-01 (2004), 91-02 (2012), 91-03 (2009), 91-04 (2011) and 91-05 (2016).

Resolutions

7/IX, 10/XII, 14/XIX, 15/XXII, 16/XIX, 17/XX, 18/XXI, 19/XXI, 20/XXII, 22/XXV, 23/XXIII, 25/XXV, 27/XXVII, 28/XXVII, 29/XXVIII, 30/XXVIII, 31/XXVIII, 32/XXIX, 33/XXX, 34/XXXI and 35/XXXIV.

9.3     The Commission **adopted** the following revised conservation measures and the new climate change resolution:

Measures on compliance

10-02 (2022), 10-04 (2022), 10-05 (2022) and 10-09 (2022)

Revised measures on general fishery matters

23-06 (2022), 24-05 (2022), 25-03 (2022) and 26-01 (2022)

Revised measures on fishery regulation

32-09 (2022), 33-02 (2022), 33-03 (2022), 41-01 (2022), 41-03 (2022), 41-04 (2022), 41-05 (2022), 41-06 (2022), 41-07 (2022), 41-09 (2022), 41-10 (2022), 41-11 (2022), 42-02 (2022), 51-04 (2022) and 51-07 (2022).

New resolutions

Resolution 36/41.

Implementation and Compliance

9.4     The Commission **adopted** a revision to CM 10-02 to require fishing vessels from the 2023/24 season to be fitted with a fully functional AIS and to have it switched on at all times when in the Convention Area except for when the operation of the AIS might compromise the safety or security of the vessel or where security incidents are imminent (CM 10-02, paragraph 2vii).

9.5     The Commission **adopted** a revision to CM 10-04 requiring Contracting Parties who are requesting VMS data to use the VMS data request form for surveillance or inspection (CM 10-04, Annex 10-04/D).

9.6     The Commission **adopted** a revision to CM 10-05 updating contact information required on a *Dissostichus* Catch Document (DCD) (CM 10-05, Annex 10-05/A5i).

9.7     The Commission **adopted** a revision to CM 10-09, updating the details on the transhipment notification template (CM 10-09, Annex 10-09/A).

General fishery matters

9.8     The Commission **adopted** a revision to CM 23-06 regarding by-catch, seabird and marine mammal data reporting requirements for krill fishing vessels (CM 23-06, paragraphs 4 and 5).

9.9     The Commission **adopted** a revision to CM 24-05 which details fishing for research purposes pursuant to CM 24-01 (CM 24-05, Table 1).

9.10    The Commission **adopted** a revision to CM 25-03 to extend the trial of mitigation devices for krill fishing vessels who use a net monitoring cable.

9.11    The Commission **adopted** a revision to CM 26-01.

9.12    The Commission noted the withdrawal of the proposal to amend CMs 21-01, 21-02 and 23-05, submitted by the EU (CCAMLR-41/25).

Fishery regulations

9.13    The Commission noted the withdrawal of the proposal by Russia for amending CM 31-02 (CCAMLR-41/39), to expand the reporting of data associated with delayed retrieval of fishing gear at the time of fishery closures. The Commission encouraged interested Members to hold intersessional discussions and to return with a revised proposal.

9.14    The Commission considered the proposal from the EU and its Member States for a new CM 32-XX to protect fish nests in the Convention Area to give effect to the recommendations of the Scientific Committee on this matter (SC-CAMLR-41/BG/05; SC-CAMLR-41, paragraph 5.44). Some Members stated that they could not support the proposal, noting that

further work was needed in the Scientific Committee, including to define the term 'fish nest area', to identify relevant indicators, and to refine the review process for opening and closing fish nest areas to bottom fishing activities.

9.15   The Commission noted that there was no consensus on the proposal.

9.16   The EU and its Member States made the following statement:

'The EU and its Member States are very disappointed that the Commission was unable to agree on the protection of fish nest areas in the waters surrounding Antarctica. As you know, the discovery of the world's largest fish nest colony with an estimated 60 million nests in the Weddell Sea has attracted a lot of attention around the world, not only in the scientific community, also among the general public. That we could not agree on protecting these extraordinary biological features due to the opposition of one Member, Russia, will be regarded as a failure by CCAMLR to act in the light of irrefutable scientific evidence. If we cannot even agree to protect these fish nest areas, then what is worth protecting? CCAMLR's scientific community has given us clear advice that fish nest areas require immediate protection, wherever and whenever they are being observed or discovered in the Convention Area. The recommendations coming forward from the EMM and FSA Working Groups and from the Scientific Committee could not have been clearer. Fish nests are indicators of vulnerable marine ecosystems that should be protected in a timely manner. All scientists that participated in these discussions in the Scientific Committee agreed on this. It is deeply concerning that Russia chose to ignore that advice.'

9.17   Germany made the following statement on behalf of the EU and its Member States:

'There is also another concern here. As you know, CCAMLR bases its decision-making on the best available science. Best available science is based on data that is not only coming forward from fishing vessels. In fact, most data, especially those essential for CCAMLR's commitment to apply a precautionary and ecosystem-based approach in the conservation of Antarctic marine living resources, comes from work carried out under national Antarctic programs. These programs and the scientists working on them, dedicate a considerable amount of time and effort in order to provide their knowledge and research results to CCAMLR. The work they do is essential for understanding the ecological relationships that underlie the functioning of the Antarctic marine ecosystems, including Antarctic marine living resources. Continuously ignoring the scientific evidence provided by these experts may be considered as a form of disrespect for their hard work and make them doubt their relationship with and any further contributions to CCAMLR.

If this vital source of expert knowledge and information dries up, then the objective of the Convention, to conserve the Antarctic marine living resources, cannot be achieved.'

9.18   Some Members supported the statements by the EU and its Member States.

Exploratory fisheries

9.19    The Commission **adopted** a revision to CM 41-01 to require research hauls to be conducted in Subarea 88.2 SSRU H (CM 41-01, Annex 41-01/B).

Toothfish catch limits

9.20    The Commission **endorsed** the advice of the Scientific Committee on catch limits in the fisheries for *D. eleginoides* in Subarea 48.4 and **adopted** CM 41-03 (2022).

9.21    The Commission considered the arrangements for exploratory fisheries for *D. mawsoni* in Subareas 48.6, 88.1 and 88.2 and Divisions 58.4.1 and 58.4.2. Russia noted that it did not agree with the notifications of four UK vessels to participate in the Subarea 88.1 and 88.2 fisheries (paragraph 7.49).

9.22    The UK made the following statement

'We have clearly heard that Russia will block the Ross Sea exploratory fishery unless four UK vessels are deleted from the list of those who may participate. The UK is not Russia. We are not going to jeopardise a scientifically derived catch. Nor are we going to hold other Members ransom. Therefore, while we are exasperated by Russia's stance, we accept that we cannot prevent it from exercising its power of veto. This said, however, we must record the duplicity of the situation. Russia claims the South Georgia toothfish fishery is unsustainable because on average it has 25% immature fish in the catch. The Ross Sea fishery catches an average of 50% immature fish. And on a stock that is demonstrably more vulnerable to the impacts of climate change. This is not science. It's politics. It is what it is.'

9.23    Many Members supported the notification of four UK vessels for the fisheries in Subareas 88.1 and 88.2, however, no consensus was reached on the inclusion of these vessels.

9.24    Some Members recalled a recent example of a Russian-flagged vessel that was nominated for the provisional CP-IUU Vessel List but was not included on the CP-IUU list and was then notified to fish for the following season.

9.25    Russia noted that it does not have information about any precedence about the issuance of licences to conduct toothfish fishery in violation of CCAMLR conservation measures.

9.26    The Commission **endorsed** the Scientific Committee's advice on catch limits (SC-CAMLR-41, Tables 4 and 5). The Commission **adopted** the following conservation measures for fisheries targeting *D. mawsoni* and/or *D. eleginoides*:

CM 41-04 – exploratory fishery for *D. mawsoni* in Subarea 48.6
CM 41-05 – exploratory fishery for *D. mawsoni* in Division 58.4.2
CM 41-06 – exploratory fishery for *D. eleginoides* in Division 58.4.3a
CM 41-07 – exploratory fishery for *D. mawsoni* in Division 58.4.3b
CM 41-09 – exploratory fishery for *D. mawsoni* in Subarea 88.1
CM 41-10 – exploratory fishery for *D. mawsoni* in Subarea 88.2
CM 41-11 – exploratory fishery for *D. mawsoni* in Division 58.4.1.

9.27    There was no consensus that directed fishing for *D. mawsoni* shall take place in 2022/23 in Division 58.4.1. Accordingly, the Commission **adopted** CM 41-11 which provides that directed fishing for *D. mawsoni* shall not take place in 2022/23 in Division 58.4.1.

Icefish catch limits

9.28    The Commission **endorsed** the Scientific Committee's advice on the limits for the fishery for *C. gunnari* in Division 58.5.2 and **adopted** CM 42-02.

Krill fisheries

9.29    After extensive discussions (paragraphs 4.10 to 4.21) the Commission **agreed** a rollover of CM 51-07 for one year and **adopted** CM 51-07 (2022).

