## UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE

—————————————————————

SOUTHERN CROSS SEAFOODS, LLC,
                            Plaintiff,

            v.

UNITED STATES, and
NATIONAL MARINE FISHERIES SERVICE,

                            Defendants.

Court No. 22-00299

## DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION TO EXPEDITE

Defendant, the United States, respectfully submits this response to the motion to expedite filed by plaintiff Southern Cross Seafoods, LLC (Southern Cross).  *See* ECF No. 15.  The Court should deny the motion because this matter should be resolved on a motion to dismiss for lack of subject matter jurisdiction.  Because the question of jurisdiction should resolve this matter, and the injury claimed by plaintiff does not warrant expedited treatment, plaintiff's motion should be denied.

## BACKGROUND

Plaintiff asserts that Southern Cross submitted an application for preapproval to import Patagonian or *Dissostichus eleginoides* toothfish harvested from the Food and Agricultural Organization of the United States Statistical Subarea 48.3 in the South Georgia fishery in the Atlantic Ocean.  Compl. ¶ 1.  Plaintiff further alleges that the National Marine Fisheries Service (NMFS) denied Southern Cross's application for preapproval, citing violations of the Commission for the Conservation of Antarctic Marine Living Resources (CCAMLR) measures. *Id*. ¶¶ 5, 36.

On October 12, 2022, plaintiff filed a complaint in this Court, requesting that the Court set aside the denial of the application for preapproval, and issue a declaratory judgment that NMFS may not deny future applications for preapproval based on the absence of a CCAMLR conservation measure in force at the time. *Id.* ¶ 9. Plaintiff asserts jurisdiction pursuant to 28 U.S.C. § 1581(i)(1)(C)-(D). *Id.* ¶¶ 10-12. However, 16 U.S.C. ¶ 2440 states that "[t]he district courts of the United States shall have exclusive jurisdiction over any case or controversy arising under the provisions of this chapter [governing the Antarctic Marine Living Resources Convention] or of any regulation promulgated under this chapter." Defendant's response to the complaint is currently due on December 12, 2022; we have notified plaintiff that we intend to move to dismiss the complaint for lack of subject matter jurisdiction. Nonetheless, and prior to other discussions about how the case should proceed, plaintiff has filed the present motion seeking to move directly to motions for judgment on the agency record on an expedited schedule prior to resolution of the jurisdictional question.

## ARGUMENT

Plaintiff's motion to expedite is both premature and unwarranted. As this Court has stated, it may expedite the briefing and consideration of an action if: 1) failure to expedite would result in mootness or deprive the relief requested of much of its value; 2) failure to expedite would result in extraordinary hardship to a litigant; or 3) the public interest in enforcement of the statute is particularly strong. *See J.D. Irving, Ltd. v. United States*, 570 F. Supp. 3d 1349, 1353 (Ct. Int'l Trade 2022) (citing *Ontario Forest Indus. Ass'n v. United States*, 444 F. Supp. 2d 1309, 1319 (Ct. Int'l Trade 2006)).

Plaintiff's claim that failure to expedite would deprive the relief it requests of much of its value fails for at least two reasons. First, plaintiff explicitly asks the Court to issue a declaratory

2

judgment preventing NMFS from denying future applications for preapproval.  Given this request, it is difficult to ascertain how, even if true, the inability to import toothfish harvested from one specific subarea into one specific country for one season, Pl. Mot. at 2-4, would deprive plaintiff of much of the value of the requested relief, as the requested relief extends into perpetuity and nothing prevents plaintiff from harvesting from other areas and importing to other countries.

Second, plaintiff claims that expedited briefing and consideration are warranted because toothfish are perishable goods.  Pl. Mot. at 4.  Plaintiff acknowledges that toothfish can be frozen for at least a two-year period, but claims, without support, that purchasers expect toothfish to be delivered with at least one year of remaining shelf life in its frozen state.  *Id*.  Given plaintiff's concession that toothfish can be frozen for at least two years, and the lack of documentary support for its assertion as to toothfish delivery expectations, it is reasonable to assume the Court has at least two years from the time fish are caught to render a decision—June 2024.  Moreover, in contravention to plaintiff's assertions, importers of toothfish have often stored toothfish in its frozen state for *over* two years and sold at higher prices.  NMFS's trade data demonstrates that on at least 15 occasions over the past 19 months, toothfish imported into the United States had been harvested more than a year earlier, and in nine of those instances, the date of harvest was between 20 and 32 months before the date of import.  *See* Dawson Decl., Exh. A.  Accordingly, assuming it prevails on the merits, even without expedited briefing plaintiff would not be deprived of even the ability to sell the toothfish caught in June 2022 in the United States.

Plaintiff claims that the public interest in enforcement of the statute is "particularly strong" in this case, primarily relying on the assertion that, without expedited briefing and consideration, the public will be unable to purchase Patagonian toothfish through the end of the

2022-2023 fishing season.  Pl. Mot. at 5.  But it is unreasonable to believe that the inability to

purchase a specific fish from a small subarea for a year constitutes a "particularly strong" public

interest; this is especially so given that plaintiff has not demonstrated that the public will be

unable to purchase toothfish altogether from any area of the world during that time period;

indeed, a significant portion of toothfish is caught outside the areas designated by the CCAMLR.

*See* CDS Implementation and Data Analysis at 4, Table 1; Exh. B.

Plaintiff also argues that the public has a strong interest in proper and accurate

enforcement of United States law.  Pl. Mot. at 5.  Setting aside the validity of plaintiff's

contention that NMFS unlawfully denied the preapproval application, which we dispute, plaintiff

cannot demonstrate that the public has a "particularly strong" interest in the enforcement of

CCAMLR laws that exceeds the normal amount of public interest in the general enforcement of

statutes and regulations.

Indeed, the public interest factor actually favors the Court's not considering the merits of

plaintiff's substantive claims until after it rules on the Government's forthcoming motion to

dismiss.  As stated above, 16 U.S.C. § 2440 vests the district courts with exclusive jurisdiction

over claims regarding the CCAMLR; accordingly, this Court does not have jurisdiction to

entertain the complaint.  Because this Court's subject matter jurisdiction is a threshold

consideration, the Court should reserve judgment on whether to expedite briefing on the merits

of plaintiff's allegations until it has determined that it possesses subject matter jurisdiction to

even consider them.  To do otherwise would waste judicial resources, as well as the resources of

the parties, and potentially force the parties to brief the substantive issues twice, in two different

courts.  And the public certainly has an interest in conserving judicial resources and promoting

judicial economy.  *See, e.g., Uniloc USA, Inc. v. Motorola Mobility LLC*, --F.4th--, Nos. 2021-

1555, 2021-1795, 2022 WL 16704090, at *6 (Fed. Cir. Nov. 4, 2022).

Finally, plaintiff claims that it will experience extraordinary hardship if the Court does not expedite briefing and consideration of this matter. Pl. Mot. at 6. However, plaintiff fails to demonstrate that any hardship it has experienced or will experience from the inability to import toothfish from subarea 48.3 into the United States during one fishing season is "extraordinary." Indeed, plaintiff has not shown that it will be unable to sell the toothfish to other countries during the season, that sales of toothfish from subarea 48.3 into the United States constitute the majority of its income, or that it will be forced to discard the toothfish if it is unable to sell to the United States during this fishing season. And, as stated above, a significant amount of toothfish is caught in areas not covered by the CCAMLR, and plaintiff has not shown that it is incapable of importing toothfish from those areas. *See* Exh. B at 4, table 1. In short, plaintiff has not established that the harm it would suffer without expedited briefing and consideration far exceeds the harm that a plaintiff allegedly damaged by a defendant's purported actions would normally incur.

