**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE**

| | |
|---|---|
| SOUTHERN CROSS SEAFOODS, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Court No. 22-00299 |
| ) | |
| UNITED STATES and ) | |
| NATIONAL MARINE FISHERIES SERVICE, ) | |
| ) | |
| Defendants. ) | |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD**

Pursuant to Rules 7 and 73.3 of the Rules of the United States Court of International Trade, defendants, the United States and National Marine Fisheries Service (NMFS), respectfully submit this response in opposition to plaintiff Southern Cross Seafoods, LLC's (Southern Cross) June 19, 2023 motion to supplement the administrative record, *see* ECF No. 36.  As explained below, with limited exceptions (which we address) we have already included the documents properly part of the administrative record;[1] all other documents are either: 1) documents not directly or indirectly relied on by NMFS in rendering the decision at issue in this case; 2) not within the possession of NMFS; 3) pre-decisional or privileged and therefore not properly part of the administrative record.  Accordingly, plaintiff's motion should be denied.

---

[1] Documents we have agreed to supplement the record with are attached to this response as Exhibit B.  One of the documents included is not discussed in plaintiff's motion, but has already been provided to plaintiff and is an email chain already provided in the administrative record which inadvertently had certain quoted text from an earlier email in the chain hidden. Appx113-114; *see also* Pl. Mot. at ECF No. 37-1, pp. 4-5.

## ARGUMENT

I.   Standard Of Review

"[J]udicial review of agency action is limited to the grounds invoked by the agency when taking the action. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) (citation omitted).  And only "documents and materials directly or indirectly considered by agency decisionmakers" are properly part of the administrative record.  *In re Section 301 Cases*, 570 F. Supp. 3d 1306, 1348 (Ct. Int'l Trade 2022) (quoting *Ammex, Inc. v. United States*, 62 F. Supp. 2d 1148, 1156 (Ct. Int'l Trade 1999).  "The obvious corollary to this rule is that materials that were neither directly *nor* indirectly considered by agency decisionmakers, even if relevant, should not be included in the record."  *Id.* (cleaned up) (emphasis in original).

The Court "assumes the record is complete where it has been certified by the agency," *Invenergy Renewables LLC v. United States*, 476 F. Supp. 3d 1323, 1355 (Ct. Int'l Trade 2020) (citing *Giorgio Foods, Inc. v. United States*, 755 F. Supp. 2d 1342, 1346 (Ct. Int'l Trade 2011)).  Accordingly, the Court should not order materials added to the administrative record "absent clear evidence to the contrary,'" *Ammex*, 62 F. Supp. 2d at 1156 (citation omitted).  Importantly, the burden is on the moving party to "put forth concrete evidence and identify reasonable, non-speculative grounds for [its] belief that the documents were considered by the agency."  *In re Section 301 Cases*, 570 F. Supp. 3d at 1348 (quoting *Fort Sill Apache Tribe v. Nat'l Indian Gaming Comm'n*, 345 F. Supp. 3d 1, 9 (D.D.C. 2018) (cleaned up) (alteration in original)); *see also Marcum v. Salazar*, 751 F. Supp. 2d 74, 78 (D.D.C. 2010) (moving party must "put forth concrete evidence that the documents it seeks to 'add' to the record were actually before the decisionmakers.").

II.     <u>The Documents Sought By Plaintiff Are Not Properly Part Of The Record</u>

Southern Cross seeks to supplement the administrative record with six categories of

documents.  We address each category of documents in turn.  As an initial matter, however,

Southern Cross's statement that the requested documents "were directly or indirectly referenced

by documents already included in the administrative record, demonstrating that they were

considered directly or indirectly by the NMFS in its decision" lacks any logical basis or legal

support.  Indeed, this statement cannot withstand scrutiny, as, by Southern Cross's logic, any

document ever even "indirectly" referenced by a document in the record should automatically

become part of the record as well; taking Southern Cross's unsupported statement as true would

result in an absurd situation where the record would never be considered complete, as every

document referenced (even indirectly) in the documents included in the record because of

reference by other documents would then need to be added as well, without end.  Moreover,

there is no reasonable basis, much less concrete evidence, for the conclusion that any and all

documents indirectly referenced in a document in the administrative record were considered by

NMFS decisionmakers in rendering the decision at issue in this case.

A.     <u>Document 1</u>

Southern Cross requests that the record should be supplemented with a certain paper cited

in the letter denying its preapproval application.  Pl. Mot. at 4.  Because the paper was cited in

the denial letter at issue in this case, it appears to be part of the administrative record, and we

will supplement the record to include this document.  We apologize for any inadvertent failure to

include this document in the first instance.

B.     <u>Document Category 2</u>

Southern Cross seeks to "include any information or supporting communications to

indicate how the NMFS obtained the outside legal opinions included in the administrative record[.]" Pl. Mot. at 4.  As set forth in the accompanying declaration by a primary NMFS decisionmaker, the legal opinions were not solicited by NMFS in any manner, but rather simply submitted unsolicited by certain external groups.  Coit Decl. ¶ 13, attached as Exhibit A. Accordingly, there is no reasonable basis to conclude that NMFS decisionmakers relied on the obtaining of the outside legal opinions in rendering the decision, and any such documents would not properly be part of the administrative record.

Southern Cross also seeks information identifying the author of a legal opinion titled "Legal Opinion in relation to the toothfish fishing licenses granted by the Government of South Georgia for the 2022 season in the 48.3 area of CCAMLR."  Pl. Mot. at 4.  At the outset, this document was not prepared by the Government and NMFS has searched but has not been able to locate information identifying the author of this document.  Coit Decl. ¶ 14.  Moreover, there is no basis for the position that NMFS would have relied on the identity of the author in making its decision.  However, we will agree to include the one email NMFS has located regarding the origin of the legal opinion, which is simply the email to which the legal opinion is attached.

C.    Document Category 3

Southern Cross seeks to supplement with "any emails, notes, or correspondence prior to December 17, 2021 relating to the NMFS determination that the importation of toothfish from Subarea 48.3 would be prohibited."  Pl. Mot. at 5.  As stated in the accompanying declaration, the administrative record already contains all non-privileged and non-pre-decisional documents relating to the NMFS decision at issue.  Coit Decl. ¶ 15.   And "[p]rivileged and deliberative documents reflecting an agency's internal deliberations do not form part of the administrative record, and, generally, are not discoverable so as to merit a privilege log, unless there is a

showing of bad faith or improper behavior." *JSW Steel (USA) Inc. v. United States*, 466 F. Supp. 3d 1320, 1328 (Ct. Int'l Trade 2020) (citing *Stand Up for California! v. U.S. Dep't of Interior*, 71 F. Supp. 3d 109, 122–23 (D.D.C. 2014), and *Oceana, Inc. v. Ross*, 920 F.3d 855, 865 (D.C. Cir. 2019)); *see also Blue Mountains Biodiversity Project v. Jeffries*, --- F.4th ---- (2023), No. 22-35857, 2023 WL 4308647, at *3 (9th Cir. Jul. 3, 2023) (agreeing with the D.C. Circuit that deliberative materials are not part of the administrative record absent impropriety or bad faith) (citing *Oceana*, 920 F.3d at 865).

Southern Cross has not alleged any impropriety or bad faith on the part of NMFS (and cannot credibly do so). Nor has it cited authority for its proposition that pre-decisional documents reflecting the mental processes of NMFS decisionmakers are properly part of the administrative record. Accordingly, there is no basis for including pre-decisional communications or other documents in the administrative record, and no reason to order the creation of a privilege log.

D.    Document Category 4

Southern Cross seeks to supplement the record with "any communications between the State Department, the NMFS, and other CCAMLR member Commissioners informing them of the NMFS decision to prohibit the importation of toothfish caught in Subarea 48.3 during periods where there is no CCAMLR catch limit in place." Pl. Mot. at 6. As stated in the accompanying declaration, because the documents described in category 4 "merely relayed the position taken by NMFS in the Cole letter, NMFS did not directly or indirectly consider them in making" the decision at issue in this case. Coit Decl. ¶ 20. As an NMFS decisionmaker has stated, in a sworn declaration, that NMFS did not consider the documents in this category, there is no cause, absent clear evidence to the contrary, to order supplementation on this topic. Moreover, as stated

by the declarant Janet Coit, communications with CCAMLR Commissioners and other

delegations are primarily undertaken by the Department of State (DOS).  *Id.* ¶ 19.  To the extent

that any documents responsive to category 4 are within the possession of DOS rather than

NMFS, they would not be properly part of the administrative record, as they are not in the

possession of NMFS and therefore would not have been considered by NMFS in rendering ***its***

decision.

      E.      Document Category 5

Regarding this category, Southern Cross seeks to "include initial exchanges between

representatives of the State Department and other delegations . . . regarding fishing in Subarea

48.3 in the absence of a catch limit adopted by the CCAMLR."  Pl. Mot. at 6.  As stated in the

accompanying declaration, NMFS has no documents in its possession that are responsive to this

request.  Coit Decl. ¶ 21.  And, as noted above, to the extent any documents responsive to this

category exist but are in the possession of DOS, they would not have been considered by NMFS

and should not be part of the administrative record.

