Slip Op. 23-171

## UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>

**SOUTHERN CROSS SEAFOODS, LLC**,

        Plaintiff,

v.

**UNITED STATES,**

and

**NATIONAL MARINE FISHERIES SERVICE,**

        Defendants.

</td><td>

Before: Timothy M. Reif, Judge

Court No. 22-00299

</td></tr>
</table>

### <u>OPINION AND ORDER</u>

[Concluding that the court lacks subject matter jurisdiction and inviting parties to file motions within 21 days of this opinion to transfer the action to the appropriate district court.]

Dated: December 7, 2023

<u>David E. Bond</u>, <u>Earl W. Comstock</u>, <u>Lucius B. Lau</u>, <u>Cristina M. Cornejo</u>, White & Case, LLP, of Washington, D.C., for plaintiff Southern Cross Seafoods, LLC.

<u>Sosun Bae,</u> Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant United States.  With her on the brief were <u>Brian M. Boynton</u>, Principal Deputy Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, <u>L. Misha Preheim</u>, Assistant Director.

<u>Keith A. Hagg</u>, Attorney-Advisor, National Oceanic Atmospheric Administration, Office of General Counsel of Silver Spring, M.D. for defendant National Marine Fisheries Service.

Reif, Judge: Before the court is a motion by the United States ("the government") and the National Marine Fisheries Service ("NMFS")[1] (collectively, "defendants") to dismiss the complaint of Southern Cross Seafoods, LLC ("plaintiff" or "Southern Cross") brought under 28 U.S.C. § 1581(i)(1)(C) and (D) for lack of subject matter jurisdiction pursuant to United States Court of International Trade ("USCIT" or "the Court") Rule 12(b)(1).  Defs.' Mot. Dismiss at 1, ECF No. 25.

Plaintiff seeks a declaratory judgment against the denial of plaintiff's application for preapproval and any future applications for preapproval of its imports of Patagonian toothfish or *Dissostichus eleginoides* ("toothfish") from the Food and Agriculture Organization of the United Nations Statistical Subarea 48.3 in the South Georgia fishery ("Subarea 48.3").  Corrected Compl. ¶¶ 1, 9, 12, 54, ECF No. 14.  The denial was due to the lack of a conservation measure ("CM") in force for the Convention on the Conservation of Antarctic Marine Living Resources ("CAMLR Convention").  *Id.*  Plaintiff also challenges the actions of NMFS under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2).  *Id.* ¶¶ 8-9, 56, 58.

In their motion to dismiss, defendants argue that plaintiff's action does not arise out of a law providing for an "embargo" or other "quantitative restriction" under 28 U.S.C. § 1581(i)(1)(C) or (D) and that, even if plaintiff's action did so arise, the Court lacks subject matter jurisdiction because the district courts have exclusive jurisdiction pursuant to 16 U.S.C. § 2440.  Defs. Mot. Dismiss at 1, 5-6.  Plaintiff opposes the motion to dismiss.  *See* Pl.'s Resp. in Opp'n to Defs.' Mot. Dismiss ("Pl. Resp."), ECF

---

[1] NMFS is a federal agency within the National Oceanic and Atmospheric Administration ("NOAA").  Corrected Compl. ¶ 15.  NOAA is situated within the U.S. Department of Commerce ("Commerce").  *Id.*

No. 26.  For the reasons discussed below, the court concludes that it lacks subject

matter jurisdiction.

## BACKGROUND

### I.      Factual background

The objective of the CAMLR Convention is "the conservation of Antarctic marine

living resources."  Convention on the Conservation of Antarctic Marine Living Resources

art. II, ¶ 1, May 20, 1980, 33 U.S.T. 3476, 1329 U.N.T.S. 47 ("CAMLR Convention").

"For the purposes of this Convention, the term 'conservation' includes rational use."  *Id.*

at art. II, ¶ 2.  Member countries of the Commission for the Conservation of Antarctic

Marine Living Resources ("CCAMLR" or "the Commission") establish conservation

measures for Subarea 48.3 by consensus.  Corrected Compl. ¶ 2; *see* CAMLR

Convention art. IX, ¶ 1.f, 33 U.S.T. at 3483, 1329 U.N.T.S. at 51.  Conservation

measures include, inter alia, "the designation of the quantity" of species that may be

harvested as well as the designation of harvesting seasons and the regulation of

harvesting methods.  CAMLR Convention art. IX, ¶ 2.a-i, 33 U.S.T. at 3483-84, 1329

U.N.T.S. at 52.  The United States implements the CAMLR Convention through the

Antarctic Marine Living Resources Convention Act of 1984 ("AMLRCA"), 16 U.S.C. §§

2431, *et seq.*[2]  Commerce has promulgated regulations to implement AMLRCA.  *See* 50

C.F.R. § 300.100–116.

---

[2] 16 U.S.C. § 2431 sets forth the intent of Congress in the implementation of the
Convention:

     (a) Findings
          The Congress finds that—
          (1) the Convention on the Conservation of Antarctic
          Marine      Living Resources establishes international

Under CCAMLR CM 31-01 (1986), "the Commission shall, at its 1987 Meeting, adopt limitations on catch, or equivalent measures, binding for the 1987/88 season. . . . For each fishing season after 1987/88, the Commission shall establish such limitations or other measures, as necessary, [for Subarea 48.3]."  CCAMLR CM 31-01 (1986).  The CCAMLR did not adopt a catch limit or equivalent measures for Subarea 48.3 for the 2021/22 fishing season because "Russia blocked consensus to adopt proposed CM 41-02."  Letter from Alexa Cole, Director, Office of Int'l Affairs, Trade, and Commerce, Nat'l Marine Fisheries Service, to Daniel Thomas, Southern Cross Seafoods, LLC ("NMFS Denial Letter") (Sept. 15, 2022) at 2, PR 83; *see* Corrected Compl. ¶ 4.

---

mechanisms and creates legal obligations necessary for the protection and conservation of Antarctic marine living resources;

(2) the Convention incorporates an innovative ecosystem approach to the management of Antarctic marine living resources, including standards designed to ensure the health of the individual populations and species and to maintain the health of the Antarctic marine ecosystem as a whole;

(3) the Convention serves important United States environmental and resource management interests;

(4) the Convention represents an important contribution to United States long term legal and political objectives of maintenance of Antarctica as an area of peaceful international cooperation;

(5) United States basic and directed research programs concerning the marine living resources of the Antarctic are essential to achieve the United States goal of effective implementation of the objectives of the Convention; and

(6) the United States has important security, economic, and environmental interests in developing and maintaining a fleet of icebreaking vessels capable of operating effectively in the heavy ice regions of Antarctica.

16 U.S.C. § 2431.

On August 8, 2022, Commerce received plaintiff's application for preapproval to import into the United States toothfish harvested from Subarea 48.3 in June and July 2022.  NMFS Denial Letter at 1; *see* Application for Pre-Approval Certificate to Import Frozen Toothfish, PR 56 (including application dated July 27, 2022, and postmark dated August 4, 2022).

On September 15, 2022, NMFS denied Southern Cross' application for preapproval ("the NMFS denial").  Decision Mem., PR 20; NMFS Denial Letter at 1. NMFS commented that statements made in the Commission demonstrate that failure to establish such a catch limit "effectively closes the fishery."  NMFS Denial Letter at 2 (footnote omitted).  NMFS noted that a "conclusion that fishing could proceed in the absence of a measure would also be inconsistent with decades of CCAMLR practice." *Id*. at 2-3.  As such, Commerce did not issue a preapproval certificate because "the toothfish at issue was harvested in contravention of CCAMLR CM 31-01."  *Id*. at 4 (citing 50 C.F.R. § 300.105(h)(2)).  Commerce explained further that, without a catch limit in effect, issuance of the preapproval application would be contrary to 50 C.F.R. § 300.105(d) and (h)(2):

> In the absence of any measure affirmatively establishing a catch limit and other fishery-specific requirements for the current season, fishing in Subarea 48.3 was not authorized under CCAMLR conservation measures. Therefore, as provided in the regulations, at 50 CFR § 300.105(d) and (h)(2), NMFS may not issue a pre-approval certificate.
>
> Denial of this application is consistent with the AMLRCA regulations and U.S. obligations under the CCAMLR Catch Documentation Scheme (CM 10-05) which prohibits [sic] the importation of toothfish harvested in a manner inconsistent with CCAMLR conservation measures.

*Id.*

## II.    Procedural history[3]

On October 12, 2022, plaintiff filed its original complaint.  Compl., ECF No. 6.  On

October 25, 2022, plaintiff corrected its complaint.  Corrected Compl.  The complaint as

corrected challenges the denial by NMFS pursuant to 50 C.F.R. § 300.105 of the

application by Southern Cross for preapproval to import toothfish harvested from

Subarea 48.3.  *Id.* ¶ 1.  Plaintiff argues that the government's denial of plaintiff's

preapproval application was "in error" and a violation of the APA because the toothfish

were not "harvested or exported in violation of any CCAMLR conservation measure in

force" or by an illegal, unreported and unregulated fishery or vessel.  *Id.* ¶¶ 7-8.

On December 19, 2022, defendants moved to dismiss the complaint.  Defs. Mot.

Dismiss.  In their motion to dismiss, defendants argue that the Court lacks subject

matter jurisdiction over the action brought by plaintiff.  Defs. Mot. Dismiss ¶ 1.  On

January 13, 2023, plaintiff opposed the motion.  Pl. Resp.  On January 27, 2023,

defendants filed their reply.  Defs.' Reply in Supp. Mot. Dismiss ("Defs. Reply Br."), ECF

No. 28.