9.30    The Commission considered a proposal by the USA and Australia to improve the management of Antarctic krill (*Euphausia superba*) fisheries in CCAMLR (CCAMLR-41/36 Rev. 1). The Commission did not reach consensus on the proposed amendments to CMs 10-03, 10-04, 10-09, 51-01, 51-02, 51-03, 51-06 and 51-07 and encouraged the proponents to work intersessionally with interested Members on the proposal.

Other fishery matters

9.31    Australia advised the Commission that any fishing or fisheries research activities in that part of Divisions 58.4.3a, 58.4.3b and 58.5.2 that constitutes the Australian exclusive economic zone (EEZ) around the Australian Territory of Heard Island and McDonald Islands must have the prior approval of Australian authorities. The Australian EEZ extends up to 200 n miles from the Territory. Unauthorised or illegal fishing in these waters is a serious offence under Australian law. Australia seeks the assistance of other CCAMLR Members in ensuring their nationals and vessels are aware of the limits of the Australian EEZ and the need for prior permission to fish there. Australia has implemented strict controls to ensure that fishing in its EEZ occurs only on a sustainable basis. Presently, fishing concessions are fully subscribed and no further concessions for legal fishing in the EEZ are available. Australian legislation provides for large penalties for illegal fishing in Australia's EEZ, including the immediate forfeiture of foreign vessels found engaged in such activities. Any enquiries about fishing in the Australian EEZ should be made initially to the Australian Fisheries Management Authority.

9.32    The Chair closed Agenda Item 9.

## Administration and Finance

Advice from SCAF

10.1    The Chair of SCAF, Ms Langerock, presented the report of SCAF-2022 (Annex 8).

10.2    The Commission **endorsed** the advice of SCAF and accepted the Audited Financial Statements (SCAF-2022, paragraphs 4, 5 and 7).

10.3    The Commission **did not endorse** the recommendation of SCAF to adopt the Australian equivalents to the International Financial Reporting Standards (A-IFRS) after the adoption of these standards was opposed by Russia (SCAF-2022, paragraphs 6). The accounting standards under which the annual financial statements of CCAMLR would be audited remain the International Financial Reporting Standards (IFRS). The Chair of SCAF indicated that this would be conveyed to the Australian National Audit Office (ANAO). The Secretariat indicated that it was uncertain of the impact of the decision but would inform the Chair of SCAF accordingly.

10.4    The Commission **endorsed** the decision of SCAF to appoint ANAO as the external auditor for 2023 and 2024.

10.5    The Commission **endorsed** the decisions of the General Capacity Building Fund Panel and the recommendations from SCAF regarding capacity building (SCAF-2022, paragraphs 18 to 21).

10.6    The Commission welcomed the report of the Executive Secretary (CCAMLR-41/05) and **endorsed** the Strategic Plan for 2023–2026 (CCAMLR-41/01 Rev. 1) (SCAF-2022, paragraph 16).

10.7    The Commission accepted the advice of SCAF on staffing matters (SCAF-2022, paragraph 17) and **endorsed** the Staff Regulations as adopted in 2019 (CCAMLR-38, paragraph 4.4), the revised CCAMLR Staffing and Salary Strategy 2023−2026 (CCAMLR-41/07, Annex 1) and the revised Job Classification Scheme (CCAMLR-41/07, Annex 2) as the three parts of CCAMLR's staffing policies.


Review of the 2022 budget, the 2023 budget and forecast budget for 2024

10.8    The Commission **adopted** the revised 2022 budget, the 2023 budget as amended by SCAF and the forecast budget for 2024 (SCAF-2022, paragraphs 22 and 58, Appendix I and Appendix II).


Administration matters

10.9    The Commission **endorsed** the recommendations of SCAF regarding the development of a Code of Conduct for the Commission which will be progressed intersessionally by an e-group led by Australia (SCAF-2022, paragraphs 59 to 63).

10.10   Noting paragraph 259 of the Final Report of the Forty-fourth Antarctic Treaty Consultative Meeting, the Commission agreed with the proposal of the UK to endorse a similar statement for CCAMLR: everyone working on CCAMLR matters, it's work and activities in the Convention Area, should be safe, welcomed, respected and free from discrimination.

10.11   The Commission **endorsed** the recommendations of SCAF regarding meeting arrangements for the Commission meetings and intersessional meetings during 2023 and 2024 (SCAF-2022, paragraphs 68 to 73).

10.12   Russia noted that the proposal in paragraph 76(ii) in the SCAF report differed from the recommendations of the Scientific Committee concerning this issue (SC-CAMLR-41, paragraph 11.24). The Commission did not endorse this proposal.

10.13   The Commission **endorsed** the recommendations on access to meeting documents in paragraphs 11 to 16 of CCAMLR-41/10, with the amendments contained in SCAF-2022, paragraph 76(i) and (iii).


Other business

10.14   The Commission thanked the Chair of SCAF for the efficient manner in which SCAF conducted its business.

10.15   The Commission noted that SCAF does not have a Vice-Chair and was seeking expressions of interest.

10.16   The Chair of SCAF agreed to remain as Chair for another year while a new Chair was being sought.

10.17   The Chair closed Agenda Item 10.


**Cooperation with the Antarctic Treaty System and international organisations**

Cooperation with the Antarctic Treaty System

11.1   The Commission considered CCAMLR-41/BG/01, submitted by the Executive Secretary, which presented a summary report of the Forty-fourth ATCM held in Berlin, Germany, from 24 May to 2 June 2022.

11.2   The Commission thanked the Executive Secretary and reaffirmed the importance of the collaboration between CCAMLR and the ATCM.

11.3   The UK recalled that CCAMLR has arrangements or memorandums of understanding (MOUs) with a number of international organisations and that to streamline knowledge exchange it might be useful if other organisations were able to share their reports.

11.4   The Executive Secretary informed the Commission that he prepared an annual summary report of CCAMLR's activities on issues of interest to the ATCM for presentation at ATCM, but did not prepare such a report for other international organisations. He proposed to share his annual summary report of CCAMLR activities with Members acting as observers at other international meetings as it could prove useful to their presentation of CCAMLR activities at the meeting they are observing.

11.5   This issue will be further explored in the intersessional period.

11.6    The Executive Secretary of the Antarctic Treaty Secretariat, Mr A. Lluberas Bonaba, highlighted that for the next ATCM, the Meeting agreed to hold a full-day joint session of the CEP and the ATCM, with SCAR and COMNAP, to consider the implementation of the Decadal Synopsis Report on the ACCE Report's recommendations at ATCM XLV, and encouraged Members, Observers and experts to submit papers on the topic to ATCM XLV and to join the meeting to support this work. In addition, he recalled that a topical session on the harmonisation of the implementation of the Polar Code was going to be held during the meeting, with the aim of facilitating a common understanding of its implementation.

Cooperation with international organisations

11.7    The Commission noted CCAMLR-41/BG/21, submitted by New Zealand, which presented an update on progress by the IMO to extend safety measures to vessels not certified under the Convention for Safety of Life at Sea (SOLAS Convention).

11.8    Dr W. Misiak (ACAP), thanked CCAMLR for its longstanding cooperation and noted that the CCAMLR–ACAP MOU had been renewed in November last year. She noted that ACAP was pleased to accept the invitation for an expert to participate in WG-IMAF's discussions and encouraged CCAMLR Members to continue their efforts to better understand the potential impacts on seabirds from trawl warp and net monitoring cable strikes. She noted that ACAP welcomed the current total estimated seabird mortality numbers in CCAMLR longline fisheries for 2022 as the lowest on record, and was encouraged by the recovery of the white-chinned petrel population at Possession Island, which showed how a combination of management strategies at sea and on land can lead to positive conservation outcomes.

Reports of observers from international organisations

11.9    Canada drew the Commission's attention to the Agreement to Prevent Unregulated Fishing in the High Seas of the Central Arctic Ocean (CAOFA), noting the opportunity for knowledge sharing between CCAMLR and the CAOFA in the future, in particular, on scientific and technical issues. Parties to the COAFA include, among others, many CCAMLR Members collaborating on issues pertinent to IUU fishing, fishery sustainability, data sharing and the use of indigenous and local knowledge. Canada indicated that the first Conference of the Parties (COP) will be hosted by Korea in Incheon, from 23 to 25 November 2022 in a hybrid format. Korea indicated that it will report back at CCAMLR-42 on the inaugural session of CAOFA and that the Agreement and Commission would benefit from each other through cooperation through various means. Korea also invited Members to consider future cooperation between CCAMLR and CAOFA going forward.

11.10   The Commission welcomed this information. Some Members noted that it was premature to make a decision on possible forms and contents of future collaboration with CAOFA, and looked forward to further information for consideration on this matter.

11.11   The Commission noted the papers submitted by ARK: SC-CAMLR-41/BG/08 which presented recommendations for improving transparency and safety in the CCAMLR krill

fishery, SC-CAMLR-41/BG/09 which presented recommendations to aid in developing and implementing the new management strategy for the krill fishery, and SC-CAMLR-41/BG/07 which presented a report on its members' fishing fleet activities over the past year.