## **CONCLUSION**

For these reasons, we respectfully request that the Court deny plaintiff's motion and first consider whether this Court possesses subject matter jurisdiction to reach plaintiff's allegations; if this Court denies our motion to dismiss, we respectfully request that the parties be allowed to submit a proposed briefing schedule within 10 days of the Court's decision.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

/s/ L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

s/Sosun Bae
SOSUN BAE
Senior Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington D.C. 20044
Tel: (202) 305-7568
Fax: (202) 514-8640
Email: Sosun.Bae@usdoj.gov

Dated: November 28, 2022                Attorneys for Defendant

# EXHIBIT A

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE

SOUTHERN CROSS SEAFOODS, LLC,
　　　　　　　　　Plaintiff,

　　　　　　v.

UNITED STATES, and
NATIONAL MARINE FISHERIES SERVICE,

　　　　　　　　　Defendants.

Court No. 22-00299

## DECLARATION OF KIM DAWSON

I, Kim Dawson, declare and state:

1.  I am an employee of the National Marine Fisheries Service, within its Office of
International Affairs, Trade, and Commerce, and am the Program Lead for the Antarctic
Marine Living Resources (AMLR) Trade Monitoring Program. In this role I manage
the Trade Monitoring Program's AMLR pre-approval database for toothfish shipments.

2.  I served in a management role for processing an application submitted by Southern Cross
Seafoods, LLC on August 8, 2022 for pre-approval to import frozen *Dissostichus
eleginoides* (toothfish) under 50 C.F.R. § 300.105, which is the subject of this litigation.

3.  To prepare this declaration, I looked at the practices of importers of *Dissostichus*,
specifically the length of time between importation and sale of product.  The AMLR
Trade Monitoring Program does not track the date when imported product is sold, but it
does track when fishing commenced and ended for the fish included in a shipment and
the estimated date of arrival (ETA) in the United States.

4. I did a search of the database that holds the approval information related to each shipment to identify any examples of a time lag between the last fishing date of fish included in a shipment and the ETA in the United States than was greater than 12 months. I did this search for import pre-approvals issued between January 2019 and December 2022, including shipments pending arrival but already preapproved and the table below identifies examples I identified:

| Approval | Fishing from date | Fishing to date | ETA | Time Diff* |
|---|---|---|---|---|
| 1 | 09/16/2019 | 12/16/2019 | 06/24/2021 | 18 months |
| 2 | 09/16/2019 | 12/16/2019 | 11/30/2021 | 23 months |
| 3 | 02/02/2019 | 02/16/2019 | 12/02/2021 | 22 months |
| 4 | 03/09/2019 | 03/22/2019 | 11/02/2021 | 32 months |
| 5 | 09/18/2019 | 10/21/2019 | 04/26/2021 | 18 months |
| 6 | 02/08/2020 | 03/13/2020 | 05/10/2021 | 14 months |
| 7 | 02/08/2020 | 03/13/2020 | 09/02/2021 | 18 months |
| 8 | 03/15/2020 | 04/13/2020 | 01/08/2022 | 21 months |
| 9 | 03/15/2020 | 04/13/2020 | 12/30/2021 | 20 months |
| 10 | 03/15/2020 | 04/13/2020 | 11/22/2022 | 31 months |
| 11 | 04/14/2020 | 05/06/2020 | 09/18/2021 | 16 months |
| 12 | 05/18/2020 | 05/26/2020 | 04/01/2022 | 23 months |
| 13 | 09/01/2020 | 12/26/2020 | 12/08/2022 | 24 months |
| 14 | 09/01/2020 | 12/26/2020 | 11/08/2022 | 23 months |
| 15 | 09/01/2020 | 12/26/2020 | 7/14/2022 | 19 months |

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 28, 2022

Kimly Dawson

# EXHIBIT B



Commission for the Conservation of Antarctic Marine Living Resources
Commission pour la conservation de la faune et la flore marines de l'Antarctique
Комиссия по сохранению морских живых ресурсов Антарктики
Comisión para la Conservación de los Recursos Vivos Marinos Antárticos

CCAMLR-41/22

09 September 2022

Original: English



**CDS Implementation and Data Analysis**

CCAMLR Secretariat



This paper is presented for consideration by CCAMLR and may contain unpublished data, analyses, and/or conclusions subject to change. Data in this paper shall not be cited or used for purposes other than the work of the CAMLR Commission, Scientific Committee or their subsidiary bodies without the permission of the originators and/or owners of the data.

# CDS Implementation and Data Analysis

Secretariat

Abstract

The Catch Documentation Scheme for *Dissostichus* spp. (CDS) was effectively implemented in 2021 by 16 Member States, 3 Acceding States, and 1 non-Contracting Party (NCP) cooperating with CCAMLR by participating in the CDS. The Secretariat contacted 13 NCPs to seek their engagement in the CDS in 2021.

Analysis of the trends in the CDS data for 2021 identified France as having landed the largest quantity of toothfish (4 187 tonnes) and exported the largest quantity of toothfish (4 282). More toothfish is caught inside the Convention Area then outside. The largest quantity of imports was by the United States of America (USA) followed by China. The majority of imports (98%) were to a country which was a Contracting Party or had a cooperative status with CCAMLR.

Recommendations have been provided for the review of CM 10-05 and the review of co-operating non-Contracting Party statuses.

## Introduction

1.      This paper provides a report on the implementation of the Catch Documentation Scheme for *Dissostichus* spp. (CDS).

2.      In the 2021 calendar year, the CDS was implemented by 16 Member States, 3 Acceding States, and 1 non-Contracting Party (NCP) cooperating with CCAMLR by participating in the CDS.

3.      There are currently 114 authorised CDS Contact Officers for 2022.

4.      In 2022, 13[1] NCPs have been identified to have imported greater than one tonne of *Dissostichus* spp. over the last three years while not cooperating with CCAMLR by participating in the CDS.

5.      The analysis reports on the trends observed in the application of the electronic CDS (e-CDS) by participants highlighting the major importing, exporting, and fishing States. The results of the Analysis have been provided in Annex 1.

---

[1]      Brunei Darussalam, Cambodia, Colombia, Kuwait, Lebanon, Malaysia, Maldives, Philippines, Qatar, Thailand, Turkey, United Arab Emirates and Viet Nam.

**CDS implementation**

Contracting Parties

6.      Funded by the CDS Fund, the Secretariat provided five online training sessions to Contracting Parties in 2022. A summary of these training sessions is provided in CCAMLR-41/20.

Cooperating non-contracting parties

7.      On 2 February 2021 Mexico was provided limited access to the CDS for the purpose of verifying export/re-export documents accompanying imports of *Dissostichus* spp. and issuing re-export documents (COMM CIRC 21/24).

8.      Mexico has not responded to the Secretariat's request to provide information to register e-CDS users and to participate in e-CDS training since being provided access. As part of SCIC's review of Mexico's limited access to the CDS (as per CM 10-05, Annex C, paragraph C4(iii)), the Secretariat requests Members to utilise diplomatic channels to communicate with Mexico whether it intends to implement the e-CDS.

9.      As per the requirement of CM 10-05, Annex C, paragraph C9, the Commission is required to review the cooperating status granted to each NCP. As part of the CCEP analysis process, Singapore was identified as having 21 issues of non-compliance with CM 10-05, paragraph 6. Further information is provided in CCAMLR-41/15.

Non-Contracting Parties

10.      NCPs not cooperating with CCAMLR by participating in the CDS identified through the e-CDS to have imported greater than 1 tonne in the three years preceding 2022 include: Brunei Darussalam, Cambodia, Colombia, Kuwait, Lebanon, Malaysia, Maldives, Philippines, Qatar, Thailand, Turkey, United Arab Emirates and Viet Nam.