      F.      Document Category 6

Finally, Southern Cross seeks "any communications from non-governmental

organizations ("NGOs") and other governments regarding whether the importation of toothfish

from Subarea 48.3 requires a CCAMLR catch limit or contravenes any CCAMLR conservation

measure, including any CCAMLR circulars and any communications . . . in response to Luis

Molledo's March 4, 2022 email[.]"  Pl. Mot. at 7.  Again, any documents not in NMFS's

possession are not part of the administrative record, as they would not have been directly or

indirectly considered by NMFS in making the decision to deny the preapproval application from

Southern Cross.  Regarding documents reflecting the above-described communications that ***were***

in NMFS's possession prior to the decision, they would not have been considered directly by NMFS in making its decision.  However, we cannot say with absolute certainty that those communications were not indirectly considered by NMFS in making its decision.  Coit Decl. ¶ 22.  Accordingly, without conceding that NMFS *actually* indirectly considered the documents, *see id.*, we will agree to include materials reflecting the communications that were in NMFS's possession prior to the time of the decision

## <u>CONCLUSION</u>

For these reasons, we respectfully request that the Court deny plaintiff's motion to supplement the administrative record.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

/s/ L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

s/Sosun Bae
SOSUN BAE
Senior Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington D.C. 20044
Tel: (202) 305-7568
Fax: (202) 514-8640
Email: Sosun.Bae@usdoj.gov

Dated: July 24, 2023                          Attorneys for Defendant

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE**

| | |
|---|---|
| SOUTHERN CROSS SEAFOODS, LLC, | ) |
| Plaintiff, | ) |
| v. | )    Court No. 22-00299 |
| UNITED STATES and | ) |
| NATIONAL MARINE FISHERIES SERVICE, | ) |
| Defendants. | ) |

**ORDER**

Upon consideration of plaintiff's motion to supplement, defendant's response, and all other relevant papers, it is hereby

ORDERED that plaintiff's motion is denied.


Dated: _____                    _____
       New York, New York                                         JUDGE

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of July, 2023, I electronically filed a copy of the foregoing using the CM/ECF system, which sent a notification of such filing to counsel of record.

/s/ Sosun Bae
Sosun Bae

# EXHIBIT A

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE TIMOTHY M. REIF, JUDGE

| | |
|---|---|
| SOUTHERN CROSS SEAFOODS, LLC,<br><br>        Plaintiff,<br><br>        v.<br><br>UNITED STATES OF AMERICA, and<br>NATIONAL MARINE FISHERIES<br>SERVICE,<br><br>        Defendant. | Court No. 22-00299 |

## DECLARATION OF JANET COIT

I, Janet Coit, declare as follows:

1.  I currently serve as the Assistant Administrator (AA) for the National Marine Fisheries Service (NMFS) of the National Oceanic and Atmospheric Administration (NOAA). NOAA is an agency within the U.S. Department of Commerce. As Assistant Administrator of NMFS, my responsibilities include overseeing the work of NMFS's Office of International Affairs, Trade, and Commerce (IATC) which, among other things, administers the agency's responsibilities under the Antarctic Marine Living Resources Convention Act (AMLRCA), 16 U.S.C. §§ 2431 *et seq*, which implements the Convention on the Conservation of Antarctic Marine Living Resources (Convention).

2.  In carrying out its AMLRCA responsibilities, NMFS routinely coordinates with the Department of State (DOS or State), Office of Ocean and Polar Affairs (OPA).  A DOS Official serves as the United States Commissioner to CCAMLR.  NMFS is charged with promulgation of regulations necessary to implement Conservation Measures (CMs) adopted by the Commission that are binding on the United States, § 2436(b), as well as

administration and enforcement of the statute and its implementing regulations. § 2439 (providing for enforcement of AMRLCA by Commerce and the department in which the Coast Guard is operating).

3. As NMFS AA, I am responsible for making determinations under the agency's AMRLCA regulations, including on applications for pre-approval certificates to import frozen toothfish made under 50 C.F.R. § 300.105(b). Acting in this capacity, I was involved in and approved the denial of the application for a pre-approval certificate dated July 27, 2022, submitted by Southern Cross Seafoods, LLC to import toothfish harvested in Subarea 48.3 that I understand to be at issue in this case.

4. On December 16, 2022, I understand that the Government filed an administrative record that consists of true copies of the documents that NMFS considered in making the decision to deny the application for pre-approval.

5. I understand that Plaintiff, Southern Cross, has filed a motion to supplement the administrative record.

***Introduction and Background***

6. I am familiar with the proceedings of the CCAMLR meeting that concluded on October 29, 2021, during which the Commission failed to adopt a CM that set a catch limit and other measures for the toothfish fishery in United Nations Food and Agriculture Organization Statistical Subarea 48.3 (Subarea 48.3). CCAMLR's failure to adopt a CM that set catch limits and other measures for the toothfish fishery in Subarea 48.3 during its 2021 annual meeting presented complex, multifaceted legal and policy issues for which there was no guiding precedent. NMFS had not previously considered whether an established fishery managed by CCAMLR could proceed in the absence of a CCAMLR-

adopted CM that set a catch limit and other measures consistent with the Convention. NMFS engaged colleagues at DOS on whether the toothfish harvested in Subarea 48.3 in the absence of a catch limit for that fishery could be legally imported into the United States. By letter dated December 17, 2021, Alexa Cole, who reports to me as the Director of NMFS Office of International Affairs, Trade and Commerce, informed Constance Arvis of DOS of NMFS's view that the import, export, or re-export of such fish would be prohibited by CM 10-05 and it would enforce such prohibitions pursuant to AMLRCA and implementing regulations at 50 C.F.R. § 300.114(d). APPX21-22.

7. I am aware that the view stated in the Cole letter is reflected in subsequent letters from me to Members of Congress and in emails from IATC staff to importers who inquired about whether NMFS could issue pre-approval certificates for import of frozen toothfish harvested from Subarea 48.3. These communications describe this view as preliminary because NMFS makes determinations on importations of toothfish on a shipment-by-shipment basis and had yet to receive an actual application for pre-approval certificate to import frozen toothfish. I am also aware that the view stated in the Cole letter is reflected in an email from Constance Arvis of DOS to Jane Rumble, an official of the United Kingdom (UK) government and the UK's Commissioner to CCAMLR. APPX1-2.

8. As stated in paragraph 3, NMFS, with my approval, denied an application for a pre-approval certificate that was submitted by Southern Cross to import toothfish harvested in Subarea 48.3. The reasons for my decision are articulated in a letter to the applicant dated September 15, 2022, and attached to a Decision Memo from me to Alexa Cole. APPX20.

9.  Based on my personal knowledge and information provided to me by my staff, the
    administrative record produced on December 16, 2022, is comprised of the following:
    1) correspondence from Members of Congress to Commerce Secretary Raimondo and
    Secretary of State Blinken sharing their concerns with the absence of a CCAMLR
    adopted CM that sets a catch limit for Subarea 48.3 and NMFS' views on whether
    toothfish harvested from that subarea during the 2021/2022 fishing season can be
    imported; 2) the Cole letter and emails between and among NMFS and NOAA personnel,
    and personnel at the Department of State and parties outside the U.S. government that
    reflect the view stated in that letter; 3) emails from parties outside the government to
    NMFS and NOAA personnel indicating that the Government of South Georgia and the
    South Sandwich Islands would issue licenses to harvest toothfish in Subarea 48.3 for the
    2022-23 fishing season; 4) legal opinions drafted by parties outside the U.S. government
    and made available to NMFS, on whether toothfish could be legally harvested in Subarea
    48.3 in the absence of a CCAMLR adopted CM that sets a catch limit for that fishery;
    5) the application for a pre-approval certificate to import frozen toothfish, dated July 27,
    2022, submitted by Southern Cross Seafoods, LLC; 6) a letter from E. Comstock and D.
    Bond to the NMFS Deputy Administrator for Regulatory Programs, S. Rauch III, that
    provides additional information to address the preliminary views articulated by NMFS in
    a letter to a Member of Congress on whether toothfish harvested from Subarea 48.3 could
    be imported into the United States; 7) a letter dated September 15, 2022 from Alexa Cole
    of NMFS to D. Thomas, of Southern Cross Seafoods, LLC denying its July 27, 2022 pre-
    approval application; 8) a Decision Memorandum from me to Alexa Cole that documents
    my decision to deny the pre-approval certificate application based on the reasons

articulated in that letter and that directs the Director of IATC to notify the applicant using that letter; 9) information presented by the governments of the UK and Argentina to CCAMLR on whether toothfish can be harvested in Subarea 48.3 in the absence of a CM adopted by the Commission that sets a catch limit for that fishery; 10) an email from E. Phelps of DOS to DOS, NOAA, and NMFS personnel that forwards views of the European Union Commissioner to CCAMLR on the Subarea 48.3 toothfish fishery.