---

[3] On December 6, 2022, the court denied plaintiff's motion to expedite briefing and
consideration.  Order Denying Mot., ECF No. 21.  On June 20, 2023, plaintiff moved to
supplement the administrative record.  Pl.'s Mot. Suppl. Admin. R., ECF No. 37.  On
July 24, 2023, defendants opposed plaintiff's motion to supplement the administrative
record.  Defs.' Mot. Opp'n. Mot. Suppl. Admin. R., ECF No. 42.  On October 5, 2023,
the court denied in part plaintiff's motion to supplement the administrative record and
ordered defendants to explain their position concerning a specific category of
documents.  Order Mot. Supp. Admin. R., ECF No. 47.  On November 6, 2023,
defendants filed their explanation pursuant to the court's order and adequately
explained their position regarding the inconsistency identified by the court in its order.
Defs.' Exp. Order Mot. Supp. Admin. R., ECF No. 48.  On November 14, 2023, plaintiff
stated that "all pending matters relating to its motion to supplement the administrative
record have been resolved."  Pl.'s Resp. Defs.' Exp. Order Mot. Supp. Admin. R. at 1,
ECF No. 49.

## JURISDICTION AND STANDARD OF REVIEW

Plaintiff alleges that the Court has exclusive jurisdiction under 28 U.S.C. § 1581(i)(C) and (D).  Corrected Compl. ¶¶ 10-12.  28 U.S.C. § 1581(i) is the Court's "residual" jurisdictional provision.  *Fujitsu Gen. Am., Inc. v. United States*, 283 F.3d 1364, 1371 (Fed. Cir. 2002) (citing *Conoco, Inc. v. United States Foreign-Trade Zones Bd.*, 18 F.3d 1581, 1584 n.4 (Fed. Cir. 1994)), and allows the Court to "take jurisdiction over designated causes of action founded on other provisions of law." *Norcal/Crosetti Foods, Inc. v. United States*, 963 F.2d 356, 359 (Fed. Cir. 1992) (citing *Nat'l Corn Growers Ass'n v. Baker*, 840 F.2d 1547, 1557 (Fed. Cir. 1988).  Defendants state that this Court lacks subject matter jurisdiction because the denial of plaintiff's preapproval application is not an embargo under 28 U.S.C. § 1581(i).  Defs. Mot. Dismiss at 1.  Additionally, defendants state that regardless of whether the instant action constitutes an embargo within the meaning contemplated in section 1581(i), CCAMLR cases fall within the exclusive jurisdiction of the district courts.  *Id.*; *see* 16 U.S.C. § 2440.

Whether a court has subject matter jurisdiction to hear an action is a "threshold" inquiry.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998).  "Without jurisdiction the court cannot proceed at all in any cause.  Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Id.* (citing *Ex parte McCardle*, 74 U.S. 506, 514 (1869)); *accord Salmon Spawning & Recovery Alliance v. United States*, 33 CIT 515, 519, 626 F. Supp. 2d 1277, 1281 (2009) (citing *Ex parte McCardle*, 74 U.S. at 514).  The party "seeking the exercise of jurisdiction . . . ha[s] the burden of establishing

that jurisdiction exists."  *Bush v. United States*, 717 F.3d 920, 924-25 (Fed. Cir. 2013)

(citing *Keener v. United States*, 551 F.3d 1358, 1361 (Fed. Cir. 2009)).

## DISCUSSION

I.   **Whether the denial of the preapproval application by NMFS constitutes an embargo or other quantitative restriction**

    A.   **Legal framework**

The USCIT's residual jurisdiction statute states in relevant part:

(1) In addition to the jurisdiction conferred upon the Court of International Trade by subsections (a)–(h) of this section and subject to the exception set forth in subsection (j) of this section, the Court of International Trade shall have exclusive jurisdiction of any civil action commenced against the United States, its agencies, or its officers, that arises out of any law of the United States providing for—
    . . .

(C) embargoes or other quantitative restrictions on the importation of merchandise for reasons other than the protection of the public health or safety; or
(D) administration and enforcement with respect to the matters referred to in subparagraphs (A) through (C) of this paragraph and subsections (a)–(h) of this section.

28 U.S.C. § 1581(i)(1)(C)-(D).  "[T]he Court will not have jurisdiction under section

1581(i)(3)[4] in the absence of a law providing for an embargo."[5]  *Salmon Spawning*, 33

---

[4] The version of the USCIT's jurisdictional statute at 28 U.S.C. § 1581(i)(3) and (4) analyzed in *Salmon Spawning* corresponds in substance to the current 28 U.S.C. § 1581(i)(1)(C) and (D).  *Compare* 28 U.S.C. § 1581(i)(3) and (4) with current version at 28 U.S.C. § 1581(i)(1)(C) and (D).

[5] The Supreme Court in *K Mart* ultimately held that there was no embargo in that case because, under the trademark law at issue (19 U.S.C. § 1526(a)), "[t]he private party, not the Government, by deciding whether and how to exercise its private right, determines the quantity of any particular product that can be imported."  *K Mart Corp. v. Cartier, Inc.,* 485 U.S. 176, 185 (1988).  Therefore, the Government did not have "*any* control over the extent or the nature of § 526(a)'s prohibition."  *Id.* at 186.

CIT at 519, 626 F. Supp. 2d at 1282 (citing *Friedman v. Kantor*, 21 CIT 901, 904, 977 F.

Supp. 1242, 1246 (1997)).

The Supreme Court has stated that "the ordinary meaning of 'embargo,' and the

meaning that Congress apparently adopted in the statutory language 'embargoes or

other quantitative restrictions,' is a governmentally imposed quantitative restriction—of

zero—on the importation of merchandise." *K Mart,* 485 U.S. at 185.[6]  The Supreme

Court added: "[N]ot every governmental importation prohibition is an embargo."  *Id.* at

187; *Native Fed'n of Madre De Dios River & Tributaries v. Bozovich Timber Prods.*, 31

CIT 585, 593 n.11, 491 F. Supp. 2d 1174, 1181 n.11 (2007) (citing *K Mart*, 485 U.S. at

187); *see Salmon Spawning*, 33 CIT at 519, 626 F. Supp. 2d at 1282 ("That restriction

must be more than a mere 'condition[] of importation.'" (quoting *K Mart*, 485 U.S. at

189)).  The Supreme Court continued: "To hold otherwise would yield applications of the

term 'embargo' that are unnatural, to say the least."  *K Mart*, 485 U.S. at 187.[6]

The Supreme Court made clear that it was drawing a distinction between

governmental importation prohibitions and embargoes: "Congress likewise declined to

grant the Court of International Trade exclusive jurisdiction over importation prohibitions

that are not embargoes."  *Id.* at 189.  The Supreme Court added, "Congress did not

commit to the Court of International Trade's exclusive jurisdiction *every* suit against the

Government challenging customs-related laws and regulations."  *Id.*  Finally, the

Supreme Court clarified that drawing this distinction was for the purpose of clarifying the

"division of jurisdiction between the Customs Court (now the Court of International

---

[6] *See infra* Section I.C for a discussion of these examples provided by the Supreme
Court.

Trade) and the district courts and to 'ensure . . . uniformity in the judicial decisionmaking process.'" *Id.* at 188 (citing H.R. Rep. No. 96–1235, at 20 (1980), U.S. Code Cong. & Admin. News 1980, pp. 3729, 3731).  That is the very issue presented to the court in the instant action.

The USCIT has noted that "by choosing the word 'embargoes' over the phrase 'importation prohibitions' in Section 1581(i)(3), Congress created a circumscribed sub-class of importation prohibitions that falls within the [USCIT's] jurisdiction."  *Native Fed'n*, 31 CIT at 593, 491 F. Supp. 2d at 1181-82 (quoting *K Mart,* 485 U.S. at 189) (citing *Earth Island Inst. v. Brown*, 28 F.3d 76, 77 (9th Cir. 1994)).  In addition, "Congress declined to grant [the USCIT] jurisdiction to review challenges to 'conditions of importation' as distinct from those involving embargoes."  *Id.* at 593, 491 F. Supp. 2d at 1182 (quoting *K Mart*, 485 U.S. at 189).

At issue in this case, AMLRCA provides inter alia that it is "unlawful . . . to . . . import . . . any Antarctic marine living resource . . . harvested in violation of a conservation measure in force with respect to the United States pursuant to article IX of the Convention or in violation of any regulation promulgated under this chapter."  16 U.S.C. § 2435(3).  In addition, Commerce regulations implementing AMLRCA specify the circumstances under which NFMS will issue a preapproval certificate for the importation of a shipment of toothfish:

> NMFS may issue a preapproval certificate for importation of a shipment of frozen *Dissostichus* species if the preapproval application form is complete and NMFS determines that the activity proposed by the applicant meets the requirements of the Act and that the resources were not harvested in violation of any CCAMLR conservation measure or in violation of any regulation in this subpart.  No preapproval will be issued for *Dissostichus* species without verifiable documentation that the harvesting vessel

reported to C–VMS continuously and in real-time from port-to-port, regardless of where such *Dissostichus* species were harvested.

50 C.F.R. § 300.105(d).  The regulations also provide that "NMFS will *not* issue a

preapproval certificate for any shipment of *Dissostichus* species . . . [d]etermined to

have been harvested or transshipped in contravention of any CCAMLR Conservation

Measure in force at the time of harvest or transshipment . . . ."  *Id.* § 300.105(h)(2)

(emphasis supplied).

### B.      Positions of the parties

Before the court is defendants' motion to dismiss.  Accordingly, the court starts

with defendants' arguments.

Defendants argue that the CAMLR Convention, AMLRCA and the regulations

under which NMFS denied Southern Cross' preapproval application do not provide for

an embargo.  Defs. Mot. Dismiss at 6-7 (quoting 16 U.S.C. § 2435(3)); *see* Defs. Reply

Br. at 3-4 (citing 16 U.S.C. § 2435; *Salmon Spawning*, 33 CIT at 519-21, 626 F. Supp.

2d at 1282-83; 50 C.F.R. § 300.105(h)(2)).  Specifically, defendants allege that the

denial, "made pursuant to 50 C.F.R. § 300.105(h), is not an embargo, and does not

'arise[] out of any law of the United States providing for' an embargo."  Defs. Mot.