11.12  Dr J. Arata (ARK) thanked the Commission for the opportunity to attend the meeting and acknowledged the significant progress the Scientific Committee achieved in advancing the new management strategy for the krill fishery. He welcomed the recognition that there is enough krill to sustain increased catches, underscoring the healthy status of the Antarctic krill population, and welcomed the future work planned on this issue. He highlighted that allocating quotas at the agreed spatial subdivision would not translate into an increase in catches to the designated catch limits, as not all areas and seasons represented feasible fishing grounds. ARK has adopted voluntary restricted zones since the 2018/19 season and is pleased to see that the Commission is now considering a work plan on the harmonisation of krill and spatial management. Dr Arata noted that the fishing industry will be able to support the increasing data demands providing that CCAMLR scientists and the fishing industry work together. He encouraged the implementation of daily catch and effort reporting when the remaining allowable catch within a specific stratum/period would be below 30 000 tonnes and suggested that each fishing notification by Flag States should provide a list of companies to be used for transhipment in the coming season, and that scientific observers could start collecting data on transhipment events to improve the Commission's knowledge of this crucial activity for fishing operations.

11.13  The Commission thanked ARK for its papers and noted the valuable contribution the fishing fleet had made and will continue to provide to science in the context of the revision of the krill management approach.

11.14  The Commission considered SC-CAMLR-41/BG/19, submitted by SCAR, which presented the annual report of SCAR to CCAMLR, providing information on recent and future activities of relevance to the Scientific Committee and the Commission. SCAR's science groups, research programs and specialised subsidiary groups have undertaken a wide variety of activities, a range of which were presented this year in SC-CAMLR-41/BG/19, BG/20, BG/21, BG/22, BG/23, BG/24 and BG/25. On behalf of SCAR, Prof. M.-A. Lea highlighted SC-CAMLR-41/BG/21 which provided a major update to the ACCE Report which has been compiled based largely on the findings of the IPCC's Sixth Assessment Reports and provided a series of recommendations, which were also the basis for the SCAR lecture given to the Commission on its first day. She indicated that SCAR would be pleased to give such a presentation each year if it should be the desire of the Commission.

11.15  The Commission welcomed SCAR's important contributions and thanked SCAR for its lecture (paragraphs 2.9 to 2.13). It welcomed future lectures from SCAR on climate change and other topics and envisioned a dynamic interaction between SCAR and CCAMLR in the future. It noted that CCAMLR would benefit from advice and recommendations from SCAR on specific topics and agreed to consider the delivery of yearly lectures by SCAR during the intersessional period.

11.16  The Commission considered CCAMLR-41/BG/31, submitted by ASOC, which presented the organisation's work over the past year and noted the six background papers it submitted to CCAMLR-41. ASOC reported that over the past year, ASOC and its member organisations had participated in a variety of activities to support Antarctic conservation, such as funding scientific research, facilitating opportunities for discussion between CCAMLR

stakeholders, and organising numerous educational and outreach activities. These activities focused on the designation of MPAs in the waters surrounding Antarctica, educational outreach on the dual crises of climate change and biodiversity loss, and protection for species and habitats. ASOC and its member organisations supported scientific research relevant to CCAMLR's work, including projects on: southern right whales, mesopelagic ecosystems, phylogenetic diversity in the waters surrounding Antarctica, blue carbon, vulnerable marine ecosystems, and estimates of the foraging needs of krill predators. Furthermore, ASOC and its members celebrated the first-ever World Krill Day on 11 August. ASOC and its member organisations celebrated the day by promoting the holiday on social media, and hosting events such as a webinar on krill for participants in China, Japan and Korea.

11.17   The Commission noted SC-CAMLR-41/BG/13, submitted by Oceanites, which presented a report summarising the present status of Antarctica's five penguin species based on data from the Mapping Application for Penguin Populations and Projected Dynamics (MAPPPD, www.penguinmap.com). The data indicated that since 2020, chinstrap penguins continued to decline in Subareas 48.1 and 48.2, Adélie penguins continued to decline in Subarea 48.1, gentoo penguins continued to increase in Subarea 48.1, and Adélie penguins increased in Subarea 88.1 and Divisions 58.4.1 and 58.4.2.

> Reports from CCAMLR representatives at meetings of international organisations in the previous intersessional period and nominations of representatives to forthcoming meetings of relevant international organisations

11.18   The Commission noted the following background papers summarising the main outcomes of meetings of other organisations of interest to CCAMLR:

- CCAMLR-41/BG/06 – Report from the CCAMLR Observer (Executive Secretary) to the 35th meeting of FAO Committee on Fisheries (COFI) and the 9th meeting of the Regional Fishery Bodies Secretariats' Network (RSN).

- CCAMLR-41/BG/09 – Report from the CCAMLR Observer (USA) to the 2021 International Commission for the Conservation of Atlantic Tunas (ICCAT) Annual Meeting (Virtual meeting, 15 to 23 November 2021).

- CCAMLR-41/BG/10 – Report from the CCAMLR Observer (USA) to the Eighteenth Regular Session of the Western and Central Pacific Fisheries Commission (WCPFC) (Virtual meeting, 1 to 7 December 2021).

- CCAMLR-41/BG/14 – Report from the CCAMLR Observer (Argentina) to the resumed Fifth Session of the United Nations Environment Assembly of the of the United Nations Environment Programme (Nairobi, Kenya, 28 February to 2 March 2022).

- CCAMLR-41/BG/15 – Report from the CCAMLR Observer (European Union) to the 9th Meeting of the Parties to the Southern Indian Ocean Fisheries Agreement (SIOFA) (Hybrid format, 4 to 8 July 2022).

- CCAMLR-41/BG/27 – Report from the CCAMLR Observer (Australia) to the 5th Special Session and 26th Annual Meetings and the 4th Special Session of the Indian Ocean Tuna Commission (IOTC) (Videoconference, 29 November 2021).

- CCAMLR-41/BG/28 – Report from the CCAMLR Observer (Australia) to the Seventh Session of the Meeting of the Parties to the Agreement on the Conservation of Albatrosses and Petrels (MoP7) (Virtual meeting, 9 to 13 May 2022).

- CCAMLR-41/BG/38 – Report from the CCAMLR Observer (Norway) to the 40th Annual Meeting of the North-East Atlantic Fisheries Commission (NEAFC) (Hybrid meeting, 9 to 12 November 2021).

- CCAMLR-41/BG/41 – Report from the CCAMLR Observer (European Union) to the 44th annual meeting of the Northwest Atlantic Fisheries Organization (NAFO) (Porto, Portugal, 19 to 23 September 2022).

11.19  The Commission considered CCAMLR-41/BG/07, submitted by the CCAMLR Secretariat, which presented the calendar of 2022/23 meetings of organisations or arrangements with nominated observers for the Commission. The table was modified to specify nominated observers (Table 1).


Cooperation with regional fisheries management organisations (RFMOs)

11.20  The Commission considered CCAMLR-41/11 Rev. 1, submitted by the CCAMLR Secretariat, which presented arrangements for cooperation under the formal Arrangements and MOUs that CCAMLR has signed with other regional organisations. The Secretariat recommended that the Commission note the increasing level of cooperation with these organisations (SIOFA, SPRFMO, SEAFO, WCPFC, CCSBT and ACAP), and authorise the extension of the Arrangement with the CCSBT for another three years.

11.21  The Commission **agreed** to authorise the extension of the Arrangement with CCSBT for another three years.

11.22  The Chair closed Agenda Item 11.


**Administrative matters**

Election of officers

12.1    The Commission welcomed Ukraine to serve as Chair of the Commission for the 2023 and 2024 meetings, in accordance with the procedure agreed by the Commission at its first meeting and reflected in the Rules of Procedure (Rule 8 and footnote 4). The Commission noted that Ukraine will take office at the conclusion of this meeting per the Rules of Procedure (Rule 10). In accepting this position, Ukraine advised that Mr Vitalii Tsymbaliuk (a Ukrainian Diplomat) would assume the role.

12.2    Mr Tsymbaliuk made the following statement:

'As we approach this historic period of Ukraine's chairmanship of CCAMLR, we would like to stress that the Commission has always been, and remains, the leading international organisation that assumes responsibility for human activities in relation to Antarctic marine living resources, as well as related ecosystems.

Recognising the great honour and privilege of chairing the Commission, Ukraine is inspired to seize this opportunity to make its remarkable contribution in order to achieve the objectives of the Convention as effectively as possible.

Article II of the Convention fully reflects our overall objectives, both short term and long term. We remain faithful to the principles and priorities of CCAMLR. In this regard, in my capacity as the future Chair of the Commission, I will do my utmost to promote CCAMLR's activities effectively, create the conditions for productive dialogue and decisions that are important to us all.

We believe that all CCAMLR nations together have the capacity to act in a fair and fruitful manner, respecting human rights and the rights of sovereign nations to their own path and development. It would be truly great to act in the situation of peace in the world, when political ambitions serve for a better world for all humanity.

Despite the very difficult situation caused by the war against my country, we will do our utmost to create a constructive atmosphere in the Commission, which will facilitate work and consensus on the most important and relevant issues.

We would also like to thank Dr Jakob Granit for successfully leading the work of the Commission during the difficult years of the COVID-19 pandemic. It was a great challenge to ensure the fulfilment of the main functions of the Commission under conditions where face-to-face meetings were not possible. We believe it is clear to everyone that Dr Jakob Granit did an excellent job in this task, which was also facilitated by the highly professional and dedicated work of the CCAMLR Secretariat under the leadership of Executive Secretary, Dr David Agnew.