11.      In accordance with CM 10-05, Annex 10-05/C, the Secretariat wrote to NCPs identified in the e-CDS to invite them to cooperate with CCAMLR by voluntarily implementing the CDS, to seek the status of an NCP cooperating with CCAMLR by participating in the CDS and to consider becoming a Contracting Party to CCAMLR.

12.      A review of the NCP engagement strategy and a proposal for 2023–2024 is provided in CCAMLR-41/17.

Global catches reported in the e-CDS

13.      Global catches of toothfish reported through the e-CDS is larger inside the Convention Area than outside, with notable quantities reported outside the Convention Area in Areas 41 and 87. Catches by area are summarised in Table 1.

Table 1:   Catches for 2021 by area.

| | Area | Catch (tonnes) |
|---|---|---|
| Outside the Convention area | 41 | 6 354 |
| | 47 | 18 |
| | 51 | 20 |
| | 57 | 30 |
| | 81 | 342 |
| | 87 | 3 474 |
| | Total | 10 238 |
| Inside the Convention Area | 48 | 1 592 |
| | 58 | 6 643 |
| | 88 | 2 770 |
| | Total | 11 005 |

Electronic CDS (e-CDS)

14.    The CDS Technical Working Group e-group, has been used as the primary mechanism for communication with CDS users for the e-CDS upgrade. Year one of the e-CDS upgrade has successfully been completed and implemented. An overview of the upgrade is available in CCAMLR-41/20/ Annex 2.

15.    A proposal for year two of the e-CDS upgrade has been submitted to the CDS Fund Review Panel (CCAMLR-41/20).

Fraudulent/invalid documents

16.    No fraudulent *Dissostichus* Catch Documents (DCDs), *Dissostichus* Export Documents (DEDs) or *Dissostichus* Re-Export Documents (DREDs) were identified or reported to the Secretariat in 2021.

Sale of seized or confiscated catches

17.    No Specially Validated *Dissostichus* Catch Documents (SVDCDs) were issued in 2021.

CDS Fund

18.    The balance of the CDS Fund is A$1 427 140.

19.    The CDS Fund Review Panel has received an application from the Secretariat to fund the second year of the e-CDS upgrade (CCAMLR-41/20). The estimated cost is A$165 000.

Review of CM 10-05

20.     It is suggested by the Secretariat that CM 10-05 is reviewed to replace the requirements of a fax number with an e-mail address. Changes have been provided in the text of CM 10-05 in Annex 2.

21.     Responses to the stakeholder engagement survey for the CDS upgrade suggested the following items would be useful to Members and would require a change to CM 10-05:

> (i)      inclusion of QR code for each document
> (ii)     comment box
> (iii)    record of number of fishing operations in a trip.
> (iv)    area caught recorded in DED/DRED
> (v)     number of specimens/units landed/exported.

**Recommendations**

22.     That SCIC notes the analysis of the CDS (Annex 1)

23.     That SCIC considers the application to the CDS Fund Review Panel (paragraph 19)

24.     That SCIC considers the cooperation status of Mexico (paragraph 8) and Singapore (paragraph 9).

25.     That SCIC considers the proposed review of CM 10-05 (paragraphs 20 and 21).

Annex 1

**CDS analysis results**

*Dissostichus* spp. Catch Documents – see Table 1 below

1.      French *Dissostichus* Catch Documents (DCDs) accounted for the largest total quantity of toothfish, attributing to 23% of total verified weight in 2021. Chile had the highest count of DCDs and landings for 2021.

2.      Japan, and Ukraine both issued DCDs, but their fishing vessels did not land in their respective territories. Therefore, Table 1 has not recorded a landing by these States.

3.      Chile, Mauritius, New Zealand, South Africa, the United Kingdom and Uruguay have all recorded a greater number of landings than DCDs, reflecting the use of these States' ports by other Members for the landing of toothfish catches due to their proximity to fishing grounds.

Table 1:    Total verified weight of toothfish by DCD issuing State for landings that occurred in 2021, ordered by largest verified weight.

| Country | Count of DCDs | Count of Landings | Verified weight (tonnes) | Percentage of annual total weight (%) |
|---|---|---|---|---|
| France | 23 | 23 | 4 187 | 20 |
| Argentina | 22 | 22 | 3 475 | 16 |
| Chile | 588 | 599 | 3 299 | 16 |
| Korea, Republic of | 23 | 2 | 3 204 | 15 |
| Australia | 21 | 4 | 2 540 | 12 |
| United Kingdom | 19 | 25 | 2 009 | 9 |
| New Zealand | 6 | 7 | 800 | 4 |
| Ukraine | 5 | - | 517 | 2 |
| South Africa | 5 | 9 | 336 | 2 |
| Spain | 53 | 11 | 336 | 2 |
| Uruguay | 4 | 57 | 222 | 1 |
| Peru | 113 | 113 | 164 | 1 |
| Japan | 4 | - | 138 | 1 |
| Ecuador | 14 | 14 | 15 | 0 |
| Mauritius | - | 14 | - | - |
| Total | 900 | 900 | 21 243 | |

*Dissostichus* spp. Export Documents

Exports – see Table 2 below

4.      France and Chile exported the largest quantities of toothfish accounting for 19% and 18% of total exports respectively. Chile had issued the most DEDs, a result of the large number of DCDs created annually by Chile.

5.      The USA issued the most DREDs with 172 followed by Spain (150) and Korea (124).

Table 2:     Total exported weight of toothfish products by exporting country ordered by largest exported quantity.

| Country | Count of DEDs | Count of DREDs | Export Quantity (tonnes) | Percent of total quantity (%) |
|---|---|---|---|---|
| France | 293 | 17 | 4 282 | 19 |
| Chile | 1 845 | 72 | 4 221 | 18 |
| Argentina | 379 | | 3 813 | 16 |
| United Kingdom[1] | 141 | 8 | 2 239 | 10 |
| Uruguay | 134 | - | 2 073 | 9 |
| Mauritius | 137 | 14 | 1 540 | 7 |
| New Zealand | 99 | 32 | 1 484 | 6 |
| Korea, Republic of | 20 | 124 | 1 073 | 5 |
| Australia | 29 | 82 | 677 | 3 |
| South Africa | 32 | - | 511 | 2 |
| Spain | 30 | 150 | 478 | 2 |
| United States of America | - | 172 | 229 | 1 |
| Singapore | - | 44 | 221 | 1 |
| Peru | 114 | - | 129 | 1 |
| China[2] | - | 24 | 75 | 0 |
| Netherlands | - | 21 | 39 | 0 |
| Ecuador | 40 | - | 26 | 0 |
| Japan | - | 6 | 9 | 0 |
| Belgium | - | 1 | 1 | 0 |
| Total | 3 293 | 767 | 23 126 | |

[1]   The United Kingdom includes exports from the overseas territory of The Cayman Islands.
[2]   China includes exports from Hong Kong SAR.


     Imports – see Table 3 below

6.      The USA accounted for the largest number of imports for 2021 (53%) followed by China (21%). Singapore and Korea were also identified as major importers in 2021 (Table 3).

7.      In CCAMLR-XXXVII/BG/03 Viet Nam was identified as a major importer of toothfish importing 3 090 tonnes in 2017. The analysis has identified that exports to Viet Nam have decreased significantly with 16 tonnes imported in 2021.