10. Beyond the aforementioned categories of documents, other materials may exist that may relate to issues regarding the harvesting in Subarea 48.3, but that I do not believe fall within the scope of the administrative record.  Based on legal advice, the administrative record includes material that was directly or indirectly considered by agency decision makers, and does not include information that is pre-decisional and deliberative.

### *Document Categories 1 and 2*

11. I understand that Plaintiff seeks supplementation of the record to include a specific document cited in the denial decision (Document 1) and documents described in five other categories of documents (Document Categories 2-6).

12. We agree to include Document 1 in the administrative record.

13. The Subarea 48.3 situation was of interest to a number of external parties, given the possible implications on the integrity of the Convention, harvest and trade of toothfish, and foreign affairs.  Some external groups provided NMFS with unsolicited legal options on whether harvesting activities could proceed legally in the absence of a CM that set a catch limit and other requirements for Subarea 48.3; these external opinions are already included in the administrative record.  Document Category 2 seeks any information or supporting communications to indicate how NMFS obtained these outside legal opinions.

Because NMFS did not solicit these opinions, NMFS did not directly or indirectly rely on how it obtained these outside legal opinions in making the decision to deny Southern Cross's pre-approval application.

14. In Document Category 2, Plaintiff also seeks any information identifying who authored the legal opinion titled "Legal Opinion in relation to the toothfish licenses granted by the Government of South Georgia for the 2022 season in the 48.3 area of CCAMLR." APPX104-110. We have searched our records, and have not located information identifying who authored this opinion. We have located one email regarding the genesis of the legal opinion and, while NMFS does not necessarily agree that this email was directly or indirectly considered in making its decision, we will agree to include the document in the administrative record, for additional context and to narrow the scope of the disagreement.

### *Deliberations in Drafting the Cole Letter*

15. Category 3 of Plaintiff's motion to supplement seeks emails, notes, or correspondence prior to December 17, 2021, the date of the Cole letter relaying NMFS's determination that the importation of toothfish from Subarea 48.3 would be prohibited in the event that a CCAMLR member's vessel harvests fishing in this area during the 2021/2022 fishing season. To the best of my knowledge, the administrative record produced on December 16, 2022, includes all non-deliberative and non-privileged records relating to the Cole letter. Based on legal advice and agency guidance, my understanding is that documents reflecting internal agency or interagency communications and discussions that occurred prior to finalization of the Cole letter are not part of the administrative record.

16. Because the United States had been the leading importer of toothfish harvested in Subarea 48.3, the UK Commissioner had asked the U.S. Commissioner for an indication of the United States' ability to import toothfish from this subarea. Industry members also raised similar questions.  NMFS administers AMLRCA in coordination with DOS, and DOS is responsible for interpretation of the CAMLR Convention.  Moreover, Constance Arvis, a DOS Official, served as the U.S. Commissioner to CCAMLR.  Accordingly, NMFS/IATC staff engaged their counterparts at DOS's OPA while attorneys in NOAA GC engaged their counterparts in DOS' Office of Legal Affairs.  Staff and attorneys at the respective agencies received input and guidance from management and policymakers. Discussions explored issues from a range of viewpoints and with significant legal advice on the interpretation of the Convention, relevant CMs, AMLRCA, and NMFS's toothfish trade monitoring regulations.

17. Based on these discussions, and as informed by legal advice, NMFS issued the Cole letter, which presented the agency's official view on whether toothfish harvested in Subarea 48.3 could be imported into the United States under its toothfish trade monitoring regulations.  Documents identified as pre-decisional or privileged are not included in the administrative record.

*Discussions with CCAMLR Commissioners and other External Parties*

18. Categories 4, 5, and 6 of Plaintiff's motion seek the following: any communications between DOS, NMFS and other CCAMLR member Commissioners informing them of the NMFS decision to prohibit the importation of toothfish caught in Subarea 48.3 (Category 4), initial exchanges between representatives of DOS and other delegations (namely the European Union and the UK) regarding fishing in Subarea 48.3 in the

absence of a catch limit adopted by CCAMLR (Category 5), and communications from NGOs and other governments regarding whether importation of toothfish from Subarea 48.3 in the absence of a catch limit would be prohibited, including any CCAMLR circulars and any communications that DOS received from the European Union, the UK or other governments in response to Luis Molledo's March 4, 2022 email (Category 6).

19. With regard to Categories 4 and 5, engagement with CCAMLR Commissioners and other delegations is principally undertaken by the U.S. Commissioner to CCAMLR, who as stated above, is a DOS Official.  That was the case for communications regarding NMFS's view, as stated in the Cole Letter, and other issues related to Subarea 48.3. Personnel from DOS were primarily responsible for engagement with foreign entities. Any documents not within NMFS's possession have not been provided as part of the administrative record.

20. With respect to the documents requested in Category 4, because such records merely relayed the position taken by NMFS in the Cole letter, NMFS did not directly or indirectly consider them in making the decision to deny the application for a pre-approval certificate submitted by Southern Cross Seafoods, LLC and they are not included in the administrative record.

21. NMFS has searched its records and found no documents in its possession responsive to the request in Category 5.

22. For Category 6, to the extent DOS officials had communications with other external parties, such as toothfish importers and non-governmental organizations, on the Subarea 48.3 situation, including CCAMLR circulars, we will agree to include materials reflecting those communications that were in NMFS's possession prior to the denial decision, for

context and to narrow the scope of the disagreement, even if we do not necessarily agree

they were considered directly or indirectly by NMFS in making the decision to deny the

application for a pre-approval certificate submitted by Southern Cross.

I hereby affirm under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 21st day of July , 2023, Silver Spring, Maryland.

# EXHIBIT B

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE TIMOTHY M. REIF, JUDGE**

| | | |
|---|---|---|
| SOUTHERN CROSS SEAFOODS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Court No. 22-00299 |
| | ) | |
| UNITED STATES and | ) | |
| NATIONAL MARINE FISHERIES SERVICE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>INDEX TO SUPPLEMENT TO ADMINISTRATIVE RECORD</u>

<u>**Document**</u>                                                                                                    <u>**Page**</u>

Email from K. Rusello to M. Kim,
    Dated January 19, 2023 ...................................................................... Appx113

Conservation at CCAMLR: Understanding Article II of the Convention on the Conservation of
Antarctic Marine Living Resources
    Dated September 17, 2016 .................................................................. Appx115

Email from K. Dawson to M. Engelke-Ros,
    Dated August 21, 2022 ....................................................................... Appx125

Email from M. Kim to A. Cole *et al.*,
    Dated March 29, 2022 ......................................................................... Appx126

Subarea 48.3 – letter received from the Russian Federation,
    Dated May 23, 2022 ............................................................................ Appx128

Fishing for toothfish in Subarea 48.3 – letter received from Argentina,
    Dated June 17, 2022 ............................................................................ Appx133

Aide-Memoire,
    Dated March 28, 2022 ......................................................................... Appx136

 **NOAA**

Mi Ae Kim - NOAA Federal <mi.ae.kim@noaa.gov>

---

### Fwd: 48.3 - importation issue

**Kristin Rusello - NOAA Federal** <kristin.rusello@noaa.gov>                    Thu, Jan 19, 2023 at 2:54 PM
To: Mi Ae Kim <mi.ae.kim@noaa.gov>

Is this what you are looking for?

---------- Forwarded message ----------
From: **Alexa Cole - NOAA Federal** <alexa.cole@noaa.gov>
Date: Mon, Jan 10, 2022 at 4:23 PM
Subject: Fwd: 48.3 - importation issue
To: Seth Sykora-Bodie - NOAA Federal <seth.sykora-bodie@noaa.gov>
Cc: Kristin Rusello - NOAA Federal <kristin.rusello@noaa.gov>

Seth -

There are two things here:

1.  The attached letter from me to Conny Arvis at State
2.  The below email chain from Conny to the UK communicating our views on this.

There were a number of State/NOAA conversations that preceded our letter - we essentially pre-discussed the contents with both NOAA and State legal and policy folks.

A

---------- Forwarded message ----------
From: **Kerry Turner - NOAA Federal** <kerry.turner@noaa.gov>
Date: Mon, Dec 20, 2021 at 8:01 AM
Subject: Fwd: 48.3 - importation issue
To: Alexa Cole <alexa.cole@noaa.gov>
Cc: Kristin Rusello - NOAA Federal <kristin.rusello@noaa.gov>

Alexa -  FYSA
---------- Forwarded message ----------
From: **Mi Ae Kim - NOAA Federal** <mi.ae.kim@noaa.gov>
Date: Fri, Dec 17, 2021 at 6:30 PM
Subject: Fwd: 48.3 - importation issue
To: Kristin Rusello <kristin.rusello@noaa.gov>, Kerry <kerry.turner@noaa.gov>, Christopher Rogers <Christopher.Rogers@noaa.gov>, Kellie Foster-Taylor <kellie.foster-taylor@noaa.gov>, <david.pearl@noaa.gov>, <lauren.fields@noaa.gov>

FYI- Conny was able to send this message because of the letter from Alexa.