Dismiss at 5 (quoting 28 U.S.C. § 1581(i)(1)(C)).  Defendants add: "In choosing to

circumscribe a subclass of importation prohibitions that come within this Court's

jurisdiction, 'Congress declined to grant this Court jurisdiction to review challenges to

conditions of importation as distinct from those involving embargoes.'" *Id.* at 6 (quoting

*Native Fed'n*, 31 CIT at 592-93, 491 F. Supp. 2d at 1181-82 (citing *K Mart,* 485 U.S. at

189)).[7]

Defendants insist that NMFS "made a case-specific determination" based on

AMLRCA and did not "prohibit trade outright."  *Id.* at 7; *see* Defs. Reply Br. at 3 ("*K Mart*

*Corp.* makes evident that a condition of trade is not an embargo even if a case-specific

application of that condition might lead to a situation where importation of a product is

prevented.").[8]  Defendants note that the regulation at issue "allow[s]" but does not

require NMFS to issue a preapproval certificate.  Defs. Reply Br. at 4 (citing NMFS

Denial Letter).  Defendants conclude that "NMFS followed its regulations and

determined the conditions in which importation is lawful . . . ."  Defs. Mot. Dismiss at 7;

*see* Defs. Reply Br. at 6 (maintaining that the "regulation and statute at issue . . . do not

prohibit trade outright"); *see also* Oral Arg. Tr. at 30:12-31:13 (arguing on behalf of

defendants that "compliance with" conservation measures, such as those providing for a

requirement as to fishing gear, represents a "condition on importation").

As support, defendants note the common meaning of an embargo that the

Supreme Court outlined in *K Mart* and highlight the Supreme Court's provision of

examples supporting the Supreme Court's conclusion that "[n]ot every governmental

---

[7] *See K Mart*, 485 U.S. at 195 (Scalia, J., dissenting) ("The Court points out . . . that it
may sometimes be difficult to distinguish a condition on importation from a prohibition
on importation containing exceptions.  That may be true, but since we are agreed that
only prohibitions and not conditions come within the meaning of embargo, that
ambiguity will have to be grappled with under the Court's view of things no less than
under mine.").

[8] At oral argument, defendants noted: "By [p]laintiff's theory, any time a
countermeasure [sic] of any type is violated and therefore a certificate is denied, that
would constitute an embargo, and that's simply not a tenable outcome."  Oral Arg. Tr. at
13:19-22.

importation prohibition is an embargo."  Defs. Mot. Dismiss at 5-6 (quoting *K Mart*, 485

U.S. at 185).  Defendants add that "just as the preapproval certificate that was denied in

this case could only be issued pursuant to certain requirements, the permits and

licenses described in *K Mart* would have required compliance with certain substantive

conditions or requirements."  Defs. Reply Br. at 2.  Likewise, defendants note that the

USCIT in *Native Federation* found that a requirement under the Endangered Species

Act ("ESA") for compliance with "certain permitting and documentation requirements"

under the Convention on International Trade in Endangered Species of Wild Fauna and

Flora ("CITES") did not entail an embargo.  Defs. Mot. Dismiss at 6 (citing *Native Fed'n*,

31 CIT at 586, 593-94, 491 F. Supp. 2d at 1176, 1182); *see* Defs. Reply Br. at 5-6

(comparing the "importation conditions" noted in *Native Federation* with those in 50

C.F.R. § 300.105(d)).

In addition, defendants distinguish the sources that plaintiff raises to the court on

the basis that they "all appear to expressly confer blanket authority to prohibit import of

products."  Defs. Reply Br. at 2-3 (citing Pl. Resp. at 13-14).  Further, defendants argue

that the NMFS determination was not a "blanket ban on toothfish importation."  *Id.* at

6.  Defendants allege that the denial is not a quantitative restriction either because there

is no "quota" or "limit on the quantity of a product that may be imported or exported."  *Id.*

at 6-7 (citing *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 88 (Fed. Cir. 1985);

*Best Foods, Inc. v. United States*, 50 Cust. Ct. 94, 95, 218 F. Supp. 576, 577 (1963);

*Bethlehem Steel Corp. v. United States*, 28 CIT 154, 159 n.8, 316 F. Supp. 2d 1309,

1314 n.8 (2004)).    Defendants also argue that this Court does not have jurisdiction

under 28 U.S.C. § 1581(i)(1)(D) if this Court lacks jurisdiction under § 1581(i)(1)(C)

because there is no embargo or quantitative restriction.  *Id.* at 4-5 (citing *Salmon Spawning*, 33 CIT at 520-21, 626 F. Supp. 2d at 1283).

Plaintiff argues that this Court has jurisdiction pursuant to 28 U.S.C. § 1581(i)(1)(C) because the decision to deny the preapproval application is an embargo under *K Mart* or, alternatively, a "quantitative restriction."  Pl. Resp. at 1-2 (citing *K Mart*, 485 U.S. at 185); *see id.* at 7-8 (arguing that 16 U.S.C. § 2435(3) is "a law providing for" such embargo or restriction).[9]  Plaintiff notes the language of the letter that Commerce sent to Southern Cross and an email from a NOAA employee — both of which reference prohibition — to support Southern Cross' position.  *See id.* at 12 (citing NMFS Denial Letter at 4; Email from K. Dawson, NOAA, to D. Thomas, Southern Cross Seafoods, LLC (July 28, 2022) ("Dawson Email"), PR 12).

Plaintiff asserts that the language of AMLRCA, 16 U.S.C. § 2435(3), and the language of 19 C.F.R. § 12.60 (1987) — which the Supreme Court noted in *K Mart* to be an example of an "embargo[] . . . to further interests relating to . . . ecology" — is fundamentally the same.  Pl. Resp. Br. at 11-12; *K Mart*, 485 U.S. at 184.  19 C.F.R. §

---

[9] The AMLRCA regulations also provide in relevant part:

> (1)  CCAMLR CDS document(s) must accompany all shipments of *Dissostichus* species as required in this section.
> (2) No shipment of *Dissostichus* species shall be released for entry into the United States unless accompanied by an accurate, complete, valid and validated CCAMLR CDS document.
> (3) *Dissostichus* species shall not be released for entry into the United States unless all of the applicable requirements of the CCAMLR Conservation Measures and U.S. regulations have been met.

50 C.F.R. § 300.106(a).

12.60 prohibits the importation of most sea otter skins taken contrary to the Provisional

Fur Seal Agreement of 1942 between the United States and Canada:

> The transportation, importation, sale, or possession of the skins of fur seals
> or sea otters is prohibited if such skins were taken contrary to the provisions
> of section 2 of the act of February 26, 1944 (58 Stat. 100-104) or, the case
> of such skins taken under the authority of the act or any fur-seal agreement,
> if the skins are not officially marked and certified as required by section 2 of
> the act.  Section 16 makes the act inapplicable to skins taken for scientific
> purposes under a special permit.

19 C.F.R. § 12.60 (1987).[10]

Plaintiff urges the court to "apply the same analysis" as in three decisions under

which federal courts applied *K Mart* and found that there was an embargo: *Humane*

*Soc'y of the United States v. Brown*, 19 CIT 1104, 1110, 1112, 901 F. Supp. 338, 344,

---

[10] Section 2 of the Provisional Fur Seal Agreement of 1942 between the United States and Canada provided that:

> It shall be unlawful, except as hereinafter provided, for any citizen or
> national of the United States, or person owing duty of obedience to the laws
> or treaties of the United States, or any vessel of the United States, or person
> belonging to or on such vessel, to engage in pelagic sealing or sea otter
> hunting in or on the waters of the North Pacific Ocean; or for any person or
> vessel to engage in sealing; or for any person or vessel to use any port or
> harbor or other place subject to the jurisdiction of the United States for any
> purpose connected in any way with the operation of pelagic sealing, sea
> otter hunting, or sealing; or for any person to transport, import, offer for sale,
> or have in possession at any port, place, or on any vessel subject to the
> jurisdiction of the United States, raw, dressed, or dyed skins of sea
> otters taken contrary to the provisions of this section or, where taken
> pursuant to section 3 of this Act, not officially marked and certified as having
> been so taken, or raw, dressed, or dyed skins of fur seals taken in or on the
> waters of the North Pacific Ocean or on lands subject to the jurisdiction of
> the United States, except seal skins which have been taken under the
> authority of this Act or under the authority of the respective parties to
> any fur-seal agreement and which have been officially marked and certified
> as having been so taken.

Provisional Fur Seal Agreement of 1942, Canada-United States., Feb. 26, 1944, ch. 65, § 2, 58 Stat. 100, 101 (repealed 1966).

346 (1995); *Earth Island Inst. v. Christopher*, 6 F.3d 648, 649 n.1, 651-52 (9th Cir.

1993); and *Int'l Labor Rights Fund v. Bush*, 357 F. Supp. 2d 204, 205, 208-10 (D.D.C.

2004).  Pl. Resp. at 13-14; *see also* Oral Arg. Tr. at 16:10-17:10 (noting on behalf of

plaintiff similarities between the statutes at issue in those cases and the language at

issue here).   In addition, plaintiff distinguishes the *Native Federation* decision from the

instant action.  Pl. Resp. at 14-15.  Specifically, plaintiff argues that the "regulations at

issue in *Native Federation* merely *regulated* trade"— but did not bar it entirely — "based

on the presentation of a valid export permit."  *Id*. at 15 (emphasis supplied).  In contrast,

plaintiff states that "NMFS is not regulating trade in toothfish; NMFS is barring trade in

toothfish from Subarea 48.3 entirely."  *Id.*; *see* Oral Arg. Tr. at 31:16-20 (explaining on

behalf of plaintiff that the provisions at issue in *Native Federation* "contemplated"

trade).  Plaintiff adds: "This is not a case where NMFS is barring Southern Cross's

imports because those imports were unaccompanied by the required documents (*i.e.*,

the [*Dissostichus* Catch Document] and [*Dissostichus* Export Document])."  Pl. Resp. at

16.