Taking on the role of Chair of the Commission, it is much easier for me to look to the future, understanding that this will be an interesting job in collaboration with the best professionals who have looked after CCAMLR for many years.

I thank you all for your attention and remain open to cooperation to achieve better mutual understanding and resolution of important issues for the benefit of all CCAMLR Members.'

12.3    Russia, noting this statement and recalling the Rules of Procedure (Rule 8), stated its expectation that the Chair of the Commission would continue the tradition of maintaining non-political impartial objectivity in leading the Commission through its business and decision-making.

12.4    The Commission expressed its gratitude to Ms Langerock for her service as Chair of SCAF over the last two years and welcomed her agreement to serve for one additional year in 2023. The Commission also encouraged Members to consider nominations for Chair of SCAF from the end of the 2023 meeting.

12.5    The Commission thanked Ms Engelke-Ros, Chair of SCIC, for guiding the meetings over the last two years, and welcomed Ms Engelke-Ros' appointment for a second term for the 2023 and 2024 meetings.

Invitation of observers

12.6    The Commission will invite the following to attend the Forty-second Meeting of the Commission as Observers:

- non-Member Contracting Parties – Bulgaria, Canada, Cook Islands, Finland, Greece, Mauritius, Islamic Republic of Pakistan, Republic of Panama, Peru and Vanuatu.

- Other States in dialogue with CCAMLR – Indonesia and Luxembourg.

- NCPs trading in re-exported *Dissostichus* spp. that has not been previously landed in the port of a Contracting Party or NCPs cooperating with CCAMLR by participating in the CDS, who are cooperating with CCAMLR through limited access to the e-CDS – Mexico and Singapore.

- NCPs not participating in the CDS but possibly involved in harvesting, landing and/or trade of toothfish in accordance with the NCP Engagement Strategy – Bermuda, Brunei Darussalam, Cambodia, Colombia, Kuwait, Lebanon, Malaysia, Republic of the Maldives, Republic of the Philippines, Qatar, Thailand, Turkey, United Arab Emirates and Viet Nam.

- NCP Flag States of vessels listed on CCAMLR NCP-IUU Vessel List – Republic of Angola, The Gambia, Islamic Republic of Iran, Nigeria, St. Vincent and the Grenadines, Tanzania and Togo.

12.7    The following intergovernmental organisations will be invited to attend CCAMLR-42 as Observers: ACAP, CCSBT, CEP, CITES, COMNAP, FAO, IATTC, ICCAT, IOC, INTERPOL, IUCN, IWC, RPOA-IUU, SCAR, SCOR, SEAFO, SIOFA, SOOS, SPRFMO, UNEP and WCPFC.

12.8    The following non-governmental organisations will be invited: ARK, ASOC, COLTO, IAATO and Oceanites Inc.

Next meeting

12.9    The Commission reconfirmed the decision at CCAMLR-38 (paragraph 13.9) that CCAMLR-42 will take place in person at the CCAMLR Headquarters building (181 Macquarie Street) in Hobart, Australia, from 16 to 27 October 2023 (COMM CIRC 20/23).

12.10    The Commission recalled its decision in paragraph 10.11 in respect of meeting arrangements for 2023 and 2024.

12.11   Russia expressed concern regarding the late or null issuance of visas to some Russian delegates by the host country (Australia), which reduced Russia's ability to provide full representation across the 2022 in-person meetings.

12.12   Australia rejected Russia's statement, noting that as host country, it is acting in accordance with the CCAMLR Headquarters' Agreement. Australia reminded the Commission of its commitment to supporting the needs of CCAMLR.

12.13   The Chair closed Agenda Item 12.

## Other business

13.1   Argentina made the following statement:

'I would like to begin my presentation by reminding all Members that despite the great progress made by the international community in terms of decolonisation, even today, in the 21st century, there are still 17 colonial situations in the world, 10 of which involve the United Kingdom. Unfortunately, one of those 10 has affected the Argentine Republic for almost 190 years.

The Government of the Argentine Republic would like to recall that the Malvinas, South Georgias and South Sandwich Islands and the surrounding maritime areas are an integral part of the Argentine national territory and are illegitimately occupied by the United Kingdom, being the subject of a sovereignty dispute recognised by the United Nations General Assembly's Resolutions 2065 (XX), 3160 (XXVIII), 31/49, 37/9, 38/12, 39/6, 40/21, 41/40, 42/19 y 43/25. This controversy has also been recognised by the UN Special Committee on Decolonization in its Resolutions, which call on both parties to the sovereignty dispute – Argentina and the United Kingdom – to resume negotiations until a just, peaceful and definitive solution to the dispute is reached, taking due account of the interests of the inhabitants of the Malvinas Islands.

Argentina reiterates that in Statistical Subareas 48.3 and 48.4 only the multilateral regulations of this Convention are applicable.

In addition, Argentina recalls that the following actions are illegal and invalid:

- activities carried out in the CAMLR Convention Area by vessels registered either in the Malvinas Islands or the South Georgias and the South Sandwich Islands, or operating from their bases in those islands, or flying the flag of alleged British authorities of those islands, which Argentina does not recognise; as well as:

  - port and at sea inspections carried out by those alleged authorities

  - the issuance of, or the intervention in, catch documents by those alleged authorities

  - any other unilateral action taken by the aforementioned colonial authorities in those territories.

The Argentine Republic reaffirms its sovereign rights over the Malvinas, South Georgias and South Sandwich Islands, and the surrounding maritime zones.'

13.2    The UK made the following statement:

'The UK rejects Argentina's statement.

The UK once again reiterates that it has no doubt about its sovereignty over the Falkland Islands and South Georgia and the South Sandwich Islands, and their surrounding maritime zones, as is well known to all delegates. We also recall the statements we have made about the management of the South Georgia fisheries earlier in this meeting, and in previous years.'

13.3    Argentina made the following statement:

'Argentina rejected the UK's statement and reaffirmed its jurisdictional position regarding its sovereignty over the Malvinas Islands, South Georgias and the South Sandwich Islands as is well known by all the parties.'

13.4    The EU and its Member States made the following statement:

'At the conclusion of the 41st meeting of the Commission for the Conservation of Antarctic Marine Living Resources, the EU and its Member States wish to underscore our commitment to conserving Antarctic marine living resources.

We welcome CCAMLR's many important achievements over the past four decades, including substantially decreasing IUU fishing in the Convention Area, significantly reducing mortality of seabirds during fishing, and adopting an impressive suite of conservation measures to conserve unique marine ecosystems and to ensure fisheries are sustainably managed. CCAMLR is also responding to the increasing impacts of climate change on the Convention Area and the marine living resources and ecosystems within it.

These achievements underscore the ongoing need for this unique international organisation. CCAMLR is a place where Members have demonstrated that they can set their geopolitical differences aside and cooperate together to conserve Antarctic marine living resources effectively.

It is in this context that we express our serious concern with the approach of the Russian Federation to the discussions at this meeting. As an original signatory of the CAMLR Convention, Russia has committed to the principle of utilising the best available science to conserve Antarctic marine living resources.

However, Russia has repeatedly ignored scientific information provided to inform key management decisions to achieve political objectives. These decisions relate to a range of important issues such marine protected areas, VME protection, fisheries management and research.

Russia's repeated rejection of the best available scientific information amounts to an abuse of its commitment to participate in consensus-based decision-making. Russia's actions undermine the integrity of CCAMLR's decision-making processes and our collective ability and responsibility to achieve the objective of the Convention.

We call on Russia to return to its approach of working with other Members in good faith and a spirit of collaboration, and to respect the principle of science-based decision-making and the ecosystem approach that underpin CCAMLR's work.'

13.5   Ukraine aligned itself with the statement by the EU and its Member States.

13.6   Argentina made the following statement:

'Argentina deeply regrets that the Commission has not been able to adopt a conservation measure that would have allowed the operation of the toothfish fishery in Subarea 48.3 during the 2022/23 season, as required by CM 31-01 for each fishing season.

We are very concerned that the Commission has not reached consensus to include the four UK-flagged vessels with British-Norwegian shipowners – that is the *Argos Georgia*, *Argos Helena*, *Nordic Prince* and *Polar Bay* – in the CP-IUU Vessel List and in the CCAMLR Compliance Report, taking into account the blatant breach of this Commission's conservation measures. This organisation's failure to sanction this action sets a grave precedent and severely affects its reputation.

Argentina also regrets that the UK has used Russia's blocking of the consensus in CCAMLR-40 as an excuse for not complying with the rules of the Convention, in stark contrast to the actions of other Members who refrained from carrying out fishing activities in Subarea 48.3 or from buying the resulting produce, as they accurately considered that they did not comply with the regulations approved by the Commission.

Fishing in this subarea without a conservation measure adopted by the Commission contravenes the CAMLR Convention. We therefore urge all CCAMLR Members to observe the Convention's regulations and refrain from fishing for toothfish in Subarea 48.3.