Table 3:     Total import weight of toothfish in 2021 by import country ordered by quantity.

| Importing Country | Participation in the CDS | Import Quantity (tonnes) | Percent of Total Quantity (%) |
|---|---|---|---|
| United States of America | ✓ | 12 240 | 52.92 |
| China[1] | ✓ | 4 960 | 21.45 |
| Korea, Republic of | ✓ | 2 196 | 9.50 |
| Singapore | ✓ | 1 487 | 6.43 |
| Japan | ✓ | 461 | 1.99 |
| Australia | ✓ | 315 | 1.36 |
| Malaysia | ✕ | 260 | 1.12 |
| Spain | ✓ | 242 | 1.05 |
| Chile | ✓ | 150 | 0.6 |
| New Zealand | ✓ | 142 | 0.62 |

| Importing Country | Participation in the CDS | Import Quantity (tonnes) | Percent of Total Quantity (%) |
|---|---|---|---|
| Canada | ✓ | 126 | 0.54 |
| Thailand | ✗ | 118 | 0.51 |
| France | ✓ | 76 | 0.33 |
| United Arab Emirates | ✗ | 64 | 0.28 |
| The Netherlands[4] | ✓ | 58 | 0.25 |
| Russian Federation | ✓ | 49 | 0.21 |
| United Kingdom[3] | ✓ | 40 | 0.17 |
| Mexico | ✓ | 23 | 0.10 |
| Mauritius | ✓ | 17 | 0.07 |
| Viet Nam | ✗ | 16 | 0.07 |
| Portugal | ✗[5] | 15 | 0.06 |
| Ukraine | ✓ | 11 | 0.05 |
| Greece | ✓ | 11 | 0.05 |
| India | ✓ | 8 | 0.03 |
| Philippines | ✗ | 7 | 0.03 |
| Qatar | ✗ | 5 | 0.02 |
| Cambodia | ✗ | 4 | 0.02 |
| Germany | ✓ | 4 | 0.02 |
| Italy | ✓ | 4 | 0.02 |
| Belgium | ✓ | 3 | 0.01 |
| Turkey | ✗ | 2 | 0.01 |
| Colombia | ✗ | 2 | 0.01 |
| Maldives | ✗ | 2 | 0.01 |
| Kuwait | ✗ | 1 | 0.01 |
| Poland | ✓ | 1 | 0.01 |
| Brunei Darussalam | ✗ | 1 | 0.00 |
| Saint Vincent and the Grenadines | ✗ | 1 | 0.00 |
| Denmark | ✗[5] | 0 | 0.00 |
| Guatemala | ✗ | 0 | 0.00 |
| Trinidad and Tobago | ✗ | 0 | 0.00 |
| Total | | 23 122 | |

1   China includes imports to Hong Kong SAR, Macao SAR and Taiwan, Province of China.
2   France includes imports to Saint Barthélemy.
3   The United Kingdom includes imports to the overseas territories of The Cayman Islands and Bermuda.
4   The Netherlands include imports to Sint Maarten.
5   Access to the e-CDS is available by virtue of European Union membership.

8.    The analysis has identified that for 2021, 98% of toothfish imports were to countries which implement the CDS (Table 4).

Table 4:    Total import weight of toothfish products and percent of total by importing country's cooperative status with the CDS for 2019 and 2020.

| Importing country's cooperative status with the CDS | Import weight (tonnes) | Percent of total weight (%) |
|---|---|---|
| Contracting and cooperative Parties | 22 624 | 98 |
| non-Contracting Parties | 498 | 2 |
| Total | 23 122 | |

Annex 2

**Conservation Measure 10-05 (2021)**
**Catch Documentation Scheme for *Dissostichus* spp.**

| Species | toothfish |
|---------|-----------|
| Area | all |
| Season | all |
| Gear | all |

The Commission,

Concerned that illegal, unreported and unregulated (IUU) fishing for *Dissostichus* spp. in the Convention Area threatens serious depletion of populations of *Dissostichus* spp.,

Aware that IUU fishing involves significant by-catch of some Antarctic species, including endangered albatross,

Noting that IUU fishing is inconsistent with the objective of the Convention and undermines the effectiveness of CCAMLR conservation measures,

Underlining the responsibilities of Flag States to ensure that their vessels conduct their fishing activities in a responsible manner,

Mindful of the rights and obligations of Port States to promote the effectiveness of regional fishery conservation measures,

Aware that IUU fishing reflects the high value of, and resulting expansion in markets for and international trade in, *Dissostichus* spp.,

Recalling that Contracting Parties have agreed to introduce classification codes for *Dissostichus* spp. at a national level,

Recognising that the Catch Documentation Scheme for *Dissostichus* spp. (CDS) provides the Commission with important information to assist with achieving the precautionary management objectives of the Convention,

Committed to take steps, consistent with international law, to identify the origins of *Dissostichus* spp. entering the markets of Contracting Parties and to determine whether *Dissostichus* spp. harvested in the Convention Area that is imported into their territories were caught in a manner consistent with CCAMLR conservation measures,

Wishing to reinforce the conservation measures already adopted by the Commission with respect to *Dissostichus* spp.,

Further recognising the importance of enhancing cooperation with non-Contracting Parties to help prevent, deter and eliminate IUU fishing in the Convention Area,

Acknowledging that the Commission has adopted a policy to enhance cooperation between CCAMLR and non-Contracting Parties,

Inviting non-Contracting Parties whose vessels fish for *Dissostichus* spp. to participate in the CDS,

<u>Further noting</u> the importance of providing a mechanism for confiscated *Dissostichus* spp. to be sold or disposed of through the CDS,

hereby adopts the following conservation measure in accordance with Article IX of the Convention:

1.   The following definitions are intended only for the purpose of the completion of CDS documents and shall be applied as stated regardless of whether such actions as landings, transhipments, imports, exports or re-exports constitute the same under any CDS participant's relevant domestic law:

   (i)   *Dissostichus* catch document (DCD) is a document, generated by the electronic CDS (e-CDS), containing information relating to the harvest, transhipment and landing of *Dissostichus* spp. as contained in Annex 10-05/A, Attachment 1.

   *Dissostichus* Export Document (DED) is a document, generated by the e-CDS, containing information relating to the export of *Dissostichus* spp. as contained in Annex 10-05/A, Attachment 1.

   *Dissostichus* Re-Export Document (DRED) is a document, generated by the e-CDS, containing information relating to the re-export of *Dissostichus* spp. as contained in Annex 10-05/A, Attachment 1.

   (ii)   CDS Contact Officer is a person appointed by a Contracting Party or non-Contracting Party cooperating with CCAMLR by participating in the CDS, whose details are provided to the CCAMLR Secretariat and who is responsible for:

   •   issuing and validating DCDs, DEDs and DREDs;
   •   requesting amendments to e-CDS data;
   •   providing e-CDS user access to other persons as required.

   (iii)   e-CDS is the web-based application implemented by CCAMLR to support the CDS for the creation, validation and storage of DCDs, DEDs and DREDs.

   (iv)   e-CDS User Manual: The CCAMLR-developed document that describes, *inter alia*, the roles, responsibilities, processes and steps associated with the operation of the e-CDS for the creation, validation and storage of DCDs, DEDs and DREDs.

   (v)   Export: Any movement of *Dissostichus* spp. in any form from territory under the control of the State or free-trade zone of landing, or, where that State or free-trade zone forms part of a customs union, any other member State of that customs union.

   (vi)   Import: The physical entering or bringing of *Dissostichus* spp. in any form into any part of the geographical territory under the control of a State, except where the *Dissostichus* spp. are landed or transhipped within the definitions of 'landing' or 'transhipment' in this conservation measure. *Dissostichus* spp. that has been previously landed and that enters the territory of a State for the sole purpose of in-bond transit to another State, without undergoing any change in quantity or form, does not constitute an import for the purposes of this conservation measure.