> **From:** "Phelps, Elizabeth (OES)" <PhelpsE@state.gov>
> **Date:** December 17, 2021 6:22:30 PM EST
> **To:** "Mi Ae Kim - NOAA Federal (mi.ae.kim@noaa.gov)" <mi.ae.kim@noaa.gov>
> **Subject: Fwd: 48.3 -  importation issue**
>
> Please share as appropriate
>
> ---
>
> **From:** Arvis, Constance C <ArvisCC@state.gov>
> **Sent:** Friday, December 17, 2021 5:47:14 PM
> **To:** Jane Rumble (Sensitive) <Jane.Rumble@fcdo.gov.uk>; Phelps, Elizabeth (OES) <PhelpsE@state.gov>; David Goddard (Sensitive) <David.Goddard@fcdo.gov.uk>
> **Cc:** Kylie Bamford (Sensitive) <Kylie.Bamford@fcdo.gov.uk>; Hogan, David F (OES) <HoganDF@state.gov>
> **Subject:** 48.3 - importation issue
>
> Jane,
>
> Greetings.  Since our last conversation, we have continued to work through the ramification of the unfortunate situation regarding the lapse of a conservation measure for statistical sub-area 48.3.  As we have discussed, we find the objections the Russian Federation had at CCAMLR-40 to be unfounded.  We continue to believe that a precautionary catch limit for toothfish can be - and should have been - set for statistical subarea 48.3.
>
> Unfortunately, after considerable interagency consultation, we now have significant certainty that for the U.S., under our existing statutory and regulatory framework, we will not be able to accept imports of toothfish caught in statistical sub-area 48.3 until such time as CCAMLR adopts a conservation measure setting catch limits and associated management measures for that area.
>
> I thought I would inform you now, before we have come to an absolutely final conclusion, since it is my hope that perhaps knowing the path the U.S. is on might, in itself,  already be sufficient to inform your thinking.
>
> I realize I am forwarding this message late on a Friday night in the holiday season, and I apologize.  I am, in fact, trying to clear this out before I go on leave. That said, my team, and Lisa in particular, will be available to you in the next few weeks should that be helpful to you.  If you need me personally, I can also be

available.

By the way, we understand through our European bureau that the British Embassy here in Washington has reached out on this issue.  We hope that this response will satisfy that inquiry as well.

I  know this response must be difficult, and I am sorry circumstances have put us in this very unhappy position.  Please know that we are firmly committed to working with you to ensure that CCAMLR is successful in establishing a precautionary catch limit for toothfish in this area at its next meeting.

All the best,

Conny

Constance C. Arvis

Acting Deputy Assistant Secretary for

   Oceans, Fisheries, and Polar Affairs

U.S. Department of State – HST 3880

SENSITIVE BUT UNCLASSIFIED

--
**Kerry Ann Turner**
Communications/Public Affairs Specialist

NOAA Fisheries: Office of International Affairs and Seafood Inspection (IASI)
NOAA - U.S. Department of Commerce
Office: 301-427-8356
kerry.turner@noaa.gov
www.fisheries.noaa.gov/topic/international-affairs



--
**Alexa Cole**
Director
Office of International Affairs and Seafood Inspection
NOAA Fisheries | U.S. Department of Commerce
1315 East West Highway
SSMC3 - 10655
Silver Spring, MD  20910
(301) 427-8286
www.fisheries.noaa.gov



--------------------------
Confidentiality Notice: This e-mail message is intended only for the named recipients. It contains information that may be confidential, privileged, attorney work product, or otherwise exempt from disclosure under applicable law. If you have received this message in error, are not a named recipient, or are not the employee or agent responsible for delivering this message to a named recipient, be advised that any review, disclosure, use, dissemination, distribution, or reproduction of this message or its contents is strictly prohibited. Please notify us immediately that you have received this message in error, and delete the message.

**Letter_NOAA to DOS on CCAMLR Subarea 48.3 - IASI.pdf**
183K



Commission for the Conservation of Antarctic Marine Living Resources
Commission pour la conservation de la faune et la flore marines de l'Antarctique
Комиссия по сохранению морских живых ресурсов Антарктики
Comisión para la Conservación de los Recursos Vivos Marinos Antárticos

CCAMLR-XXXV/BG/28

17 September 2016

Original: English

COMMISSION

**Conservation at CCAMLR: Understanding Article II of the Convention on the Conservation of Antarctic Marine Living Resources**

Delegations of Australia and the USA



This paper is presented for consideration by CCAMLR and may contain unpublished data, analyses, and/or conclusions subject to change. Data in this paper shall not be cited or used for purposes other than the work of the CAMLR Commission, Scientific Committee or their subsidiary bodies without the permission of the originators and/or owners of the data.

*Conservation at CCAMLR:  Understanding Article II of the Convention on the Conservation of Antarctic Marine Living Resources*

*Delegations of Australia and the United States*

**Abstract/Summary**

Article II has periodically been the subject of discussion in the Commission.  As CCAMLR moves through its fourth decade of service as a vital part of the Antarctic Treaty system, the delegations of United States and Australia considered it was important to recall the development of the Convention and to articulate our views on what "conservation" means for CCAMLR.  At its core, this involves taking a close look at Article II of the Convention to see how the term is applied and to consider its intended interpretation, as well as revisiting the background and context of the Convention.  This examination consistently emphasizes that the central object and purpose of the Convention is conservation. It is clear to our delegations that the correct way to think about "conservation" in CCAMLR is that "conservation" is the Convention's singular objective, and that any rational use must be consistent with that objective.

## I.     Introduction

A fundamental tenet of the Commission for the Conservation of Antarctic Marine Living Resources (CCAMLR or Commission) is that it focuses on conservation.  This conservation focus is a direct consequence of the legal architecture of its constituent instrument, the Convention on the Conservation of Antarctic Marine Living Resources (CAMLR Convention or Convention). While this is proclaimed through the use of the word "conservation" in the title of the Convention, the regime's conservation DNA runs a lot deeper – the Antarctic Treaty parties that negotiated the Convention had very specific goals in mind related to how the Commission and the broader Convention regime would function.  In particular, CCAMLR is a conservation organization. It was explicitly designed differently from most regional fisheries management organizations, which are established with the specific purpose of facilitating cooperation between States who fish for highly migratory and straddling stocks and ensuring the ongoing sustainability of these stocks. Rather, CCAMLR was established with a broader purview and function which allows for fishing within its conservation framework.  This conservation focus is enshrined throughout the Convention's text, and rightly shapes every aspect of the Commission's work.

Article II (1) of the Convention unambiguously and unequivocally states that the objective of the Convention is the conservation of Antarctic marine living resources.[1]  Article II of the

---

[1] Article II (1), CAMLR Convention.

Convention (Article II), along with Article I, provides the foundation and touchstone for the responsibilities and work of the Commission.  As noted in this paper, the proper construction of Article II in light of its ordinary meaning; its relevant interpretive context; the historical context within which Article II was adopted; and how the Commission has given effect to the Convention make it clear that the singular objective of the Convention is the conservation of Antarctic marine living resources.  In this paper, we articulate our views on what "conservation" means for CCAMLR.

## II.      Brief Background and Historical Context

The CAMLR Convention has its origins in the Antarctic Treaty, and forms an integral part of the Antarctic Treaty system. The negotiation of the CAMLR Convention involved a series of discussions among the Antarctic Treaty Consultative Parties (ATCPs) between 1975 and 1980. Understanding this history, as summarized in this section, is important to understand the objective of the ATCPs in establishing the CAMLR Convention and, through that, the intended interpretation of the Convention, particularly its Article II.

The negotiations were conducted within the legal and institutional framework governing Antarctic Treaty Consultative Meetings (ATCMs), established under Article IX of the Antarctic Treaty.  That ATCM framework expressly provides for ATCPs to meet "for the purpose of [*inter alia*] formulating and considering … measures in furtherance of the principles and objectives of the Treaty, including…preservation and conservation of living resources in Antarctica."[2] Seen in this context, not only were the negotiations always destined for an instrument with conservation at its core, the ATCPs were legally constrained from expanding beyond a primary purpose of "preservation and conservation" by virtue of the ATCM's prescribed mandate in Article IX.

Thus, under the auspices of Antarctic Treaty Article IX, at the Eighth Antarctic Treaty Consultative Meeting (ATCM-VIII) in 1975, the ATCPs adopted Recommendation VIII-10 which recognized "the need to promote and achieve within the framework of the Antarctic Treaty, the objectives of protection, scientific study and rational use of [Antarctic] marine living resources."  The Recommendation went on to focus attention on scientific study as an essential basis for protection and rational use of Antarctic marine living resources.