        Plaintiff alleges further that the Court has jurisdiction pursuant to

28 U.S.C. § 1581(i)(1)(D) based on the "administration and enforcement" of

16 U.S.C. § 2435(3).  *Id.* at 8; *see* Oral Arg. Tr. at 17:15-21 (arguing on behalf of plaintiff

that an "embargo is always enforced at the ports on an entry-by-entry basis").

        **C.    Analysis**

        To determine whether the Court has jurisdiction over the instant action, the court

considers: (1) whether the denial constitutes an embargo or other quantitative restriction

on the importation of merchandise; (2) whether AMLRCA and its implementing

regulations provide for such an embargo or other quantitative restriction; and (3)

whether AMLRCA and its implementing regulations provide for the administration and

enforcement of such an embargo or other quantitative restriction.  For the reasons

discussed below, the court concludes that (1) the denial pursuant to AMLRCA

regulations, 50 C.F.R. § 300.105(d) and (h)(2), by NMFS of Southern Cross'

preapproval application does not constitute an embargo or other quantitative restriction,

and (2) neither AMLRCA, 16 U.S.C. § 2435(3), nor its regulations,

50 C.F.R. § 300.105(d) and (h)(2), provide for an embargo or other quantitative

restriction, or the administration and enforcement thereof.

### 1.    Whether NMFS' denial of plaintiff's preapproval application constitutes an embargo or other quantitative restriction

Plaintiff's action arises out of a challenge to the denial by NMFS of plaintiff's

preapproval application.  Corrected Compl. ¶ 1 ("This action concerns Defendants'

unlawful denial of Southern Cross's application for preapproval to import [toothfish]

. . . .").  Defendants argue that the Court does not have jurisdiction over the

denial.  Defs. Mot. Dismiss at 5 (quoting 28 U.S.C. § 1581(i)(1)(C)).  Plaintiff argues that

NMFS, by its denial of plaintiff's application, is "barring trade in toothfish from Subarea

48.3 entirely" such that the denial constitutes an embargo — "a governmentally imposed

quantitative restriction—of zero", *K Mart*, 485 U.S. at 185 — or other quantitative

restriction within the meaning of the statute.  Pl. Resp. at 15; *see* Pl. Resp. at 8 (arguing

that "NMFS's action is an 'embargo'" or else that "it is certainly a 'quantitative restriction

on the importation of merchandise'").  The court is unpersuaded.

NMFS is not authorized under AMLRCA or its implementing regulations to

institute a blanket ban on toothfish through the denial of an application for a preapproval

certificate.  *See generally* 16 U.S.C. §§ 2431, 2435; 50 C.F.R. § 300.105.  Rather,

NMFS "*may* issue a preapproval certificate" if certain conditions are met, including that

NMFS determines that the instant "resources were not harvested in violation of any

CCAMLR conservation measure."  50 C.F.R. § 300.105(d) (emphasis supplied).

Similarly, NMFS "will not issue a preapproval certificate" for a toothfish harvest or

transshipment determined to be "in contravention of" any conservation measure.

50 C.F.R. § 300.105(h)(2).  Moreover, "the proper focus of an analysis of jurisdiction

under 28 U.S.C. § 1581(i) is the law upon which the plaintiffs' action is based, and

whether that law (rather than the specific claims set forth by the plaintiff) provides for an

embargo."  *Int'l Labor Rights Fund*, 357 F. Supp. 2d at 209 n.3.  The court addresses

the statutes and regulations governing the instant action *infra* Section I.C.2.

      The NMFS denial before the court pertained to one shipment of toothfish.  As

such, the denial does not constitute an embargo or other quantitative restriction.

      The NMFS denial of plaintiff's preapproval certificate was specific to plaintiff's

application: "[NMFS] is denying issuance of a pre-approval certificate *for this shipment

of toothfish* for the reasons outlined below."  NMFS Denial Letter at 1 (emphasis

supplied).  The NMFS denial also stated the foundational legal predicate for the

application of AMLRCA by NMFS, namely that "fishing in Subarea 48.3 was not

authorized under CCAMLR conservation measures" and that "the toothfish at issue was

[sic] harvested in contravention of CCAMLR CM 31-01."  NMFS Denial Letter at 4; *see*

NMFS Denial Letter at 3-4 (quoting 50 C.F.R. § 300.105(d)).  As such, NMFS

determined not to issue a preapproval certificate to Southern Cross because NMFS

determined that the *specific* toothfish shipment at issue was "harvested or transshipped

in contravention of a[] CCAMLR Conservation Measure in force at the time of harvest or transshipment."  *See* NMFS Denial Letter at 4[11] (quoting 50 C.F.R. § 300.105(h)(2)).

Similarly, in a different context, Southern Cross inquired of NMFS whether Southern Cross could import fish from another part of the South Georgia waters.  NMFS responded in a manner consistent with its explanation in the letter denying the preapproval application in the instant case: "[a]ny final determination would, as always, be made upon submission of an application for preapproval to import a specific shipment."  Dawson Email.[12]

Accordingly, the NMFS denial is not an embargo or other quantitative restriction within the meaning of 28 U.S.C. § 1581(i).

---

[11] It is notable that the language of subsection (h)(2), applied by NFMS in this case, is distinct *even from* the language of subsection (h)(1) of the same section of the same statute.  Compare 50 C.F.R. § 300.105(h)(1) with 50 C.F.R. § 300.105(h)(1).  Subsection (h)(1) provides that NMFS will not issue a preapproval certificate for *any* shipment of *Dissostichus* species . . . [i]dentified as originating from Statistical Area 51 or Statistical Area 57 in the eastern and western Indian Ocean outside and north of the Convention Area", 50 C.F.R. § 300.105(h)(1) (emphasis supplied) whereas subsection (h)(2) expressly requires NMFS to tie denial of a preapproval application to only those shipments ""[d]etermined to have been harvested or transshipped *in contravention of any CCAMLR Conservation Measure in force at the time of harvest or transshipment*."  Again, subsection (h)(2) expressly contemplates and provides for import of shipments from the identified region subject only to the conditions of meeting the terms of the conservation measure whereas subsection (h)(1) applies a restriction not tied to the terms of a conservation measure.

[12] Moreover, plaintiff's contention that NMFS "will prohibit all toothfish imported from Subarea 48.3" is conjecture.  Pl. Resp. at 15 (emphasis omitted).  The AMLRCA regulations provide for a process by which the United States can determine not to accept a conservation measure.  16 U.S.C. § 2434(a).  The U.S. government could change its position with respect to the requirement of adhering to conservation measures for the approval or preapproval of applications to import toothfish from Subarea 48.3.

### 2.    Whether AMLRCA and its implementing regulations provide for embargoes or other quantitative restrictions

#### i.    Embargoes

In light of plaintiff's request for declaratory judgment applicable to future preapproval applications, the court turns to whether the applicable statute and regulations provide for an embargo.  Corrected Compl. ¶¶ 9, 12, 51 (citing 28 U.S.C. § 2201(a), which authorizes "any court of the United States . . . [to] declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought").  Plaintiff argues that the NMFS denial of plaintiff's preapproval application amounts to an embargo based on what plaintiff argues is the provision for an embargo under AMLRCA, 16 U.S.C. § 2435(3). Pl. Resp. at 1-2.

The court examines first the applicable statutes and regulations in the instant action, then considers the case law in which this Court and other courts have concluded that the statutes before them envisaged embargoes and consequently fell within the jurisdiction of this Court.  The court concludes that AMLRCA and its implementing regulations provide "conditions of importation" and the potential for other types of "governmental importation prohibition[s]" that do not constitute embargoes.  *See K Mart*, 485 U.S. at 187.

AMLRCA, its implementing regulations and the CAMLR Convention all "anticipate[] trade in" toothfish.  *Native Fed'n*, 31 CIT at 595, 419 F. Supp. 2d at 1183. Under AMLRCA, "[i]t is unlawful . . . to . . . import . . . any Antarctic marine living resource . . . harvested in violation of a conservation measure in force with respect to the United States pursuant to article IX of the Convention . . . ."  16 U.S.C. § 2435(3).

*See also* 50 C.F.R. § 300.114(d).  AMLRCA regulations by their terms "regulate[] . . .
*[t]he import* . . . into the United States of any Antarctic marine living resource."
50 C.F.R. § 300.100(b)(2) (emphasis supplied); *see* 50 C.F.R. § 300.104(a)(1) ("A
person *may import* . . . AMLR into the United States only under a NMFS-issued
International Fisheries Trade Permit (IFTP)." (emphasis supplied)).  Under the AMLRCA
regulations, imports of toothfish must have a preapproval certificate, which NMFS may
issue.  *See* 50 C.F.R. § 300.105(d); *see also* 50 C.F.R. § 300.104(a)(2) (providing that
frozen toothfish shipments "must also be accompanied by . . . a preapproval
certificate"); 50 C.F.R. § 300.106(e)(1) (defining toothfish import requirements).  For
NMFS to issue such a preapproval certificate, NMFS must be able to determine that a
condition has been met, namely that the toothfish were not "harvested in violation of any
CCAMLR conservation measure ."  *Id.* § 300.105(d); *see id.* § 300.105(h)(2).

Under the CAMLR Convention, as noted *supra* Section I, "'conservation' includes
*rational use*."  CAMLR Convention, art. II.2 (emphasis supplied); *see* CAMLR
Convention art. IX.2(c) ("The conservation measures . . . include . . . the designation of
the quantity which may be harvested from the populations of regions and sub-regions").
In addition, Congress found that "the Convention incorporates an innovative ecosystem
approach to the *management* of Antarctic marine living resources . . . ."
16 U.S.C. § 2431(a)(2) (emphasis supplied).  Further, when certain conditions are met,
NMFS "*may* issue a preapproval certificate for importation of a shipment of frozen
[toothfish]."  50 C.F.R. § 300.105(d) (emphasis supplied).  As such, to the extent that
the provisions amount to a "governmental importation prohibition," they are nonetheless
not embargoes.  *K Mart*, 485 U.S. at 187.  Instead, the regulation delineates the

preapproval framework for the importation of toothfish that is harvested in compliance with CCAMLR conservation measures and that meets certain other prerequisites.  *See* 50 C.F.R. § 300.105(d).