Argentina would like to contribute to finding a solution to this issue. To this effect, we aim to carry out a scientific research cruise to Subarea 48.3, with the objective of studying *Dissostichus eleginoides* (Patagonian toothfish) and *Champsocephalus gunnari* (icefish) populations, and therefore provide relevant data that can be used to work on a scientific solution to the present problem. In this regard, Argentina offers Members access to the data that will arise from the mentioned cruise.

We encourage all Members of the Commission to act responsibly and in a spirit of Antarctic cooperation to facilitate CCAMLR's correct functioning.'

13.7   Norway made the following statement:

'Norway aligns itself with the statement by the EU and its Member States. CCAMLR is a vital component of the Antarctic Treaty System. Norway is particularly concerned that Russia, as an original signatory to the Antarctic Treaty and the CAMLR Convention,

and as a country with a proud history of contributing to the international scientific and political cooperation in Antarctica, is effectively undermining the Antarctic Treaty System.'

13.8    Chile, New Zealand, Korea, Australia, the UK and the USA aligned themselves with the statements made by the EU and its Member States, Ukraine and Norway.

13.9    Russia made the following statement:

'In the light of individual groundless statements against the Russian Federation, we believe it is important to note the following.

The Russian Federation has a responsible attitude to the fulfillment of obligations under the Convention. During the 41st meeting, Russia submitted a significant number of papers with substantiated proposals on a wide range of issues.

Despite diverging views, consensus was reached on a climate resolution and a special session of CCAMLR.

At the same time, unlike representatives of a number of other countries, Russia refrained from politicising the negotiation process within the framework of CCAMLR, going beyond the CCAMLR mandate.

Also, the Russian Federation pays special attention to compliance with CCAMLR conservation measures and cannot agree with statements that there are grounds for fishing for toothfish in Subarea 48.3 in the absence of a CCAMLR conservation measure. Fishing in violation of CCAMLR CM 31-01 is considered as IUU fishing.

International scientific research cruise should form the basis for a CCAMLR decision to resume fisheries for toothfish in Subarea 48.3. In this context, we positively consider Argentina's initiative to conduct research in this area.

For our part, in order to search for mutually acceptable solutions, we are ready to interact constructively on all issues within the competence of CCAMLR.'

13.10    The UK made the following statement:

'The UK is disappointed by the position taken by Argentina with respect to the operation of the South Georgia toothfish fishery, and that despite all the exchanges we have had on this matter, they have again raised the issue here, at such length and on the final night of the meeting.

The UK recalls the various statements we have made before and during this meeting on this matter. We also note that Argentina has made a number of lengthy and emotional statements, and we are concerned that some of the detail of these may not have been entirely clear on the translations we heard. We therefore reject all of the statements by Argentina on this matter, which include a number of elements that we do not recognise to be true. We also reject this latest statement and in respect of the scientific cruise just announced by Argentina, we reserve our position.

The UK would also, however, like to associate itself with the statement made by the EU and its Member States. Russia has sought to sow discord in this Commission and prevent it from making progress against its objectives. We reject Russia's statement.'

13.11   Argentina made the following statement:

'Argentina states that it was surprised by UK's negative attitude towards the scientific research cruise announced by Argentina, given that science is the most important activity that Members should carry out in the Area of the Convention, and that Argentina is planning said cruise, at considerable financial costs, in order to contribute to reaching a long-term solution to the current situation in Subarea 48.3.'

13.12   COLTO made the following statement:

'COLTO would like to express its deep concern for the ever-increasing politicisation of this Commission.

COLTO has 50 members across 12 countries. COLTO Members have operated in the Convention Area, fully supporting and underpinning the scientific requirements of CCAMLR whilst constantly improving the environmental and safety standards of research fishing in the region. COLTO provides practical innovation to address emerging impacts created by fishing activities, such as helping to reduce seabird mortality to negligible levels in the Convention Area, the effective elimination of IUU fishing from the Convention Area, and work on target species by-catch, whale depredation, and benthic interactions to name a few.

However, year on year we are seeing proposals that are based on best available science, being blocked.

We are seeing measures designed to improve the safety of life at sea, being blocked.

We are seeing measures designed to improve the compliance process, being blocked.

Now we are seeing two of the best managed fisheries in the world, the Ross Sea Antarctic toothfish fishery and the Patagonian toothfish fishery in Subarea 48.3, being held hostage.

We cannot keep going along like this. Something needs to change.'

13.13   The Chair closed Agenda Item 13.


## Report of the Forty-first Meeting of the Commission

14.1   The report of the forty-first meeting of the Commission was adopted.

**Close of the meeting**

15.1    At the close of the meeting, the Chair thanked the host country Australia, the Chairs of SCIC, SCAF and the Scientific Committee, all Members and Observers for their contributions to CCAMLR-41, and noted the richness of the experience for him personally. The Chair also noted how challenging the organisation of the meeting had been due to the COVID-19 pandemic, and despite geopolitical issues existing between Members, he expressed gratitude for the willingness of Members to work together to achieve the outcomes detailed in this report. He also thanked the Executive Secretary and the Secretariat, the interpreters, Congress Rental and all support staff for their hard work in the lead up to and during CCAMLR-41. Finally, the Chair welcomed Mr Tsymbaliuk as Chair of the Commission for the next two years from the conclusion of the 41st meeting.

15.2    Argentina, on behalf of the Commission, thanked Dr Granit for his excellent guidance and leadership throughout the year and during this meeting. Argentina further thanked him for his dedication in applying the spirit of cooperation and  consulting widely with CCAMLR Members through his two-year tenure.

15.3    Belgium thanked the Chair and all Members for their contributions, and noted the growing diversity of representatives in both Commissioner and meeting chair roles.

15.4.   The Executive Secretary presented Dr Granit with an engraved gavel marking his tenure as Chair of the Commission.

15.5    The Chair closed the meeting.

Table 1    List of 2022/23 meetings of organisations or arrangements with nominated observers for the Commission.

| Entity | Dates (where available) | Venue (where available) | Observer |
|---|---|---|---|
| The Agreement for the Conservation of Albatrosses and Petrels (ACAP) MoP | 2025 | New Zealand | Australia |
| The Antarctic Treaty Consultative Meeting (ATCM) | 29 May to 8 June 2023 | Helsinki, Finland | * |
| The FAO COFI Sub-Committee on Fisheries Management | 2023 | Online | * |
| The Commission for the Conservation of Southern Bluefin Tuna (CCSBT) | 9 to 12 October 2023 | Busan, Korea | New Zealand |
| The Inter-American Tropical Tuna Commission (IATTC) | 31 July to 11 August 2023 | Canada | |
| The International Commission for the Conservation of Atlantic Tunas (ICCAT) | 14 to 21 November 2022 | Vale do Lobo, Portugal | United States |
| The Indian Ocean Tuna Commission (IOTC) | 8 to 12 May 2023 | Mauritius | Australia |
| The World Conservation Union (IUCN) | 2025 | TBD | |
| The International Whaling Commission (IWC) | 2024 | Lima, Peru | Australia |
| The Northwest Atlantic Fisheries Organization (NAFO) | 18 to 22 September 2023 | TBD | EU |
| The North East Atlantic Fisheries Commission (NEAFC) | 15 to 18 November 2022 | London, UK | Norway |
| The South East Atlantic Fisheries Organisation (SEAFO) | 30 November to 1 December 2022 | Swakopmund, Namibia | |
| The Southern Indian Ocean Fisheries Agreement (SIOFA) | 3 to 7 July 2023 | Mauritius | EU |
| The South Pacific Regional Fisheries Management Organisation (SPRFMO) | 7 to 17 February 2023 | Manta, Ecuador | Chile |
| The United Nations Environment Programme (UNEP) | 26 February to 1 March 2024 | Nairobi, Kenya | Argentina |
| The Commission for the Conservation and Management of the Highly Migratory Fish Stocks of the Western and Central Pacific Ocean (WCPFC) | 27 November to 3 December 2022 | Da Nang, Viet Nam | |

*    The Commission normally requests the Executive Secretary to be its nominated Observer at these meetings.

The Secretariat also notes that in 2017 (SC-CAMLR-XXXVI, paragraph 10.32) the Scientific Committee agreed that information on upcoming meetings was no longer required given the improved dissemination of details of meetings, and that the Scientific Committee Bureau could deal with intersessional requests for representatives from CCAMLR to attend scientific meetings.

Annex 3

**Opening Address by the Governor of Tasmania, Her Excellency
the Honourable Barbara Baker AC**

**Opening Address by the Governor of Tasmania, Her Excellency
the Honourable Barbara Baker AC**

'Mr Chair, Your Excellencies, Distinguished Delegates, Ladies and Gentlemen. Good morning and welcome to the 41st annual meeting of the Commission.

Dr Granit, I would like to extend a very warm welcome to you again to Hobart. These are very different circumstances to those from last year when due to the COVID pandemic I had to cancel my in-person address, instead addressing you online, and I am very pleased to see you here for a second time.

I must say it is wonderful to see everyone here in person. International travel is still not easy, and it is an honour that so many of you have made the effort to come here in person. I understand that in addition to those of you in this room, many more are joining remotely as audience, and I welcome you all both in person and virtually to Hobart. The pandemic has not been a good experience for us all, with much sadness caused around the world, but it is obvious that necessity has stimulated new ideas about how to make meetings such as this most effective and inclusive.