(vii) Landing: The initial unloading or transfer of *Dissostichus* spp. in any form from a vessel to dockside, even if subsequently transferred to another vessel, in a port or free-trade zone where the *Dissostichus* spp. are certified by an authority of the Port State as landed.

(viii) Port State: The State that has control over a particular port area or free-trade zone for the purposes of landing, transhipment, importing, exporting and re-exporting and whose authority serves as the authority for landing or transhipment certification.

(ix) Re-export: Any movement of *Dissostichus* spp. in any form from territory under the control of a State, free-trade zone, or member State of a customs union of import unless that State, free-trade zone, or any member State of that customs union of import is the first place of import, in which case the movement is an export within the definition of 'export' in this conservation measure.

(x) Specially Validated *Dissostichus* Catch Document (SVDCD): A DCD that has been specially issued by a State, or by the Secretariat on behalf of a State, to accompany seized or confiscated *Dissostichus* spp. offered for sale or otherwise disposed of by the State.

(xi) Transhipment: The transfer of *Dissostichus* spp. that have not previously been landed, from one vessel directly to another, either at sea or in port. The offload or transfer in port of *Dissostichus* spp. from a vessel to a container is a landing within the definition of 'landing' in this conservation measure.

2.  Each Contracting Party and non-Contracting Party cooperating with CCAMLR by participating in the CDS shall take steps to identify the origin of *Dissostichus* spp. landed in, imported into, or exported or re-exported from its territories and determine whether *Dissostichus* spp. harvested in the Convention Area that is landed in, imported into, or exported or re-exported from its territories was caught in a manner consistent with CCAMLR conservation measures.

3.  Each Contracting Party and non-Contracting Party cooperating with CCAMLR by participating in the CDS shall require that each landing of *Dissostichus* spp. at its ports and each transhipment of *Dissostichus* spp. from, or to, its vessels be accompanied by a completed DCD. The landing or transhipment of *Dissostichus* spp. without a DCD is prohibited. The use of the e-CDS to generate, validate and complete a DCD is mandatory.

4.  DCDs must be completed as described in Annex 10-05/A.

5.  A Flag State must be satisfied, through the use of VMS data (as described in Conservation Measure 10-04, paragraph 2) that the FAO area(s) or CCAMLR subarea(s) or division(s) where the *Dissostichus* spp. were taken was accurately reported by the vessel on the DCD, and check the vessel's authorisation to fish before issuing a unique Flag State Confirmation Number on a DCD. The Flag State's CDS Contact Officer shall not issue a Flag State Confirmation Number on a DCD if there is reason to believe that the information submitted by the vessel is inaccurate or that the *Dissostichus* spp. were taken in a manner inconsistent with CCAMLR conservation measures if fishing occurred in the CAMLR Convention Area.

6.   Each Contracting Party and non-Contracting Party cooperating with CCAMLR by participating in the CDS shall require that each shipment of *Dissostichus* spp. imported into, or exported or re-exported from its territory be accompanied by a DED or DRED. The import, export or re-export of *Dissostichus* spp. without a DED or DRED is prohibited.

7.   DEDs and DREDs must be completed as described in Annex 10-05/A. The use of the e-CDS to generate, validate and complete a DED and/or a DRED is mandatory.

8.   When DCDs, DEDs or DREDs need to be provided in hard-copy form, a printout of the document generated by the e-CDS shall be accepted.

9.   Each Contracting Party and non-Contracting Party cooperating with CCAMLR by participating in the CDS shall ensure that its customs authorities or other appropriate government officials request and examine the documentation of each shipment of *Dissostichus* spp. imported into, or exported or re-exported from its territory. The examination will confirm that documentation for each shipment includes DED(s) and, where appropriate, DRED(s) that account for all the *Dissostichus* spp. contained in the shipment and verify that the information contained in the DEDs and/or DREDs is consistent with the information contained in the e-CDS. Where necessary, such officials shall also examine the content of any shipment to verify the information contained in the DED(s) and/or DRED(s).

10.  If, as a result of an examination referred to in paragraph 9 above or any other inspection or investigation conducted in accordance with relevant domestic law, a question arises regarding the information contained in a DCD, DED or DRED, the exporting State whose government authority validated the document(s) and, as appropriate, the Flag State whose vessel completed the document are called on to cooperate with the importing State with a view to resolving such question.

11.  Once created using the e-CDS, all DCDs, DEDs and DREDs will be available to the CCAMLR Secretariat and any Member who has had a role in the completion of the documents, as well as the importing State.

12.  Any Contracting Party or non-Contracting Party cooperating with CCAMLR by participating in the CDS may require additional verification, from the relevant CDS Contact Officer, of information contained in DCDs, DEDs or DREDs by using, *inter alia*, VMS, in respect of *Dissostichus* spp.[1] taken outside the Convention Area, when landed at, imported into, or exported or re-exported from its territory.

13.  If, following an examination under paragraph 9 or any other inspection or investigation conducted in accordance with relevant domestic law, questions under paragraph 10 or requests for additional verification of documents under paragraph 12 arise, and it is determined, after consultation with the States concerned, that any information contained within a DCD, DED or DRED is invalid or the *Dissostichus* spp. were not harvested in a manner consistent with CCAMLR conservation measures, the import, export or re-export of *Dissostichus* spp. that are the subject of the document(s) is prohibited.

14.  If a Contracting Party or non-Contracting Party cooperating with CCAMLR by participating in the CDS has cause to sell or dispose of seized or confiscated *Dissostichus*

spp., it may issue an SVDCD specifying the reasons for that validation. The SVDCD shall include a statement describing the circumstances under which confiscated fish are moving in trade. To the extent practicable, Contracting Parties shall ensure that the sale of seized or confiscated *Dissostichus* spp. does not result in any financial benefit accruing to those responsible for, or benefiting from, the activities that led to the seizure or confiscation of the catch (i.e. including operators, effective beneficiaries, owners, logistics and service providers). If a Contracting Party or non-Contracting Party cooperating with CCAMLR by participating in the CDS issues an SVDCD, it shall immediately report all such validations to the Secretariat for conveying to all Parties and, as appropriate, recording in trade statistics.

15. Where a non-Contracting Party[2] has cause to sell or dispose of seized or confiscated *Dissostichus* spp., a Contracting Party may request the Secretariat to issue a SVDCD on behalf of that non-Contracting Party. The request shall be accompanied by a statement from the Contracting Party specifying the reasons for requesting the SVDCD. The statement shall include all of the necessary information to enable the Secretariat to complete an SVDCD on behalf of the non-Contracting Party and an explanation of:

(i)   the circumstances in which the *Dissostichus* spp. were seized or confiscated, including details of the vessel from which the *Dissostichus* spp. were seized; or, if *Dissostichus* spp. had been landed when it was seized, the details of the vessel from which the *Dissostichus* spp. were landed, as far as they are known;

(ii)  the steps taken to ensure that the information to be contained in the SVDCD is accurate and to maintain the effectiveness of the CDS. Such steps shall include, at a minimum:

(a)   action taken by the Contracting Party to support the non-Contracting Party in monitoring the unload, or in seizing or confiscating the *Dissostichus* spp. if it had already been unloaded, including steps taken to verify the species and catch weights;

(b)   action taken by the Contracting Party to support efforts by the non-Contracting Party to ensure that the sale of the seized or confiscated *Dissostichus* spp. does not result in any financial benefit accruing to those responsible for, or benefiting from, the activities that led to the seizure or confiscation of the catch (i.e. including operators, effective beneficiaries, owners, logistics and service providers);

(c)   action taken to seek information from other States that have links to the vessel to ensure that the sale of the seized or confiscated *Dissostichus* spp. does not result in any financial benefit accruing to those responsible for, or benefiting from, the activities that led to the seizure or confiscation of the catch (i.e. including operators, effective beneficiaries, owners, logistics and service providers);

(iii) the laws of the non-Contracting Party:

(a)   under which the product was seized or confiscated, and which would apply to the sale or disposal of the product;

     (b)    that may have been breached by the master, crew and any other persons associated with the operations of the vessel from which the *Dissostichus* spp., was seized, confiscated or landed.