The Working Group on Marine Living Resources which met from 21 September – 6 October 1977 in London, "agreed to include in its Report the understanding of the group that the word 'conservation' as used in the draft Recommendation includes rational use, in the sense that harvesting would not be prohibited, but the regime would exclude catch allocation and other economic regulation of harvesting.  It was similarly the understanding of the Group that the word

---

[2] Article IX(f), Antarctic Treaty.

000117

'resources' was not limited to commercially exploitable species."[3]  While this statement from part-way through the Convention's genesis may not comprehensively reflect the product finally agreed upon, it clearly shows that the *focus* and intent of the CAMLR Convention was never envisaged as enabling commercial exploitation, but rather that economic factors were at the very least subsidiary to the CAMLR Convention's conservation goals.

ATCM Recommendation IX-2 (London, 1977) called on the ATCPs to contribute to scientific research on Antarctic marine living resources, observe interim guidelines on their conservation, and hold a Special Antarctic Treaty Consultative Meeting to set up a definitive conservation regime for such resources, which, given the urgency of the issue, was meant to be concluded by the end of the following year. In agreeing to hold this Special Antarctic Treaty Consultative Meeting the ATCPs agreed to take into account the following elements:

- "The regime should provide for the effective conservation of the marine living resources of the <u>Antarctic ecosystem as a whole</u>;
- The regime should cover the area of specific competence of the Antarctic Treaty;
- The regime should, however, <u>extend north of 60$^\text{o}$ South latitude where that is necessary for the effective conservation of species of the Antarctic ecosystem</u>, without prejudice to coastal state jurisdiction in that area;
- The regime should not apply to species already regulated pursuant to existing international agreements <u>but should take into account the relationship of such species to those species covered by the regime</u>."[4]

A second Special Antarctic Treaty Consultative Meeting (SATCM II-1) was held from 27 February to 16 March 1978 in Canberra to elaborate a draft definitive regime for the conservation of Antarctic marine living resources.  The Chairman's draft[5] prepared during the course of the meeting contained the current formulation of Article II (1) and Article II (2) to address some ATCPs' concern that in their countries' languages the word "conservation" in paragraph 1 of Article II would be translated to mean "preservation".[6]  As such Article II (2) was formulated to make clear that commercial harvesting could take place within the definition of conservation.  It is clear that such harvesting was intended to be subsidiary to the singular objective of the Convention.

One of the key items of the draft convention negotiated at the Buenos Aires Second Special Antarctic Consultative Meeting round 2 (SATCM II – 2) from 17 – 28 July 1978 was Article II (3).  Negotiations on Article II (3) sought to further clarify that any harvesting and associated

---

[3] Report of the Ninth Consultative Meeting, 19 September – 7 October 1977, London, Paragraph 10.
[4] Recommendation: ATCM IX-2, ATCM IX, London, 1977 (emphasis added).
[5] ANT/SCM/17/Rev 2, 15 March 1978, English.
[6] CCAMLR-XXXIV/BG/25, 19 September 2015, *Implementing Article II of the CAMLR Convention*, submitted by ASOC, at 4.

3

activities in the Convention Area must be conducted in accordance with the Convention and with three specific principles of conservation (outlined in paragraphs 3(a) to 3(c) of Article II).

Despite having been unable to meet the 1978 target date for conclusion of a definitive regime for the conservation of Antarctic marine living resources, the ATCPs reaffirmed their commitment to the early conclusion of such a regime at ATCM X in1979.[7]  The final text of the CAMLR Convention was adopted the following year at the Conference on the Conservation of Antarctic Marine Living Resources held in Canberra.[8] The text for the CAMLR Convention was opened for signature on 1 August 1980.  The CAMLR Convention came into force on 7 April 1982.

The preamble to the Convention and its Articles III-V clearly articulate the ATCPs' commitment to linking the Convention to the principles and objectives of the Antarctic Treaty, and to protecting and preserving the Antarctic environment.  In particular seven of the ten preamble paragraphs clearly show the intention of the ATCPs negotiating the Convention to use it as an instrument to conserve the Antarctic ecosystem and protect the Antarctic environment.[9] Further, Article V expressly acknowledges the obligations and responsibilities of ATCPs to protect and preserve the environment of the Antarctic Treaty area, and obliges Contracting Parties (to the Convention) that are not Parties to the Antarctic Treaty to observe relevant Measures relating to the protection of the Antarctic environment adopted by the ATCM.

Further supporting the objective and in line with the ecosystem conservation approach, Article I specifies the Convention Area and defines it as including the Antarctic marine ecosystem.[10] Article I (2) also comprehensively identifies that all living organisms are included in its scope – 'Antarctic marine living resources means the populations of fin fish, molluscs, crustaceans and all other species of living organisms, including birds, found south of the Antarctic Convergence'. The Antarctic marine ecosystem is described as the 'complex of relationships of Antarctic marine living resources with each other and the physical environment'.[11]

The Convention's role in the Antarctic Treaty system, as expressly acknowledged in its preambular and substantive provisions, provides relevant context for interpreting its obligations. Indeed, as noted in the Secretariat's paper, '*Information on CCAMLR and its links to the Antarctic Treaty*,' the "relationship between the CAMLR Convention, the Antarctic Treaty and the Treaty's Protocol on Environmental Protection, as well as the conservation principles

---

[7] Recommendation ATCM X-2 *Antarctic Marine Living Resources* (1979).
[8] The Final Act http://www.ats.aq/documents/DCCCAMLR/fr/DCCCAMLR_fr001_e.pdf - Note: The text of the Convention attached to the Final Act contains the rectifications agreed subsequent to the Conference, but the Final Act is the unrectified version agreed on 20 May 1980.
[9] Preamble paragraphs 1, 3, 5, 6, 7, 8, and 10 of the CAMLR Convention.
[10] Article II (1).
[11] Article I (3).

4

embedded in the Convention itself, distinguish the CAMLR Convention from traditional Regional Fisheries Management Organisations, and reflect the CAMLR Convention's status as an integral part of the Antarctic Treaty system."[12]

### III.    Article II:  The object and purpose is conservation.  Conservation includes and circumscribes rational use.

Article II is at the core of the Convention and, therefore, the Commission's responsibilities.  The stated objective, and therefore object and purpose, of the CAMLR Convention is the conservation of Antarctic marine living resources.  Although for the purposes of the Convention, the term 'conservation' includes rational use,[13] the ordinary meaning of the Convention's terms as well as the Convention's context and the practice of the CAMLR Parties make it clear that there is a single objective of the Convention: conservation.

Firstly, in our delegations' view, the ordinary meaning of the terms in the Convention, in particular Article II, is quite clear.  Article II (1) states unambiguously that "[t]he objective of this Convention is the conservation of Antarctic marine living resources."  Although the inclusion of the reference to 'rational use' in Article II (2) informs the overall interpretation of this provision, the structure of Article II as a whole places the two concepts on distinctly different levels. Notably, Article II does not state that conservation and rational use are dual objectives of the Convention.  It is clear that "rational use," as used in Article II of the Convention, is subsidiary to "the conservation of Antarctic marine living resources" and does not have equal standing in the application of the Convention.  There is no suggestion in Article II or the history of the negotiation of the Convention that conservation and rational use are equally weighted.  The purpose of Article II is to ensure the conservation of Antarctic marine living resources, wherein rational use is allowed but only in accordance with the principles of conservation identified in Article II (3).  The chapeau of Article II (3) clearly states that 'Any harvesting …<u>shall be</u> conducted in accordance with the provisions of this Convention <u>and with the …principles of conservation</u>' [set out in the subparagraphs][14].

Article II (2) states "[f]or the purposes of this Convention, the term 'conservation' includes rational use" and the practice of CCAMLR confirms the point already evident from the text and

---

[12] Information on CCAMLR and its links to the Antarctic Treaty, https://www.ccamlr.org/en/system/files/e-linkages_1.pdf
[13] Article II (2).
[14] The three principles of conservation set out in Article II (3) can be summarised to the following:
- o  Prevent decrease in size of harvested populations to levels below those which ensure stable recruitment;
- o  Maintain ecological relationships between harvested, dependent and related species; and
- o  Prevent ecosystem changes or risk of change which are not reversible in 2-3 decades and restore any depleted populations. (emphasis added).

5

structure of Article II, that any rational use is subservient to and circumscribed by the overriding conservation goals.  The Commission has agreed that harvesting and associated activities are to be conducted in accordance with the following principles of conservation which is a summary of Article II[15]:

    (i)      maintenance of ecological relationships;

    (ii)     maintenance of populations at levels close to those which ensure the greatest net annual increment;

    (iii)    restoration of depleted populations; and

    (iv)    minimisation of the risk of irreversible change in the marine ecosystem.