In *K Mart*, the Supreme Court addressed two instances of governmental importation prohibitions that did not constitute embargoes: (1) a regulation requiring a permit and appropriate "tagging" for milk and cream importation, 485 U.S. at 187 (quoting 19 C.F.R. § 12.7(a)-(b) (1987)[13]); and (2) a regulation requiring inspection for meat product importation, *id.* (quoting 19 C.F.R. § 12.8 (1987)[14]).  The Supreme Court reasoned that "[t]o hold [that every governmental importation prohibition is an embargo] would yield applications of the term 'embargo' that are unnatural, to say the least."  *Id.* The Supreme Court illustrated such an application by explaining that the "prohibitory nature" of the milk and cream regulations "would convert licensing and tagging requirements into embargoes on unlicensed or improperly tagged dairy products."  *Id.* Similarly, the Supreme Court noted that the meat product inspection requirement "would magically become an embargo of uninspected (but not necessarily tainted) meat."  *Id.*

AMLRCA establishes as a condition of importation that the shipment be harvested in compliance with CCAMLR conservation measures.  16 U.S.C. § 2435(3). AMLRCA provides the authority for NMFS to deny a pre-approval application on the

[13] The regulation provides in relevant part that "the importation into the United States of milk and cream is prohibited unless the person by whom such milk or cream is shipped or transported into the United States holds a valid permit from the Department of Health and Human Services."  19 C.F.R. § 12.7(a) (1987).  In addition, the regulation outlines tagging requirements and adds: "Customs officers shall not permit the importation of any milk or cream that is not tagged in accordance with such regulations."  *Id.* § 12.7(b).

[14] The regulation provides in relevant part that "meat . . . products shall not be released from Customs custody prior to inspection . . . ."  19 C.F.R. § 12.8(a) (1987).

grounds that this condition has not been met.  16 U.S.C. § 2436(b) (providing the

authority to the Secretary of Commerce to promulgate regulations to implement

conservation measures); 50 C.F.R. § 300.105 (implementing regulation of the statute).

This denial may constitute a prohibition on importation of the imports in question.

50 C.F.R. § 300.105(h)(2).  As the Supreme Court found in *K Mart,* such a prohibition

may not "magically" become an embargo of imports that do not meet the conditions of

AMLRCA.  In sum, the conditional regulatory language of AMLR parallels that of the

statute and regulations for milk and meat importation, which the Supreme Court

previously discussed did not constitute embargoes within the jurisdiction of the USCIT.

*See K Mart*, 485 U.S. at 187.

  That conclusion is further supported by the USCIT's holding in *Native Federation*.

31 CIT 585, 491 F. Supp. 2d 1174.  Similar to AMLRCA, the statute at issue in *Native*

*Federation* stated that it was "unlawful . . . to engage in any trade in any specimens

contrary to the provisions of the Convention."  16 U.S.C. § 1538(c)(1).  In addition,

under the ESA regulations, imports of bigleaf mahogany are required to be

accompanied by an export permit.  *Native Fed'n,* 31 CIT at 594, 491 F. Supp. 2d at

1182 (citing 50 C.F.R. § 23.12(a)(2)(i)[15]).  The USCIT in *Native Federation* looked to the

language of CITES and the ESA to guide the Court's reasoning that the regulation —

including, in certain instances, a prohibition — of mahogany imports did not constitute

an embargo:

---

[15] 50 C.F.R. part 23 was revised and "reorganized the sections and added provisions
from certain applicable resolutions and decisions adopted by the CITES Conference of
the Parties (CoP) at its second through thirteenth meetings (CoP2 - CoP13)."  72 Fed.
Reg. 48,402-01.  The 2007 version of the regulation reflects a later version of the Final
Rule in which 50 C.F.R. § 23.11-12 are condensed.

> By entering into [CITES], the United States did not agree to end trade in
> CITES-listed species, nor did it elect to do so by enacting Section 9(c) to
> implement the Convention.  On the contrary, the aim of CITES and the
> provisions of the ESA that implement it is to *permit trade* in certain species
> in a controlled, sustainable manner.

*Id.* at 597-98, 491 F. Supp. 2d at 1185 (emphasis supplied) (citing CITES Proclamation

of the Contracting States, 27 U.S.T. at 1090).  The *Native Federation* court concluded

that the section of the ESA applicable to bigleaf mahogany did not "forbid" or

"completely ban" trade but rather "regulate[s]" such trade through permit requirements.

*Id.* at 593-94, 491 F. Supp. 2d at 1182-83.  For the category of species under which

bigleaf mahogany falls, the ESA and CITES, "while restricting trade, do not restrict the

quantity of imports to zero."  *Id.* at 598, 491 F. Supp. 2d at 1185-86 (citing *K Mart* , 485

U.S. at 185).[16]

The AMLRCA regulations spell out specific requirements for preapproval

certification, much like the CITES and ESA regulations at issue in *Native Federation* set

out requirements for permitting.  *Compare* 50 C.F.R. § 300.105(d) (requiring that the

"preapproval application form is complete and NMFS determines that the activity

proposed by the applicant meets the requirements of the Act and that the resources

---

[16] To reach this conclusion, the court highlighted several aspects of the ESA and CITES
statutes and their similarity to aspects in the Supreme Court's decision in *K Mart*: (1) the
flexibility under the CITES language for parties to "adopt stricter measures," weighing
against a ban; (2) the similarity between the regulations noted in *K Mart* that provide for
"conditions of importation" — milk permits and meat inspections — to CITES/ESA
regulations; (3) that the CITES/ESA regulation "anticipates trade in those species,
[which include bigleaf mahogany,] on the condition that 'the requirements in ... [50
C.F.R. § 23.12(a)(2)(i)] are met,' i.e., the presentation of a valid foreign export permit;"
and (4) the "qualitatively different" nature of the other examples of embargoes because
they do not have a "simple permitting scheme" but instead have "stringent statutory
requirements" and "prohibit trade outright albeit with limited exceptions."  *Id.* at 595-96,
491 F. Supp. 2d at 1183-85 (quoting 50 C.F.R. § 23.11(a)).

were not harvested in violation of any CCAMLR conservation measure or in violation of

any regulation") *with* 50 C.F.R. § 23.12(a)(2)(i) (requiring "a valid foreign export permit

issued by the country of origin").

Plaintiff raises four examples to support its argument that AMLRCA and its

regulations, as applied by NMFS, provide for an embargo.  Pl. Resp. at 12-14 (citing

19 C.F.R. § 12.60 (1987); *Humane Soc'y*, 19 CIT 1104, 901 F. Supp. 338*; Earth Island*,

6 F.3d 648; *Int'l Labor Rights Fund*, 357 F. Supp. 2d. 204).

AMLRCA and its implementing regulations are distinct from the examples of

embargoes that plaintiff provides.  *See* 19 C.F.R. § 12.60 (1987); *K Mart*, 485 U.S. at

184 (describing 19 C.F.R. § 12.60 (1987) as an embargo); *Humane Soc'y,* 19 CIT at

1112-1113, 901 F. Supp. at 346 (explaining that 16 U.S.C. § 1826a, which "prohibit[s]

the importation" of fishing-related products, confers jurisdiction to this Court under the

provision for residual jurisdiction because § 1826a lists embargo language); *Earth

Island*, 6 F.3d at 652 (concluding that the 16 U.S.C. § 1537(b) implemented a ban on

importation of shrimp products and "prohibit[ed]" shrimp imports that did not comply with

regulations protecting sea turtles and holding that those terms corresponded to the

embargo language conferring jurisdiction on the USCIT); *Int'l Labor Rights*, 357 F.

Supp. 2d at 207 (holding that the language of 19 U.S.C. § 1307, stating that goods

produced by forced labor and "importation thereof is hereby *prohibited*," constituted

embargo language conferring jurisdiction on this Court) (emphasis supplied).  The court

analyzes each in turn.

The first example that plaintiff references is 19 C.F.R. § 12.60 (1987), which the

Supreme Court in *K Mart* referred to as providing for an embargo.  485 U.S. at 184; *see*

Pl. Resp. at 12.  The regulation in question prohibits the importation of "skins of fur seals or sea otters . . . if such skins were taken contrary to the provisions of section 2 of the [Provisional Fur Seal Agreement of 1942 between the United States of America and Canada]."  19 C.F.R. § 12.60 (1987).  The regulation provides a limited exception for the import of sea otter skins and fur seals by "Indians, Aleuts, or other aborigines dwelling on the American coasts of the waters of the North Pacific Ocean."  Provisional Fur Seal Agreement of 1942 (repealed 1944), ch. 65, § 3.[17]

    The CAMLR Convention, AMLRCA and its implementing regulations expressly *envision and provide* that harvesting of Antarctic marine resources will and should occur.  *See* CAMLR Convention art. II.2 (noting that "'conservation' includes rational use"), art. II.3 ("Any harvesting and associated activities in the area to which this Convention applies shall be conducted in accordance with the provisions of this Convention and with the following principles of conservation . . . ."), art. IX.2(c) (noting "the designation of the quantity [of species] which may be harvested").  AMLRCA implements the CAMLR Convention, 16 U.S.C. § 2431(b), and the AMLRCA regulations provide a framework under which importers can attain preapproval to import harvested

---

[17] The Provisional Fur Seal Agreement of 1942 prohibited importing illegally taken skins, and forfeiture thereof:

> The importation or bringing into territory of the United States . . . of skins of fur seals or sea otters taken in the waters mentioned in section 632 of this title . . . except such as have been taken under the authority of the respective parties to the convention between the Governments of the United States, Great Britain, Japan, and Russia . . . to which the breeding grounds of such herds belong, and have been officially marked and certified as having been so taken, is hereby prohibited . . . .