Tasmania is immensely proud of the fact that this highly respected international organisation, with its 40 years of achievement, is headquartered in Hobart. We highly value the continuing relationship that we at Government House have with the Commission and with your Secretariat. I am honoured to be able to open your meeting and can report that this has been an almost unbroken tradition since 1984 when one of my predecessors, Sir James Plimsoll, opened your third meeting.

Since this is the first in-person meeting since 2019, I am sure that you have much to discuss, and I am aware that despite the pandemic you have made significant progress in your work over the last two years.

I am encouraged that the working groups of the Scientific Committee have continued to make progress during their intersessional meetings on the new krill management plan. Effective management of this fishery, delivered over the last 40 years by CCAMLR, is of course of great importance to the Antarctic ecosystem as well as to the world, more so than ever given the strong and increasing interest in krill harvesting.

I note that data and research now being reviewed by the Scientific Committee to assist with krill management decisions includes information on the changes that are happening to the Antarctic marine ecosystem. This includes the welcome recovery of previously depleted populations of fin and humpback whales. Of course, there are also broader changes arising from climate change that are impacting all ecosystems across the globe, including the Antarctic. This was starkly brought into focus by the record temperatures, droughts and bushfires seen across the northern hemisphere this summer. I am pleased that you regularly include consideration of climate change in your work, and I note that you have set aside specific time later today to hear from the Scientific Committee on Antarctic Research on this very topic.

Finally, I was interested to see that at your last meeting you agreed to consider holding a special meeting on marine protected areas, which would be only the third special meeting that you have

had as a Commission. I can assure you that if you choose to have a meeting on this subject here in Hobart, you will again find a very warm welcome from us.

Distinguished Delegates, Ladies and Gentlemen, I will bring my brief address to a close by wishing you well in your endeavours over the next two weeks. The international community, and all of us who care deeply about the future of our oceans and of Antarctica owe you a debt of gratitude for continuing to work hard to develop innovative and effective solutions to the problems that confront us.

So, without further ado I will hand you back to your Chair to start your deliberations.

Thank you for your attention.'

CCAMLR-41 Report – Preliminary version

Annex 5

**Summary of activities of the Commission during the
2021/22 intersessional period – Report of the Chair**

**Summary of activities of the Commission
during the 2021/22 intersessional period**

**Report of the Chair**

**Intersessional meetings**

1.     The following intersessional meetings of the Scientific Committee were held in 2022:

- Scientific Committee Symposium, 8 to 10 February, online.

- Workshop on Conversion Factors for Toothfish, 12 to 13 April, online.

- Workshop on the Ross Sea Data Collection Plan, 12 to 12 August, online.

- Working Group on Acoustic Survey and Analysis Methods (SG-ASAM), 30 May to 3 June, online.

- Working Group on Statistics, Assessments and Modelling (WG-SAM), 27 June to 1 July, online.

- Working Group on Ecosystem Monitoring and Management (WG-EMM), 4 to 11 July, online.

- Working Group on Incidental Mortality Associated with Fishing (WG-IMAF), 10 to 14 October, Headquarters, Hobart.

- Working Group on Fish Stock Assessment (WG-FSA), 10 to 20 October, Headquarters, Hobart.

2.     The work of the Commission and Scientific Committee was supported by a number of e-groups which were active during the year.

3.     On behalf of CCAMLR, I would like to express my gratitude to the conveners, the hosts of these meetings and the Secretariat for their expert support and facilities.

**CCAMLR-regulated  fisheries**

4.     In the 2021/22 season to 31 July 2022, 13 CCAMLR Members participated in fisheries and research targeting icefish, toothfish and krill (see SC-CAMLR-41/BG/01). Members reported a total catch of 353 885 tonnes of krill, 9 746 tonnes of toothfish and 1 021 tonnes of icefish from the Convention Area.

5.     The Secretariat monitored CCAMLR fisheries using catch and effort reports and notifications of vessel movements. Where necessary, Members and vessels were advised of the closure of areas and fisheries.

6.      During the 2021/22 season, 44 deployed scientific observers were appointed in accordance with the Scheme of International Scientific Observation: 30 on longline vessels, two on trawl vessels fishing for icefish, and 12 on vessels fishing for krill.

## CCAMLR's fishery monitoring and compliance

7.      To date in the 2021/22 season, 748 *Dissostichus* catch documents, 2 199 export documents and 769 re-export documents have been issued by 20 Contracting Parties and one Non-Contracting Party (NCP) (Singapore) cooperating with the Catch Documentation Scheme for *Dissostichus* spp. (CDS).

8.      No vessels included on the NCP-IUU (illegal, unreported and unregulated) Vessel List were reported as sighted by Members inside the Convention Area in 2021/22.

9.      The Secretariat has continued to cooperate with INTERPOL during 2022.

## Science

10.      226 participants from 22 Members attended the mid-year scientific meetings of WG-ASAM, WG-SAM and WG-EMM. The General Science Capacity Fund supported one new scholarship recipient and six continuing recipients.

## Cooperation with other organisations

11.      The Commission was represented at meetings of 15 international organisations and programs in 2021/22 and maintained relationships with six organisations it has formal Agreements with. CCAMLR provided comments on 'Ecosystem approach to fisheries' and 'CCAMLR experience with affording protection to Vulnerable Marine Ecosystems' to two meetings of the United Nations Division of Ocean Affairs and Law of the Sea. Sixty-two non-Member Contracting Parties, NCPs, intergovernmental organisations and non-governmental organisations were invited to attend CCAMLR-41 as Observers.

12.      The Scientific Committee had a joint meeting with the SIOFA Scientific Committee from 29 November to 1 December 2021.

## Secretariat

13.      The Secretariat continued to provide fishery monitoring and compliance services to support the work of the Standing Committee on Implementation and Compliance (SCIC), science and data management services to support the work of the Scientific Committee, technical and logistic support to intersessional meetings of the Scientific Committee's working groups, and support for CCAMLR communications, the website and e-groups.

14.    The Secretariat continued to provide quarterly financial and investment reports to Members through the year.

15.    The Executive Secretary's Report to CCAMLR-41 includes a report on the fourth year of implementation for the 2019–2022 Strategic Plan.



CCAMLR-41 Report – Preliminary version

Annex 6

**Proposal for an extraordinary meeting of the Commission
on Spatial Planning and Marine Protected Areas**

**Proposal for an extraordinary meeting of the Commission
on Spatial Planning and Marine Protected Areas**

Secretariat and the Chair of the Commission

**Abstract**

Draft terms of reference and proposals for the arrangements for an extraordinary meeting of the Commission are presented. The terms of reference were developed by the Secretariat and the Chair of the Commission as requested in CCAMLR-40, paragraph 7.29. This paper also includes proposed practical arrangements for a meeting to be held in Chile from 24 to 28 April 2023/19 to 23 June 2023.

**Introduction**

1.      These draft terms of reference and proposed arrangements for an extraordinary meeting of the Commission on how to reach consensus on progressing marine protected area (MPA) implementation have been prepared by the Secretariat and the Chair of the Commission as requested in CCAMLR-40, paragraph 7.29, taking into account comments provided by the 'Commission special session on MPAs' e-group and at the Heads of Delegation meeting 7 June 2022.

2.      Background to the issue is presented in Appendix A.

**Draft Terms of reference**

1.      Objective and issues related to substance of the meeting

      1.1      Objective

The objective of the meeting will be, consistent with the Convention, to agree through dialogue on an inclusive approach that will facilitate the Commission to reach consensus on how to progress marine protected area (MPA) design, designation, implementation and the establishment of research and monitoring plans (RMP) based on the best scientific evidence available, taking relevant adopted conservation measures into account. The meeting will identify how CCAMLR can use MPAs to deliver on its conservation objective and principles set out in Article II, and develop a representative system of MPAs consistent with its commitment reaffirmed in the declaration on the occasion of the 40th Meeting.

      1.2      Issues to be discussed

The meeting will consider the following topics:

1.2.1 Best practices and evaluation of the lessons learned and effectiveness of the overall conservation measures related to marine protected areas already adopted by CCAMLR.

1.2.2 How the adopted general framework for the establishment of CCAMLR MPAs (CM 91-04 (2011)) could be improved

1.2.3 How to progress the MPA proposals.

2.    Preparatory steps related to procedures for the meeting

2.1    Status and program of the meeting

The meeting will be convened as an extraordinary meeting under Rule 11(a) of the Rules of Procedure of the Commission. Following the precedent on nomenclature set by the Second Special Meeting of the Commission (Bremerhaven, Germany, 15 and 16 July 2013) the meeting will be the Third Special Meeting of the Commission.

A final agenda will be developed per Rules 15, 16 and 17 of the Commission's Rules of Procedure, based on these terms of reference (CCAMLR-40, paragraph 7.30).

Recognising the importance of science in this process, Members are encouraged to include their Scientific Committee Representatives in their delegations. The Chair of the Scientific Committee will be present and be available to inform discussions.

2.2    Location and timing of the extraordinary meeting

The extraordinary meeting will take place in-person in Chile. Proposed dates are 24 to 28 April 2023 or 19 to 23 June 2023. Observers will be invited to attend the extraordinary meeting under Rule 30 of the Rules of Procedure of the Commission.