    (iv)    the action taken, or being taken, by the non-Contracting Party under the laws identified in paragraph (iii):

        (a)    details of the responsible non-Contracting Party authority;

        (b)    whether the responsible non-Contracting Party authority obtained copies of the crew list of the vessel from which the *Dissostichus* spp., was seized, confiscated or landed and of the passports of the master and crew. Copies of these documents shall accompany the statement if they are available, subject to the Contracting Party's domestic law.

16.    The Contracting Party shall provide additional information to the Secretariat as it becomes available.

17.    The Secretariat shall, as soon as practicable, circulate to all Contracting Parties the request and information provided under paragraph 15. Contracting Parties shall make any comments or requests for further information, where the information required by paragraph 15 has not been provided, within fourteen (14) days.

18.    The Contracting Party making the request under paragraph 15 shall provide the further information requested, if available, or the reasons why that information is not available, within fourteen (14) days from any Contracting Party making a request for further information in accordance with paragraph 17.

19.    If there are no comments on the request in accordance with paragraph 17, or if the Contracting Party making the request under paragraph 15 has responded in accordance with paragraph 18, the Secretariat shall issue an SVDCD if the request contains the information required by paragraph 15.

20.    Where the Secretariat has issued an SVDCD in accordance with paragraph 15, the Secretariat will, if requested to do so by the Contracting Party on behalf of the non-Contracting Party:

    (i)    generate a DED to accompany a shipment from the territory of the non-Contracting Party of all, or a portion of, the *Dissostichus* spp. subject to the SVDCD;

    (ii)    facilitate temporary access by the non-Contracting Party to the e-CDS to enable the non-Contracting Party to complete the DED.

21.    Once one SVDCD has been issued in respect of a particular non-Contracting Party under paragraph 15, SCIC shall determine at its next meeting whether a further SVDCD may be issued in respect of that non-Contracting Party without that non-Contracting Party submitting an application to become a non-Contracting Party cooperating with CCAMLR by participating in the CDS.

22.    At its annual meeting SCIC shall review all circumstances under which an SVDCD was issued in the period since the last annual meeting, and shall recommend to the Commission any further action that it deems appropriate.

23.    A Contracting Party, a non-Contracting Party cooperating with CCAMLR by participating in the CDS, or a non-Contracting Party on whose behalf an SVDCD has been issued by the Secretariat under paragraph 15, may transfer all, or part of, the proceeds from the sale of seized or confiscated *Dissostichus* spp. into the CDS Fund created by the Commission or into a national fund which promotes achievement of the objectives of the Convention. In addition, a Contracting Party, a non-Contracting Party cooperating with CCAMLR by participating in the CDS or a non-Contracting Party on whose behalf an SVDCD has been issued by the Secretariat under paragraph 15, may offer voluntary contributions to support the CDS Fund and its related activities. A Contracting Party or non-Contracting Party cooperating with CCAMLR by participating in the CDS may, consistent with its domestic law, decline to provide a market for toothfish offered for sale with an SVDCD by another State. Provisions concerning the uses of the CDS Fund are found in Annex 10-05/B.

24.    Non-Contracting Parties which are involved in the trade of *Dissostichus* spp. are encouraged to cooperate with CCAMLR by participating in the CDS and to approach CCAMLR with requests for assistance in this regard. The procedure regarding cooperation with CCAMLR in the voluntary implementation of the CDS by non-Contracting Parties involved in the trade of *Dissostichus* spp. including, but not limited to, those that have had an SVDCD issued on their behalf, is set out in Annex 10-05/C.

---

[1]    Excluding by-catches of *Dissostichus* spp. by trawlers fishing on the high seas outside the Convention Area. A by-catch shall be defined as no more than 5% of total catch of all species and no more than 50 tonnes for an entire fishing trip by a vessel.

[2]    That is not a non-Contracting Party cooperating with CCAMLR by participating in the CDS.

Annex 10-05/A

A1.   Each Contracting Party and non-Contracting Party cooperating with CCAMLR by participating in the CDS shall require that each landing of *Dissostichus* spp. at its ports and each transhipment of *Dissostichus* spp. from or to its vessels be accompanied by a completed DCD created using the e-CDS.

A2.   Each Contracting Party and non-Contracting Party cooperating with CCAMLR by participating in the CDS shall require that each shipment of *Dissostichus* spp. imported into, or exported or re-exported from its territory be accompanied by a DED or DRED created using the e-CDS.

A3.   The use of the e-CDS is described in the e-CDS User Manual that includes, *inter alia*, the roles, responsibilities, processes and steps associated with the operation of the e-CDS for the creation, validation and storage of DCDs, DEDs and DREDs.

A4.   Each DCD, created by the relevant Flag State using the e-CDS, includes a specific identification number (Document Number) consisting of:

    (i)   a four-digit number, consisting of the two-digit International Organization for Standardization (ISO) country code plus the last two digits of the year for which the DCD is issued;

    (ii)   a four-digit sequence number (beginning with 0001) to denote the order in which DCDs are issued;

    (iii)   a single-digit number and / (e.g. /1) following the four-digit sequence number to denote when multiple recipients are recorded for a DCD.

A5.   A DCD must include the following information:

    (i)   the name, address, telephone and ~~fax numbers~~ e-mail of the issuing authority;

    (ii)   the name, home port, national registry number and call sign of the vessel and, if issued, its IMO/Lloyd's registration number;

    (iii)   the reference number of the licence or permit, whichever is applicable, if issued;

    (iv)   the net weight of *Dissostichus* spp. landed or transhipped, by species, product type, and

        (a)   by CCAMLR statistical subarea or division if caught in the Convention Area; or

        (b)   by FAO statistical area, subarea or division if caught outside the Convention Area[1];

    (v)   the start date and end date of fishing, and the date of port departure and the date of port entry;

    (vi)   in the case of a transhipment or landing, the name of the master of the fishing vessel, the transhipment port and country/area (or, in the case of an at-sea transhipment,

the at-sea coordinates) and the date of transhipment. In the case of a transhipment within a port, in addition to the above, the name and signature of the port authority. In the case of a landing, the intended landing port and country, the landing date and the certification of landing;

(vii)  in the case of a transhipment and subsequent landing, the name of the master of the receiving vessel, and name, call sign and IMO/Lloyd's number of the receiving vessel (i.e. the vessel to which the catch has been transhipped), the intended landing port and country and the intended date of landing;

(viii) in the case of *Dissostichus* spp. sold upon landing, the name, address, telephone and e-mail ~~fax numbers~~ of the recipient(s) of the *Dissostichus* spp. to whom the fish was sold and the amount of each species and product type received.

A6.  Each DED and DRED issued by the Export State using the e-CDS shall include the specific identification number (Document Number) of the DCD to which the export relates.

A7.  Each DED and DRED shall include the following information:

(i)  the export code;

(ii)  the name of the fishing vessel for a DED;

(iii)  the original export code for a DRED;

(iv)  the start date and end date of fishing;

(v)  the net weight of *Dissostichus* spp. exported, by species and product type;

(vi)  the name and address of the importer of the shipment and the port or place of arrival;

(vii)  the exporter's name and address;

(viii) name/title, government of the Export State and date;

(ix)  the transport details of the shipment:

(1)  if by sea

(a)  container number, AND
(b)  vessel name, AND
(c)  bill of lading number, if available[2]

AND

(d)  expected date of export and port of departure;

(2)  if by air

(a)  flight number, and airway bill number, AND
(b)  expected date of export and place of departure;

(3)  if by other means (ground transportation)

(a)  truck registration number and nationality of trucking company, OR
      railway transport number, AND

(b)  bill of lading number or other shipment document to identify shipment;

AND

(c)  expected date of export and place of departure.