The Commission also agreed that a useful extension of the principles set out in Article II and thus rational use involved *inter alia* the following elements:

    (i)      that the harvesting of resources is on a sustainable basis;

    (ii)     that harvesting on a sustainable basis means that harvesting activities are so conducted as to ensure that the potential for achieving the highest possible long-term yield is preserved, subject to the principles of conservation above; and

    (iii)    that the cost-effectiveness of harvesting activities and their management is given due weight.[16]

In the Commission's deliberations it has 'reaffirmed that any harvesting and related activities within the Convention Area must be carried out in accordance with the provisions of the Convention. It [has] re-emphasised the need to ensure that no irreversible damage is done to the Antarctic marine ecosystem while comprehensive conservation measures are being further developed'.[17]  Article II was intended and has been proven to provide ample flexibility to satisfy a broad range of Members' interests in the Convention Area, while uniting the membership in the common purpose of conservation of Antarctic marine living resources.

The Commission has also undertaken various efforts to give specific consideration to Article II's conservation goal, including the establishment of the Working Group on the Development of Approaches to Conservation of Antarctic Marine Living Resources (WG-DAC) at the Fifth Meeting of the Commission in 1986[18]; agreement to include a new agenda item on the Commission agenda titled 'Consideration of the implementation of the objective of the

---

[15] CCAMLR VII (1988), report, paragraph 139 agreed that this text set out in CCAMLR VI (1987), Report, Paragraph 114 was a summary of Article II and should not be accorded special status.

[16] CCAMLR VI (1987), Report, paragraph 115 was amended by CCAMLR VII (1988), Report, paragraph 139.  With the revisions as set out in CCAMLR VI (1987), Report, paragraph 115, the Commission agreed, that rational use involved *inter alia* the elements set out in this paragraph.

[17] CCAMLR VI (1987), report, Paragraph 117.

[18] CCAMLR X, Report, Paragraph 61-64.

6

000121

Convention' at its Fourteenth meeting in 1995[19]; and giving prominent attention to the issue in two CCAMLR Symposiums, held in 2005 and 2015.

## IV.     Importance of Article II to the current work of CCAMLR

The fact that Article II is at the core of the Convention and that the singular objective is the conservation of Antarctic marine living resources has obvious and direct relevance to the way the Commission, and its Scientific Committee, has approached and should approach the most salient Antarctic marine conservation and management issues, such as setting catch limits for established fisheries, considering research fishing, developing new and exploratory fisheries, accounting for climate change, and implementing spatial and ecosystem management regimes in the CCAMLR areas, such as Small-Scale Management Units and marine protected areas (MPA).

Furthermore, Article IX of the Convention is clear that 'The function of the Commission shall be to give effect to the objective and principles set out in Article II of [the] Convention.'   To this end Article IX sets out a number of ways in which the Commission can do this including 'identify conservation needs and analyse the effectiveness of conservation measures',[20] and 'formulate, adopt and revise conservation measures'[21] including on the topics elaborated in Article IX(2).

The Commission's functions manifested through the adoption of conservation measures clearly include the regulation of harvesting. This is to be expected in light of the intended interpretation of Article II discussed above, which allows for rational use provided it does not impede conservation. Indeed, the Commission's mandate to regulate harvesting elaborated in the terms of Article IX (2), taken together with the conservation principles in Article II (3), reinforce the conclusion that harvesting is permissible only where it does not impede conservation. Critically, however, there is nothing in Article IX that implies, nor expressly provides for, a role for the Commission in *promoting* rational use, nor in regulating it in any manner other than within the overarching objective of conservation.  Consequently, under the plain language of Article IX, read in conjunction with Article II, the Commission has no authority to balance, or reverse the primacy of the convention's conservation objective against the rational use of resources, that is merely allowed within the convention mandate.

To give effect to the objective of conservation, the management approach taken by CCAMLR is therefore, as a general matter, characterised by:

---

[19] CCAMLR XIV (1995), Report, Paragraph 15.12.
[20] Article IX (1) (e).
[21] Article IX (1) (f).

7

- o   a 'precautionary' approach. This means that CCAMLR collects data as it can, then weighs up the extent and effect of uncertainties and gaps (i.e. 'deficiencies') in such data before taking a management decision.
- o   an 'ecosystem' approach. This takes into account the delicate and complex relationships between organisms (of all sizes) and physical processes (marine, terrestrial, and atmospheric) that constitute the Antarctic marine ecosystem.[22]

CCAMLR established its precautionary approach when adopting the approach for setting catch limits for krill. The aim is to take account of uncertainties in knowledge when deciding how best to avoid or minimise risks and to ensure the objective of Article II will always be highly likely to be met.  The Commission's precautionary approach expressly allows for management decisions to be made despite the uncertainties in the underlying scientific evidence. It expressly does not require a delay in making timely management decisions, consistent with Article II on the basis of insufficient scientific evidence.

CCAMLR's ecosystem approach not only focuses on regulating fishing for certain species, but it also aims to ensure that fishing does not adversely impact other species that are related to, or dependent on, the target species. This has led to CCAMLR conservation measures such as the reduction of incidental seabird mortality caused by longline fishing and managing impacts of bottom fishing on vulnerable marine ecosystems.[23]

CCAMLR's commitment to establish a representative system of Antarctic MPAs to conserve biodiversity in the Convention Area, as reflected in the General Framework for the Establishment of CCAMLR MPAs (CM 91-04), lies at the intersection of its ecosystem and precautionary approaches.  The Commission recognized the role of MPAs in contributing to sustaining ecosystem structure and function, maintaining the ability to adapt to climate change, and reducing the potential for introduction of invasive species.  These approaches are further manifested in the objectives for MPAs set out in CM 91-04, which are decidedly focused, with full consideration of Article II, on ecosystem conservation.

A key feature distinguishing CCAMLR from most RFMOs is that CCAMLR was not created to exploit fishery resources. While the primary objective of most RFMOs is to achieve maximum sustainable yield of target stock(s), CCAMLR, from the beginning, has clearly articulated the need for precautionary, ecosystem conservation in the Convention itself[24] and continues to

---

[22] Information on CCAMLR and its links to the Antarctic Treaty, https://www.ccamlr.org/en/system/files/e-linkages_1.pdf

[23] Slightly amended from Information on CCAMLR and its links to the Antarctic Treaty, https://www.ccamlr.org/en/system/files/e-linkages_1.pdf

[24] Article II (3)

8

demonstrate the application of these approaches in addressing the key conservation and management issues that come before the Commission.

## V.        Conclusion

On the basis of the historical backdrop against which the Convention was negotiated, the negotiating history itself, (as highlighted in Section II), the text of the convention, the history of its implementation and the continued practice of the Parties while the Convention has been in force,  the central object and purpose of the Convention is consistently and demonstrably conservation. It is clear to our delegations that the only way to think about "conservation" in CCAMLR is as its singular objective.  From its inception, the Convention has distinguished itself from organizations set up with the objective of promoting and managing commercial fisheries. This distinction, intended by the parties that negotiated the Convention, is a hallmark of the Convention and of the Commission.  CCAMLR is focused on managing resources based on an ecosystem and precautionary approach which rely upon the best available science at the time at which conservation measures are developed.  The consensus nature of the Commission necessitates that Members work together to achieve the Convention's objective.  If the Members are clear on their agreement with respect to conservation as the core of the Commission's mission and purpose, CCAMLR will be well placed to find common ground and succeed in its future efforts.

9



Mi Ae Kim - NOAA Federal <mi.ae.kim@noaa.gov>

## Fwd: LEGAL OPINION / SOUTH GEORGIA

**Kim Dawson - NOAA Federal** <Kim.Dawson@noaa.gov>                     Sun, Aug 21, 2022 at 11:00 AM
To: Meggan Engelke-Ros - NOAA Federal <Meggan.Engelke-Ros@noaa.gov>, Mi Ae Kim - NOAA Federal <mi.ae.kim@noaa.gov>

Interesting, from COLTO via Ignacio..

---------- Forwarded message ---------
From: **Ignacio Arocena** <iarocena@san-isidro.cl>
Date: Fri, Aug 19, 2022 at 2:53 PM
Subject: LEGAL OPINION / SOUTH GEORGIA
To: Kimberly Dawson <kim.dawson@noaa.gov>, Lori Robinson - NOAA Federal <Lori.Robinson@noaa.gov>

--
Kimberly Dawson
Fisheries Biologist/ NOAA Fisheries
Office of International Affairs, Trade, and Commerce
3209 Frederic Street
Pascagoula, MS 39567
**NEW** Office #: (601) 568-2275

3 attachments



**image003.png**
42K



**image004.png**
1K

**Legal Opinion licences granted by UK in 48.3 AREA tracked (2).docx**
32K



Alexa Cole - NOAA Federal <alexa.cole@noaa.gov>

---

## Fwd: Fw: Argentina - Note Verbale DE 28/2022
1 message

---

**Mi Ae Kim - NOAA Federal** <mi.ae.kim@noaa.gov>                    Tue, Mar 29, 2022 at 11:22 AM
To: Alexa Cole <alexa.cole@noaa.gov>, Kristin Rusello <kristin.rusello@noaa.gov>, Christopher Rogers
<Christopher.Rogers@noaa.gov>, Kellie Foster-Taylor - NOAA Federal <kellie.foster-taylor@noaa.gov>, David Pearl - NOAA
Federal <david.pearl@noaa.gov>, Lauren Fields <lauren.fields@noaa.gov>

Hi all,

FYI - In the attached, Argentina lays out their position that toothfish fishing in Subarea 48.3 and subsequent trade of fish
by any CCAMLR Members would be illegal.