Provisional Fur Agreement, 16 U.S.C. § 635 (repealed 1944). ch. 65, §18, 58 Stat. 104.

Antarctic marine living resources, including frozen toothfish, if certain conditions are met. *See* 50 C.F.R. §§ 300.100(b)(2), 300.105.  In sum, the Provisional Fur Seal Agreement of 1942 as addressed by the Supreme Court in *K Mart* is not apposite to the assessment of the CAMLR Convention, CCAMLR CMs and AMLRCA in the instant case.  *K Mart ,* 485 U.S. at 184.

Plaintiff next raises this Court's holding in *Humane Society* that the High Seas Driftnet Fisheries Enforcement Act ("HSDFEA") was within the USCIT's exclusive jurisdiction.  Pl. Resp. at 13; *see Humane Soc'y*, 19 CIT at 1104, 1121, 901 F. Supp. at 340, 352.  The Court in *Humane Society* exercised jurisdiction over plaintiff's action, concluding that the language of the HSDFEA explicitly provided authority for the Secretary of the Treasury at the direction of the president to implement a prohibition on imports of fish and fish products from nations that do not comply with the requirements of the HSDFEA.  Pl. Resp. at 13; *see Humane Soc'y*, 19 CIT at 1104, 1112-1113, 901 F. Supp at 338, 340, 346, 352.  Plaintiffs there alleged that defendants — the Secretary of Commerce and the Secretary of State — had failed to exercise their "responsibilities" under the HSDFEA to identify any country (in that case, Italy) that engaged in the proscribed fishing.  *Id.* at 1105-06, 1111, 901 F. Supp. at 341, 345 (citing 16 U.S.C. § 1826a(b)(1)(A)-(B)).  Upon such identification, the HSFDEA prohibited fish imports from that nation.  *Humane Soc'y*, 19 CIT at 1110, 901 F. Supp. at 344 (citing 16 U.S.C. § 1826a(b)(3)[18] (delineating the procedure to instate a "[p]rohibition on

---

[18] Specifically, 16 U.S.C. § 1826a authorizes the President to direct the Secretary of the Treasury to prohibit importation into the United States of fish and fish products and sport fishing equipment:

imports of fish and fish products and sport fishing equipment").  The *Humane Society* court relied on *Earth Island* to conclude that the USCIT had exclusive jurisdiction over that action.  *Id.* at 1112-13, 901 F. Supp at 346.

AMLRCA again stands in contrast to the statute — HSFDEA — before the court in *Humane Society*.  The HSFDEA establishes a procedure to implement a blanket prohibition.  AMLRCA, by contrast, does not do so; rather, it sets out the requirements necessary to import toothfish in compliance with the conservation measures adopted. AMLRCA prohibits the import of products *conditionally* and *only if* they are harvested in violation of regulations promulgated under this chapter.  16 U.S.C. § 2435.  This

---

(3) Prohibition on imports of fish and fish products and sport fishing equipment
    (A) Prohibition
        The President—
        (i) upon receipt of notification of the identification of a nation under paragraph (1)(A); or
        (ii) if the consultations with the government of a nation under paragraph (2) are not satisfactorily concluded within ninety days, shall direct the Secretary of the Treasury to prohibit the importation into the United States of fish and fish products and sport fishing equipment (as that term is defined in section 4162 of Title 26) from that nation.
    (B) Implementation of prohibition
        With respect to an import prohibition directed under subparagraph (A), the Secretary of the Treasury shall implement such prohibition not later than the date that is forty-five days after the date on which the Secretary has received the direction from the President.
    (C) Public notice of prohibition
        Before the effective date of any import prohibition under this paragraph, the Secretary of the Treasury shall provide public notice of the impending prohibition.

16 U.S.C. § 1826a(b)(3) (1995).

approach is comparable to that involving the conditions on imports described in *Native Federation*, *supra* Section I.C.2.i.  Specifically, 50 C.F.R. § 300.105 requires that importers of toothfish provide a "complete" preapproval application and that NMFS then "determine[] that the activity proposed by the applicant meets the requirements of the Act and that the resources were not harvested in violation of any CCAMLR conservation measure or in violation of any regulation in this subpart."  50 C.F.R. § 300.105(d).  The language of the regulations is formulated in a way that *enables* the importation of toothfish so long as the conditions of the statute and regulations are met.  The CMs of the CAMLR Convention in turn provide a framework and conditions such that importers that wish to import fish from the area may seek to do so.  *See* 16 U.S.C. § 2435(3).  For the foregoing reasons, the statute and holding in *Humane Society* are inapposite to the statute and regulations at issue in the instant action.

The third case that plaintiff presents to the court is the decision of the U.S. Court of Appeals for the Ninth Circuit ("Ninth Circuit") in *Earth Island*.  Pl. Resp. at 13-14 (citing *Earth Island*, 6 F.3d at 649 n.1, 651-52).  There, the Ninth Circuit held that the statute at issue, which banned shrimp imports from countries that did not protect sea turtles from commercial nets, was an embargo such that the USCIT had exclusive jurisdiction.  *Earth Island,* 6 F.3d at 649, 651 (citing The Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 1990, Pub.L. 101–162, Title VI, § 609, 103 Stat. 1037 (1989) (codified at 16 U.S.C. § 1537 note  ("Section 609") (2000)).[19]  Section 609 prohibited shrimp imports harvested with

---

[19] Section 609(b) provides for a prohibition on shrimp imports with exceptions — exceptions that must be recognized and certified by the President:

technology harmful to sea turtles unless the president otherwise certified to Congress

that a country had taken steps to protect sea turtles.  *Id.* at 649 n.1, 650.  The Ninth

Circuit focused on two subsections of the statute:

> Subsection (a) of 16 U.S.C. § 1537 requires the Secretary of State to initiate
> negotiations with foreign countries to develop treaties to protect sea turtles,
> and to report to Congress about such negotiations.  Subsection (b) requires
> limitations on the importation of shrimp from nations that have not moved to
> protect sea turtles.  If the President certifies that a country has undertaken
> measures to protect turtles, shrimp imports from that country are not
> banned.

*Id.* at 650 (citing Section 609(a)-(b)).  The Ninth Circuit drew a parallel to the embargo

on sea otter and fur seal skins identified in *K Mart* to hold that the "prohibitions on

---

> (b)(1) IN GENERAL.—The importation of shrimp or products from shrimp
> which have been harvested with commercial fishing technology which may
> affect adversely such species of sea turtles shall be prohibited not later than
> May 1, 1991, except as provided in paragraph (2).
>
> (2) CERTIFICATION PROCEDURE.—The ban on importation of shrimp or
> products from shrimp pursuant to paragraph (1) shall not apply if the
> President shall determine and certify to the Congress not later than May 1,
> 1991, and annually thereafter that—
>
> (A) the government of the harvesting nation has provided documentary
> evidence of the adoption of a regulatory program governing the incidental
> taking of such sea turtles in the course of such harvesting that is
> comparable to that of the United States; and
> (B) the average rate of that incidental taking by the vessels of the harvesting
> nation is comparable to the average rate of incidental taking of sea turtles
> by United States vessels in the course of such harvesting; or
> (C) the particular fishing environment of the harvesting nation does not pose
> a threat of the incidental taking of such sea turtles in the course of such
> harvesting.

Section 609(b).

shrimp importation for environmental protection" were, similarly, within the USCIT's

jurisdiction.  *Id.* at 652.[20]

      Section 609 is distinct in at least two respects from AMLRCA.  First, Section 609

authorizes the executive to impose a nation-wide ban — an embargo — on importation

of shrimp or products from shrimp from the specific country.  Section 609(b).  As the

Ninth Circuit found in *Earth Island*, the Section 609 ban on shrimp importation exists *de*

*facto* unless the president certifies affirmatively that a nation is in compliance with the

---

[20] Following the Ninth Circuit's decision, plaintiff refiled at the USCIT and several USCIT
decisions ensued.  *See Turtle Island Restoration Network v. Evans*, 284 F.3d 1282
(Fed. Cir. 2002); *see also Turtle Island Restoration Network v. Mallett*, 24 CIT 627, 110
F. Supp. 2d 1005 (2000).  In one such decision, the USCIT explained that "the catch of
vessels equipped with TEDs from nations without such comparable foundation [as in the
U.S. program to require the use of TEDs] continues subject to embargo":

> This court was constrained to conclude in slip op. 99–32 yet again that
> paragraph (1) of section 609(b) is specifically contingent upon the
> certification procedure established by section 609(b)(2), which offers the
> only congressionally-approved breaches of the embargo, either via
> subparagraphs (A) and (B) or through (C).  Paragraphs (b)(1) and (b)(2)
> are pari materia; they cannot be read independently, or out of the context
> adopted by Congress, including section 609(a), to slow or stanch the
> extinction of species of sea turtles.  And so long as the U.S. government
> reports that the "foundation of the U.S. program" continues, with "limited
> exceptions", to be that "all other commercial shrimp trawl vessels
> operating in waters subject to U.S. jurisdiction in which there is a likelihood
> of intercepting sea turtles must use TEDs at all times", the catch of
> vessels equipped with TEDs from nations without such comparable
> foundation continues subject to embargo.

*Turtle Island Restoration Network v. Mallett,* 24 CIT at 631, 110 F. Supp. 2d at 1009.
The Federal Circuit noted later that "the Ninth Circuit ruled that because 28 U.S.C. §
1581(i) vests exclusive jurisdiction over embargoes and other trade restrictions in the
USCIT, an action to compel enforcement of the import prohibitions of section 609(b)
could lie only with [the USCIT]."  *Turtle Island Restoration Network v. Evans*, 284 F.3d
1282, 1287 (Fed. Cir. 2002) (citing *Earth Island,* 6 F.3d at 652).  Ultimately, the Federal
Circuit reversed in part the USCIT's decision in *Turtle Island Restoration Network v.
Mallett* for reasons unrelated to jurisdiction.  *See Turtle Island Restoration Network v.
Evans*, 284 F.3d 1282, 1297.

requirements of the statute.  6 F.3d at 650.  Section 609 itself provides for the

establishment of an embargo; the statute subsequently provides exceptions to the "ban

on importation of shrimp" if the President certifies that the governments of harvesting

nations meet listed requirements.  Section 609(b).  By contrast, subsection (h)(2) of the

AMLRCA regulations does not create a nation-wide or other ban on imports; rather,

subsection (h)(2) expressly *permits* NMFS to preapprove certificates of importation of

Antarctic marine living resources so long as they are not harvested in violation of CMs.