2.3    Process to prepare for the extraordinary meeting

The Commission will welcome inputs from Members, experts or Observers with specific marine spatial planning experience or expertise.

Existing Commission papers and reports, and e-group commentary, should be collated to provide sufficient background for Members to understand the history and status of the issues as discussed in CCAMLR.

The Commission requests the Secretariat to undertake the above work, as necessary in collaboration with the Scientific Committee or Members. The Commission may also ask the Secretariat to prepare an information paper with an overview of past discussions on MPAs.

### 2.4    Outcome of the meeting

Agreement on the way forward, including particular actions, proposals, proceedings and a roadmap (action plan) to reach the objective of the Convention through consensus, will be the key outcome of the meeting.

Such a roadmap (action plan) will most likely include several actions by the Commission to be agreed at the meeting.

**Practical proposal for the meeting**

Provision is made for the meeting to be held according to the modality of CCAMLR-41, i.e. an in-person fully interpreted formal meeting with streaming to audience only, to have the same number of attendees as at CCAMLR-41, and to run to the daily timetable outlined in Appendix B.

A preliminary agenda will be circulated according to Rule 15 at least 100 days prior to the start of the meeting. A draft preliminary agenda and schedule is included as Appendix B for consideration by the Commission.

Observers will be invited, but it is proposed that those observers from non-Contracting Parties that are normally invited to CCAMLR meetings due to their engagement in trade in toothfish and interest in the Catch Documentation Scheme (CDS) need not be invited to this meeting. A proposed list is included as Appendix C. Unlike the October annual meetings, press will not be invited to the first day, although there would be a press release at the end of the meeting.

**Recommendations**

It is proposed that the Commission approve the proposal of convening an extraordinary meeting of the Commission on MPAs during the first semester of 2023.

Approve the use of voluntary contributions to support the meeting.

CCAMLR-41 Report – Preliminary version

Appendix A

**Background**

Since its inception, the Commission has developed a number of different spatial management or area-based management approaches that are consistent with Article IX.

These include defining management areas, subareas and divisions within the Convention Area and setting catch limits by area. See for example conservation measures that regulate fisheries in the 41 (toothfish), 42 (icefish) and 51 (krill) series.

They include also area-based management approaches affording protection related to fishing activities to areas surrounding vulnerable marine ecosystems and prohibiting fishing for *Dissostichus* spp. in depths shallower than 550 m (Conservation Measures (CMs) 22-06 to 22-09 from the period 2009–2019).

Protected areas are also defined in these conservation measures:

- CM 91-01 Procedure for according protection of CEMP sites (2004)

- CM 91-02 Protection of the values of Antarctic Specially Managed and Protected Areas (2012)

- CM 91-03 Protection of the South Orkney Island southern shelf (2009)

- CM 91-04 General framework for the establishment of CCAMLR Marine Protected Areas (2011)

- CM 91-05 Ross Sea region Marine Protected Area.

The designation of special areas for research is part of CM 91-01 and the protection of areas for research following ice-shelf retreat is found in CM 24-04.

The Commission is consulted under the Antarctic Treaty on the designation of Antarctic Specially Managed (ASMA) and Antarctic Specially Protected Areas (ASPA) with a marine component (CM 91-02).

CCAMLR has implemented two high-seas marine protected areas (MPAs) (CMs 91-03 and 91-05).

Three more MPAs have been proposed over the last 11 years (East Antarctic Representative System of MPAs, Weddell Sea MPA, Antarctic Peninsula – Domain 1 MPA).

All these measures can be seen as contributing to a framework of spatial planning and management in the Convention Area and within the Antarctic Treaty System as a whole.

Over the last several meetings the Commission has made little progress towards agreeing the three new MPA proposals.

CCAMLR-41 Report – Preliminary version

The Commission has also made little progress on agreeing research and monitoring plans for the existing MPAs (CMs 91-03 and 91-05).

The objections to progressing these issues have been voiced for a number of years and include concerns about CCAMLR's overall process for designating and monitoring MPAs as well as the detail of specific proposals.

Some Members consider that the current framework for the establishment of MPAs (CM 91-04) does not provide sufficient detail on the specific requirements for the entire MPA process, omits some key elements of that process and requires further clarification.

Other Members consider that CM 91-04 describes the process in sufficient detail (see recent discussions in CCAMLR-38, paragraphs 6.15 to 6.24; CCAMLR-39, paragraphs 8.19 to 8.35; CCAMLR-40, paragraphs 7.1 to 7.5).

Several initiatives have been taken to explore a way forward, including the Second Special Meeting of the Commission (Bremerhaven, Germany, 15 and 16 July 2013).

This was followed by e-group discussions in 2016 on the development of the MPA Checklist proposed by Japan (CCAMLR-XXXIV/19).

In 2019 the Commission considered a proposal from Russia for intersessional work to reach a common understanding on the procedural aspects of designating MPAs, but it could not reach agreement on this proposal (CCAMLR-38, paragraphs 6.15 to 6.18).

Russia and China have in the past two years continued to suggest revisions to the procedures for the designation of MPAs.

The lack of consensus on how to progress spatial management and MPAs is causing reputational risks to the Commission considering also that it has been leading on ecosystem-based management approaches over time.

CCAMLR-41 Report – Preliminary version

Appendix B

**Draft preliminary agenda and schedule for the
Third Special Meeting of the Commission**

1.   Welcome, adoption of the agenda, introductory remarks

2.   Best practices and evaluation of the lessons learned and effectiveness of the overall conservation measures related to marine protected areas already adopted by CCAMLR

3.   How the adopted general framework for the establishment of CCAMLR marine protected areas (MPAs) (CM 91-04 (2011)) could be improved

4.   How to progress the MPA proposals

5.   Outcome of the meeting and next steps

6.   Adoption of the report of the Third Special Meeting of the Commission.

CCAMLR-41 Report – Preliminary version

The Schedule for a meeting from 24 to 28 April 2023 or 19 to 23 June 2023 is proposed as follows:

|  | **Morning**<br>**0900–1030, 1100–1230** | **Afternoon**<br>**1400–1530, 1600–1730** |
|---|---|---|
| Day 1 | 09:00 Heads of Delegation<br>11:00 Agenda item 1 and 2 | 14:00 Agenda Item 2 |
| Day 2 | Agenda Item 3 | Agenda Item 3 |
| Day 3 | Agenda Item 4 | Agenda Item 4 |
| Day 4 | Agenda Item 5 | Agenda Item 5<br>Report preparation |
| Day 5 | Report adoption | Report adoption |

The meeting will allow for breakout sessions to advance progress if needed.

CCAMLR-41 Report – Preliminary version

Appendix C

**Proposed list of observers to be invited to the
Third Special Meeting of the Commission**

This list is modified from that in COMM CIRC 22/58–SC CIRC 22/58. The Commission is invited to modify the list as appropriate.

- non-Member Contracting Parties – Bulgaria, Canada, Cook Islands, Finland, Greece, Mauritius, Islamic Republic of Pakistan, Republic of Panama, Peru and Vanuatu.

- other States in dialogue with CCAMLR – Indonesia, Luxembourg and Turkey.

- intergovernmental organisations – ACAP, CCSBT, CEP, CITES, COMNAP, FAO, IATTC, ICCAT, IOC, INTERPOL, IUCN, IWC, RPOA-IUU, SCAR, SCOR, SEAFO, SIOFA, SOOS, SPRFMO, UNEP and WCPFC.

- non-governmental organisations – ARK, ASOC, COLTO, IAATO and Oceanites Inc.

# Attachment B



## POLAR POINTS

*A blog of the* **Polar Institute**



BLOG POST

# No. 16 | Antarctic Treaty System shows resilience in the face of Ukraine war tensions

By Evan T. Bloom on *November 10, 2022*



POLAR INSTITUTE

GOVERNANCE    ENVIRONMENT    POLAR    ARCTIC/ANTARCTIC

SHARE ➴

The second major diplomatic meeting under the Antarctic Treaty System since the start of the Ukraine war concluded on November 4 in Hobart, Tasmania and many were waiting to see if the Treaty System, which operates on consensus of its members, would succumb to the tensions.  The answer is no – while there was considerable time spent on national statements about Ukraine and procedural wrangles about how these would or would not be reflected in the meeting's final report, the Commission for the Conservation of Antarctic Marine Living Resources (CCAMLR, which handles fisheries and marine protection in the Southern Ocean) by and large conducted its business in the usual way.

That's not to say that the meeting was a great success. Russia and China continued for the sixth year in a row to prevent establishment of new marine protected areas, a major goal of most parties and the environmental community, and to slow steps to implement existing MPAs.  Both countries continued to fend off efforts to improve compliance rules related to the burgeoning krill fishery, with China in effect arguing that there's no need to increase safeguards against illegal, unregulated and unreported (IUU) fishing in relation to krill in the absence of evidence of IUU activities.  Russia in particular continued its practice of politicizing the work of the Commission's scientific committee, upending attempts by the scientists of other states to provide agreed scientific advice in numerous instances to the Commission.