---

[1]  Report the FAO statistical area/subarea/division where the *Dissostichus* spp. was taken and indicate whether the *Dissostichus* spp. was taken on the high seas or within an EEZ.

[2]  If the bill of lading number is not indicated on the export/re-export document at the time of issuance, it shall be provided to the Secretariat within five working days of receipt by the exporting/re-exporting State.

Annex 10-05/A, Attachment 1

*Dissostichus* Catch Document, *Dissostichus* Export Document, *Dissostichus* Re-export
Document and Specially Validated *Dissostichus* Catch Document
to be used from 1 February 2018

| *DISSOSTICHUS* CATCH DOCUMENT | | | | | V 1.9 |
|---|---|---|---|---|---|

| Document number: | Flag State confirmation number: |
|---|---|

**1. Issuing authority of document**

| | Address: | Telephone: | ~~Fax~~ E-mail: |
|---|---|---|---|

**2. Fishing vessel**

| Name: | Home port: | Registration number: | Call sign: | IMO/Lloyd's number (if issued): |
|---|---|---|---|---|

| **3. Licence number (if issued)** | **Fishing dates for catch under this document** | |
|---|---|---|
| | **4. From:** | **5. To:** |
| | **6. Date of port departure:** | **7. Date of port entry:** |

| **8. Description of fish (landed/transhipped)** | | | | | | **9. Description of fish sold** |
|---|---|---|---|---|---|---|
| Species | Type | EEZ | Area caught | Estimated weight to be landed (kg) | Verified weight landed (kg) | Net weight sold (kg) |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**10. Description of fish sold**

| Name of recipient: | |
|---|---|
| Address: | Telephone: | ~~Fax~~ E-mail: |

**11. Landing/Transhipment information:** I certify that the above information is complete, true and correct, and that for any *Dissostichus* spp. taken in the Convention Area, I certify that it was taken in a manner which is consistent with CCAMLR conservation measures.

| Master of fishing vessel or authorised representative: (print in block letters) | Date: | Transhipment port and country or at-sea coordinates: | Transhipment date: |
|---|---|---|---|
| | | Landing port and country: | Landing date: |

**12A1. Certificate of transhipment and subsequent landing:** I certify that the above information is complete, true and correct to the best of my knowledge.

| Master of receiving vessel: | Vessel name: | Call sign: | IMO/Lloyd's number: |
|---|---|---|---|
| | Intended landing port and country: | Intended date of landing: | |

**12B1. Transhipment within a port area** (countersignature by Port Authority if appropriate)

| Name: | Authority: | Date: |
|---|---|---|

**13. Certificate of landing:** I certify that the above information is complete, true and correct to the best of my knowledge.

| Name: | Authority: | Date: |
|---|---|---|

19

| *DISSOSTICHUS* EXPORT DOCUMENT | | V1.9 |
|---|---|---|
| Catch Document number: | | Export code: |
| From: | To: | Fishing vessel name: |

**1. Description of fish exported**

| Species | Type | Net weight exported (kg) |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

**2. Transport details** – complete one of the four sections below

| Complete this section if transport method is by **SEA**: <br><br> Container number: <br><br> Vessel name: <br><br> Bill of lading number: | Complete this section if transport method is by **ROAD**: <br><br> Truck registration number: <br><br> Nationality of truck: |
|---|---|
| Complete this section if transport method is by **AIR**: <br><br> Flight number: <br><br> Airway bill number: | Complete this section if transport method is by **RAIL**: <br><br> Railway transport number: <br><br> Bill of lading number: <br> (or other shipment document number to identify shipment) |
| Complete the following section regardless of the transport method | |
| Expected date of export: | Port or place of departure: |

**3. Exporter certification**: I certify that the above information is complete, true and correct to the best of my knowledge.

| Name: | Address: |
|---|---|
| | Date: | Export licence: |

**4. Import section**

| Name of importer: | Importer address: |
|---|---|
| Port or place of arrival: | State/Province: | Country: |

**5. Export government authority validation**: I certify that the above information is complete, true and correct to the best of my knowledge.

| Name/Title: | Government: | Date of issue: |
|---|---|---|

20

| *DISSOSTICHUS* RE-EXPORT DOCUMENT | | V1.9 |
|---|---|---|
| Catch Document number: | | Export code: |
| From: | To: | Original export code: |

### 1. Description of fish exported

| Species | Type | Net weight exported (kg) |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

### 2. Transport details – complete one of the four sections below

| Complete this section if transport method is by **SEA** | Complete this section if transport method is by **ROAD**: |
|---|---|
| Container number: | Truck registration number: |
| Vessel name: | Nationality of truck: |
| Bill of Lading number: | |
| Complete this section if transport method is by **AIR**: | Complete this section if transport method is by **RAIL:** |
| Flight number: | Railway transport number: |
| Airway bill number: | Bill of lading number: (or other shipment document number to identify shipment) |
| Complete the following section regardless of the transport method | |
| Expected date of re-export: | Port or place of departure: |

### 3. Exporter certification: I certify that the above information is complete, true and correct to the best of my knowledge.

| Name: | Address: |
|---|---|
| | Date:   Export licence: |

### 4. Import section

| Name of importer: | | Importer address: |
|---|---|---|
| Port or place of arrival: | State/Province: | Country: |

### 5. Export government authority validation: I certify that the above information is complete, true and correct to the best of my knowledge.

| Name/Title: | Government: | Date of issue: |
|---|---|---|

21

| SPECIALLY VALIDATED *DISSOSTICHUS* CATCH DOCUMENT | | | | | | V 1.0 |
|---|---|---|---|---|---|---|

**Document number:**

**1. Issuing authority of document**

| Name: | Address: | Telephone: | ~~Fax~~E-mail: |
|---|---|---|---|

**2. Fishing Vessel**

| Name: | Home port: | Registration number: | Call sign: | IMO/Lloyd's number (if issued): |
|---|---|---|---|---|

| 3. Licence number (if issued) | **Fishing dates for catch under this document** |
|---|---|
| | 4. From: | 5. To: |
| | 6. Date of port departure: | 7. Date of port entry: |

**8. Description of fish (Landed/Transhipped)**

**9. Description of fish sold**

| Species | Type | EEZ | Area caught | Estimated weight to be landed (kg) | Verified weight landed (kg) | Net weight sold (kg) |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**10. Description of fish sold**

**Name of recipient:**

| Address: | Telephone: | ~~Fax~~E-mail: |
|---|---|---|

**Reason/s for the sale of seized/confiscated catch recorded on this SVDCD:**

| Landing port and country: | Landing date: |
|---|---|

**11. Certificate of landing:**  I certify that the above information is complete, true and correct to the best of my knowledge.

| Name: | Authority: | Date: |
|---|---|---|

22

Annex 10-05/B

**The use of the CDS Fund**

B1.   The overall objective of the Catch Documentation Scheme for *Dissostichus* spp. (CDS) Fund ('the Fund') is to provide a mechanism which enables the Commission to enhance its capacity to prevent, deter and eliminate IUU fishing in the Convention Area by, *inter alia*, improving the effectiveness of the CDS.

B2.   The Fund will be operated according to the following provisions:

(i)     The Fund shall be used for special projects, or special needs of the Secretariat if the Commission so decides, aimed at enhancing the Commission's capacity to contribute to the prevention, deterrence and elimination of IUU fishing in the Convention Area. The Fund may also be used for assisting the development and improving the effectiveness of the CDS and for other such purposes as the Commission may decide.