Mi Ae

---------- Forwarded message ---------
From: **Phelps, Elizabeth (OES)** <PhelpsE@state.gov>
Date: Mon, Mar 28, 2022 at 5:28 PM
Subject: Fw: Argentina - Note Verbale DE 28/2022
To: Mi Ae Kim - NOAA Federal (mi.ae.kim@noaa.gov) <mi.ae.kim@noaa.gov>, Meggan Engelke-Ros - NOAA Federal
(meggan.engelke-ros@noaa.gov) <meggan.engelke-ros@noaa.gov>, Keith Hagg (Keith.Hagg@noaa.gov)
<keith.hagg@noaa.gov>, Scott, Lela R <ScottLR2@state.gov>, George Watters - NOAA Federal
(george.watters@noaa.gov) <george.watters@noaa.gov>, Penhale, Polly A. (ppenhale@nsf.gov) <ppenhale@nsf.gov>,
Gilanshah, Bijan (bgilansh@nsf.gov) <bgilansh@nsf.gov>


As mentioned this morning. ARG note on 48.3.


Lisa

---

**From:** Agustín Cardenes <a.cardenes@embassyofargentina.us>
**Sent:** Monday, March 28, 2022 4:55 PM
**To:** Paz, Gianni F <PazGF@state.gov>
**Cc:** Nevarez, Daniela <NevarezD@state.gov>; Phelps, Elizabeth (OES) <PhelpsE@state.gov>; Marcos Stancanelli
<tob@embassyofargentina.us>
**Subject:** Argentina - Note Verbale DE 28/2022

Dear Gianni, Daniela and Elizabeth,

I hope this email finds you well.

Attached you will find Note Verbale 28/2022, which encloses an Aide-Mémoire regarding the current situation in Subarea
48.3 of CCAMLR.

I would highly appreciate it if you could acknowledge receipt of this email.

Best regards,

--
Agustín Cárdenes
Second Secretary
Political Section, Embassy of Argentina
1600 New Hampshire Ave NW, Washington, DC 20009
Direct number: (202) 238 6438
a.cardenes@embassyofargentina.us

SENSITIVE BUT UNCLASSIFIED

---


**NV DE 28-2022.pdf**
901K



Monday, 23 May 2022

**COMM CIRC 22/49**
**SC CIRC 22/47**

# Subarea 48.3 – letter received from the Russian Federation

TO ALL MEMBERS OF THE COMMISSION AND THE SCIENTIFIC COMMITTEE

Please find attached a letter received from the Russian Federation.

Sincerely,

Dr David Agnew
Executive Secretary

Attch.

**Post** PO Box 213, North Hobart, Tasmania 7002 Australia
**Address** 181 Macquarie Street, Hobart, Tasmania 7000 Australia

**Web** ccamlr.org
**Email** ccamlr@ccamlr.org

**Telephone** +61 3 6210 1111
**Fax** +61 3 6224 8744

**РОССИЙСКАЯ ФЕДЕРАЦИЯ**
**ФЕДЕРАЛЬНОЕ АГЕНТСТВО**
**ПО РЫБОЛОВСТВУ**
(РОСРЫБОЛОВСТВО)
Рождественский бульвар, д. 12, Москва,
107996, Российская Федерация

Факс: +7 (495) 628-19-04, 987-05-54
Тел.: +7 (495) 628-23-20
E-mail: harbour@fishcom.ru
http://www.fish.gov.ru



**RUSSIAN FEDERATION**
**FEDERAL AGENCY**
**FOR FISHERIES**

12 Rozhdestvensky blvd, Moscow,
107996, Russian Federation

Fax: +7 (495) 628-19-04, 987-05-54
Phone: +7 (495) 628-23-20
E-mail: harbour@fishcom.ru
http://www.fish.gov.ru

«_18_» _05_ 20_22_ г. № _4537-ПС/У03_

Исполнительному Секретарю
АНТКОМ
Дэвиду Агнью

Уважаемый д-р Д. Агнью!

Ссылаясь на циркулярные письма COM CIRC 22/39 от 5 апреля 2022 года и COM CIRC 22/39 от 12 апреля 2022 г. по вопросу регулирования промысла патагонского клыкача (*D. eleginoides*) в Статистическом подрайоне 48.3 считаем необходимым отметить следующее.

Регулирование промысла патагонского клыкача (*D. eleginoides*) в Статистическом подрайоне 48.3 осуществляется Комиссией (Мера по сохранению СМ 31-01). При этом в рамках 40-го совещания Комиссии стороны исходя из рекомендаций Научного комитета не смогли прийти к согласию по допустимому ограничению на вылов патагонского клыкача в Подрайоне 48.3 на сезон 2021/22 г. В этой связи Мера по сохранению 41-02 не продлена на сезон 2021/22 г. и промысел клыкача закрыт на 2022 год (CCAMLR-40, п. 6.21, 9.14).

В соответствии со статьей IX Конвенции о сохранении морских живых ресурсов Антарктики (далее – Конвенция) установлен порядок вступления в силу Мер по сохранению АНТКОМ, принятых или отмененных Комиссией. Российская сторона не располагает какой-либо обоснованной информацией в рамках АНТКОМ в отношении того, что любая стана-член, являющаяся Стороной Конвенции о сохранении морских живых ресурсов Антарктики, в одностороннем порядке может уклониться в данных обстоятельствах от

выполнения решения Комиссии в отношении закрытия промысла клыкача в подрайоне 48.3 на текущий сезон.

В связи с этим любой промысел клыкача в подрайоне 48.3 в текущем сезоне, осуществляемый любым судном под любым флагом, должен идентифицироваться АНТКОМ, как ННН промысел в районе АНТКОМ, а также в соответствии с действующей СДУ (система документаций уловов) АНТКОМ должен уведомить государства порта о том, что улов видов Dissostichus spp. полученный в Подрайоне АНТКОМ 48.3 в 2022 году является незаконным.

Кроме того, полагаем важным отметить безосновательность политически мотивированных претензий в упомянутом циркуляре Соединенного Королевства, затрагивающих Российскую Федерацию, призванных отвлечь внимание государств-членов АНТКОМ от нарушения норм и правил АНТКОМ и переложить вину за свои действия на других.

Российская Федерация, как государство-член АНТКОМ, в полной мере следуя принципам и целям Конвенции, а также нормам Договора об Антарктике, не может игнорировать случаи, когда безответственные коммерческие интересы превалируют над обеспечением сохранения уязвимой экосистемы Антарктики, и полагает принципиально важным, чтобы управление ресурсами в любом районе АНТКОМ основывалось на балансе между их сохранением и рациональным использованием (Статья II Конвенции).

Прошу распространить данное письмо среди государств-членов АНТКОМ.


Заместитель руководителя
Росрыболовства

В.И. Соколов

**РОССИЙСКАЯ ФЕДЕРАЦИЯ**
**ФЕДЕРАЛЬНОЕ АГЕНТСТВО**
**ПО РЫБОЛОВСТВУ**
**(РОСРЫБОЛОВСТВО)**
Рождественский бульвар, д. 12, Москва,
107996, Российская Федерация

Факс: +7 (495) 628-19-04, 987-05-54
Тел.: +7 (495) 628-23-20
E-mail: harbour@fishcom.ru
http://www.fish.gov.ru



**RUSSIAN FEDERATION**
**FEDERAL AGENCY**
**FOR FISHERIES**

12 Rozhdestvensky blvd, Moscow,
107996, Russian Federation

Fax: +7 (495) 628-19-04, 987-05-54
Phone: +7 (495) 628-23-20
E-mail: harbour@fishcom.ru
http://www.fish.gov.ru

18/05/2022     4537-ВС/У03

To the Executive Secretary
of CCAMLR Secretariat
Dr David Agnew

Dear Dr Agnew,

With reference to COMM CIRC 22/39 of 5 April 2022 and COMM CIRC 22/39 of 12 April 2022 on the management of the Patagonian toothfish (*D. eleginoides*) fishery in Statistical Subarea 48.3, we consider it necessary to note the following.

Patagonian toothfish (*D. eleginoides*) fisheries in Statistical Subarea 48.3 are regulated by the Commission (Conservation Measure 31-01). Nevertheless, at the 40th meeting of the Commission, the Members, on the basis of the Scientific Committee's recommendations, were unable to reach an agreement on the maximum allowable catch limit of the Patagonian toothfish in Subarea 48.3 for the 2021/22 season. As a result, the Conservation Measure 41-02 was not extended for the 2021/22 season and the toothfish fishery was closed for 2022 (CCAMLR-40, paragraphs. 6.21, 9.14).