*See* 50 C.F.R. § 300.105(h)(2).  As noted, subsection (h)(2) does not preliminarily

impose an embargo.  *Id.*; 16 U.S.C. § 2435(3).

      The second key distinction is that Section 609 and its implementing regulations

establish a mechanism for the creation, application and administration of an embargo,

whereas neither AMLRCA nor its implementing regulations do the same.  Unlike the

embargo in *Earth Island,* the action in the instant case that plaintiff would portray as an

"embargo" is the result of plaintiff failing to meet the requirements of a NMFS

preapproval application and NMFS' inability to approve the application for importation

when plaintiff cannot show compliance with CMs.  *See* NMFS Denial Letter at 3-4 (citing

50 C.F.R. § 300.105(d), (h)(2)).  The provision of the statute and regulations in the

instant action serve to *facilitate* importation of toothfish within the parameters of

CCAMLR CMs, whereas the statute before the Ninth Circuit in *Earth Island* served to

*prohibit* the importation of shrimp from an entire country if the country was found not to

comply with shrimp trawl fishing protocols that protect sea turtles.  *Earth Island,* F.3d at

649.

Further, the circumstances of the instant denial — based on the failure of the CCAMLR "to adopt catch limits or other measures as necessary in accordance with CM 31-01," NMFS Denial Letter at 3 — are distinct from the prohibition in Section 609. Section 609 prohibits shrimp importation harvested in a way that endangers sea turtles, whereas AMLRCA, prohibits importation of Antarctic marine living resources harvested in a way that does not comply with measures adopted by a committee pursuant an international convention.  *Compare* Section 609, 16 U.S.C. § 1537(b), *with* AMLRCA, 16 U.S.C. § 2435(3).  The inability of such a commission, the CCAMLR, to adopt, by consensus, "limitations [on catch] or other [equivalent] measures," CM 31-01, is not the equivalent of a limitation instituted affirmatively by a law of the United States government to effectuate an importation prohibition of zero. *See K Mart*, 485 U.S. at 185.

Last, plaintiff raises a decision of the U.S. District Court for the District of Columbia ("D.D.C."), *International Labor Rights Fund*, 357 F. Supp. 2d at 205, 208-10. The D.D.C. granted defendant's motion to dismiss for lack of subject matter jurisdiction because plaintiffs' claims arose out of section 307 of the Tariff Act of 1930 ("Section 307"),[21] which expressly provides for an embargo on goods produced from forced labor.

---

[21] Section 307 of the Tariff Act of 1930, 19 U.S.C. § 1307, provided in relevant part that:

> All goods . . . mined, produced, or manufactured wholly or in part in any foreign country by convict labor or/and forced labor or/and indentured labor under penal sanctions shall not be entitled to entry at any of the ports of the United States, and the importation thereof is hereby prohibited, and the Secretary of the Treasury is authorized and directed to prescribe such regulations as may be necessary for the enforcement of this provision.  The provisions of this section relating to goods, wares, articles, and merchandise mined, produced, or manufactured by forced labor or/and indentured labor, shall take effect on January 1, 1932; but in no case shall

*Id*. at 206.  On this basis, the D.D.C. concluded that the USCIT had exclusive

jurisdiction over an action under Section 307:

> In contrast to the provision of the Tariff Act at issue in *K Mart*, Section 307
> expressly "provides for" an "embargo" under 28 U.S.C. § 1581(i)(3), as
> defined by the Supreme Court.  The plain language of Section 307 states
> that goods produced in a foreign country as a result of forced or convict
> labor "shall not be entitled to entry at any of the ports of the United States,
> and the importation thereof is hereby prohibited."

*Id.* at 208 (citing 19 U.S.C. § 1307).  The D.D.C. added that "[n]either the interest in

uniformity of judicial review, nor Congress' intent to reserve certain cases for the

specific expertise of the CIT, would be served by retaining jurisdiction over the plaintiffs'

claims."  *Id.* at 209.  The D.D.C. also found support for its position in the fact that the

USCIT had exercised jurisdiction over Section 307 cases in the past.  *Id.* at 209 (citing

*McKinney v. U.S. Dep't of Treasury*, 9 CIT 315, 614 F. Supp. 1226 (1985); *China Diesel*

*Imps., Inc. v. United States*, 18 CIT 515, 855 F. Supp. 380 (1994)).

   The prohibition under Section 307 on importation of goods produced or

manufactured by forced labor is distinct from the conditions on importation provided for

by AMLRCA.  Under Section 307, the importation of goods produced by forced labor is

banned in its entirety, and the statute provides for the Secretary of the Treasury to

prescribe regulations for the enforcement of the statute.  19 U.S.C. § 1307.  By contrast,

---

> such provisions be applicable to goods, wares, articles, or merchandise so
> mined, produced, or manufactured which are not mined, produced, or
> manufactured in such quantities in the United States as to meet the
> consumptive demands of the United States.

19 U.S.C. § 1307 (2000).  Congress removed the "consumptive demand" clause, as
part of the Trade Facilitation and Trade Enforcement Act in 2015, which Customs
stated, would "[enhance Customs'] ability to prevent products made with forced labor
from being imported."  Trade Facilitation and Trade Enforcement Act of 2015, Pub. L.
No. 114-25, § 910, 130 Stat. 122, 239 .

AMLRCA does not provide for the issuance of a ban on all imports of Antarctic marine

living resources.  Rather, as described *supra*, AMLRCA provides for mechanisms and

legal obligations necessary for the protection and conservation of Antarctic marine living

resources.  16 U.S.C. § 2431(a)(1).  Under AMLRCA, were NMFS to determine that an

importation of a shipment of Antarctic marine living resources was harvested in violation

of a CCAMLR CM under the international framework for resource management

established by the CAMLR Convention and implemented by AMLRCA, NMFS would be

authorized to prohibit importation of that shipment.  16 U.S.C. § 2435.  In contrast to the

default ban provided for in Section 307, AMLRCA and its implementing regulations do

not provide for such a ban; rather, the statute and regulations expressly provide for

importation so long as importers meet delineated requirements so that harvesting of

Antarctic living resources can be balanced with the underlying conservation efforts of

the statute.[22]  *Compare* Section 307 (prohibiting entry of all goods produced by forced

labor), *with* 16 U.S.C. § 2435 (making unlawful the import of Antarctic marine living

---

[22] For similar reasons, the Uyghur Forced Labor Prevention Act ("UFLPA"), Pub. L. No. 117-78, 135 Stat. 1525 (2021), is also distinguished from AMLRCA.  *See Ninestar Corp. v. United States*, 47 CIT __, __, Slip Op. 23-169, at 17, 19 (Nov. 30, 2023) (holding that the UFLPA is a law providing for embargoes within the meaning of 28 U.S.C. § 1581(i) and closely related to section 307).  On December 1, 2023, plaintiff filed a notice of subsequent authority, arguing that the *Ninestar* decision supports the conclusion that a "[g]overnment action that bars the importation of individual shipments is an embargo within the meaning of 28 U.S.C. § 1581(i)."  Pl.'s Notice Sub. Auth. at 2, ECF No. 50. The court concludes that the UFLPA is distinct from AMLRCA in that the UFLPA provides for an embargo of goods that are from the Xinjiang Uyghur Autonomous Region of the People's Republic of China or are produced by entities associated with that region.  The UFLPA allows for exceptions to the default ban by delineating a rebuttable presumption that the import prohibition applies to goods from or associated with the region.  Pub. L. No. 117-78, § 3, 135 Stat. at 1529.

resources harvested in violation of the CAMLR Convention or in violation of regulations promulgated under the statute).

In the instant action, the court concludes that AMLRCA, 16 U.S.C. § 2431 *et seq.*, and the implementing regulations, 50 C.F.R. §§ 300.105(d), (h)(2), as invoked by NMFS, *see* NMFS Denial Letter at 4, *regulate* the import of toothfish in conjunction with international conservation efforts agreed to by the United States and adopted by consensus by the CCAMLR under the CAMLR Convention.  The language in AMLRCA and its implementing regulations making it unlawful to import toothfish is expressly conditioned on the terms of the CAMLR Convention and the conservation measures adopted thereunder.  The denial by NMFS of the preapproval application does not constitute an "embargo" under 28 U.S.C. § 1581(i)(1)(C).

### ii.      "Other quantitative restrictions"

Defendants argue further that NMFS' denial of plaintiff's pre-approval application is not an "other quantitative restriction[]" on the importation of toothfish within the meaning of AMLRCA.  *See* Defs. Mot. Dismiss at 6-7.  On this point, plaintiff does not present any specific arguments but only asserts without support or legal analysis: "even if not an embargo, it is certainly a 'quantitative restriction on the importation of merchandise.'"  Pl. Resp. at 8.