Russia continued its efforts begun last year to stoke, rather deliberately, tensions between the UK and Argentina when it prevented establishment of a catch limit for toothfish in the waters near South Georgia, which is subject to conflicting British and Argentine territorial claims.  During this year the UK licensed its companies to go fishing regardless.  Even though there was adequate science to support some fishing in this area, as there was no CCAMLR catch limit in force, the U.S., which provides the largest market for this product (sold in restaurants as Chilean Sea Bass), moved to block imports into the U.S.  As a result, a U.S. importing company brought suit in U.S. courts employing the UK's arguments.  All of this is messy and unfortunate, but flows from prior Russian troublesome behavior and isn't an offshoot of the Ukraine conflict per se.

Vetoing marine protected areas, holding up compliance and anti-IUU efforts, and undermining scientific work is all bad for the Commission and for those who want CCAMLR to make progress in [...] these are normal attributes of the work of the Commission that we've seen, in greater or less extent, over past years.  Russia wasn't kicked out of meetings (whether that could even be done consistent with the underlying treaty isn't clear), it didn't prevent the bulk of fisheries management work that is the lifeblood of the organization or attempt to extend its veto further than previously. These were all serious concerns in the run-up to the meeting.

Indeed, Russia during the meeting joined with all the other members in agreeing that usual process be observed in that Ukraine would take over the chairmanship of the organization for the next two years.  This was possibly because CCAMLR's rules explicitly provided for this and Russia had no procedural way of avoiding the result.  However, it perhaps says something that despite Ukraine denouncing Russian military

action at the beginning of the meeting, and many members leaving the room once it was Russia's turn to speak, Russia did not protest or raise any difficulties when the point came to acknowledge Ukraine taking the chairmanship of CCAMLR

At the Antarctic Treaty Consultative Meeting in Berlin in May this year, there was an extensive fight over the final report, with the Russians attempting to prevent inclusion of a record of interventions criticizing it over the Ukraine war.  In Hobart, while the Russians delayed the meeting with maneuvering to delete or amend that sort of material, in the end they did not this time object to the report.

Thus, by and large, the expected work of the Commission was accomplished.  The parties even reached consensus agreement on a resolution on climate change and a plan to host an intersessional meeting next year on MPAs.  Although the failure to establish new MPAs was disappointing, there was no indication prior to the meeting that Russia and China would change their positions this year, and as expected, they did not.

There is plenty of reason to worry about the state of the Treaty System.  A minority of countries stifle attempts to promote widely accepted environmental goals, including protection of Antarctic species or promoting large-scale ocean conservation.  There is also a failure to fully incorporate climate change into Antarctic policies even though Antarctic science is vital for understanding the global climate and melting Antarctic ice will, in the future, cause significant sea-level rise.  The continuing crisis in Ukraine makes cooperation with Russia on polar issues much less feasible.

SHARE ➤

Nevertheless, that CCAMLR has not unraveled as a consequence of the Ukraine war has some important benefits.  Antarctic cooperation depends on the Treaty System, and its framework has provided political stability and a channel for discourse for decades.  In the Arctic, regional cooperation (albeit lacking a treaty to hold it together) is in a parlous state with the suspension of the work of the Arctic Council.  But countries active in Antarctica are finding a path forward, although often a difficult one, with Russia.  This means that there continues to be a commonly accepted structure in which to debate the future of marine protected areas or develop new approaches for managing krill stocks, among other issues.  In sum, despite dire predictions, the state of Antarctic diplomacy remains largely as it was.



# EVAN T. BLOOM

*Senior Fellow, Polar Institute;*
*Former Acting Deputy Assistant Secretary for Oceans and Fisheries and Director for Ocean and Polar Affairs, U.S. Department of State*

READ MORE

 ## POLAR INSTITUTE

Since its inception in 2017, the Polar Institute has become a premier forum for discussion and policy analysis of Arctic and Antarctic issues, and is known in Washington, DC and elsewhere as the Arctic Public Square. The Institute holistically studies the central policy issues facing these regions—with an emphasis on Arctic governance, climate change, economic development, scientific research, security, and Indigenous communities—and communicates trusted analysis to policymakers and other stakeholders. ***Read more***

SHARE ➔

© 2022 The Wilson Center. All Rights Reserved

# Attachment C

10/27/22, 2:33 PM
Case 1:22-cv-00299-TMR    Document 15    Filed 11/21/22    Page 123 of 126
Russia may again block Antarctic marine protections

**ELECTION '22** | **12 days** left to vote | How to vote | Candidate guide | Minnesota Poll | Who's running for Minnesota Legislature

WORLD

# Russia may again block Antarctic marine protections

**By NICK PERRY** Associated Press | **OCTOBER 26, 2022 — 11:40PM** |  Listen

WELLINGTON, New Zealand — Delegations from Russia and Ukraine are among those meeting in Australia this week to decide the future of Antarctica's pristine waters.

Conservationists say new marine protected areas and rules to prevent overfishing are desperately needed, but that Russia could use its veto-like powers to once again block progress.

Achieving the required consensus for action among this diverse group of 27, which also includes China, the United States and the European Union, has always been an immense challenge.

And when two of the members are at war — and relations between China and many Western nations have deteriorated — consensus looms as an even bigger obstacle. Just this month, Russian bombing in Ukraine's capital, Kyiv, partially destroyed Ukraine's Antarctic research center.

Yet despite the enormous political hurdles, some remain hopeful that scientific arguments will win through. The U.S. is paying more attention to the region under President Joe Biden, and this year has sent a relatively high-level delegation led by Monica Medina, an assistant secretary in the State Department.

In an interview with The Associated Press, Medina said Antarctica was "a really fragile, crumbling part of the planet that needs all our help to withstand the challenges we face with climate change."

The meeting in Hobart in the Australian island state of Tasmania is the first in-person gathering of the Commission for the Conservation of Antarctic Marine Living Resource in three years, after the COVID-19 pandemic kept meetings online.

ADVERTISEMENT



**Penn Avenue**
Family Dental

**612-922-0894**
pennavenuefamilydental.com

It comes as New Zealand's Prime Minister Jacinda Ardern makes a rare visit by a world leader to Antarctica, to see firsthand the scientific research taking place and to mark the 65th anniversary of New Zealand's Scott Base.

The two-week meeting in Hobart began Monday with a mass walkout when the Russian delegates started speaking. Kostiantyn Demianenko, who is leading the Ukrainian delegation, said they were grateful for the international support and that Russia had no right to be at the table.

"A state that kills the civilian population, destroys the air and ground civilian infrastructure of another country and defiantly violates the basic provisions of international law should definitely be limited in its right to participate in the activities of international organizations such as CCAMLR," he wrote in an email.

Still, he acknowledged, Russia remained a member of the group.

He said that back home, Ukraine was trying to rebuild its National Antarctic Research Center in Kyiv, although ongoing drone attacks made that difficult.

ADVERTISEMENT

"Cracks in the walls, broken windows, destroyed equipment led to the impossibility to use these facilities for work," he wrote.

Russia's delegation did not respond to a request for comment.

Medina said the U.S. backed the walkout because it condemns the war in Ukraine, but it remains hopeful for progress in Hobart.

"Right now, Russia is blocking consensus on adoption of three MPA (marine protected area) proposals, but China is as well," Medina said. "So we are here trying to work through the issues with both countries. Not one-on-one necessarily, although we will be trying with the People's Republic of China to work through the issues informally."

She said Russia had been using what amounts to its veto power to block progress not only in Hobart but at a number of international forums.

ADVERTISEMENT

"It can block consensus. That is a huge impediment to our ability to move forward on some things here, but other things do go ahead in a sort of ordinary course of business," Medina said.

Some hope the group could make progress on other agenda items, including new rules on krill fishing and reaching agreement on fishing for valuable Antarctic toothfish, marketed as Chilean sea bass.

Andrea Kavanagh, who directs the Pew Bertarelli Ocean Legacy Project's Antarctic and Southern Ocean protection work, said the problem with krill fishing around Antarctica has been that it's almost all concentrated in one small area.

She said the depletion of the small, shrimp-like creatures affects predators including seabirds, penguins, seals and whales. She said the fishery doesn't necessarily need to be reduced, just spread out.

Kavanagh said Norway is the biggest fisher of krill, which is used for human health supplements and feed for aquariums and salmon farms.

ADVERTISEMENT

"It's not a food security issue," Kavanagh said. "Krill is used for luxury products."

Russia last year used its veto-like powers to reject the toothfish catch limits proposed by the commission's scientists. That led to Britain taking its own action by issuing licenses without CCAMLR approval, putting it offside with many other members.

Medina said Britain had been trying to sell some of the toothfish in America but the U.S. had refused to buy it. But she said it was not up to the U.S. to tell Britain to stop its fishing.

She said Britain's fishing was "within the bounds of what had been permitted in the past, and should not in any way be controversial other than the fact that Russia has blocked it."

One bright spot of the meeting so far has been that discussions with China appeared to have been more positive than in previous years, said Kavanagh. It was also helpful to have high-level support from the U.S. and resume face-to-face discussions, she said.

ADVERTISEMENT

She pointed out the group had managed before to get Russia on board, back in 2016 when it created a marine protected area twice the size of Texas in the Ross Sea.

Countries should not interpret consensus as a veto power, Kavanagh added, but rather should offer counterproposals so everyone works toward a compromise.

But in recent years, she said, "nobody's offering counterproposals that are legitimate. It's all just 'No.'"

---