(ii)    The Fund shall be used primarily for projects conducted by the Secretariat, although the participation of Members in these projects is not precluded. While individual Member projects shall be considered, this shall not replace the normal responsibilities of Members of the Commission. The Fund shall not be used for routine Secretariat activities.

(iii)   Proposals for special projects may be made by Members, by the Commission or the Scientific Committee and their subsidiary bodies, or by the Secretariat. Proposals shall be submitted to the annual meeting of the Commission as working papers and be accompanied by an explanation of the proposal and an itemised statement of estimated expenditure.

(iv)    The Commission will, at each annual meeting, designate six Members to serve on a Review Panel to review proposals and to make recommendations to the Commission on whether to fund special projects or special needs. The Review Panel will meet during the first week of the Commission's annual meeting.

(v)     The Commission shall review all proposals and decide on appropriate projects and funding as a standing agenda item at its annual meeting.

(vi)    The Fund may be used to assist Acceding States and non-Contracting Parties that wish to cooperate with CCAMLR by contributing to the prevention, deterrence and elimination of IUU fishing in the Convention Area, so long as this use is consistent with provisions (i) and (ii) above. Such assistance shall be provided within the scope of the CCAMLR Cooperation Enhancement Program contained in the Policy to Enhance Cooperation between CCAMLR and non-Contracting Parties. Acceding States and non-Contracting Parties may submit proposals for consideration by the Commission at its annual meeting, if the proposals are sponsored by, or in cooperation with, a Member or the Secretariat.

(vii)   The Financial Regulations of the Commission shall apply to the Fund, except in so far as these provisions provide or the Commission decides otherwise.

23

(viii) The Secretariat shall report to the annual meeting of the Commission on the activities of the Fund, including its income and expenditure. Annexed to the report shall be reports on the progress of each project being funded by the Fund, including details of the expenditure on each project. The report will be circulated to Members in advance of the annual meeting.

(ix) Where an individual Member project is being funded according to provision (ii), that Member shall provide an annual report on the progress of the project, including details of the expenditure on the project. The report shall be submitted to the Secretariat as a working paper to be circulated to Members in advance of the annual meeting. When the project is completed, that Member shall provide a final statement of account certified by an auditor acceptable to the Commission.

(x) The Commission shall review all ongoing projects at its annual meeting as a standing agenda item and reserves the right, after notice, to cancel a project at any time should it decide that it is necessary. Such a decision shall be exceptional, and shall take into account progress made to date and likely progress in the future, and shall in any case be preceded by an invitation from the Commission to the project coordinator to present a case for continuation of funding.

(xi) The Commission may modify these provisions at any time.

Annex 10-05/C

**Procedure regarding cooperation with CCAMLR in the implementation of the CDS by non-Contracting Parties involved in the trade of *Dissostichus* spp.**

C1. Prior to the annual meeting of the Commission, the Executive Secretary shall contact all non-Contracting Parties which are known to be involved in the trade with *Dissostichus* spp. including, but not limited to, those that have had an SVDCD issued on their behalf, to urge them to become a Contracting Party to CCAMLR or to attain the status of a non-Contracting Party cooperating with CCAMLR by participating in the Catch Documentation Scheme for *Dissostichus* spp. (CDS) in accordance with the provisions of Conservation Measure 10-05. The Executive Secretary shall produce a summary paper for consideration by the Commission. The Executive Secretary shall provide copies of this conservation measure and any related resolutions adopted by the Commission.

C2. The Executive Secretary shall also establish contact with any non-Contracting Party during the intersessional period, as soon as possible after it was known the non-Contracting Party was engaged in the trade with *Dissostichus* spp. The Executive Secretary shall immediately circulate any written responses to the Members of the Commission.

C3. The Executive Secretary shall encourage non-Contracting Parties seeking to cooperate with CCAMLR by participating in the CDS to approach the CCAMLR Secretariat with requests for assistance in that regard. Proposals must demonstrate how any specific assistance requested will help to combat IUU fishing in the Convention Area. Such requests will be considered by the Commission at its annual meeting.

C4.  Any non-Contracting Party interested in cooperating with CCAMLR, as a non-Contracting Party engaged in the trade of *Dissostichus* spp. and participating in the CDS, may, provided such non-Contracting Party prohibits the landing, in its ports, of *Dissostichus* spp. that have not been previously landed in the port of a Contracting Party, or a non-Contracting Party cooperating with CCAMLR by participating in the CDS, apply to the Executive Secretary requesting limited access to the CDS for the purpose of verifying export/re-export documents accompanying imports of *Dissostichus* spp. and issuing re-export documents:

   (i)   Any request for limited access to the CDS received by the Executive Secretary after 1 September, shall be considered by the Commission at the annual meeting.

   (ii)  The Executive Secretary shall circulate any request for limited access received before 1 September, along with any supporting materials, to Members via Commission Circular. If after 45 days no objection is received from any Member, the Secretariat shall provide limited access to the CDS to the requesting non-Contracting Party and subsequently notify the Commission.

   (iii) The Standing Committee for Implementation and Compliance (SCIC) shall be responsible for reviewing the limited access to the CDS granted to each non-Contracting Party under paragraph (i) or (ii) and for recommending to the Commission whether that non-Contracting Party shall retain access. The Commission shall review the limited access to the CDS granted to each non-Contracting Party annually and may revoke this access if the non-Contracting Party has acted in a manner that undermines the effectiveness of the CDS.

C5.  Any non-Contracting Party that seeks to be accorded the status of non-Contracting Party cooperating with CCAMLR by participating in the CDS shall apply to the Executive Secretary requesting such status. Such requests must be received by the Executive Secretary no later than ninety (90) days in advance of an annual meeting of the CAMLR Commission in order to be considered at that meeting.

C6.  An applicant for the status of a non-Contracting Party cooperating with CCAMLR by participating in the CDS shall confirm in writing:

   (i)   its commitment to implement Conservation Measure 10-05; and
   (ii)  the measures it has in place to ensure compliance with Conservation Measure 10-05.

C7.  Any non-Contracting Party cooperating with CCAMLR by participating in the CDS shall fulfil the following requirements:

   (i)   Information requirements:

         (a)   communicate the data required under the CDS.

   (ii)  Compliance requirements:

         (a)   implement all the provisions of Conservation Measure 10-05;

25

(b) inform CCAMLR of all the measures taken to ensure compliance by its vessels used for the transhipments of *Dissostichus* spp. and its operators, including, *inter alia*, and as appropriate, inspection at sea and in port, CDS implementation;

(c) respond to alleged violations of CCAMLR measures by its vessels transhipping *Dissostichus* spp. and its operators, as determined by the appropriate bodies, and communicate to CCAMLR the actions taken against operators.

C8.   SCIC shall be responsible for reviewing requests for the status of non-Contracting Party cooperating with CCAMLR by participating in the CDS and for recommending to the Commission whether the applicants should be granted such status.

C9.   Annually the Commission shall review the cooperating status granted to each non-Contracting Party. The Commission may revoke such status if the non-Contracting Party concerned has not complied with the criteria for retaining such status established by this measure.

C10.  Contracting Parties engaged in the trade of toothfish with non-Contracting Parties are encouraged to assist in capacity building and promote the voluntary implementation of the CDS.

C11.  Contracting Parties shall report to the Secretariat 45 days before the annual meeting on efforts undertaken pursuant to paragraph C10. The Secretariat shall include a summary of these efforts in an annual report to SCIC concerning the effectiveness of the non-Contracting Party Engagement Strategy.

26