In accordance with Article IX of the Convention on the Conservation of Antarctic Marine Living Resources (hereinafter referred to as the Convention), the procedure was established for the entry into force of CCAMLR Conservation Measures adopted or cancelled by the Commission. The Russian Federation does not have any substantiated information within CCAMLR to the effect that any Member that is a Party to the Convention on the Conservation of Antarctic Marine Living Resources could unilaterally refuse to implement the Commission's decision to close the toothfish fishery in Subarea 48.3 for the current season.

Therefore any toothfish fishery in Subarea 48.3, during the current season by any vessel flying any flag, must be identified by CCAMLR as an IUU fishing in the

CCAMLR Area and CCAMLR must also, in accordance with the current CDS (Catch Documentation Scheme), notify the Port States that the catch of *Dissostichus* spp. taken in CCAMLR Subarea 48.3 in 2022 is illegal.

Furthermore, we believe it is important to note the lack of merit in the politically motivated claims in the said UK circular affecting the Russian Federation, designed to divert the attention of CCAMLR Members from the violation of CCAMLR rules and regulations and to shift the blame for their actions to others.

The Russian Federation, as a CCAMLR Member State, fully respecting the principles and objectives of the Convention as well as the rules of the Antarctic Treaty, cannot ignore instances where irresponsible commercial interests prevail over ensuring the conservation of the fragile Antarctic ecosystem and considers it fundamental that resource management in any CCAMLR area is based on a balance between conservation and sustainable use (Article II of the Convention).

Please circulate this letter to all CCAMLR Members.

Deputy Head
Federal Agency for Fisheries                                 V.I. Sokolov

 CCAMLR

Friday, 17 June 2022

**COMM CIRC 22/59**
**SC CIRC 22/59**

# Fishing for toothfish in Subarea 48.3 – letter received from Argentina

TO ALL MEMBERS OF THE COMMISSION AND THE SCIENTIFIC COMMITTEE

Please find attached a letter received from Argentina relating to the activity of vessels fishing for *Dissostichus eleginoides* in Subarea 48.3 in the current season and the treatment of catch data arising from this activity.


Sincerely,

Dr David Agnew
Executive Secretary

Attch.

**Post** PO Box 213, North Hobart, Tasmania 7002 Australia
**Address** 181 Macquarie Street, Hobart, Tasmania 7000 Australia

**Web** ccamlr.org
**Email** ccamlr@ccamlr.org

**Telephone** +61 3 6210 1111
**Fax** +61 3 6224 8744

000133



Ministerio de Relaciones Exteriores
Comercio Internacional y Culto

Nota N° 4/2022

16 de junio de 2022

Estimado Dr. David Agnew:

En relación con COMM CIRC 22/54, la Argentina desea agradecer la información suministrada por la Secretaría Ejecutiva.

De acuerdo a la información que surge del sitio web de CCRVMA bajo "Lista de desplazamientos de los barcos", los buques pesqueros "Nordic Prince", "Argos Helena" y "Argos Georgia", de bandera británica, se encuentran pescando *Dissostichus eleginoides* -austromerluza negra- en la subárea 48.3, habiendo ingresado a dicha área el 2, 6 y 8 de junio, respectivamente.

Atento a que la actividad de pesca en cuestión constituye pesca INDNR, se solicita a la Secretaría Ejecutiva que:

a) arbitre los medios necesarios a fin de incluir en la lista de barco INDNR a estos y a todos aquellos buques que realicen pesca de *Dissostichus eleginoides* en la Subárea 48.3 en esta temporada por fuera del marco legal de la CCRVMA y,

b) no avale ni ponga a disposición para ninguna operatoria comercial los datos de captura que se recopilen de esos buques dado que se trata de pesca INDNR.

Solicitamos a la Secretaría que circule esta nota entre los Miembros de la Comisión y del Comité Científico.

Lo saludo atentamente,

Fausto López Crozet

Comisionado de Argentina ante CCRVMA

**UNOFFICIAL TRANSLATION**

Note N° 4/2022

16 June 2022

Dear Dr. Agnew,

In relation to COMM CIRC 22/54, Argentina expresses its appreciation for the information provided by the Executive Secretariat.

According to the CCAMLR website, under "List of Vessel Movements", the British-flagged fishing vessels "Nordic Prince", "Argos Helena" and "Argos Georgia" are fishing *Dissostichus eleginoides* -Patagonian toothfish- in subarea 48.3, having entered that area on June 2, 6 and 8, respectively.

Given that the fishing activity in question constitutes IUU fishing, we request that the Executive Secretariat:

a) arbitrate the necessary means to include in the IUU vessel list these vessels and any other vessels fishing in the current season *Dissostichus eleginoides* in Subarea 48.3 outside the legal framework of CCAMLR, and

b) do not endorse or make available the catch data collected from those vessels for any commercial operation as it is IUU fishing.

We request the Secretariat to distribute this letter among the Members of the Commission and the Scientific Committee.

Yours sincerely,

[Signature]

Fausto López Crozet

Argentina Commissioner to CCAMLR

"2022 – THE MALVINAS ARE ARGENTINE"



*Embassy*
*of the*
*Argentine Republic*

DE 28/2022

The Embassy of the Argentine Republic presents its compliments to the Department of State – Office of Brazil and Southern Cone Affairs – and has the honor to enclose an Aide-Mémoire regarding the current situation in Subarea 48.3 of the Commission for the Conservation of Antarctic Marine Living Resources (CCAMLR).

The Embassy of the Argentine Republic avails itself of this opportunity to reiterate to the Department of State – Office of Brazil and Southern Cone Affairs – the assurances of its highest consideration.

Washington, DC March 28, 2022



U.S. DEPARTMENT OF DEFENSE
**Office of Brazil and Southern Cone Affairs**
Washington, DC

### AIDE MEMOIRE – SUBAREA 48.3 CCAMLR CURRENT SITUATION

In the 40th meeting of the Commission for the Conservation of Antarctic Marine Living Resources (CCAMLR-40), due to Russia´s opposition Members have not reached consensus regarding the establishment of catch limits for the species *Dissostichus eleginoides* (Patagonian toothfish) in Subarea 48.3, which encompasses the waters surrounding the South Georgias Islands. The absence of a conservation measure for the toothfish fishery in Subarea 48.3 leads to the closure of said fishery in the 2021-22 season.

This is the first time in CCAMLR's history that its Members have failed to agree on a catch limit in a Convention area so as to adopt a new conservation measure, despite scientific advice being available.

It should be noted that Subarea 48.3 in question is highly politically sensitive since it encompasses the waters surrounding the South Georgias Islands, that are the subject to a sovereignty dispute between Argentina and the United Kingdom.

Within the framework of CCAMLR it is the exclusive responsibility of the Commission to adopt annually conservation measures in Subarea 48.3. In fact, in this case, Conservation Measure (MC) 31-01 (1986), fully in force, provides that "before each fishing season the Commission shall establish limitations on catch or other similar measures for the area around South Georgia, as required. "

Faced with this unprecedented situation of absence of a conservation measure for the toothfish fishery in Subarea 48.3, Commission Members must ensure the proper functioning of CCAMLR as a key organization within the Antarctic Treaty System to guarantee the conservation of the Antarctic marine ecosystem. To do this, we appeal to the principle of good faith that underlies decision-making by consensus, as well as the spirit of Antarctic cooperation.

**The implications of not having adopted a CM** regarding the toothfish fishery in Subarea 48.3 are clear:

-the fishery will remain closed during the 2021-22 season.

-Commission Members cannot carry out regular fishing activities in this Convention Area.

-if a Member were to carry out fishing activities for toothfish in Subarea 48.3, deliberately ignoring the fact that there is no CM authorizing it, it would be violating the Convention, CM 31-01 and it would incur in illegal fishing. The product of said illegal fishing would also be illegal so it cannot be commercialized.

-Any alleged unilateral action by a Member, such as the issuance of fishing licenses, would be contrary to and in violation of the multilateral CCAMLR regime. In case a Member decides to adopt unilateral measures, both fishing activities and the commercialization of the produce would be illegal.

000137

**Closing remarks**

Subarea 48.3 toothfish fishery is clearly governed by CCAMLR multilateral rules. The lack of a CCAMLR conservation measure in this 2021-22 season does not under any circumstances enable a Member to adopt unilateral measures to avoid the closure of said fishery.

If unilateral measures were accepted in Subarea 48.3, this would undermine CCAMLR´s multilateral system and it would be indirectly playing into the hands of Russia´s obstructionism.

We understand that this issue affects commercial interests of the United States as an importer and consumer of toothfish from Subarea 48.3.

However, Argentina trusts that the United States, as a leading actor in the Antarctic Treaty System, will join and give priority to diplomatic efforts and multilateral negotiations to guarantee the effective functioning of CCAMLR –and the adoption of a conservation measure in the next annual meeting– ensuring this organization remains, as in the last 40 years, in the forefront of conservation of Antarctic marine living resources in the waters surrounding the Antarctic continent.

000138