NMFS' denial of plaintiff's preapproval application does not constitute an "other quantitative restriction[]."  28 U.S.C. § 1581(i)(1)(C).  Just as the denial of plaintiff's preapproval application does not arise out of a law providing for an embargo, similarly, the denial does not arise out of a law providing for "other quantitative restrictions on the importation of merchandise."  *Id.*  As described, the Supreme Court defined an embargo

in *K Mart* as a "governmentally imposed quantitative restriction—of zero."  485 U.S. at

185.  By extension, under that interpretation, the common meaning[23] of the term

"quantitative restriction" would appear to be a governmentally imposed quantifiable limit

that is *not* zero.  *See, e.g.*, *Best Foods, Inc.*, 50 Cust. Ct. at 95, 218 F. Supp. at 577

(noting that 7 U.S.C. § 624 authorizes the imposition of what the court describes as

"fees or quantitative restrictions (quotas)"); *Bethlehem Steel Corp.*, 28 CIT at 159 n.8,

316 F. Supp. 2d at 1314 n.8 (stating that a "quantitative restriction agreement" under

19 U.S.C. § 1671c(c)(3) is "an agreement by a foreign government to limit the volume of

imports of the merchandise at issue into the United States—that is, an agreement

establishing a quota"); *Maple Leaf Fish Co.*, 762 F.2d at 88 (referencing a report by the

U.S. International Trade Commission that, the court said, "recommended import relief

taking the form of quantitative restrictions, *or import quotas*, for a 3-year period"

(emphasis supplied)); *American Ass'n of Exps. & Imps.-Textile & Apparel Grp. v. United

States*, 751 F.2d 1239, 1244 (Fed. Cir. 1985) (describing 7 U.S.C. § 1854 (1982) as "a

law providing for quantitative restrictions on textiles" and referring to "quotas established

under the authority of [that] section");[24] *see also R.J.F. Fabrics, Inc. v. United States*, 10

CIT 735, 741, 743, 651 F. Supp. 1431, 1435, 1436-37 (1986) (finding that "jurisdiction

---

[23] As the Supreme Court in *K Mart* focused on the common meaning of "embargo," so too does this court focus on the common meaning of "quantitative restriction."  *See K Mart*, 485 U.S. at 189; *see also Conoco*, 18 F.3d at 1581.

[24] Under the statute at issue in *American Ass'n of Exporters & Importers-Textile & Apparel Group*, 7 U.S.C. § 1854 (1982), the President is permitted to negotiate agreements "limiting the export from such countries and the importation into the United States" of certain products.  751 F.2d at 1241 (quoting 7 U.S.C. § 1854 (1982)).  In the instant action, no such provision authorizing the President to impose limits on imports appears in AMLRCA, 16 U.S.C. § 2435, or its implementing regulations, 50 C.F.R. § 300.105.

exists under § 1581(i) since plaintiff's cause of action arises out of the administration

and enforcement of a quantitative restriction on imported goods" where the "action

requires a determination as to country of origin of merchandise excluded for possible

violations of quota requirements").

Further, there are no "catch limits or other measures" in place pursuant to CMs

with respect to the harvest of the toothfish at issue in this case.  NMFS Denial Letter at

3; *see* Corrected Compl. ¶ 22 ("The most recently-adopted catch limits were for the

2019/2020 and 2020/2021 seasons . . . ." (citing CM 41-02 ¶ 4 (2019-2021))).[25]

---

[25] The laws at issue address violations of CCAMLR conservation measures and do not
address explicitly violations of toothfish catch limits.  *See* 16 U.S.C. § 2435(3); 50
C.F.R. § 300.105(d), (h)(2).  Moreover, CCAMLR conservation measures may be
broader than just quantity designations; conservation measures may address not only
the quantity of a species that may be harvested but also other aspects of harvesting,
such as the designation of harvesting seasons and the regulation of harvesting
methods.  CAMLR Convention art. IX(2)(a)-(i).  Article IX states in relevant part:

> 2. The *conservation measures* referred to in paragraph 1(f) above *include*
> the following:
> (a) the *designation of the quantity* of any species which may be harvested
> in the area to which this Convention applies;
> (b) the designation of regions and sub-regions based on the distribution of
> populations of Antarctic marine living resources;
> (c) the *designation of the quantity* which may be harvested from the
> populations of regions and sub-regions;
> (d) the designation of protected species;
> (e) the designation of the size, age and, as appropriate, sex of species
> which may be harvested;
> (f) the designation of open and closed seasons for harvesting;
> (g) the designation of the opening and closing of areas, regions or sub-
> regions for purposes of scientific study or conservation, including special
> areas for protection and scientific study;
> (h) regulation of the effort employed and methods of harvesting, including
> fishing gear, with a view, inter alia, to avoiding undue concentration of
> harvesting in any region or sub-region;
> (i) the taking of such other conservation measures as the Commission
> considers necessary for the fulfilment of the objective of this Convention,
> including measures concerning the effects of harvesting and associated

In sum, AMLRCA and its implementing regulations do not impose a non-zero numerical or quantitative limit or quota on the importation of toothfish.  *See generally* 16 U.S.C. § 2435(3); 50 C.F.R. § 300.105(d), (h)(2).  Moreover, NMFS did not specify any such limit in its denial.  *See generally* NMFS Denial Letter.

The denial by NMFS of the preapproval application does not constitute an "other quantitative restriction[]" under 28 U.S.C. § 1581(i)(1)(C).

### iii.     "Administration and enforcement" with respect to the denial

Plaintiff has failed to establish jurisdiction under 28 U.S.C. § 1581(i)(1)(C) based on the existence of an embargo or other quantitative restriction.   Accordingly, the Court does not have jurisdiction under § 1581(i)(1)(D) over the "administration and enforcement" of any such embargo or quantitative restriction.

"[S]ection 1581(i)(4) as it relates to section 1581(i)(3) provides [that] the Court of International Trade [has] . . . jurisdiction over cases that arise out of any law providing for the administration and enforcement of an embargo."  *Sakar Int'l, Inc. v. United States*, 516 F.3d 1340, 1346 (Fed. Cir. 2008).  In *Native Federation*, this Court explained with respect to the statute at issue in that case: "Since Section 9(c) does not provide for an embargo, Section 1581(i)(4) does not provide an independent basis for jurisdiction."  31 CIT at 598, 491 F. Supp. 2d at 1186 (citing *Retamal v. U.S. Customs & Border Prot.*, 439 F.3d 1372, 1375 (Fed. Cir. 2006)); *see also Salmon Spawning*, 33 CIT at 521, 626 F. Supp. 2d at 1283-84 ("[W]here a law fails to invoke the Court's

---

activities on components of the marine ecosystem other than the harvested populations.

CAMLR Convention art. IX(2)(a)-(i) (emphasis supplied).

jurisdiction under § 1581(i)(3) because it is not an embargo or other quantitative

restriction . . . no jurisdiction remains for the Court under § 1581(i)(4)." (citing *Native*

*Fed'n*, 31 CIT at 598, 491 F. Supp. 2d at 1186)).  Similarly, as discussed *supra*

Section I.C.2 and 3, AMLRCA, 16 U.S.C. § 2435, and its implementing regulations,

50 C.F.R. § 300.105, do not provide for an embargo or other quantitative restriction on

the importation of merchandise.  The denial by NMFS of the preapproval application

does not constitute an embargo or other quantitative restriction and does not reflect the

administration or enforcement of an embargo or other quantitative restriction under

AMLRCA or its implementing regulations.  As such, the Court does not have jurisdiction

independently under section 1581(i)(1)(D).

## II.    Whether the Court has exclusive jurisdiction over this action

Plaintiff and defendants dispute whether this Court or the district courts have

exclusive jurisdiction over the instant action.  *Compare* Defs. Mot. Dismiss at 8-12;

Defs. Reply Br. at 7-16, *with* Pl. Resp. at 8-11, 16-21.  Parties' arguments pertain to two

potentially conflicting jurisdictional statutes: 28 U.S.C. § 1581(i), described *supra*

Section I.A, and 16 U.S.C. § 2440, which states that "[t]he district courts of the United

States shall have exclusive jurisdiction over any case or controversy arising under the

provisions of this chapter [governing 16 U.S. Code Chapter 44A - AMLRC] or of any

regulation promulgated under this chapter."  *See* Defs. Mot. Dismiss at 8-12; Pl. Resp.

at 8-11, 16-21; Defs. Reply Br. at 7-16.

The court will not consider whether its jurisdiction is exclusive over the action,

because the court concludes, *supra* Section I, that it does not have jurisdiction over this

action under 28 U.S.C. § 1581(i) due to the lack of an embargo or other quantitative

restriction.

## III.    Transfer of action

If the "court finds that there is a want of jurisdiction, the court shall, if it is in the

interest of justice, transfer such action or appeal to any other such court . . . in which the

action or appeal could have been brought at the time it was filed or noticed."  28 U.S.C.

§ 1631; *see Salmon Spawning*, 33 CIT at 518, 626 F. Supp. 2d at 1281 (citing 28

U.S.C. § 1631).  "It is in the interest of justice to transfer an action if it preserves a

party's right to be heard on its potentially meritorious claim."  *Salmon Spawning*, 33 CIT

at 518, 626 F. Supp. 2d at 1281 (citing *Galloway Farms, Inc. v. United States*, 834 F.2d

998, 1000 (Fed. Cir. 1987)).  During oral argument, plaintiff stated that the Southern

District of Florida would be the proper district court for transfer of the case.  Oral Arg. Tr.

at 82:6-14.  Defendants did not adopt a definitive position, stating that "if the Court

decides it doesn't have jurisdiction and if the Court decides it's appropriate, [the

government] wouldn't oppose transfer of the action to the appropriate District Court."

Oral Arg. Tr. at 82:17-24.

The court invites parties to file motions to transfer under 28 U.S.C. § 1631 to the

appropriate district court.  *Dalton v. Southwest Marine, Inc.*, 120 F.3d 1249, 1250 (Fed.

Cir. 1997) ("[S]ection 1631 is a remedial statute designed to eliminate any prejudice that

results from filing in an improper forum.").

## CONCLUSION

For the reasons discussed, the court does not have subject matter jurisdiction

over the instant action and invites parties to file within 21 days of this opinion and order

a motion to transfer.  28 U.S.C. § 1631.  In the motions to transfer, the court directs

parties to indicate which district court has jurisdiction over the underlying action.  Absent

parties' confirmation of their view as to the proper district court for transfer of this action,

the court will enter a dismissal of the action and judgment will enter accordingly.


                                            /s/      Timothy M. Reif
                                            Timothy M. Reif, Judge

Dated:      December 7, 2023
            New York, New York